## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DUANE E. NORMAN, SR., | : | |
| on behalf of himself and all others | : | CIVIL ACTION |
| similarly situated, | : | No. 18-5225 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRANS UNION, LLC, | : | |
| | : | |
| Defendant. | : | |

McHugh, J.                                                      August 14, 2020

### CLASS CERTIFICATION MEMORANDUM

I.     Background ............................................................................................................ 2
       A. Factual Background ..................................................................................... 2
       B. Procedural Posture ...................................................................................... 8
II.    The Legal Standards Governing Class Certification ........................................... 9
III.   The FCRA's Reasonable Reinvestigation Provision ......................................... 10
       A. How does the consumer satisfy his duty to trigger an agency's reinvestigation
          obligation?................................................................................................ 11
       B. The consumer need not first "show" an inaccuracy to trigger the agency's duty to
          conduct a reasonable reinvestigation ....................................................... 17
       C. Trans Union's remaining attempts to evade its reinvestigation duty are unavailing.. 28
       D. The FCRA establishes the options available to a consumer reporting agency in
          response to a dispute ................................................................................ 34
IV.    Norman triggered Trans Union's reinvestigation obligation ............................. 36
V.     The Class's FCRA Claim.................................................................................. 38
       A. Standards for class certification ................................................................ 38
       B. The components of Norman's proposed class ........................................... 39
       C. Norman has satisfied the prerequisites of Rule 23(a) ............................... 46
       D. Norman has satisfied the prerequisites of Rule 23(b)(3) .......................... 51
VI.    Conclusion ........................................................................................................ 60

* * * * *

Section 611(a) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681i(a), requires a

consumer reporting agency to conduct a reasonable reinvestigation of any item of information on

a consumer's credit file if the consumer alleges the item to be inaccurate.  Plaintiff Duane

Norman's credit file reported that a business had accessed his credit, and he disputed the

business's right to do so with Trans Union.  Trans Union concedes that Norman lodged the

dispute, and further concedes it conducted no reinvestigation of his complaint, but contends it

was not obligated to do so because Norman's file accurately reflected that an inquiry had been

made.  Discovery has revealed that Trans Union has taken the same position with numerous

consumers, and Norman now seeks to certify a class of others he alleges were wrongly denied

reinvestigation of their disputes.

Having carefully analyzed Trans Union's rationale for its position, I have concluded that

it has an artificially narrow view of its obligations under § 1681i(a), one that is inconsistent with

the text and structure of § 1681i(a), and Third Circuit precedent, particularly *Cushman v. Trans

Union Corp.*, 115 F.3d 220 (3d Cir. 1997), the Court's seminal pronouncement concerning the

scope of an agency's reinvestigation obligation under § 1681i(a).  I am also satisfied that

Norman has identified issues appropriate for resolution on a class-wide basis, and has met the

requirements of Rule 23, with the result that I will certify a class.

I.     **Background**

A.  **Factual Background**

**1. *The Solicitation*.**  In February 2018, a telemarketer for Safe Home Security, which is

not a party here, called Duane Norman (Plaintiff) to sell him some home-security paraphernalia.

Complaint ¶ 20, ECF 1; Pl.'s Mot. for Class Certification, at 3, ECF 23.  Norman initially was

interested in Safe Home's offerings.  Norman Dep., at 82:12-14, 93:22-23, 95:22-96:9, 98:6-25,

ECF 23-2.  But his initial interest allegedly dulled when the telemarketer told Norman that, to

proceed to a sale, Safe Home would need to obtain Norman's credit report.  ECF 1 ¶ 21; ECF 23,

at 3-4.  According to Norman, he "refused, emphatically stating that he did not authorize Safe

Home to obtain his credit report."  ECF 1 ¶ 22; ECF 23, at 4; *see also* ECF 23-2, at 79:13-81:20

("So I said yo, no, you're definitely not running my credit.  I said no, just forget about it.").  Safe

Home obtained Norman's credit report from Trans Union anyway.  Answer ¶ 23, ECF 13.

     **2. *The Hard Inquiry*.**  As a result of Safe Home's request for and acquisition of

Norman's credit report, Trans Union recorded on Norman's credit file that Safe Home made a

"Regular Inquiry" for Norman's credit.  Here is the Safe Home inquiry challenged by Norman:



As shown in the listing, "regular inquiries" are "posted" on a consumer's credit report "when

someone accesses your credit information from TransUnion."  A regular inquiry "means that the

company listed"—like Safe Home here—"received your credit information on the dates

specified."  Regular inquiries "remain on your credit file for up to 2 years."

     In the industry, "regular" inquiries, which are disclosed to third parties, also are known as

"hard" inquiries.  *See* Trans Union Br. Opp. Plaintiff's Mot. for Class Cert., at 2-3, ECF 31

("Inquiries which are disclosed to third parties are typically called 'hard' inquiries.").  Hard

inquiries are notations on a consumer's credit file that some entity (like Safe Home here) requested and received from Trans Union credit data about a consumer.

A hard inquiry is also defined in reference to its antonym—a "soft" inquiry.  Unlike hard inquiries, soft inquiries do not appear on credit reports sent to third parties.  ECF 38, at 6.  Further, hard inquiries, unlike soft inquiries, lower a consumer's credit score.  Trans Union concedes that only hard inquiries can damage a consumer's credit score.[1]

**3. *The First Dispute*.**  Norman immediately discovered that Safe Home had obtained his credit report and that a record indicating as much had appeared on his credit report.  ECF 23, at 4.  The next morning, Norman contacted Safe Home and then Trans Union.  ECF 13 ¶ 25.  He demanded that both remove the record from his credit report.  ECF 1 ¶ 25.  Both refused.  Norman advised the Trans Union representative that he told the Safe Home representative not to run his credit.  ECF 23-2, at 86:10-16; ECF 23, at 4.  Trans Union claimed it could not remove the record and that Norman would have to speak with Safe Home.  ECF 23-2, at 86:21-22.  Norman did.  But Safe Home, like Trans Union, refused to do anything to remove the inquiry.

So Norman sent a letter to Trans Union formally disputing the Safe Home entry on his credit report.  ECF 23-3, at 2 (Letter of July 12, 2018).  Minus addresses and salutations, the full text of the July Letter is as follows:

---

[1] *See e.g.*, Why Did I Get an Inquiry on My Credit Report? (Dec. 12, 2019), https://www.transunion.com/blog/credit-advice/why-did-i-get-an-inquiry-on-my-credit-report ("Because hard inquiries show that you're potentially looking for new credit, they do impact your credit score."); Credit Myths and Misconceptions, https://www.transunion.com/article/credit-score-myths ("Hard inquiries by a lender or creditor . . . can slightly lower your credit score."); Credit corner: what's an inquiry?, https://www.transunion.com/article/credit-corner-whats-an-inquiry ("Credit scoring models typically factor in the number of hard inquiries you have when they're calculating your credit score.  Generally, too many inquiries made within a short timeframe is concerning to lenders when it comes to your credit-worthiness.  Rest assured, though, that hard inquiries are removed from credit reports 2 years after the date they're made."); How Rate Shopping Can Impact Your Credit Score, (Oct. 8, 2019) https://www.transunion.com/blog/credit-advice/how-rate-shopping-can-impact-your-credit-score ("These hard inquiries will often lower your credit score.").

I write to dispute the following inquiry that appears on my credit report REDACTED dated May 17, 2018:

- SAFE HOME SECURITY, 55 Sebethe Drive, Cromwell, CT 06416, (800) 833-3211 x1507.

I never gave permission to have my credit run.  In fact, I told their representative specifically to NOT run my credit.  They did anyway.  I complained to this company, but they still would not remove it.  Right after the inquiry, I called TransUnion to dispute this inquiry, but they told me to call Safe Home Security.  Neither has removed this inquiry to this day.  I demand the immediate removal of this inquiry from my credit report.

**4. *The First Response*.**  Trans Union responded the next month.  ECF 23-6 (Letter of August 13, 2018).  The response explained how and why inquiries appear on a consumer's credit report and touted an identity protection product it was selling.  A member of Trans Union's litigation department explained at a deposition that the letter sent to Norman included the following components.  It began with an opening:

We appreciate you taking the time to contact us at TransUnion. Our goal is to maintain complete and accurate credit information. It's our commitment to you.

This was followed by a paragraph explaining the inquiries on his credit report:

Ref: Explanation of the Inquiries on Your Credit Report

The inquiries listed on your credit report are a record of the companies that obtained your credit information. The identity of each company by trade name and contact information is provided. All inquiries remain on your credit report for two years. Credit information may be requested only for the following permissible purposes: credit transactions, employment consideration, review or collection of an existing account or other legitimate business need, insurance underwriting, government licensing, rental dwelling, or pursuant to a court order. Your written authorization may not be required to constitute permissible purpose. If you believe that an inquiry on your credit report was made without permissible purpose, then you may wish to contact the creditor directly, by phone or in writing, regarding its purpose. Please note that your specific consent to the release of your credit information is not necessary for a permissible purpose to exist.

Next came a paragraph containing an offer to purchase Trans Union's identity protection software:

Want to Do More to Protect Your Info?
We take protecting your identity seriously and we want to offer you these helpful tips you can take going forward:
- Keep an eye on your credit. Look for signs of suspicious activity, like unfamiliar accounts or credit checks from companies you've never done business with.
- Be careful on the internet. Use secure passwords on your computer and web accounts. Make sure to change them often.
- Lock your credit report. With a service that offers credit lock, you can keep thieves out of your credit report in a matter of seconds.

Finally, the letter closed as follows:

We're here to help. Should you have any further questions please contact us at:
- www.transunion.com
- (800) 916-8800
- P.O. Box 2000
- Chester, PA 19016-2000

Please have your file number ready REDACTED

Wagner Deposition, ECF 23-4, at 75-78.

The letter sent to Mr. Norman was not tailored to Mr. Norman.  It was a form letter, automatically generated from a library of previously constructed form paragraphs.  *Id.* at 75; ECF 23, at 11.  In this case, the paragraphs comprising Mr. Norman's letter were four:  a <001 Consumer Letter Opening Paragraph>, a <502 Inquiry Explanation>, a <351 True Identity Offer>, and a <002 Formal Letter Closing>.   Norman refers to the entire letter as the "502 Letter," evidently deriving the title from the paragraph addressing the substance of the inquiry. For purposes of discussion, I will adopt this terminology.

**5. *The Second Dispute*.**  Trans Union did not remove the Safe Home inquiry from Mr. Norman's credit report after sending him the first 502 Letter in the middle of August 2018.  So, on August 30, 2018, Norman again wrote to Trans Union to dispute the continued inclusion of the Safe Home inquiry on his credit report.  ECF 23-4, at 2-3 (Letter of August 30, 2018).  In the August Letter, Norman raised all the same points as he did in his July Letter, and a few others. Norman repeated his desire "to dispute the [Safe Home] inquiry that appears on my credit report."  He reiterated that he "never gave permission to have my credit run," and that during the phone call with Safe Home he "told their representative specifically to NOT run my credit."  He also observed that "[Trans Union has] the ability to ask [Safe Home] for a recording of this conversation," which would "confirm that I immediately protested when the Safe Home Security representative told me he wanted to pull my credit report."  And Norman reminded Trans Union that he "complained" to "Safe Home Security," but Safe Home "would not remove the inquiry."

New to the August 2018 dispute letter, Norman also responded to each "permissible purpose" for which credit information may be requested.  In Trans Union's response to Norman's initial dispute, Trans Union stated that "[c]redit information may be requested only for the following permissible purposes: credit transactions, employment consideration, review or collection of an existing account or other legitimate business need, insurance underwriting, government licensing, rental dwelling, or pursuant to a court order."  ECF 23-6, at 3.  Norman point-by-point refuted each "permissible purpose" Trans Union suggested Safe Home may have had when it requested Norman's credit report.  ECF 23-4, at 3.

In his August letter, Norman also contested Trans Union's position that "[a user's] written authorization may not be required to constitute permissible purpose," and that "[a user's] specific consent to the release of your credit information is not necessary for a permissible purpose to exist."  Norman again reminded Trans Union that he was contesting neither "specific consent" nor "written authorization."  In both his initial and follow-up disputes, he told Trans Union that he provided Safe Home affirmative and explicit *dissent*.  In the dispute letters, Norman wrote that Safe Home not only did not "have [his] consent to pull [his] credit," he "told their representative specifically to NOT run my credit."  ECF 23-6, at 2-3.  Finally, like the July 2018 dispute letter, Norman "demand[ed] the immediate removal of this inquiry from my credit report."  *Id.* at 2-3.

On September 6, 2018, Trans Union sent Norman another 502 Letter, identical to the one sent on August 13.  The September 502 Letter, like the August 502 Letter, included form opening and closing paragraphs, an offer to purchase Trans Union's identity protection software, and the 502 Paragraph, which explained in general terms that the "inquiries listed on your credit report are a record of the companies that obtained your credit information."  ECF 23-7, at 3.

**B. Procedural Posture**

Dissatisfied with the responses from Trans Union, Norman has sued.  In his Complaint, Norman claims that Trans Union failed to uphold its duties under the FCRA to promptly reinvestigate "any item of information contained in a consumer's file at a consumer reporting agency," if a consumer, through a "dispute," alleges the item to be "incomplete or inaccurate." 15 U.S.C. § 1681i(a)(1)(A).  Norman sues on his behalf and on a behalf of a class of 246,518 other consumers "to whom Trans Union sent its '502 Letter' in response to a written dispute of an inquiry."  ECF 23, at 3.

According to Norman, a consumer's receipt of the 502 Letter is sufficient to demonstrate that the consumer (1) "directly disputed" (2) "the completeness or accuracy of" (3) "any item of information contained in [his] file," and that (4) the agency failed to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file."  ECF 23, at 1-3 (citing 15 U.S.C. § 1681i(a)(1)(A)).

Trans Union opposes the motion both substantively and procedurally.  Trans Union argues that its refusal to reinvestigate Norman's dispute did not violate any duty imposed by the FCRA because the Safe Home inquiry on Norman's credit file was accurate, and it could not have reasonably expected to discover an inaccuracy had it conducted a reinvestigation.  It also argues that Norman has failed to carry each of his class certification burdens.  In the main, Trans Union contends that Norman's "class definition is overbroad because it includes people who Plaintiff admits do not have claims against Trans Union and are not members of the class he seeks to represent"; that Norman's individual claims are not typical of absent class members; and that individual issues predominate because multiple elements of each class member's § 1681i(a) claim will require individualized analysis.

## II.        The Legal Standards Governing Class Certification

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2009) (internal citation omitted). Thus, the party seeking to certify a class "bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015) (discussing and clarifying preponderance of evidence standard in class certification determinations).

The requirements of Rule 23 are well-established. All potential classes must initially "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted). If the plaintiff satisfies the four requirements of Rule 23(a), he may seek to certify a class of one of three types, each with additional requirements. *See* Fed. R. Civ. P. 23(b)(1)-(3).

Norman here seeks certification under Rule 23(b)(3). ECF 23, at 21. Rule 23(b)(3) requires proving, first, that questions of law or fact common to class members predominate over individualized questions, which is commonly called the "predominance" requirement, and, second, that the class action device is superior to other methods for resolving the claims, which is often referred to as the "superiority" requirement. Fed. R. Civ. P. 23(b)(3).

"Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). In conducting this inquiry, the district court must assess "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.* at 312 (citations omitted); *see also Behrend*, 569

U.S. at 34 (noting that under Rule 23(b)(3), "the court's duty is to take a close look at whether common questions predominate over individual ones" (cleaned up)).

But Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  To determine whether the plaintiff has carried his burden by a preponderance of the evidence, the "rigorous analysis" prescribed by the Court of Appeals means the district court "cannot be bashful." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (quotation marks omitted).  It "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.*; *see also Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 482 (3d Cir. 2018).

Here, Trans Union's opposition of Norman's request for class certification cannot be separated from the duties imposed on the parties by the particulars of § 1681i.  For one, Trans Union, in arguing that individual issues predominate over common issues, asserts that Norman the individual has not satisfied all necessary elements of § 1681i(a), and that individual evidence would be required for each putative class member.  For another, Trans Union argues that its duty to conduct a reasonable reinvestigation pursuant to § 1681i(a) is not triggered unless the consumer "shows" the disputed item is inaccurate.

Thus, before reaching the requirements of Rule 23, I first analyze the duties imposed by § 1681i(a).  In doing so, I will address the various arguments offered by Trans Union for why its duty to conduct a reasonable reinvestigation was not triggered in this case, and Norman's arguments in return.  After review of the operation of § 1681i, I turn back to the question of class certification.

### III.    The FCRA's Reasonable Reinvestigation Provision

The threshold legal question involves the scope of the reinvestigation duty described in § 1681i(a).  In full, subject to two exceptions not relevant here, § 1681i(a)(1)(A) provides that

> if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

Section 1681i(a)'s reasonable reinvestigation provision thus imposes two duties—an initial duty on the consumer to lodge some kind of dispute and a subsequent duty on the consumer reporting agency to conduct some kind of reinvestigation.  The agency's duty to reinvestigate is triggered only if the consumer first fulfills his statutory duties.

To trigger an agency's duty to conduct a reasonable reinvestigation, the consumer must (1) "directly . . . dispute" (2) "the completeness or accuracy of" (3) "any item of information contained in [the] consumer's file."  15 U.S.C. § 1681i(a)(1)(A).  If the consumer fulfills that duty, then the consumer reporting agency must promptly and free of charge "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file."  *Id.* The following sections discuss how a consumer and an agency fulfill their respective obligations under § 1681i(a).

## A.  How does the consumer satisfy his duty to trigger an agency's reinvestigation obligation?

How must a consumer (1) "directly . . . dispute" (2) "the completeness or accuracy of" (3) "any item of information contained in [his] file"?  Because the second component—disputing "completeness" or "accuracy" of an item in a consumer's file—is the most complex, I will deal with it last.  To begin, I track the text.

**1. *Dispute "directly".*** Section 1681i(a)(1)(A) first requires that the consumer lodge his dispute "directly." That requirement is straightforward, and ensures the agency is provided proper notice that an item of information in the consumer's file may be inaccurate. By embedding in § 1681i(a)'s reinvestigation provision a term that demands notice, the FCRA facilitates a more efficient allocation of an agency's resources in conducting its reinvestigation. *See Cushman*, 115 F.3d at 224 ("[O]nce a claimed inaccuracy is *pinpointed*, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information" (emphasis added)); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 286-87 (7th Cir. 1994) ("When a credit reporting agency receives [] notice [of the alleged inaccuracy], it can target its resources in a more efficient manner and conduct a more thorough investigation"). A letter posted to an agency's consumer relations department or other equivalent department, as happened here, would satisfy the direct-dispute requirement.

**2. *"Any item of information contained" in the consumer's file.*** Section 1681i(a)(1)(A) next requires that the consumer's dispute identify the incompleteness or inaccuracy of "any item of information contained in [the] consumer's file." Information contained in a consumer's file is defined broadly. A "file," when used in connection with information on a consumer, "means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. § 1681a(g). Thus, a consumer may dispute information appearing on his credit file available to members of the public—*e.g.*, a report of a hard inquiry available to a third party—or information available only to him.

Like the direct dispute requirement, this requirement serves an efficiency purpose. Limiting consumers' dispute capacity to items "contained" in their files means an agency would have no duty to reinvestigate the completeness or accuracy of an item of information *not*

contained in its file.  In other words, an agency would have no duty to reinvestigate under

§ 1681i(a)(1)(A) if a consumer complained, for instance, that his file *in toto* was somehow

incomplete or inaccurate, or that some item of information should be have been included but was

not.  *See, e.g.*, *Desautel v. Experian Info. Sols., LLC*, 2020 WL 2215736, at *3 (D. Minn. May 7,

2020) (attached at ECF 43-3).  Instead, a consumer must identify a particular piece of

information in his file and allege that item to be inaccurate or incomplete.  15 U.S.C.

§ 1681i(a)(1)(A).

     **3.** *Disputing "the completeness or accuracy of" any item*.  Section 1681i(a)(1)(A) last

requires the consumer to dispute the "completeness or accuracy of any item of information

contained in [his] file."  Because the parties' dispute centers on the term "accuracy," I will focus

my analysis there.  At first blush, this requirement seemingly is straightforward—a transitive

verb ("dispute") followed by two interrelated objects (the "accuracy" of "any item of information

contained in a consumer's file").  Nevertheless, the parties spend significant energy disputing the

intended legal effect of "accuracy," and what it might mean to "dispute" it.  Further, the case law

addressing these terms is equal parts extensive and subtle.  Thus, this portion of the opinion will

proceed deliberately.

     Modern courts have embraced dictionaries as tools of statutory construction.[2]

Accordingly, in interpreting a statute, "'[o]rdinarily, a word's usage accords with its dictionary

---

[2] Whether or not the increasing reliance on contemporaneous dictionary definitions will produce sounder judicial
decisions, I am not entirely sure.  As I recently noted, "[a]s modern scholars increasingly conduct empirical research
into how Congress actually operates, there is also reason to question whether the drafters of legislation rely on
dictionaries to the same degree as the courts."  *United States v. Safehouse*, 408 F. Supp. 3d 583, 607 n.37 (E.D. Pa.
2019) (citing Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical
Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 938-939 (2013)).
Further, exclusive reliance on dictionaries has long been seen as at least incomplete.  *See id.* (noting that Judge
Learned Hand claimed that "[i]t is not enough for a judge just to use a dictionary" because, "[i]f he should do no
more, he might come out with a result which every sensible man would recognize to be quite the opposite of what
was really intended; which would contradict or leave unfulfilled [the statute's] plain purpose").  In any case, "[i]n

definition.'"  *Pellegrino v. Transp. Sec. Admin.*, 937 F.3d 164, 170 (3d Cir. 2019) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015)).  Under one prominent dictionary definition from around 1970, the year the FCRA was enacted, "dispute" means "to question the truth of," or "to oppose in any way."  Webster's New World Dictionary (2d coll. ed. 1972); *see also Dispute*, Oxford English Dictionary (1st ed. 1971) (defining dispute as "to argue against, contest, controvert" or "call in question or contest the validity or accuracy of a statement").  Further, around the same time "accuracy" was defined as "the quality, state, or degree of being accurate; free from mistake or error," with accurate defined as "prepared with care, careful, exact" or "free from mistake or error."  Webster's New World Dictionary (2d. coll. ed. 1971).  Later dictionaries define "accuracy" similarly.  *See, e.g.*, Oxford English Dictionary (1st ed. 1984) (defining accuracy as "the state of being accurate" or "precision or exactness resulting from care"); Oxford English Dictionary (2d ed. 1989) (largely same).

Unsurprisingly, those definitions comport with how the terms "dispute" and "accuracy" are understood today.  According to the Oxford English Dictionary, for example, "dispute" used as a transitive verb means to "question whether (a statement or alleged fact) is valid or true."  And "accuracy" means "the quality or state of being correct or precise."  Merriam-Webster defines the terms similarly.  As a transitive verb, "dispute" means "to make the subject of disputation" or "to call into question (as the validity or the existence of something)."  And "accuracy" means "the quality, state, or degree of being accurate"—with "accurate" defined as "the quality or state of being correct"—or "freedom from mistake or error."

---

modern practice appellate courts have made extensive use of dictionaries, making it necessary for district courts to employ the same tool."  *Id.*

Putting those definitions together, then, requiring a consumer to "dispute the accuracy" of some item of information in his file is best understood to mean that the consumer must call into question the validity, truth, correctness, or precision of the item of information contained in his file; or call into question whether some item of information contained in his file is free from mistake or error.

**4. *Trans Union's understanding of "accuracy" is incomplete*.**  Throughout its pleadings, however, Trans Union makes several arguments for why "disputing the accuracy" of some item of information demands more than the text of the provision suggests.

In doing so, Trans Union offers an artificially narrow definition of accuracy.  Trans Union observes that an inquiry on a consumer's file "is merely a factual notation that a user . . . received Trans Union credit data about a consumer on a specific date."  ECF 31, at 22.  It thus contends that such an inquiry is "accurate" if the inquiry in fact occurred and the agency subsequently reports that it occurred.  In its view, then, the Safe Home inquiry on Norman's file necessarily was "accurate" because the inquiry by Safe Home indeed occurred.  *Id.* at 21-22.

An unstated premise of Trans Union's position is that an agency's reporting of an inquiry on a consumer's file is a neutral fact.  But inquiries that appear on a consumer's file and are disclosed to third parties negatively impact credit scores.  In fact, in consumer education materials Trans Union makes available to the public, it cautions about the effect of such inquiries on a consumer's credit score.[3]  Indeed, as Norman points out, under Trans Union's interpretation of the statute, "that an inquiry occurred does not make its continued presence on a consumer's report accurate, any more than a credit report's notation of repossession would be 'accurate' when a borrower's car is wrongfully repossessed."  ECF 38, at 14-15.

---

[3] Trans Union concedes that inquiries by third parties can damage a consumer's credit score.  *See supra* note 1.

Contrary to Trans Union's stated position, it is not the case that listing such inquiries on a consumer's file reflects no more than that "a user . . . received Trans Union credit data about a consumer on specific date."  ECF 31, at 22.  Inquiries on consumer credits reports convey something more, and have not just negative connotations, but potentially negative effects.  Thus, the appearance of an inquiry on a consumer's file may be considered inaccurate even if the inquiry in fact occurred.

Precedent weighs heavily against Trans Union's narrow interpretation of accuracy. Various circuits have held that information appearing on a consumer's report that is technically correct may nonetheless be inaccurate if presentation of that information could create a misleading impression.  *See, e.g.*, *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013); *Boggio v. USAA Federal Savings Bank*, 696 F.3d 611, 617 (6th Cir. 2012); *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008).

Most recently, in *Shaw v. Experian Information Solutions, Inc.*, the Ninth Circuit concluded that an item of information on a consumer's credit report is "inaccurate" if it either is "patently incorrect" or is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions."  891 F.3d 749, 756 (9th Cir. 2018).  Citing *Saunders*, the *Shaw* Court noted that even if an item of information in a consumer report is "technically accurate," it still "may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression."  *Id.* at 757.

I find *Shaw*'s formulation of "accuracy" to be particularly instructive because it defines the term in a manner consistent with the goals of the FCRA—to promote fairness in the reporting of credit status.  For example, an inquiry reporting that a consumer's car was repossessed would literally be true if the car, in fact, was repossessed.  But if the repossession was illegal or

unwarranted or the result of mistaken identity, simply listing the "fact" that the vehicle was repossessed would create in one reading the consumer's file a misleading impression. The purposes of the FCRA are therefore served by allowing a consumer to dispute the accuracy of that item of information, and for the agency to conduct a reasonable reinvestigation as a result. Trans Union's definition of accuracy is too narrow to accomplish the goals of the FCRA.

In all, taking guidance both from dictionaries and precedent, for a consumer to "dispute the accuracy" of some item of information contained in his credit report means that the consumer must (i) call into question the validity, truth, correctness, or precision of the item of information contained in his credit report; (ii) call into question whether some item of information contained in his credit report is free from mistake or error; or (iii) call into question whether some item of information contained in his credit report is "patently incorrect" or "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions."

### B. The consumer need not first "show" an inaccuracy to trigger the agency's duty to conduct a reasonable reinvestigation

In addition to defining accuracy in overly narrow terms, Trans Union further argues that its reinvestigation obligation is not triggered unless the consumer first makes a preliminary showing that the disputed item of information is inaccurate. *See, e.g.*, ECF 31, at 21 ("Trans Union cannot be liable to Plaintiff under Section 1681i if the disputed inquiry is accurate."); *see also id.* at 16 n.4 ("Trans Union disagrees with Plaintiff's contentions that is has the duty to investigate accurate inquiries where the user allegedly did not have a permissible purpose urged by Plaintiff."). That position is not supported by the text of § 1681i(a), the statute's structure, or the phalanx of circuit court authority Trans Union cites for support.

### 1. *The text of Section 1681i requires the consumer to "dispute" an inaccuracy, not "show" an inaccuracy.* To begin, requiring a consumer to make a prima facie showing of an

item's inaccuracy to trigger the agency's reinvestigation duty is not supported by the text of § 1681i(a).  Section 1681i(a) requires the consumer to "dispute" the "accuracy of any item of information contained in [his] file at a consumer reporting agency."  The text of § 1681i does not require the consumer to "show" the inaccuracy of any item in the consumer's file.  Besides the different words, the substantive difference between the actual text of § 1681i(a) and Trans Union's preferred text is easy to understand.

A hypothetical illustrates the difference.  Consider a federal judge reviewing a memorandum from a summer intern that cites a Third Circuit case purporting to hold that numerosity can never be satisfied unless a class contains at least 250 members.  The judge, skeptical of that assertion, instructs the supervising law clerk, "Please read the case cited, this interpretation of the decision cannot possibly be correct."  In instructing the supervising law clerk in that way, the judge is "disputing the accuracy" of the intern's proposition.  *Showing* its inaccuracy requires an additional step—retrieving the case and any other relevant authorities, reviewing them, and concluding one way or the other whether numerosity cannot be satisfied unless the proposed class numbers more than 250.

Section 1681i(a) works in much the same way.  The provision requires that the consumer "dispute" the accuracy of some item of information on their credit file.  It goes no further.  A plain reading of the text of § 1681i(a) supports the conclusion that so long as the "accuracy" of some piece of information on the consumer's file is "disputed . . . directly," a consumer has fulfilled his duty to trigger the agency's reasonable reinvestigation obligation.

**2.** *The statute's structure supports the plain reading*.  The structure of § 1681i(a) supports the conclusion that a consumer need not "show" an inaccuracy to trigger an agency's

reinvestigation duty.  To understand why requires a discussion of the purpose of the FCRA and its twin provisions ensuring the accurate reporting of consumer credit information.

The "FCRA was prompted by 'congressional concern over abuses in the credit reporting industry.'"  *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996) (quoting *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)).  By enacting the FCRA, Congress recognized the "vital role" consumer reporting agencies play in collecting and transmitting consumer credit information, 15 U.S.C. § 1681(a)(3), "and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole," *Philbin*, 101 F.3d at 962.

Indeed, Congress thought the accurate reporting of consumer credit information so vital, it designed the FCRA "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a)(4).  Those same Congressional findings have accompanied the FCRA since the inception of its statutory life.  *See* Fair Credit Reporting Act, Pub. L. No. 91-508, 84 Stat. 1128 (1970).

To ensure that consumer reporting agencies exercise their grave responsibilities with fairness and impartiality, and with respect for a consumer's right to privacy, Congress developed "[a]n elaborate mechanism . . . for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."  *Id.* § 1681(a)(2).  A crucial cog in that elaborate mechanism was to require the agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b); *see also Philbin*, 101 F.3d at 962.

The FCRA contains two complementary provisions detailing the reasonable procedures consumer reporting agencies must adopt—15 U.S.C. § 1681e, and 15 U.S.C. § 1681i. Understanding both provisions is relevant to a diligent disposition of this case.  Through § 1681e, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  *Id.* § 1681e(b).  Through § 1681i, consumer reporting agencies must promptly reinvestigate "any item of information in a consumer's file" if the consumer alleges it to be "incomplete or inaccurate."  *See* 15 U.S.C. § 1681i(a)(1)(A).

Taken together, Section 1681e and 1681i form a two-pronged system designed to regulate, and minimize, the risks attendant to the inaccurate reporting of consumer credit information.  Indeed, various Courts of Appeals have analyzed these provisions in strictly cost-benefit terms, including the Third Circuit.  *See, e.g.*, *Cushman*, 115 F.3d at 224-25.

Section 1681e creates an initial duty for consumer reporting agencies to follow certain "reasonable procedures to assure maximum possible accuracy."  The central purpose of § 1681e is to avoid the worst cases.  But the structure of the statute implicitly recognizes that onerous precautions can be expensive and thus jeopardize other important values.

Thus, in analyzing the scope of § 1681e's "reasonable procedure" requirement, various courts, among them the Third Circuit, have suggested that "the costs" of requiring an agency to adopt overly strict procedures at the outset would "outweigh any potential benefits of such [] requirement[s]."  *Cushman*, 115 F.3d at 225; *see also Henson*, 29 F.3d 280 (noting that overly strict frontend precautionary rules "would also require credit reporting agencies to engage in background research which would substantially increase the cost of their services," which "they would be forced to pass on . . . to their customers and ultimately to the individual consumer").

That cost-benefit calculus flips, however, once a consumer pinpoints a claimed inaccuracy.  That is, "when one goes from the § 1681e(b) investigation to the § 1681i(a) reinvestigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly."  *Cushman*, 115 F.3d at 225.  That is so because "a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information."  *Id.*

The flipping of the cost-benefit calculus when an agency moves from § 1681e procedures to a § 1681i reinvestigation is best understood as a shifting of the investigatory burden from the consumer to the agency.  Following *Cushman*'s cost-benefit framework, under § 1681e, agencies are not required to design procedures that prevent the appearance of all conceivable inaccuracies.  That promotes efficiency, as there are myriad potential inaccuracies that could affect a consumer credit report.  Requiring an agency to account in advance for each potential discrepancy may cause negative downstream consequences, including raising the cost of credit for certain consumers.

The burden of reinvestigation, however, lies with the agency.  *Cushman*, 115 F.3d at 225; *Henson*, 29 F.3d at 286-87 ("A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice. . . . [because once] a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation."); *Stevenson v. TRW, Inc.*, 987 F.2d 288, 291 (5th Cir. 1993) (noting that "[t]he statute places the burden of [re]investigation squarely on" the consumer reporting agency).

As *Cushman* observed, the text and structure of the FCRA's investigation provisions "evince[] Congress's intent that consumer reporting agencies, having the opportunity to reap

profits through the collection and dissemination of credit information, bear grave responsibilities to ensure the accuracy of that information."  *Cushman*, 115 F.3d at 225 (internal quotation and citation omitted).  To *Cushman*, the "grave responsibilities" imposed by the FCRA require that a § 1681i(a) reinvestigation "must consist of something more than merely parroting information received from other sources."  *Id.*  Thus, "a reinvestigation that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.*

Cushman remains good law in the Third Circuit.  In *Cortez v. Trans Union LLC*, the Third Circuit reaffirmed *Cushman*'s central holding.  617 F.3d 688, 713 (3d Cir. 2010).  Like *Cushman*, *Cortez* concluded that any "reasonable reinvestigation" under § 1681i(a) "must mean more than . . . making only a cursory investigation into the reliability of information that is reported to potential creditors."  *Id.*  Both *Cushman* and *Cortez*, then, have addressed the extent to which a consumer reporting agency must go beyond an original source in determining whether information is accurate.  And in analyzing the structure of the statute, they have unambiguously held that an agency must reinvestigate once a consumer has lodged a dispute, and that precedent weighs heavily against Trans Union's position here.

**3. *The caselaw Trans Union offers to support its position that a consumer must preliminarily "show" an inaccuracy addresses a different type of Section 1681i(a) claim.*** Perhaps sensing that the plain text of § 1681i(a) does not support its position, Trans Union turns to the case law.  Trans Union cites a string of cases from multiple circuits (including a nonprecedential of the Third Circuit) for the proposition that "without a showing that the reported information was in fact inaccurate, a claim brought under § 1681i must fail." *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 67-68 (1st Cir. 2008).  Proceeding from there,

Trans Union advances a related proposition.  Trans Union argues that it "cannot be liable to Plaintiff under Section 1681i if the disputed inquiry is accurate."  ECF 31, at 21.[4]  Thus, under Trans Union's view of the statute, it has no duty to conduct any reinvestigation pursuant to § 1681i(a) unless the consumer first "shows" that the disputed information is "inaccurate."  *See, e.g.*, Transcript at 17:1-6, ECF 44.

The cases offered by Trans Union are inapplicable here.  In each case cited by Trans Union, the court was addressing the *reasonableness* of the agency's § 1681i(a) reinvestigation, not whether the agency had a duty to reinvestigate in the first place.  Certainly, there is language in the cases Trans Union cites suggesting that proof of inaccuracy may be a necessary element of a 1681i(a) claim.  *See, e.g.*, *DeAndrade*, 523 F.3d at 67-68 (noting that "the weight of authority in other circuits indicates that without a showing that the reported information was in fact inaccurate, a claim brought under § 1681i must fail"); *see also Shaw*, 891 F.3d at 756 (holding that "to sustain either a § 1681e or a § 1681i claim, a consumer must first make a prima facie showing of inaccurate reporting by the [consumer reporting agency]" (internal quotations omitted)); *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008) (holding that a plaintiff filing suit under § 1681i must make a "prima facie showing of inaccurate reporting").

But that line of cases is distinguishable from this case in a fundamental respect.  In each case cited by Trans Union, the consumer reporting agency had conducted *some* reinvestigation, and the question for the court was whether that reinvestigation was reasonable.  In other words,

---

[4] Trans Union's briefing, to support the proposition that "[it] cannot be liable to Plaintiff under Section 1681i if the disputed inquiry is accurate," cites *Schweitzer* to say that "if [the] disputed 'information was in fact inaccurate, a claim brought under § 1681i must fail.'"  ECF 31, at 21 (citing *Schweitzer v. Equifax Info. Sols. LLC*, 441 Fed. App'x 896, 904 n.9 (3d Cir. 2011)).  Trans Union's discussion of *Schweitzer*'s holding appears to include a typo.  I understand Trans Union's point to be that *unless* (not *if*) the disputed information is *inaccurate*, a claim under § 1681i must fail.  That proposition is, of course, a corollary to their main point, that is, *if* the disputed information is *accurate*, then a claim under § 1681i must fail.

each court's interpretation of the term "accuracy," and their discussions of what kind of showing a plaintiff must make to sustain a § 1681i(a) claim, concern what a consumer must show to demonstrate that a reinvestigation *actually conducted* was unreasonable, not what a consumer must show to *trigger* a reasonable reinvestigation.

I first address *Schweitzer v. Equifax Info. Sols. LLC*, 441 Fed. App'x 896 (3d Cir. 2011), a *per curiam* nonprecedential decision from a panel of the Third Circuit. In *Schweitzer*, a consumer contacted Equifax (another consumer reporting agency) to dispute the accuracy of multiple items that appeared on his credit report. *Id.* at 899-900. In response, the agency contacted the third-party source of the information, attempted to confirm the information's validity, and notified Schweitzer that most of the information he disputed was accurate and, thus, would remain on his report. *Id.* at 899-901.

Believing the agency's investigation was unreasonable, Schweitzer sued pursuant to Sections 1681e and 1681i. *Id.* at 901.[5] The district court concluded that Schweitzer "did not provide any evidence demonstrating that Equifax failed to reinvestigate at his request under §1681i(a)." *Schweitzer v. Equifax Info. Sols.*, 2010 WL 3809987, at *11 (W.D. Pa. Sept. 21, 2010). Accordingly, the district court granted summary judgment to Equifax.

---

[5] The interplay between Sections 1681e and 1681i is important to understanding the scope of an agency's § 1681i reinvestigation duty, and I analyze that interplay below. In *Schweitzer*, the plaintiff's § 1681e claim alleged that Equifax was negligently noncompliant because inaccurate information had appeared on his credit report, the inaccuracy was due to Equifax's failure to follow reasonable procedures to assure maximum possible accuracy, and he suffered injury as a result. In granting summary judgment to Equifax, the district court held that Schweitzer "cannot make out a prima facie case" under § 1681e "because he failed to provide evidence that his credit reports actually contained inaccurate information." The Court of Appeals "agree[d] with this conclusion," and reaffirmed that "[i]n order to make out a prima facie violation of section [1681e(b) ], the [FCRA] implicitly requires that a consumer must present evidence tending to show that a credit reporting agency prepared a report containing 'inaccurate' information." *Schweitzer*, 441 Fed. App'x at 902.

The appellate panel largely affirmed.[6]  To support its holding, the Court of Appeals cited to *DeAndrade* for the proposition that "without a showing that the reported information was in fact inaccurate, a claim brought under § 1681i must fail."  *Id.* at 904 n.9 (citing *DeAndrade*, 523 F.3d at 67).  Trans Union now seizes upon *Schweitzer*'s citation to *DeAndrade* to support its contention that liability cannot attach under § 1681i(a) if the disputed inquiry is accurate, thus implying that its duty to conduct a reasonable reinvestigation pursuant to § 1681i(a) is not triggered unless the consumer first "shows" that the reported information is "inaccurate."  ECF 31, at 21.

*Schweitzer* does not get Trans Union that far.  Putting to one side that *Schweitzer* is a nonprecedential opinion issued *per curiam*, Trans Union misreads the case.  The panel was not attempting to answer whether a consumer had to "show" an "inaccuracy" to *trigger* the agency's duty to reasonably reinvestigate.  It was not even presented with that question.  Rather, the panel's focus was on examining whether the reinvestigation conducted by the agency was "reasonable."  The same is true for the remaining cases relied upon by Trans Union.  In each, the

---

[6] With respect to one piece of information alleged by Schweitzer as inaccurate, the panel concluded that genuine issues of material fact precluded summary judgment on the agency's claim that it conducted a reasonable reinvestigation.  In doing so, following *Cushman* and *Cortez*, the panel observed that the inquiry under § 1681i "is not simply whether the credit reporting agency reinvestigated, but whether that reinvestigation was 'reasonable.'" *Schweitzer*, 441 Fed. App'x at 904.  The Court allowed that "the parameters of a reasonable investigation will often depend on the circumstances of a particular dispute." *Id.* (quoting *Cortez*, 617 F.3d at 713).  But "a *reasonable* reinvestigation must mean more than simply . . . making only a cursory investigation into the reliability of information that is reported to potential creditors." *Id.* (quoting *Cortez*, 617 F.3d at 713) (emphasis added).  With respect to that item of information—a credit account that was reported as being included in a bankruptcy— Schweitzer had written to the agency multiple times asserting that it "was inaccurately reported as being included in his bankruptcy." *Id.* at 904.  Schweitzer provided to Equifax the bankruptcy case number, the dates that the case had been filed and closed, and details concerning the circumstances of the bankruptcy filing. *Id.*  In response these disputes, Equifax sent the creditor notice of the dispute but did not investigate further.  Thus, the Court of Appeals concluded that "there is a genuine issue of material fact concerning" whether "[those] reinvestigations . . . were reasonable under § 1681i(a)." *Id.*

consumer reporting agency conducted some reinvestigation and only *after* the conclusion of

those reinvestigations did the consumer pursue a claim under § 1681i(a).[7]

The situation here is entirely different.  Unlike the consumer reporting agencies in the

cases cited, here Trans Union conducted no reinvestigation whatsoever.  ECF 31, at 5

("[B]ecause the inquiry relates to the consumer, and reflects the accurate fact that Trans Union

provided that consumer's information to the identified user on the identified date[,] there is

nothing inaccurate about the inquiry and therefore nothing to investigate."); ECF 44, at 17:2

("[T]he reason why . . . there was nothing to investigate [was because] . . . the inquiry

information . . . originated with TransUnion.  So that's the reason why TransUnion does not

investigate these types of disputes."); *see also* ECF 27, at 81:13-17 (filed under seal).

The distinction between *Schweitzer* and the other cases relied upon by Trans Union and

the situation here is crucial.  Where an agency responds to a consumer's dispute and either

rejects it on the merits or takes corrective action, it has carried out its statutory duty.  If a

consumer then sues under § 1681i(a), it makes eminent sense for a court to shift the burden to the

---

[7] *See Wright v. Experian Info. Sols.*, 805 F.3d 1232, 1242 (10th Cir. 2015) ("Mr. Wright sent a letter to the CRAs disputing their reports of the lien . . . . Experian sent a description of Mr. Wright's dispute to LexisNexis . . . . [and] to a different contractor Intelenet, which determined Mr. Wright's credit report should be updated to reflect a 'Paid Federal Tax Lien.'  Neither CRA removed the lien from its report, but they changed their reports to show the lien had been released.  They also sent Mr. Wright summaries of the results of their investigations." (internal citations omitted)); *Carvalho v. Equifax Information Services*, 629 F.3d 876, 882 (9th Cir. 2010) ("Pursuant to their standard procedures, the [consumer reporting agencies] each sent an electronic [] form to [the collection agency] with a cursory description of the dispute and a request that [the collection agency] verify the account information.  [The collection agency] responded by reporting that the information was 'accurate,' and the [consumer reporting agencies] each updated [the consumer's] credit report to indicate that the information about the [the collection agency's] debt had been verified but was disputed by [the consumer]."); *DeAndrade*, 523 F.3d at 64 ("Trans Union sent a letter to DeAndrade indicating receipt of his request to investigate the disputed item.  Trans Union then contacted [the mortgage holder] to verify the accuracy of the item."); *Wantz v. Experian Information Solutions*, 386 F.3d 829, 832 (7th Cir. 2004) ("Experian investigated by sending a dispute verification form to a third-party vendor."); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1160-61 (11th Cir. 1991) ("TRW received a letter from Cahlin requesting that TRW verify the status of his account with GMAC.  On that same day, TRW telephoned GMAC to verify whether GMAC wanted the 'paid charge off' notation changed to 'paid satisfactory'.  TRW processed this change through its computer records [], and all credit reports issued after that date reflect that Cahlin's GMAC account was 'paid satisfactory'.").  As in *Schweitzer*, in each case the consumer's complaint was that the investigation was unreasonable.

consumer to "show that the disputed information contained in a consumer report is inaccurate in order to prevail on a § 1681i FCRA claim." *See DeAndrade*, 523 F.3d at 65.

But where an agency fails in the first instance to reinvestigate in response to a consumer's dispute, it would be inconsistent with the statute for a court to then require the consumer to make a threshold showing of inaccuracy, when the statute provides that the duty to reinvestigate lies with the reporting agency. Granting the agency the freedom to decline to conduct any reinvestigation after a consumer has lodged an appropriate dispute would frustrate the purpose of the reinvestigation requirement.

Congress enacted the reinvestigation requirement in § 1681i(a) to balance competing factors—assuring maximally accurate consumer credit data without overly taxing the efficient functioning of the consumer credit market. To do that, Congress struck a compromise. Congress provided consumers private rights of action in federal court for certain injuries arising under the statute,[8] but also delegated to the agencies a front-line role in adjudicating disputes. The congressional findings set forth in the FCRA reflect this. *See* 15 U.S.C. § 1681(a)(2) (discussing the "elaborate mechanism" designed by Congress and delegated to the agencies "for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers").

For these reasons, Trans Union's citation to various decisions of the courts of appeals to support its argument that its duty to conduct a reasonable reinvestigation is only triggered when

---

[8] Plaintiffs have a private right of action to sue for violations of 1681i(a). "Sections 1681n and 1681*o* of Title 15 respectively provide private rights of action for willful and negligent noncompliance with any duty imposed by the FCRA and allow recovery for actual damages and attorneys' fees and costs, as well as punitive damages in the case of willful noncompliance." *Philbin*, 101 F.3d at 962.

the consumer makes a preliminary showing of inaccuracy is misplaced.  The plain text of § 1681i(a), as elucidated by *Cushman* and *Cortez*, must govern.

In all, the plain text of § 1681i(a) and the structure of the FCRA's investigation provisions dictate that a consumer need not make a prima facie showing of inaccuracy to trigger an agency's reinvestigation obligation, and no case law offered by Trans Union suggests, let alone compels, a contrary result.

### C.  Trans Union's remaining attempts to evade its reinvestigation duty are unavailing

Trans Union makes two additional arguments to support its reading of the statute.  First, Trans Union argues that its duty to reinvestigate is limited to information supplied by entities known as "furnishers."  Second, it claims that it cannot be liable under § 1681i(a) for failing to reinvestigate if the entity that requested the consumer's credit information had a "permissible purpose" in doing so.  Like its interpretation of its reinvestigation duty under § 1681i(a), Trans Union's remaining arguments are misplaced.

**1. *The reinvestigation duty under Section 1681i(a) is not limited to information supplied by "furnishers."***  Trans Union argues that the duty to reinvestigate pursuant to § 1681i(a)(1) is triggered only when the information in dispute is supplied to a consumer reporting agency by an entity commonly referred to as a furnisher.  *See e.g.*, ECF 31, at 2-3.  I do not find that argument persuasive.

Trans Union largely bases its argument on the use of the term "furnisher" within one of the subheadings in § 1681i(a).  Specifically, Trans Union argues that because paragraph (1), entitled "Reinvestigation required," is followed by paragraph (2), entitled "Prompt notice of dispute to furnisher of information," the duty to reinvestigate is limited to disputes of information supplied by furnishers.

The term "furnisher" is not defined anywhere in the statute.  There is, however, a separate provision, § 1681s-2, that sets forth the obligations of those who supply information to consumer reporting agencies.  That section is entitled, "Duty of furnishers of information to supply accurate information."  15 U.S.C. § 1681s-2(a).  The duty imposed in the body of that provision extends to any "person," *id.*, with "person" broadly defined as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity."  15 USC § 1681a(b).

In Trans Union's view, Safe Home is most aptly described as an end user of the consumer reporting system, rather than a "furnisher" in the technical sense.  Thus, Trans Union contends that it has no obligation to reinvestigate Norman's dispute of information provided by Safe Home.

Trans Union cites no case law in support of its construction, but argues that the term "furnisher" as used in the title of § 1681i(a)(2) must be understood to limit an agency's reinvestigation duty under § 1681i(a)(1) or it would otherwise be superfluous.

Trans Union is correct that a heading can in some instances provide insight into the meaning of a statute.  But the Supreme Court has cautioned that "the title of a statute cannot limit the plain meaning of the text."  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947)) (cleaned up).  Instead "for interpretive purposes," headings are useful "only when [they] shed light on some ambiguous word or phrase."  *Id.* (cleaned up).

Turning to the text here, § 1681i(a)(1)(A) refers to the "completeness or accuracy of *any* item of information contained in a consumer's file." (Emphasis added). That all-encompassing language is qualified in only two ways: "[s]ubject to subsection (f) and except as provided in

subsection (g)."  Subsection (f) sets forth a specific procedure to be followed in the case of

"resellers" of credit data, and subsection (g) deals with medical debt for which the Veterans

Administration might have responsibility.  The combination of the broad language of the statute,

along with two specifically defined exceptions not relevant here, allows for no ambiguity.

Importantly, Congress clearly recognized different actors within the consumer reporting

system.  And while Congress addressed the role of resellers in subsection (f), it made no separate

provision for "furnishers" of consumer credit information.  Furthermore, within the body of

paragraph (2), the duty of a consumer reporting agency is stated in as broad a fashion as

paragraph (1), namely, to "provide notification of the dispute to *any* person who provided any

item of information in dispute." (Emphasis added).  That supports a conclusion that the term

furnisher in the heading was used in the generic and not technical sense, as one who supplies

information.

In that regard, it should be noted that even Trans Union in its briefing uses the term

"furnish" both technically and generically, referring to Safe Home, which it characterizes as an

"end user," as furnishing information.  *See, e.g.*, ECF 31, at 2 (noting that consumer reporting

agencies "prepare and furnish 'consumer reports,' sometimes colloquially called 'credit

reports'").

Trans Union cites federal regulations seeking to support its argument that it need not

conduct reinvestigations when the dispute concerns an inquiry from a "user."  *See* ECF 31, at 2-3

(citing 12 C.F.R. §§ 1022.40-43).  But those regulations do not address the obligations of

consumer reporting agencies such as Trans Union.  Rather, those regulations clearly address the

obligations of third parties supplying information when a consumer directly disputes the

accuracy of an item at its source.

Further, the regulation was specific to § 1681s-2, issued pursuant to a direct delegation of authority from Congress.[9]  Trans Union is correct that within regulations governing a specific subset of actors in the consumer reporting systems, end users were relieved of the obligation to reinvestigate.  By no means do those regulations in anyway undermine the clear obligations of consumer reporting agencies separately set forth in § 1681i(a).  And as set forth above, Congress provided specific exceptions to broad reach of § 1681i(a), without enacting the limitation that Trans Union would have me recognize here.

Trans Union finally argues that some effect must be given to Congress's choice of the word "furnisher" in the heading of paragraph (2) or that paragraph would be surplusage.[10]  In the first instance, as in *Yeskey*, the body of the statute is more important than any headings, and a court should not strain to find meaning in a heading when to do so would require it to depart from the text.  Second, to the extent that Trans Union's position is that some meaning must be given to the term furnisher in the heading, I would agree, but the meaning that best comports with its usage in this context is a generic one.  And even if Trans Union's understanding of paragraph (2) is correct, that understanding would in no way limit its reinvestigation obligation under § 1681i(a)(1).  Finally, statutory canons are merely tools.  I have previously identified some of the risks that attend their use.[11]

---

[9] *See* 15 U.S.C. § 1681s-2(a)(8)(A) (noting that "[t]he Bureau [of Consumer Financial Protection] . . . shall prescribe regulations that shall identify the circumstances under which a furnisher shall be required to reinvestigate a dispute concerning the accuracy of information contained in a consumer report on the consumer, based on a direct request of a consumer").

[10] For that matter, it is not entirely clear whether Trans Union argues that the entire paragraph would be surplusage, or the simply the term.

[11] *Safehouse*, 408 F. Supp. 3d at 590 ("[J]udicial canons need to be employed with an awareness of their limitations. Two criticisms in particular resonate with me.  First, many canons are premised on unrealistic assumptions about how Congress creates law.  Second, the manipulability of canons carries the potential for judges to rewrite statutes based on personal preferences under the guise of adherence to objective rules."); *see also id.* at 589 n.6.

The Court of Appeals recently declined to apply the rule where to doing so would come "at the expense of [a] a more natural reading, the structure of the paragraph, and the structure of the Act." *Tima v. Attorney General*, 903 F.3d 273, 278 (3d Cir. 2018).  Rote application of the rule would cause the same incongruous result here, dramatically limiting the scope of § 1681i(a) on the basis of an undefined term that appears in a heading.  And to accept Trans Union's argument, one must first follow a tortuous path heavily dependent upon a regulation issued under a different section of the statute that was clearly aimed at different entities within the credit industry.

**2.** ***Trans Union's arguments regarding permissible uses of the consumer reporting*** ***system do not obviate its duty to reinvestigate***.  Under the FCRA, "[a]n entity may gain access to an individual's consumer report only with the written consent of the individual, unless the consumer report is to be used for certain 'permissible purposes,' in which case written consent is not required." *Dixon v. Shamrock Financial Corp.*, 522 F.3d 76, 77 (1st Cir. 2008) (citing 15 U.S.C. § 1681b); *see also* 15 U.S.C. § 1681b(f)(1) ("A person shall not use or obtain a consumer report for any purpose unless—(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under the section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.").

Trans Union observes that its obligation is to issue consumer reports for permissible purposes, 15 U.S.C. § 1681e(a), and to that end, must only have "reasonable procedures" to limit the issuance of them for impermissible purposes. *Id.*  Trans Union stresses that it may rely upon representations of subscribers to its credit reports, and that any that party that accesses credit unlawfully is separately subject to sanctions under the FCRA.

Trans Union also cites various decisions that have held that so long as there is a permissible reason to access credit, a consumer's consent is not required.  ECF 31, at 26 n.13 (alleging that because "[Norman] did not 'consent to Safe Home accessing his information is not relevant because a user may access a consumer's information without consent'"); *see also id.* (citing cases).  Trans Union also cites a decision where a credit check was deemed permissible even over a consumer's objection.  *Id.* at 25 (citing *Newlin v. Comcast Cable of Ind., Inc.*, 2014 WL 1207513, at *3 (N.D. Ind. Mar. 24, 2014)) ("Plaintiff's objection to Comcast obtaining his credit report, standing alone, would not suffice to overcome a legitimate business need.").

But the fact that Safe Home might have had a legitimate basis to tap Norman's credit file misses the point.  Whatever the ultimate resolution would have been to Norman's dispute—and there is substantial opposing precedent about limitations on access to a consumer's file[12]—the statute requires Trans Union to investigate.  This was the essential point of *Cushman*:

> A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice. . . . [A] credit reporting agency may initially rely on public court documents, because to require otherwise would be burdensome and inefficient.  However, such exclusive reliance may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his credit report.  When a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation.

115 F.3d at 224 (internal quotation omitted).

In short, the fact that Trans Union may ultimately have resolved the dispute

---

[12] For example, see *Boone v. T-Mobile USA Inc.*, 2018 WL 588927, at *8 (D.N.J. 2018) ("The harm was that plaintiffs' personal information was negligently made available to outsiders without plaintiffs' consent.  Second, although T-Mobile had Boone's consent, that consent was allegedly limited to a soft credit inquiry.  For a hard credit inquiry, written consent or a permissible purpose would have been required. . . . Moreover, Boone specifically told T-Mobile he did not want them to conduct a hard credit check.").  For other, similar examples, see also *Qureshi v. Penkhus Motor Co.*, 2016 WL 5372184, at *1-3 (D. Colo. Sept. 26, 2016); *Heaton v. Soc. Fin., Inc.*, 2015 WL 6744525, at *4-5 (N.D. Cal. Nov. 4, 2015); *Traveler v. Glenn Jones Ford Lincoln Mercury* 1987, Inc., 2006 WL 173687, at *1, *3-5 (D. Ariz. Jan. 24, 2006).

against Norman does not obviate its duty to investigate.  Further, the statute accounts for potential burdens on the part of reporting agencies by providing a number of options by which disputes can be addressed.

### D.  The FCRA establishes the options available to a consumer reporting agency in response to a dispute

*Cushman*'s cost-benefit analysis recognizes that until such time as a dispute is lodged, an agency is largely entitled to rely upon the accuracy of the information supplied by third parties. But even when the obligation to reinvestigate is triggered, the FCRA accounts for the potential costs involved by providing agencies with various options.

**1. *The Agency may delete the disputed item*.**  Section 1681i(a)(1) provides that upon appropriate notice of a dispute from a consumer, the agency shall within thirty days "conduct a reasonable reinvestigation" or "delete the item from the file in accordance with paragraph (5)." Paragraph (5) in turn sets forth procedures governing correction or removal of information designed to make certain that unreliable information does not later resurface in the report.  Thus, an agency is not obligated to pursue any investigation if it elects simply to delete the disputed item.

**2. *The Agency may determine the dispute is frivolous or irrelevant*.**  "A consumer reporting agency may terminate a reinvestigation of information disputed by a consumer . . . if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant."  *Id.* § 1681i(a)(3).  If the agency terminates a reinvestigation by reason of frivolity or irrelevance, it "shall notify the consumer of such determination."  *Id.*  In that notification, the agency must include "the reasons for the determination" that the dispute was "frivolous or irrelevant," as well as "identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information."  *Id.*

At argument, Trans Union validly pointed out that some disputes lack merit on their face, as for instance, when the consumer's complaint names a different reporting agency or criticizes a third party that supplied information.  Under § 1681i(a)(3), in such instances the agency can summarily resolve the dispute simply by replying with the reason the consumer's complaint is deemed frivolous or irrelevant.[13]

    **3. *The Agency must otherwise proceed with a reinvestigation*.**  If the agency elects not to delete the item and does not respond with a reason the dispute is considered frivolous or irrelevant, *Cushman* and *Cortez* make clear that § 1681i(a)(1) requires the agency to proceed with a reinvestigation.  The statute specifies a "reasonable reinvestigation" to determine if the disputed information is inaccurate, with the further requirement to update the file as to the status of the disputed information.  If the agency determines that the information is inaccurate, incomplete, or cannot be verified, it must delete or modify the information and "promptly notify the furnisher of that information" that the information has been modified or deleted from the consumer's file.  *Id.* § 1681i(a)(5)(A).

Once the reasonable reinvestigation is complete, the agency "shall provide written notice to a consumer of the results of a reinvestigation."  *Id.* § 1681i(a)(6).  That written notice must include five components:  (1) "a statement that the reinvestigation is completed"; (2) "a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation"; (3) "a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency"; (4) "a notice that the consumer has the right to add a statement to the

---

[13] Once a consumer lodges a dispute, however, the consumer reporting agency "must assume a consumer's dispute is bona fide, unless there is evidence to the contrary." 40 Years of Experience with the Fair Credit Reporting Act, Federal Trade Commission, 2011 WL 3020575, at *69.

consumer's file disputing the accuracy or completeness of the information"; and (5) "a notice

that the consumer has the right to request . . . that the consumer reporting agency furnish

notifications" that a consumer may request the agency resend his credit report "to any person

specifically designated by the consumer who has within two years prior thereto received a

consumer report for employment purposes, or within six months prior thereto received a

consumer report for any other purpose." *Id.*

## IV.    Norman triggered Trans Union's reinvestigation obligation

Having analyzed the statute, it is useful to return to the underlying facts, and to Norman's

allegation that Trans Union failed to uphold its reinvestigation obligation in violation of

§ 1681i(a) of the FCRA.

Trans Union concedes it conducted no reinvestigation of the Safe Home entry disputed

by Norman on the ground that its reinvestigation duty was never triggered.  ECF 31, at 5

("[B]ecause the inquiry relates to the consumer, and reflects the accurate fact that Trans Union

provided that consumer's information to the identified user on the identified date[,] there is

nothing inaccurate about the inquiry and therefore nothing to investigate.").  Thus, my analysis

here focuses only on whether Norman fulfilled his obligations pursuant to "directly dispute" the

"completeness or accuracy" of the Safe Home inquiry on his file, pursuant to § 1681i(a)(1)(A).

My analysis contains two steps.  First, I conclude that the Safe Home inquiry qualifies as

"any item of information" in Norman's file, and that Norman adequately lodged a "direct

dispute" with Trans Union.  Second, given the extensive discussion of how a consumer meets the

statutory requirement to "dispute" the "accuracy" of some item of information contained in his

file, I conclude that Norman has done so here.

To begin, Norman lodged his disputed with Trans Union "directly," as required by

§ 1681i(a)(1)(A).  In July and August 2018, Norman sent two letters to Trans Union, each of

which "disputed" the Safe Home entry on his credit report.  In the first, Norman "wr[o]te to dispute the [Safe Home] inquiry that appears on my credit report."  Ex. 23-3.  In the second, like the first, Norman "wr[o]te to dispute the [Safe Home] inquiry that appears on my credit report." Ex. 23-4.  Trans Union received both letters, ECF 31, at 12, and does not otherwise contest that Norman "disputed" the Safe Home inquiry on his credit report.

Moreover, Norman's dispute identified an "item of information" contained in his credit file.  *See* § 1681i(a)(1)(A).  Trans Union does not contest that soon after Safe Home requested Norman's credit information, a "regular inquiry," also known as a "hard" inquiry, appeared on Norman's credit report.  *See* ECF 31, at 9.  Safe Home's request for Norman's credit information, and the subsequent appearance of that request on Norman's credit report, represents an item of information.

Section 1681i(a)(1)(A) last requires the consumer to "dispute" the "accuracy" of some item of information contained in his credit file.  As discussed above, "disputing the accuracy" of an item means that the consumer must indicate in his dispute that some item on his credit report is imprecise, inexact, or capable of misleading prospective creditors.  Norman did that here.

Both of Norman's letters to Trans Union "dispute[d] the [Safe Home] inquiry that appears on my credit report."  Further, both letters not only stated that Norman "never gave permission to have my credit run," they also made clear that Norman "told [the Safe Home] representative specifically to NOT run my credit."  Norman observed that "[Trans Union has] the ability to ask [Safe Home] for a recording of this conversation," which Norman believed would reveal that he expressly dissented to Safe Home's request to access his credit file.  ECF 23-3, at 2; ECF 23-6, at 2-3; *see also* Norman Deposition, ECF 23, Ex. 2, at 86:10-16 (noting that

Norman told a Trans Union representative over the phone that he told the Safe Home representative *not* to run his credit).

Further, for the reasons discussed above, the question at this point is not whether the Safe Home inquiry was accurate in the sense that such an inquiry was in fact made.  Instead, the question is whether Norman disputed its accuracy by *calling into question* whether the inquiry was proper.  He clearly did so, regardless of Trans Union's view of the merits of the dispute.

Norman took the steps required under § 1681i(a) to trigger Trans Union's duty to reinvestigate.  Because Trans Union conducted no reinvestigation of Norman's dispute, it follows that Trans Union failed to fulfill the obligations it owed Norman under § 1681i(a).

## V.      The Class's FCRA Claim

Having concluded that Norman triggered Trans Union reinvestigation duty under § 1681i(a), and that Trans Union failed to conduct any reinvestigation, I turn to the class claims.  Norman seeks to certify the following class:

> For the period beginning two years prior to the filing of the Complaint and through the time of judgment, all persons residing in the United States and its Territories to whom Trans Union sent its "502 Letter" in response to a written dispute of an inquiry.

ECF 23, at 3.  According to Norman, there are 246,518 consumers that fit this definition.  For purposes of discussion, I will refer to this group of consumers as the "Proposed Class Consumers."

### A.  Standards for class certification

To determine whether to certify Norman's proposed class, I must be "satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  *Hydrogen Peroxide*, 552 F.3d at 309 (internal quotation marks omitted).  To prevail, Norman must prove by a preponderance of the evidence that the prerequisites of both Rule 23(a) and Rule 23(b)(3) are met.

Under Rule 23(a), Norman must prove there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation.  And under Rule 23(b)(3), Norman must prove that questions of law or fact common to class members predominate over individualized questions and that the class action device is superior to other methods for resolving the claims.

The Court of Appeals has noted that "[i]t is often appropriate to discuss commonality and predominance together because the commonality inquiry is subsumed into the predominance inquiry."  *See, e.g.*, *Reyes*, 802 F.3d at 486; *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) ("[W]here an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement." (internal quotation marks omitted)).  I will follow that guidance and conduct the commonality analysis alongside the predominance one.

### B.  The components of Norman's proposed class

To frame the issue, I will first discuss the components of Norman's class definition and how Norman supports the conclusion that 246,518 consumers fit within it.  Norman, in a discovery request for the production of documents, sought from Trans Union the following:

> A copy of each written communication Trans Union received from a consumer from December 5, 2016 to the present, which disputed a hard inquiry included in the consumer's Trans Union file, and that resulted in Trans Union mailing a letter to that consumer that contained "Paragraph #502 Inquiry Information" and "Paragraph #351 True Identity Offer."

ECF 23, Ex. 12.  After lodging a series of general and specific objections,[14] Trans Union produced 246,518 pieces of consumer correspondence.

---

[14] Generally, Trans Union claimed that fulfilling the request would be unreasonable "because of undue burden or cost, and . . . may not be proportional to the needs of the case or the potential relevance (if any) of such information."  ECF 23-13, at 8.  Trans Union also made two specific objections.  Trans Union (1) "object[ed] to this request as overly broad and unduly burdensome to the extent that it seeks documents relating to communications

**1.** ***The pieces of correspondence are in fact from consumers to whom Trans Union sent the 502 Letter.***   Notwithstanding its objections, Trans Union concedes that each item of correspondence it produced is from a consumer to whom it sent a 502 Letter.  ECF 31, at 7 (Trans Union noting that "the pieces of correspondence were received from consumers to whom Trans Union also sent the [502] Letter"); *see also* ECF 23, at 14 (Norman noting the same).

**2.** ***There were no reinvestigations when a 502 Letter was sent.***   The evidence in the record before me also suggests that, each time Trans Union sent a consumer at 502 Letter, it conducted no reinvestigation of the underlying consumer inquiry.  *See, e.g.*, ECF 31, at 28 ("At best, Trans Union sending the Inquiry Information Letter demonstrates that it did not conduct a reinvestigation in response to an array of consumer correspondence"); ECF 31, at 16 n.4 ("Trans Union does not contest that its alleged non-investigation of inquiry disputes is a common issue."); ECF 31-C, ¶ 7 (Declaration of Donald Wagner, representative from Trans Union's Litigation Support department) ("Trans Union will send the [502] Letter in response to any consumer correspondence concerning an inquiry where Trans Union does not investigate or remove the inquiry."); ECF 27, at 40:16-20 (Deposition of Wagner) ("Q. [W]hen Trans Union sends the 502 letter out . . . am I correct that it does not investigate that disputed inquiry[?]  A. That is correct.").

**3.** ***Trans Union's admissions serve to define a class within the recipients of 502 letters.***   Trans Union's admission that it conducted no reinvestigation for each correspondence received from a Proposed Class Consumer narrows the class inquiry in two important respects.  First,

---

from consumers who would not be members of the putative class"; and also (2) "object[ed] to this Request as vague and ambiguous and not readily susceptible to response due to the undefined phrases "disputed a hard inquiry," "from a consumer," and "containing 'Paragraph #502 Inquiry Information' and/or 'Paragraph #351 True Identity Offer.'" Id.

because Trans Union conducted no reinvestigation of any correspondence received from a Proposed Class Consumer as required by *Cushman* and *Cortez*, the central question for Rule 23 purposes becomes whether each Proposed Class Consumer fulfilled his obligation to trigger Trans Union's reinvestigation obligation under § 1681i(a).  Second, Trans Union's admission also means that within Norman's proposed class of 246,518 consumers there is necessarily some group of consumers that, like Norman, disputed the accuracy of some item information on their credit file and for whom Trans Union failed to conduct any reinvestigation.

**4. *Is it a fair inference that the communications which resulted in 502 letters represented disputes that would trigger Trans Union's duty to investigate?*** Because there is necessarily some subset of consumers within the set of 246,518 consumers that disputed the accuracy of some item information on their credit file and for whom Trans Union failed to conduct any reinvestigation, I next consider whether the consumer communications on which Norman relies were with respect to all recipients sufficient to trigger Trans Union's reinvestigation obligation by disputing "the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency."  *See* 15 U.S.C. § 1681i(a)(1)(A).

To Norman, a consumer's receipt of a 502 Letter provides enough evidence for class certification purposes because it means, first, the consumer fulfilled his obligations under § 1681i(a) to trigger Trans Union's reinvestigation obligation and, second, Trans Union conducted no reinvestigation.  ECF 23, at 14 (noting 502 Letter "indicate[s] that in the case of each one of these 246,518 consumer disputes, like the case of Mr. Norman, Trans Union conducted no investigation of the disputed inquiry and left the unrectified inquiry on the disputing consumer's file").

Because Trans Union has conceded that no reinvestigation occurred for any consumer who received a 502 Letter, the success of Norman's argument turns on whether a consumer's receipt of a 502 Letter proves that the instigating correspondence triggered Trans Union's reinvestigation obligation. That is, does receipt of a 502 Letter prove by a preponderance of the evidence that the consumer disputed the completeness or accuracy of an item of information contained in the consumer's file? *See* 15 U.S.C. § 1681i(a)(1)(A).

Norman points to various evidence in the record that he says either conclusively proves or strongly implies that each recipient of a 502 Letter had disputed an inquiry that appeared on his credit report.[15] ECF 38, at 4-5. Norman first points to language Trans Union used in its 502 Letter as emblematic of "hard inquiries to credit reports," ECF 38, at 6, and argues as follows:

**502 Letter Example 1. "The inquiries listed on your credit report are a record of the companies that obtained your credit information."** Norman notes that only hard or regular inquiries are "listed" on a consumer's credit "report" that can be viewed by third parties. ECF 38, at 6. Norman claims that "soft inquiries"—like account reviews or promotional inquiries—"may remain on a consumer disclosure (*i.e.*, a copy of all a CRA's file data on the consumer provided to the consumer, 15 U.S.C. § 1681(g), [but] those soft inquiries are not provided to or visible on credit reports sold to third party users, as is the case with the disputed hard inquiries here." *Id.* Further, because § 1681i(a) allows a consumer to dispute "any item of information contained in [the] consumer's credit file," even if in some instances the letter was sent in response to disputes over soft inquiries, such disputes would also fall within the broad scope of § 1681i(a).

---

[15] I take it as a given that each correspondence from a Proposed Class Consumer was "direct" insofar as it was in writing and received by Trans Union. I do not read any submission by Trans Union to argue otherwise, and thus will not discuss the point in any detail.

**502 Letter Example 2.  "All inquiries remain on your credit report for two years."**
As with inquiries "listed" on a credit report, Norman alleges that the "only type of inquiries that remain on a credit report for two years are 'regular' or 'hard inquiries.'"  *Id.*

**502 Letter Example 3.  "If you believe that an inquiry on your credit report was made without permissible purpose, then you may wish to contact the creditor directly . . . regarding its purpose."**  Norman finally notes that this language from the 502 Letter all but concedes that a third party inquired about a consumer's credit, as it describes a remedy for consumers who "believe that an *inquiry on credit report* was made without permissible purpose."  *Id.*  Norman contends that such language would be nonsensical in a letter to a consumer unless that consumer in fact had disputed a hard inquiry that appeared on a consumer's credit report.[16]

In addition to language in the 502 Letter, Norman also refers the Court to the parties' exchange of documents during discovery.  During discovery, Trans Union produced the identities of the 246,518 class members in response to Norman's request for "communications that Trans Union received from a consumer" during the class period that "*disputed a hard inquiry included in the consumer's Trans Union file*."  ECF 23-13, at 8 (emphasis added).

Trans Union rejects Norman's argument.  By way of preliminary observation, I note that many of Trans Union's objections are premised upon what I have concluded is a deficient reading of the statute.  Nevertheless, I take Trans Union to make three main counter arguments.  First, receipt of 502 Letter "does not necessarily reflect the 'dispute' that caused Trans Union to send the Inquiry Information Letter."  ECF 31, at 7.  Second, 502 Letters are sent in response to

---

[16] Trans Union has not contested Norman's representations as to the nature of hard inquiries and what appears on a publicly available credit report.

hard and soft inquiries.  *Id.*  Third, the many communications from Proposed Class Consumers "include correspondence wholly unrelated to inquiries."  *Id.*

In making these arguments, Trans Union largely relies on testimonial evidence produced in the course of litigation, much of it unsupported (or contradicted) by better evidence in the record produced before litigation commenced.  There is a declaration from Richard Orlowski, a consultant in Trans Union's litigation department.  Mr. Orlowski contends that "the method by which Trans Union could potentially identify correspondence responsive to [Norman's discovery request] also results in the identification of correspondence that does not meet the criteria described by that request, including correspondence that does not represent a dispute of an inquiry and/or is wholly unrelated to inquiries."  ECF 31, Ex. A ¶ 7.

Mr. Orlowski contends that Trans Union "does not track in its systems" various variables that would have ensured that its document production produced only documents responsive to Norman's request.  *Id.* ¶ 8.  But the examples offered by Orlowski of the shortcomings of Trans Union's systems either are irrelevant to class certification issues or refuted by other evidence.  For example:

- **Orlowski contends that Trans Union does not track "[w]hether a piece of correspondence that led to Trans Union sending the Inquiry Information Letter was a request for reinvestigation, as defined by Section 1681a(i) of the FCRA."**

This objection attempts to read into the statute a requirement that is not there.  The FCRA does not impose any requirement that a consumer formally make a "request for reinvestigation" to trigger an agency's reinvestigation obligation under § 1681i(a).  The consumer's duty is framed in non-technical terms.  Under § 1681i(a), a consumer need only directly dispute "the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency."  Further, if Trans Union deems the dispute to be frivolous or irrelevant, it need only respond with a reason the inquiry will not be pursued.

- **Orlowski contends that Trans Union does not track "[w]hether a piece of correspondence that led to Trans Union sending the Inquiry Information Letter 'disputed a hard inquiry.'"**

This claim is inconsistent with the language of the 502 Letter, the content of which would make no apparent sense unless Trans Union was responding to disputes involving inquiries for a consumer's credit file made by a third party.

- **Orlowski contends that Trans Union does not track "[w]hether a piece of correspondence that led to Trans Union sending the Inquiry Information Letter contended that a user did not have a permissible purpose in connection with a specific inquiry into a consumer's credit file."**

This objection misconstrues an agency's obligations under § 1618i(a). Trans Union is entitled to presume that a third party has a "permissible purpose" in accessing a consumer's credit. But once a dispute is raised, the agency's duty to reinvestigate is triggered. That reinvestigation may conclude that an inquiry was permissible, but such a conclusion would not obviate the need for it to investigate unless it deletes the item.

- **Orlowski finally contends that Trans Union does not track "[a]ny other details about the nature or substance of a piece of correspondence that led to Trans Union sending the Inquiry Information Letter."**

It is difficult to discern what significance to attribute to this claimed lack of specificity in its records. But as discussed above, it is reasonable to presume that the content of a response is dictated by the substance of the inquiry, and the content of the 502 Letter is directed to hard inquiries in several respects.

The second piece of testimonial evidence offered by Trans Union is the declaration of Donald Wagner, a representative from Trans Union's litigation support department. It is largely duplicative of Orlowski's. Mr. Wagner reiterates that, "before sending a 502 Letter, Trans Union does not evaluate, or record in its systems, whether the correspondence from the consumer: (a) disputed the accuracy or completeness of an inquiry on that consumer's Trans Union file; (b)

was sent directly by the consumer; or (c) asserted a dispute that was frivolous or irrelevant." Moreover, Trans Union does not "evaluate, or track in its systems, whether the correspondence from the consumer: (a) related to a hard inquiry or a soft inquiry; (b) contended that a user lacked a permissible purpose; or (c) the specific reason that a consumer was questioning or challenging an inquiry."

As with Mr. Orlowski, these points suffer from two essential weaknesses: the specific language of the 502 Letter refutes Trans Union's characterization of its purpose, and it would have me define the scope of its duty under § 1681i(a) far more narrowly than did the Third Circuit in *Cushman* and *Cortez*.  During deposition testimony, Mr. Wagner acknowledged that the sending of a 502 Letter signified that no reinvestigation took place.  He also acknowledged that Trans Union did not specifically communicate to consumers a determination that their disputes were "frivolous or irrelevant," notwithstanding the requirements of § 1681i(a)(3)(B).

Having set forth and analyzed the parties' view of the relevant evidence, I will now consider the specific requirements of Rule 23, and whether Norman has satisfied each prerequisite.

### C.  Norman has satisfied the prerequisites of Rule 23(a)

**1. *The proposed class is sufficiently numerous*.**  Rule 23(a) first requires that the proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although "[n]o minimum number of plaintiffs is required to maintain a suit as a class action," if the potential number of plaintiffs is more than forty, "the first prong of Rule 23(a) has been met."  *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).  Like all Rule 23 requirements, numerosity must be proven by a preponderance of the evidence.  *See Hydrogen Peroxide*, 552 F.3d at 307.

Norman's proposed class measures 246,518 Trans Union consumers who allegedly disputed with Trans Union an inquiry that appeared on their credit report and for whom Trans Union conducted no reinvestigation.  Trans Union does not contest that Norman's proposed class satisfies the numerosity requirement, and it clearly does.

**2. *Norman's claims are typical*.**  Rule 23(a) next requires named plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality inquiry involves a comparison of "the attributes of the plaintiff" and "the class as a whole" to determine if they are sufficiently similar.  *See Marcus*, 687 F.3d at 598.  That inquiry "ensures the interests of the class and the class representatives are aligned so that the latter will work to benefit the entire class through the pursuit of their own goals."  *In re National Football League Players Concussion Injury Litig.*, 821 F.3d 410, 427-28 (3d Cir. 2016) (internal quotations omitted).

The typicality inquiry also requires courts to ask whether there is "some degree of likelihood a unique defense will play a significant role at trial."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006).  A unique defense precludes certification where the defense is "both inapplicable to many members of the class and likely to become a major focus of the litigation."  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Nevertheless, the Court of Appeals has "set a low threshold for typicality."  *Id.* (internal quotations omitted).  Indeed, "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."  *Id.*  To test for these similarities, the Court of Appeals has identified "three distinct, though related, concerns":

> (1) the claims of the class representative must generally be the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances

> underlying that theory; (2) the class representative must not be subject to a defense
> that is both inapplicable to many members of the class and likely to become a major
> focus of the litigation; and (3) the interests and incentives of the representative must
> be sufficiently aligned with those of the class.

*See Marcus*, 687 F.3d at 598 (quoting *In re Schering Plough Corp. ERISA Lit.*, 589 F.3d 585,

602 (3d Cir. 2009)).

Norman satisfies each component of the typicality test here.  First, Norman advances one

legal claim with common supporting facts.  He contends that each member of the proposed class

satisfied their obligations under § 1681i(a) by disputing as inaccurate or incomplete some item of

information on their credit report, after which Trans Union failed to conduct any reinvestigation.

*See* 15 U.S.C. § 1681i(a).

Further, Norman demonstrates that the factual circumstances underlying that theory are

common across the proposed class.  Norman notes that each member of the proposed class

received a 502 Letter.  He then argues that receipt of the 502 Letter is sufficient to demonstrate

that each member of the proposed class satisfied their obligations under § 1681i(a) to trigger

Trans Union's reinvestigation obligation, which Trans Union failed to fulfill.  Norman also

points to various other documentary and testimonial evidence supporting his theory.  *See supra*

Section V.B.

Second, Norman is not subject to any defense that is inapplicable to many members of

the class that would become a major focus of the litigation.  In contending that Norman's

individual claim is atypical of many members of the proposed class, Trans Union relies on

arguments premised upon a fundamental misunderstanding of when and how its reinvestigation

obligation is triggered under FCRA.

Trans Union argues that because the Safe Home inquiry that appeared on Norman's

credit report was "accurate," it cannot be liable to Norman under § 1681i(a).  For the reasons

explained it detail above, however, the weight of authority across several circuits is that a factually accurate entry that is nonetheless misleading may properly be disputed by a consumer as inaccurate. *See supra* Section III.B. As the Ninth Circuit observed in *Shaw*, this is particularly the case where an entry can affect credit, as Trans Union concedes hard inquiries can.

Trans Union also argues that Norman's claims are atypical because Safe Home had a permissible purpose when it requested Norman's credit report and, therefore, "a significant portion of the trial in this matter would necessarily be dedicated to determining whether Safe Home had a permissible purpose to access [Norman's] information." ECF 31, at 23. As with its arguments about "accuracy," Trans Union misunderstands the nature of this case. Norman's complaint is not that Trans Union unreasonably sided with Safe Home following an investigation; his complaint is that no investigation took place. The ultimate merits of the dispute do not have controlling significance. Similarly, Safe Home may well have had a permissible purpose in requesting Norman's credit report. If so, the dispute would have been properly resolved against Norman. It does not follow that Trans Union could assume such an outcome without investigating. And if it deemed the dispute either frivolous or irrelevant on its face, the statute provides a mechanism to resolve the dispute on that basis, which Trans Union here never followed.

Trans Union finally argues that Norman's proposed class fails the typicality prong because even a "favorable resolution of the issue for [Norman] would do nothing to establish the claims of other putative class members." ECF 31, at 27 (citing *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 599). Trans Union contends that "[t]he complex analysis above would resolve the necessary 'inaccuracy' element of only [Norman's] Section 1681i claim," and the

same analysis would have to be repeated for each class member. But, for all of the reasons set forth above, the "complex analysis" referred to by Trans Union depends upon legal theories that are lacking in merit.

Like for Norman, because Trans Union has conceded it conducted no reinvestigation, the only question is whether each member of the proposed class disputed the accuracy of some item of information on their credit file. I am persuaded that the preponderance of evidence supports the conclusion that they did.

**3. *Norman is an adequate representative*.** Rule 23(a) finally requires named plaintiffs to demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry has two components, testing whether plaintiff's counsel is qualified to represent the class and detecting "conflicts of interest between named parties and the class they seek to represent." *Schering Plough*, 589 F.3d at 602.

Norman's counsel has abundant experience litigating FCRA class actions. *See, e.g.*, ECF 23, Exs. 13, 14 (detailing cases in which counsel have been certified to represent classes under the FCRA and other consumer protection laws). Further, there is no conflict of interest between Plaintiff and his proposed class. Plaintiff presses one claim under one provision of the FCRA that is typical of the class, and the claim does not invite a defense unique to him. *See Schering Plough*, 589 F.3d at 602 (noting that there are "clear similarities between the components of the typicality inquiry relating to the absence of unique defenses and alignment of interests, and [the] second part of the adequacy inquiry that focuses on possible conflicts of interest."). Other than the issues raised in the typicality discussion, Trans Union does not independently challenge Norman's ability to adequately represent the class. Accordingly, Norman has satisfied the adequacy requirement, and with that the requirements of Rule 23(a).

### D.  Norman has satisfied the prerequisites of Rule 23(b)(3)

Norman seeks certification under Rule 23(b)(3), which is permissible when the Court "finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3) (emphasis added); *see Hydrogen Peroxide*, 552 F.3d at 310.  The twin requirements of Rule 23(b)(3) are known as predominance and superiority.

In addition to those textual requirements, a Rule 23(b)(3) class must also be "currently and readily ascertainable based on objective criteria."  *Marcus*, 687 F.3d at 593.  As with the Rule 23(a) inquiries, the party seeking class certification "has the burden of making this showing by a preponderance of the evidence, and the district court must 'undertake a rigorous analysis of the evidence to determine if the standard is met.'"  *City Select Auto Sales v. BMW Bank of North America Inc.*, 867 F.3d 434 (3d Cir. 2017); *see also Hydrogen Peroxide*, 552 F.3d at 318 (discussing the origin and contours of the "rigorous analysis" requirement).

**1. *The proposed class is currently and readily ascertainable.***  To satisfy the ascertainability standard, a plaintiff must show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"  *Byrd*, 784 F.3d at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)).  Importantly, however, a plaintiff need not "be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'"  *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)) (emphasis in *Byrd*).

Norman's proposed class is currently and readily ascertainable.  As explained, Norman's class definition rises and falls on a consumer's receipt of the 502 Letter.  Trans Union already

has produced a catalog of all consumers who received a 502 Letter, and the consumer correspondences that instigated the 502 Letter's sending.

In arguing that the class is not ascertainable, Trans Union alleges that receipt of a 502 Letter cannot identify a class member "because the sending of the [502] Letter does not establish the necessary elements of a reinvestigation claim."  ECF 31, at 37.  This argument is without merit.  Put simply, in arguing that Norman's class definition includes some consumers who do not have a claim under § 1681i(a), Trans Union conflates ascertainability with an argument alleging that Norman's class definition is overbroad, which is better addressed by the predominance inquiry.  *See, e.g.*, *Byrd*, 784 F.3d at 167 ("[W]hether the defined class specifies a particular group that was harmed during a particular time frame, in a particular location, in a particular way . . . is not included in our ascertainability test.").

**2. *Proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating the controversy*.**  Rule 23(b)(3) next requires that the class action to be "superior" to other available adjudicatory methods.  The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (internal quotation marks omitted).  To do so, courts consider the "nonexhaustive list of factors" detailed in Rule 23(b)(3).  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615-16 (1997).  Those factors include "[t]he class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A), (D).

The superiority requirement is satisfied.  According to Norman, Trans Union has violated statutory rights of many thousands of consumers from around the country.  Individual litigation,

even for statutory damages, would be nonsensical for most of the proposed class.  Further, the

dominant factual and legal issues will facilitate an efficient, classwide adjudication on the merits.

Accordingly, proceeding as a class action would be superior to other available methods for the

fair and efficient adjudication of the case.

 **3. *Common questions of law and fact predominate over individual ones*.**  Rule 23(b)(3)

finally requires that common questions of law or fact "predominate" over questions affecting

individual class members.  The predominance inquiry "calls upon courts to give careful scrutiny

to the relation between common and individual questions in a case." *Tyson Foods, Inc. v.

Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  To that end, the analysis entails (a) first examining

each element of the plaintiff's legal claim to see if it involves common issues of law or fact and

then (b) determining whether issues common to the class overwhelm issues subject to

individualized proof.  *See Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 370-71 (3d

Cir. 2015); *see also* 2 Newberg on Class Actions § 4:50 (5th ed.) ("[T]he predominance analysis

logically entails two steps—the characterization step and the weighing step.  A court must first

characterize the issues in the case as common or individual and then weigh which

predominate.").

 The first step is essentially the commonality analysis under Rule 23(a)(2).  *See Danvers*,

543 F.3d at 148 ("The commonality requirement is subsumed by the predominance

requirement.").  Proving commonality requires the plaintiffs to demonstrate that their claims

"depend upon a common contention," the resolution of which "will resolve an issue that is

central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.

However, commonality "does not require identical claims or facts among class members."

*Marcus*, 687 F.3d at 597-98 (alteration omitted).  "For purposes of Rule 23(a)(2), even a single

common question will do."  *Dukes*, 564 U.S. at 359 (quotation marks and alterations omitted).

   Norman proposes several common questions.  Some address the consumer's preliminary

dispute step, which demands the consumer "dispute" the "completeness or accuracy" of "any

item of information" in his file.  15 U.S.C. § 1681i(a)(1)(A).  For example, to address whether

each Proposed Class Consumer sufficiently triggered Trans Union's reinvestigation obligation,

Norman asks the following:

- During the class period, was a consumer's receipt of a 502 Letter the result of the
  consumer "disputing" the "completeness or accuracy of any item of information
  contained in the consumer's file"?

   Other questions address Trans Union's subsequent reinvestigation step, in which the

agency must promptly "conduct a reasonable reinvestigation to determine whether the disputed

information is inaccurate and record the current status of the disputed information or delete the

item from the file."  *Id.*  For example, Norman asks:

- During the class period, did a consumer's receipt of a 502 Letter mean that Trans
  Union conducted no reinvestigation of the consumer's underlying dispute?  If yes, did
  a consumer's receipt of a 502 Letter mean that Trans Union deleted the inquiry
  disputed by the consumer?

- During the class period, did Trans Union have a uniform policy of not conducting any
  reinvestigation of consumer disputes of credit inquiries?  If yes, was such a policy
  willful?

   Norman proposes further common questions.  ECF 38, at 21.  In any case, each

representative question offered by Norman and listed above is capable of classwide resolution.

For one, Trans Union has conceded that it had a uniform policy of not conducting

reinvestigations of consumer disputes of hard inquiries.  For another, because Norman relies

exclusively on the 502 Letter to support his class claims, determining whether a consumer's

receipt of the 502 Letter means that the agency's reinvestigation obligation was triggered is

likewise capable of classwide resolution.  Thus, because each question "is central" and can be resolved across the class "in one stroke," *see Dukes*, 564 U.S. at 350, Norman has satisfied the commonality requirement.

Nevertheless, finding that Norman has offered common questions, I must still examine whether those questions predominate over individual ones.  The predominance requirement of Rule 23(b)(3) "is even more demanding" than the commonality prerequisite since the Court must "ensure that issues common to the class *predominate* over those affecting only individual class members."  *Behrend*, 569 U.S. at 34 (emphasis added); *Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).  After careful consideration of the parties' pleadings and the robust record they have created, I conclude that Norman has satisfied the predominance requirement of Rule 23(b)(3).

Trans Union offers three general arguments to support its claim that individual issues will predominate at trial:  (i) that "proof that an inquiry is inaccurate is [] an individualized issue that precludes class certification"; (ii) that "[m]ultiple elements of class member's Section 1681i(a) claims will require individualized inquiries"; and (iii) that Norman's proposed class is overbroad. ECF 31, at 27-35.  I address each argument in turn.

**(i). Proof of inaccuracy is not required.**  First, a consumer need not "prove" or otherwise make a prima facie showing of inaccuracy to trigger the agency's reinvestigation duty. As explained in detail above, such a requirement is unsupported by the text and structure of § 1681i(a), and Trans Union offers no applicable precedent that deviates from the statute's plain text.  *See supra* Section III.B.

**(ii). Individual Section 1681i(a) issues will not predominate.**  Second, the record before me suggests that the vast majority of the proposed class members' § 1681i(a) claims will

be addressed by common questions.  It seems true that some limited aspects of Norman's case could require individualized determinations.  But the presence of some individualized determinations "are of no consequence in determining whether there are common questions concerning liability." *In re Suboxone Antitrust Litig.*, 2020 WL 4331523, at *5 (3d Cir. July 28, 2020); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." (citation omitted)).  Instead, courts need only be assured that common issues predominate.  *See Tyson Foods*, 136 S. Ct. at 1045.

Trans Union offers several arguments for why Norman cannot establish the necessary elements of each class member's claim by common proof.  Trans Union claims that common proof cannot show:

**Whether a putative class member disputed the accuracy of an inquiry.**  As explained above, *see* Section V.B., Norman points to the language of the 502 Letter to show that each proposed class member "disputed the accuracy of an inquiry."  Trans Union opens the 502 Letter by telling each proposed class member that "our goal is to maintain complete and accurate credit information."  The letter then discusses why and how "inquiries" can appear on a consumer's file, and the course a consumer might take to remedy an inquiry that he believes erroneously appears.

Further, Norman refers to the parties' discovery exchanges.  During discovery, Trans Union produced the identities of the 246,518 class members in response to Norman's specific request for "communications that Trans Union received from a consumer" during the class period that "*disputed a hard inquiry included in the consumer's Trans Union file.*"  ECF 23-13,

at 8 (emphasis added).  If some of the documents produced were non-responsive or overinclusive, that is not a basis for a blanket conclusion that there are no common issues.

**Whether the dispute was frivolous or irrelevant.**  As to consumers who may have lodged a frivolous dispute, Congress already prescribed under § 1681i the specific steps an agency must take.  The 502 letter that Trans Union sent would not comply with the statute, which, as discussed above, requires the agency to provide reasons for its conclusion.

**Whether the inquiry at issue was a hard inquiry.**  Norman has presented strong circumstantial evidence that each recipient of a 502 Letter disputed an inquiry appearing on his credit report caused by a third party requesting that consumer's credit.  *See supra*, Section V.B. But if one assumes that 502 letters were sent where a consumer disputed a soft inquiry, § 1681i(a) would nonetheless apply, because it encompasses disputes regarding "any item of information in a consumer's file."  In that regard, Norman's proposed class definition does not limit members to those who disputed only hard inquiries.  Trans Union fails to explain why the duty to investigate would not be triggered by such a dispute.

**Whether the inquiry was on the consumer's file.**  The 502 Letter states that it was sent in response to "inquiries listed on your credit report."  It further instructed consumers what to do if that consumer "believe[d] that an inquiry on your credit report was made without permissible purpose."  Thus, the language of the letter itself makes clear that recipients had disputed some item of information that appeared on the consumer's file.

**Whether the dispute came directly from the consumer.**  Neither party devotes serious time in their pleadings discussing whether some portion of the proposed class comprises not consumers but, for example, credit repair organizations instead.  Differentiating between bona

fide consumers and third-party organizations does not seem like a difficult task, and certainly is not sufficient to defeat predominance.

**(iii). The proposed class is not overbroad.**  Finally, Trans Union offers five examples of consumer "disputes" among the 246,518 that it believes do not satisfy the elements of § 1681i(a). But no example consumer offered by Trans Union demonstrates that the class definition offered by Norman is overbroad.

**Example Consumer 1.**  "A consumer who believed that Trans Union should remove certain inquiries, despite admitting that, when car shopping, he gave a car dealer his information 'in order to see if they would finance' the purchase."  ECF 31, Ex. K (some internal quotation marks omitted).

Trans Union tries to characterize this letter as a consumer complaining about an inquiry she explicitly authorized.  Fairly read, however, the gravamen of the complaint is not that the *dealer* improperly accessed the credit report, but also "gave our information to seven other financial institutions . . . who ran a hard inquiry on the same day. . . . My credit score went down due to this."  The parent then "ask[ed] if there is any way to correct [those hard inquiries] on my file," and "that they should be removed or moved to a soft inquiry so that my score recovers."

It seems this consumer "directly disputed" a series of hard inquiries that appeared on his credit file, triggering Trans Union's reinvestigation obligation.  The consumer described the inquiries at issue, why they were inaccurate, i.e. not authorized, and asked Trans Union "if there is any way to correct" them.  In reply, the consumer received a 502 Letter which, according to Trans Union's corporate representative, signifies that Trans Union conducted no reinvestigation. As I have construed the FCRA, this would violate § 1681i(a).

**Example Consumer 2.**  "A consumer who asks Trans Union to remove soft inquiries from her Experian and Equifax files."  ECF 31, at Ex. L.

Trans Union is correct that this dispute is frivolous, in that the consumer erroneously wrote to it to dispute hard inquiries that appeared on her Experian credit report.  In response, the consumer received a 502 Letter, not the notice required under § 1681i(a)(3).

**Example Consumer 3.**  "Consumers who, without explanation, ask Trans Union to remove an inquiry from their file that they 'feel' should not be there because it is 'negatively affecting [their] credit score.'"  ECF 31, Exs. M, N.

Again, like Consumer 2, these disputes may be categorized as frivolous or irrelevant.  Once again, 15 U.S.C. § 1681i(a)(3)(C) sets forth the method by which an agency is to respond, setting forth "the reasons" a dispute is deemed frivolous, and identifying "any information required" to investigate the dispute, which is not accomplished by Trans Union sending a 502 Letter.

**Example Consumer 4.**  "A consumer who admits he completed two credit applications to finance a car purchase, but asked Trans Union to remove two related inquiries because 'he did not think' that the lender would access his information while arranging financing and because he felt the reports 'were not of use' in that transaction."  ECF 31, Ex. O.

As with Consumer 1, Trans Union's description of the consumer's dispute is incomplete.  It is true that this consumer "asked Trans Union to remove *two related inquiries*" from his credit file.  *Id.* (emphasis added).  But unlike with the two authorized inquiries, the consumer claimed that he never gave permission for the additional credit inquiries.  Like Norman, this consumer received a 502 Letter, meaning Trans Union conducted no reinvestigation at all.

**Example Consumer 5.**  "A consumer who admits that he applied for and was approved for credit but didn't believe the creditor should have check his credit more than once."  ECF 31, Ex. P.

Presumably, Trans Union categorizes this dispute as frivolous or irrelevant.  Nonetheless, the consumer would not have received notice with the reasons that Trans Union deemed it so as the statute mandates.  *See* 15 U.S.C. § 1681i(a)(3).

In the final analysis, Trans Union's objections are in many ways directed at the structure of the statute itself.  As set forth in *Cushman*, agencies may take most inquiries at face value. But once a consumer calls the accuracy of the report into question, a duty arises.  Even then, Congress provided agencies with options: delete, summarily deny while providing a reason, or reinvestigate.  The fact that not every dispute is well-founded does not undermine the obligation the statute creates.

In summary, Norman offers several common questions, and the evidence in the record suggests that those common questions will predominate at trial.  Trans Union is correct that Norman's sizable proposed class is not without some possible individualized issues.  But most of those issues are overblown, derived from misunderstandings of the law, or resolvable within the confines governing class actions.

**VI.**    **Conclusion**

In the final analysis, Trans Union has adopted a uniform policy as to a category of disputes based upon its interpretation of § 1681i(a). But its interpretation is an aggressive one given the language of the statute and the Third Circuit's decisions in this area.  Plaintiff has stated a valid cause of action and has identified significant common issues for a class of consumers, with the result that the motion to certify will be granted.

    /s/Gerald Austin McHugh
United States District Judge