# EXHIBIT 11



Compressed Transcript of the Testimony of
**DAVID B. LASATER, Ph.D., 5/5/22**

**Case:** Norman, Sr. v. Trans Union, LLC

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -
DUANE E. NORMAN, SR.,   : CIVIL ACTION
on behalf of himself and :
all others similarly    :
situated,               :
                        :
        Plaintiff,      :
                        :
    vs.                 :
                        :
TRANS UNION LLC,        :
                        :
        Defendant.    : NO. 2:18-CV-052225-GAM

- - -

Remote videotaped video conference deposition of DAVID B. LASATER, Ph.D., taken on Thursday, May 5, 2022, commencing at 10:06 a.m., before Andrea M. Brinton, Professional Court Reporter and Notary Public.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
(215) 985-2400 * (609) 567-3315 * (800) 477-8648
www.summitreporting.com

---

Page 2

1    **ALL PARTIES PRESENT VIA VIDEO CONFERENCE **
2    APPEARANCES:
3    FRANCIS, MAILMAN, SOUMILAS, P.C.
     BY:  JAMES A. FRANCIS, ESQUIRE
4    BY:  JORDAN M. SARTELL, ESQUIRE
     1600 Market Street
5    Suite 2510
     Philadelphia, Pennsylvania 19103
6    (215) 735-8600
     jfrancis@consumerlawfirm.com
7    jsartell@consumerlawfirm.com
          and
8    FLITTER MILZ, P.C.
     BY:  ANDREW M. MILZ, ESQUIRE
9    450 North Narberth Avenue
     Narberth, Pennsylvania 19072
10   (610) 510-7310
     amm@consumerslaw.com
11   Counsel for Plaintiff
12   REED SMITH, LLP
     BY:  MICHAEL O'NEIL, ESQUIRE
13   BY:  ALBERT E. HARTMANN, ESQUIRE
     10 South Wacker Drive
14   40th Floor
     Chicago, Illinois 60606
15   (312) 207-1000
     michael.oneil@reedsmith.com
16   albert.hartmann@reedsmith.com
     Counsel for Defendant
17
     ALSO PRESENT:
18   Anne Reader, Esquire - In-House Counsel for
     TransUnion LLC
19
     Yvette Samuel, Videographer
20
     Rayne Bennett, Paralegal for Mr. Soumilas
21
22
23
24

---

Page 3

1              I N D E X
2    WITNESS                    PAGE
3    DAVID B. LASATER, Ph.D.
4    EXAMINATION
5        By Mr. Francis        6, 192
         By Mr. O'Neil           169
6
7                  - - -
8            E X H I B I T S
9                         PAGE FIRST
     EXHIBIT NO.   DESCRIPTION      REFERENCED
10
     Lasater-1     Expert Report of David B.      12
11                 Lasater, Ph.D.
12   Lasater-2     Retention Agreement      33
13   Lasater-3     Invoices            33
14   Lasater-4     Rebuttal Expert Report of      168
                   David B. Lasater, Ph.D.
15
     Lasater-5     Supplemental Rebuttal Expert   168
16                 Report of David B. Lasater, Ph.D.
17
18
19
20
21
22
23
24

---

Page 4

1          THE VIDEOGRAPHER:  We are on
2    the record at 10:06 a.m., on May 5th,
3    2022.
4          This is the remote video
5    deposition of David Lasater, Ph.D., in
6    the case of Duane E. Norman, Sr., on
7    behalf of himself and all others
8    similarly situated, vs. TransUnion LLC,
9    filed in the United States District
10   Court, for the Eastern District of
11   Pennsylvania, No. 2:18-CV-05225-GAM.
12         This deposition is being held
13   remotely via Zoom video conferencing.
14         My name is Yvette Samuel, with
15   Summit Court Reporting, and I am the
16   certified legal videographer.  I am
17   recording this proceeding remotely.  The
18   court reporter is Andrea Brinton, also
19   with Summit.
20         The attorneys participating in
21   this proceeding acknowledge that neither
22   of us is physically present with the
23   witness and that the court reporter will
24   be reporting this proceeding remotely.

1 (Pages 1 to 4)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 5

1    They further acknowledge, in
2    lieu of an oath administered in person,
3    the witness will verbally declare that
4    his testimony in this matter is under
5    penalty of perjury.
6    The parties and their counsel
7    consent to this arrangement and waive any
8    objections at this time or in the future
9    to this manner of reporting and swearing
10   in the witness.
11   They also acknowledge and agree
12   that the official transcript is solely
13   the one transcribed by the court
14   reporter.
15   Counsel, for the record, please
16   indicate your agreement by stating your
17   name and that you agree, and please also
18   indicate who you represent, beginning
19   with plaintiff.
20   MR. FRANCIS:  Yes, good
21   morning.  This is Jim Francis, I
22   represent the plaintiff in the certified
23   class.  We agree and consent to the
24   remote taking of this deposition.

Page 6

1    MR. O'NEIL:  Good morning.
2    This is Michael O'Neil on behalf of
3    TransUnion and the witness.  We also
4    consent to the remote nature of the
5    deposition.
6    THE COURT REPORTER:  Doctor,
7    you're David Lasater, Ph.D.?
8    THE WITNESS:  I am.
9    - - -
10   DAVID B. LASATER, Ph.D., after having been
11   first duly sworn, was examined and testified as
12   follows:
13   - - -
14   EXAMINATION
15   - - -
16   BY MR. FRANCIS:
17   Q.  Great.  Good morning again, Dr. Lasater.
18   As you heard, my name is Jim Francis and I'm one of
19   the attorneys who represents the plaintiff in the
20   class that was certified in this case.
21   Today I'm going to be taking your
22   deposition because TransUnion submitted an expert
23   report from you -- purportedly from you in this
24   case -- or several reports, actually.  I think three

Page 7

1    as of yesterday.
2    From my review of your CV, it appears
3    that you've been deposed many times; is that correct?
4    A.  That's correct.
5    Q.  Okay.  So I'm assuming that you're
6    generally familiar with the process, but I'll just
7    give you a couple basic instructions that are
8    important for me.
9    If I ask you a question and you don't
10   understand my question, please let me know;
11   otherwise, I will assume that you understood my
12   question and you're answering it to the best of your
13   ability.
14   Do you understand that?
15   A.  I do.
16   And, Mr. Francis, as a -- as a -- as a
17   personal practice, in deposition, so that I do
18   understand your question and sometimes need to
19   concentrate on words in it, I have -- I have plain
20   paper that occasionally I will write your question on
21   or -- or a phrase from that question on that piece of
22   paper.
23   I'm very happy for you to have that
24   piece of paper if you need it or want it at the end

Page 8

1    of the deposition, but I want you to know that I --
2    that I have it.
3    Also, with respect to the reports,
4    for -- for efficiency, if you -- if -- if you are --
5    if you're all right with my having a clean hard copy
6    of -- of my reports, I have -- I have those three
7    here and would appreciate being able to use those,
8    and I -- and I affirm that they are newly printed
9    this morning, without any notes or -- or marginalia,
10   and so from -- just from the standpoint of the
11   process from this end, I wanted to advise of -- of
12   the situation that I'm in right now.
13   Q.  No, I appreciate that, and in going in your
14   order, I have no problem with you taking notes of my
15   questions, and I may or may not ask you to show me
16   those notes at the end.  I don't know that I will,
17   but I appreciate you mentioning that.
18   As for the three hard copy reports, I
19   think that's great, in fact, I prefer that, because
20   sometimes it's hard on the screen via Zoom to scroll
21   through some of these documents, it takes a little
22   while.
23   So that if you have a hard copy there,
24   like I do, I'm still going to put the reports on the

2  (Pages 5 to 8)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 9

1   screen so we have any particular excerpts that I want
2   to ask you about in front of us, in front of counsel,
3   but I'm going to be working off a paper copy as well,
4   so --
5       A.  Very good.
6       Q.  -- I appreciate -- I appreciate that.
7       A.  Very good.
8       Q.  Along those lines, do you have any other
9   documents that are in front of you, other than that
10  blank paper you showed me on the screen and your
11  three reports?
12      A.  I have the -- I have a -- I have a binder
13  that has the -- that has the -- that has the
14  exhibits, also newly printed this morning, so
15  exhibit -- the -- the exhibits to the reports are in
16  a ring binder separate from the -- separate from the
17  reports.
18      Q.  That's perfect.  That's great.  And in
19  terms of your -- your binder, is your CV part of the
20  report or is it within -- or do you consider that
21  part of the exhibits in the binder?
22      A.  Let me see how it was printed, Mr. Francis.
23      Q.  Sure.
24      A.  Evidently, it's in the -- it's -- it's in

Page 10

1   the ring binder.
2       Q.  Okay.  So when I mark your report, I'm
3   going -- the first report, I'm going to mark the
4   report, along with the annexes and the exhibits, as
5   one document.
6           MR. FRANCIS:  So that's just
7       for you, Andrea.  We can talk about that
8       later, but there are numerous attachments
9       and exhibits, but it's -- we have it as
10      one -- one document.  Okay.  So we're
11      good and ready to go.
12  BY MR. FRANCIS:
13      Q.  All right.  So I was giving you
14  instructions, Dr. Lasater, and, as I said, I'm going
15  to abbreviate them because of your extensive
16  experience in testifying.
17          You, no doubt, are aware that during
18  the course of the deposition, counsel may state an
19  objection to the record or something like that.
20  We -- I don't pay any attention to those unless he
21  instructs you not to answer.
22          So despite the fact that there's an
23  objection made, I will expect you to answer the
24  question.

Page 11

1       Q.  Do you understand that?
2       A.  Very well.
3       Q.  Okay.  If at any point of the deposition
4   you don't understand what I'm saying or if the audio
5   doesn't transcribe correctly, let me know that so we
6   have a clear understanding of what I'm asking and
7   what you -- and the question that you're answering.
8           So just let me know if you can't hear
9   me, especially in light of the audio concerns that
10  the court reporter identified earlier; okay?
11      A.  Very well.
12      Q.  All right.  And, sir, you are aware that
13  even though we're not sitting in a courtroom today
14  and in front of the judge and/or the jury, who may
15  ultimately hear this case, you are aware that the
16  testimony that you give today is subject to the
17  penalty of perjury?
18      A.  I do.
19      Q.  Okay.  Great.
20          MR. FRANCIS:  All right.  So,
21      Rayne, what I would like to do right now
22      is mark the expert report dated March
23      11th, 2022 of David B. Lasater, Ph.D. as
24      Lasater-1.

Page 12

1   BY MR. FRANCIS:
2       Q.  And as I said earlier, Dr. Lasater, I'm
3   referring to this exhibit, Exhibit 1, as something
4   which contains Annexes 5 and 6, and the training
5   manual, as well as your CV.
6           So what I would like to do right now
7   is turn your attention to your resume, what you call
8   5.1, Resume and Rule 26 Disclosure, and ask you some
9   questions about it.
10      A.  Very good.
11      Q.  Okay.  Do you have it in front of you?
12      A.  I do.
13      Q.  So what I have in front of me appears at
14  the pages -- would be page 32 through 35.
15          Do you have that at the bottom of your
16  pages?
17      A.  I do.
18      Q.  Okay.  Great.  So is there anything missing
19  from your resume, slash, CV that -- that -- in terms
20  of your experience or your education?
21      A.  A -- one -- one line item in the -- let me
22  see if it's here.
23          One line -- line item in the heading
24  of trial testimony.

3  (Pages 9 to 12)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 13

1    Q.  Okay.
2    A.  Most recently I testified in an
3  international arbitration.  The -- the parties were a
4  Brazilian cell phone provider named Surf, S-U-R-F,
5  and its parent company, which is based in New Delhi,
6  Plintron.
7    Q.  Okay.  Other than that -- go ahead.
8    A.  That's the only thing that's missing.
9    Q.  Okay.  All right.  Just so we have a clean
10  record of it, would you just identify your education
11  for the record, please.
12    A.  Yes, sir.  I have an undergraduate -- an
13  undergraduate degree in accounting from the
14  University of Houston; I have a master's degree in
15  professional accounting, and a Ph.D. in accounting
16  research methodologies, financial markets and
17  quantitative methods from the University of Texas.
18    Q.  Okay.  Let's go in order.
19      When did you get your BA in accounting
20  in Houston?
21    A.  December 1973.
22    Q.  And did you say that was the University of
23  Houston?
24    A.  That is the University of Houston.

---

Page 14

1    Q.  Okay.  And then you said you got a master's
2  in accounting; is that right?
3    A.  Yes, I took the master's degree and the
4  Ph.D. concurrently.  The master's degree was granted
5  in, I believe, 1979; and the Ph.D. was conferred,
6  upon the completion of my dissertation, in 1982.
7    Q.  Okay.  And where did you go for both of
8  those degrees?
9    A.  Again, the -- the master's -- the master's
10  in professional accounting and the Ph.D. are at the
11  University of Texas at Austin.
12    Q.  Okay.  In connection with any of the
13  degrees that you obtained and the institutions that
14  you attended, did you take any courses in computer
15  science?
16    A.  Yes.
17    Q.  Okay.  When -- what courses did you take in
18  computer science?
19    A.  I took courses in computer science at the
20  University of Houston as part of the business and
21  accounting program, the focus was on Fortran language
22  programming.
23      I took computer science courses at the
24  University of Texas dealing with machine language and

---

Page 15

1  recursive algorithms, two different courses.
2    Q.  Okay.  Two different courses at the
3  University of Texas, and how many courses at the
4  University of Houston?
5    A.  Again, in the computer science department,
6  one at the University of Houston and two at the
7  University of Texas.
8    Q.  Gotcha.  Okay.  Did you receive any degree
9  from either of those institutions in computer
10  science?
11    A.  No.
12    Q.  And did you receive any degrees from either
13  of those institutions in engineering of any sort?
14    A.  No.
15    Q.  Okay.  Did you take any coursework or
16  receive any degrees from either of those institutions
17  in psychology?
18    A.  No.
19    Q.  Did you take any courses or did --
20    A.  I'm sorry.  I'm sorry.  Did --
21  did -- I'm sorry, did you say did I take any courses
22  in psychology and receive any degrees.  If that's
23  what you asked, I have to back up and -- and change
24  my answer, please.

---

Page 16

1    Q.  Okay.  Did you take any coursework in
2  psychology?
3    A.  Yes, sir, at least -- at least two courses
4  in the undergraduate program at the University of
5  Houston, and at least three courses in my master's
6  and doctoral program at the University of Texas.
7    Q.  Okay.  Did you receive any degrees from
8  either of those institutions in psychology?
9    A.  No, sir.
10    Q.  Did you take any coursework or engage in
11  any studies at either university in linguistics?
12    A.  Not by that title.
13    Q.  Did you take any coursework from either of
14  those universities in something which was similar, or
15  that you think was similar -- similar, to linguistics
16  that had a different title?
17    A.  Well, in relation to the -- in relation to
18  the psychology courses, the use of language,
19  especially -- especially as language is provided
20  in -- in decision rules, is important, and so to the
21  extent that the language of decision rules was part
22  of the master's and doctoral program at the
23  University of Texas, I would say yes.
24    Q.  Okay.  And did you receive any degrees from

---

4 (Pages 13 to 16)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 17

1    either of those -- those universities you mentioned
2    in linguistics?
3         A.   No, sir.
4         Q.   Are there any other educational degrees
5    that you hold, other than the ones you've identified?
6         A.   No, sir.
7         Q.   Okay.  Subsequent to graduating from the
8    University of Texas with your Ph.D. and up until now,
9    have you taken any coursework in computer science?
10        A.   I think that's a hard -- when you say taken
11   any coursework in computer science, throughout the
12   training at -- at the St. Charles facility of Arthur
13   Andersen, with whom I was employed from 1988 until
14   2002, and prior to that, while I was on the faculty
15   at Michigan State University, between 1980 and 1988,
16   I was exposed to a lot of programming, a lot of
17   program development.
18             Computer science -- computer science
19   programming is fundamental to the work that -- that I
20   and my teams do, to the extent that we stay abreast
21   of changes in -- in either analytic platforms or
22   languages that are used in both data analysis and in
23   the statistical processing of data, I would say that
24   each -- each step of the way is one that has training

Page 18

1    associated with it.
2         Q.   Okay.  You're referring to work situations;
3    correct?
4         A.   Yes, sir.
5         Q.   Okay.  Subsequent to graduating from the
6    University of Texas with your Ph.D. in 1982, did
7    you -- have you attended any schools or institutions
8    in connection with a computer science program or
9    course?
10        A.   And when you say schools, do you mean
11   stand-alone and separate from anything that would be
12   offered in a professional environment?
13        Q.   Yes.
14        A.   The answer would be no.
15        Q.   Okay.  And you mentioned that you had
16   exposure -- among other things, you mentioned that
17   you had exposure to computer science within -- in
18   connection with those two work situations you
19   mentioned.
20             Putting aside education, did you have
21   any or -- did you have any further exposure to
22   computer science since 1988?
23             MR. O'NEIL:  Objection, vague.
24             THE WITNESS:  Well, computer

Page 19

1    science is -- is fundamental to my
2    everyday work, Mr. Francis, and so
3    exposure is -- exposure is a really soft
4    term here.
5    BY MR. FRANCIS:
6         Q.   Okay.  Since 1988, have you received any
7    formal training from either -- any employer in
8    connection with computer science?
9             MR. O'NEIL:  Objection, vague.
10            THE WITNESS:  Once again,
11   training at Arthur Andersen, at our St.
12   Charles facility, would have included
13   courses that are offered at that
14   facility, which is just west of -- just
15   west of Chicago.  As -- as new
16   technologies were implemented, we were
17   trained on those technologies.  Same
18   thing -- same thing within FTI.
19   BY MR. FRANCIS:
20        Q.   Okay.  When was the last time you received
21   any training in computer science?
22        A.   Formal training in computer science, where
23   I received it or sought it and learned it on my own?
24        Q.   Where you received it.

Page 20

1         A.   Where someone -- where someone else was in
2    front of the room or on a screen presenting?
3         Q.   Correct.
4         A.   Probably 1999 or 2000.
5         Q.   Do you have any certifications in computer
6    science?
7         A.   No.
8         Q.   Does the first page of your resume, slash,
9    CV, does it accurately identify your work history?
10        A.   It summarizes it.  It's a long -- it's a
11   long history.
12        Q.   In connection with your work history, have
13   you ever worked in any role that you would consider
14   to be an IT role?
15            MR. O'NEIL:  Objection, vague.
16            THE WITNESS:  When you say IT
17   role, Mr. Francis, our understanding of
18   that, mine and yours, might be different,
19   so perhaps if you would give me some
20   ideas about what you're thinking, I'd be
21   able to better answer.
22   BY MR. FRANCIS:
23        Q.   Sure.  Like if corporations have IT
24   departments, right, where somebody goes there and --

5 (Pages 17 to 20)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 21

1    with a question or that department performs a
2    function which we identify as IT, that's what I'm
3    referring to, but if you have a -- if you think you
4    have a history -- a work history in IT, let me know
5    what that is.
6        A.  I think you said exposure or -- or
7    experience, and so I'm trying to -- I'm trying to
8    answer your question.
9        Q.  Have you ever been paid to serve in an IT
10    role to any company?
11        A.  I understand IT, Mr. Francis, and I'm going
12    to define it here, in terms of the provision of the
13    hardware, the provision of the software, the
14    maintenance of those two elements of data management
15    and data usage, and so I have never been in a, what
16    I'll call, box and wires role, and I have never been
17    in a software maintenance role.
18        Q.  Okay.  Have you ever written any
19    programming language in connection with a work
20    assignment?
21        A.  Oh, yes.
22        Q.  All right.  Similar question with regard to
23    engineering; have you ever served in any type of
24    engineering role in your work history for any

Page 22

1    company?
2        A.  Not by that title, no, sir.
3        Q.  Okay.  Since graduating from the University
4    of Texas with your Ph.D. back in 1982, have you taken
5    any formal courses in psychology?
6            MR. O'NEIL:  Objection, asked
7        and answered.
8            THE WITNESS:  Only with respect
9        to employee relations within the
10        organizations that I have been involved
11        in.
12    BY MR. FRANCIS:
13        Q.  Okay.  Were those formal --
14        A.  And those were --
15        Q.  -- courses?
16        A.  And those were -- those were extensive.
17        Q.  And those were formal courses?
18        A.  Yes, they are.
19        Q.  Okay.  And what formal courses in
20    psychology did you take in connection with the
21    employment role you mentioned?
22        A.  Many dimensions of -- many dimensions of
23    employee relations.
24        Q.  Okay.  And you took courses?

Page 23

1        A.  Courses that were -- courses that were
2    offered, courses that were part of the training
3    programs at each of the -- at each of the employers.
4        Q.  Okay.  And when was the last time you took
5    a psychology course at one of those employers?
6        A.  Maybe six months ago.
7        Q.  Okay.  All right.  In connection with any
8    of your degrees, did you take any coursework in
9    communications?
10        A.  Yes.
11        Q.  Okay.  How many different courses did you
12    take in communications?
13        A.  At least two; one in undergraduate school
14    and one in the master's program.
15        Q.  Okay.
16        A.  And when we -- when we say communications,
17    I'm -- I'm excluding marketing from that.
18        Q.  Okay.
19        A.  If we -- if we include marketing, then the
20    course count probably goes to six.
21        Q.  Okay.  Since 1982, when you graduated from
22    the University of Texas, have you taken any other
23    coursework in communications or communication
24    studies?

Page 24

1        A.  No.
2        Q.  And, likewise, do you have any degrees in
3    communications or communication studies?
4        A.  No.
5        Q.  Since graduating from the University of
6    Texas back in 1982 with your Ph.D., have you taken
7    any formal coursework in linguistics?
8        A.  No.
9        Q.  Have you ever worked for a credit repair
10    organization?
11        A.  Not to my knowledge.
12        Q.  Okay.  Have you ever been involved with a
13    professional assignment, or work assignment, which
14    involved a credit repair organization?
15        A.  Not to my knowledge.
16        Q.  Okay.  At any point, either in your
17    education or your work history, did you receive any
18    training or education in fraud detection?
19        A.  Vast.
20        Q.  Okay.  Tell me about your training in fraud
21    detection.
22        A.  Fraud detection becomes a part of the
23    auditing element of accounting -- formal accounting
24    education, and -- and that continued from both the

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

**Norman, Sr. v. Trans Union, LLC**                     **DAVID B. LASATER, Ph.D., 5/5/22**

Page 25

1    undergraduate program through the master's degree
2    program and the -- and the doctoral program.
3            Fraud detection is -- is an essential
4    element of the work that I do every year, I won't say
5    every day, but every year, where -- where fraud
6    detection is an element of making sure that financial
7    statements are faithfully presented or that
8    transactions, both domestic and foreign, are in
9    compliance with anti-fraud regulations.
10        Q.   Okay.  So are you saying that your
11   experience with fraud detection relates to the
12   preparation of financial statements?
13        A.   With respect to -- with respect to any
14   representation or any transaction that would take
15   place differently but for the fraud.
16        Q.   Okay.  Have you ever received any training
17   in terms of consumer fraud detection?
18        A.   I work in consumer fraud regularly.
19        Q.   Okay.  Can you show me where on your CV, or
20   your resume, where you reference working in consumer
21   fraud detection.
22        A.   Well, so -- so in the -- in the
23   mortgage-backed securities litigation environment, in
24   the CFPB environment, the detection of

Page 26

1    misrepresentation by either applicants -- applicants
2    for mortgages or in the area of applicants --
3    applications -- I said applications for mortgages, I
4    think that would be it, where -- where -- where
5    persons make representations with respect to those
6    applications that are full of misrepresentations.
7        Q.   Okay.  And at which point in your career or
8    when in your career were you looking at fraud --
9    fraud situations in connection with consumer mortgage
10   applications?
11        A.   Once again, with respect to the residential
12   mortgage-backed securities litigation, beginning in
13   2011.
14        Q.   Okay.  And then, when was the last time you
15   had any role or assignment in terms of looking at
16   fraud situations in connection with consumer mortgage
17   applications?
18        A.   Oh, probably 18 months ago.
19        Q.   Okay.  Have you received any formal
20   training in terms of handwriting analysis?
21        A.   No, and -- and -- and, Mr. Francis, it occurs to
22   me also to say that with respect to consumer
23   applications in the -- in the banking environment for
24   loans separate from mortgages but also in the banking

Page 27

1    environment where CFPB is looking at fair lending,
2    the question is with respect to the fair lending in
3    the -- on the application side of -- of the
4    transaction between banks and their -- and their
5    customers is also the potential for applicant
6    misrepresentations and the ability to detect that
7    using -- using other means.
8        Q.   Okay.
9        A.   So -- so I didn't answer your next
10   question, I'm sorry.
11        Q.   No, I think you did.  I asked you whether
12   or not you had any formal education or training in
13   terms of handwriting analysis.
14            I think your answer was no; correct?
15        A.   Correct.
16        Q.   Okay.  And have you had any experience in
17   terms of any administration of -- or use of polygraph
18   or lie detectors?
19        A.   No, sir.
20        Q.   Do you have any certifications in the Fair
21   Credit Reporting Act?
22        A.   No, sir.
23        Q.   In connection with your role as an expert
24   witness, outlined in your resume, have you ever

Page 28

1    served as an expert witness on behalf of a consumer
2    plaintiff?
3        A.   I'm pausing, Mr. Francis, because my -- my
4    work history is long, so I'm -- I'm trying to recall.
5            As a household consumer, the answer
6    would be no --
7        Q.   Okay.  On page --
8        A.   -- based on -- based on -- based on my
9    recollection.
10        Q.   Okay.  On page 1 of your CV, you reference
11   that your litigation experience includes securities
12   class actions, employment class actions, product
13   liability class actions, among other types of cases.
14            In any of the securities class actions
15   or employment class actions or product liability
16   class actions that you had experience with, were you
17   employed on behalf of the plaintiff?
18        A.   Not to my recollection.
19        Q.   In your CV, specifically at pages 33, 34
20   and 35, you mention and you reference a bunch of
21   cases, excuse me, that you testified in.
22            Are you aware of any written court
23   decisions which held that you were qualified to serve
24   as an expert witness in that particular case?

7 (Pages 25 to 28)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 29

1    A.  Every single one of the trial testimony
2    references.
3    Q.  Okay.  So is it your -- it's your testimony
4    that for all of the trial testimony that you
5    reference at page 33, there is a written finding from
6    the Court that you were qualified to serve as an
7    expert witness?
8    A.  Yes, sir, because in each of those -- in
9    each of those cases, counsel would have proffered me
10   as an expert and the Court would have accepted me or
11   not and accepted my testimony or not.
12   Q.  Well, I'm aware of generally how that
13   works.
14       My question for you is, is there going
15   to be a written decision or finding in each one of
16   those cases?
17   A.  There would be in the transcript somewhere,
18   certainly.
19   Q.  Okay.  Other than what would be in the
20   trial transcript, do you know of any written court
21   decisions finding that you were qualified to serve as
22   an expert over an objection from an opposing counsel?
23   A.  I don't know.  A lot of that is often
24   behind the scenes, so I'm not -- I'm not aware of

Page 30

1    any -- of any -- any separate -- any separate
2    decisions --
3    Q.  Okay.  And --
4    A.  -- except for -- go ahead.
5    Q.  And for --
6    A.  Go ahead.
7    Q.  And for the trial testimony that you
8    referenced at page 33, what was the area of expertise
9    or knowledge that you were designated or found
10   qualified to testify about?
11   A.  Mr. Francis, I've tried to indicate, for
12   economy in -- in this discussion, the areas there,
13   and I think I see only one entry that doesn't have
14   the bold, where I've tried to provide definitions.
15       So in each of those where those
16   components were of analysis and testimony were
17   required, the Court accepted my analysis and my
18   representations.
19   Q.  I see.  And are you referring to the S, R
20   and V designations which precede the case names?
21   A.  Yes, sir.
22   Q.  Okay.  Have you ever been qualified by a
23   court to offer expert testimony in the area of fraud
24   detection?

Page 31

1    A.  No, sir.
2    Q.  And have you ever been found qualified to
3    serve as an expert witness in the area of
4    linguistics?
5    A.  No, sir.
6    Q.  Have you ever been found qualified to
7    testify in the area of communication studies or
8    communications?
9    A.  No, sir.
10   Q.  Have you ever been found qualified to serve
11   as an expert witness in terms of Fair Credit
12   Reporting Act compliance?
13   A.  Not yet, no, sir.
14   Q.  Okay.  Have you ever been found qualified
15   to serve as an expert witness in the area of computer
16   science?
17       MR. O'NEIL:  Objection, vague.
18       THE WITNESS:  Once again, where
19   large databases are involved, where the
20   processing of data from these databases
21   are involved, where the computer -- the
22   computer requirements for that and the
23   discussion -- the discussion with respect
24   to the evidential quality of that

Page 32

1    analysis as computers are used in it, the
2    answer would be yes.
3        In terms of -- in terms of pure
4    computer science, I'm not aware of
5    litigation that, except in patent
6    litigation, that -- that deals with pure
7    computer science, so the answer is no.
8    BY MR. FRANCIS:
9    Q.  And have you ever been qualified to serve
10   as an expert witness in the area of IT?
11   A.  Once again, it's a vague question, Mr.
12   Francis, because in the area of IT, if we're talking
13   about box and wires or the maintenance of software,
14   the answer is no.
15   Q.  Okay.
16   A.  The application of it for use in bringing
17   evidence to a courtroom, yes.
18   Q.  Okay.  But you're not aware in connection
19   with any of the cases where a Court found that you
20   could serve as an expert witness and testify in the
21   area of IT generally.
22       MR. O'NEIL:  Objection, vague.
23       THE WITNESS:  Once again, as it
24   pertains to box and wires and the

8 (Pages 29 to 32)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 33

1   maintenance of software or the
2   appropriate application of software in a
3   particular situation, with respect to the
4   latter, the answer is yes, with respect
5   to the maintenance of the software, the
6   answer is no.
7       MR. FRANCIS:  Okay.  Rayne,
8   would you please mark as Lasater-2 the
9   retention agreement that was received
10  yesterday or two days ago, whenever it
11  was; and, as No. 3, the invoices that
12  were also included, and then let's start
13  with Lasater-2.
14  BY MR. FRANCIS:
15      Q.  Dr. Lasater, I've marked as Lasater-2 a
16  document that was provided to us recently, it's Bates
17  labeled DL1 through DL10.
18          Do you have that in --
19      A.  I don't.
20      Q.  -- here?
21          You don't have that with you?
22      A.  No, sir.
23          MR. FRANCIS:  Okay.  Rayne,
24  let's put that up on the screen.

Page 34

1   BY MR. FRANCIS:
2       Q.  Okay.  Dr. Lasater, I've had my assistant,
3   Rayne Bennett, put up on the screen a document that
4   was supplied in connection with a subpoena that was
5   served in connection with your deposition, and what
6   I'm going to do is give you mouse control over this
7   document.  You can take your -- your cursor and
8   scroll through it.  I just have a few questions for
9   you about this.
10      A.  I can take control, but if you want to
11  scroll through it and ask the questions, I'm fine
12  with that.
13      Q.  Sure.  My first question is, does this
14  document -- let me try.
15          Does this document identify the
16  retention agreement between you and your company and
17  TransUnion in this case?
18          MR. O'NEIL:  Objection, vague.
19          THE WITNESS:  It appears to be
20  an unsigned copy of it, yes, sir.
21  BY MR. FRANCIS:
22      Q.  Okay.  And do I read this correctly to mean
23  that you were first retained by TransUnion in this
24  litigation on or about June 1, 2021?

Page 35

1       A.  Yes, sir.
2       Q.  Okay.  Had you had any involvement in
3   working for TransUnion in this litigation prior to
4   June of 2021?
5       A.  No.
6       Q.  Okay.  Putting aside this litigation, had
7   you ever worked for TransUnion or worked on a matter
8   in which TransUnion was a party prior to this case?
9       A.  Not to my recollection.
10      Q.  Okay.  And putting aside TransUnion, had
11  you ever worked for or at the direction of anybody
12  from Reed Smith in connection -- in serving as an
13  expert witness?
14      A.  Yes.
15      Q.  Okay.  And prior to June of 2021, had you
16  worked with TransUnion's counsel in this matter?
17      A.  No.
18      Q.  And prior to June of 2021, had you ever
19  been involved as an expert witness in any case that
20  involved claims under the Fair Credit Reporting Act?
21      A.  Ask me your question again, please, Mr.
22  Francis.
23      Q.  Prior to June of 2021, when you got this
24  case, had you ever been formally retained to serve as

Page 36

1   an expert witness in any case which involved claims
2   under the Fair Credit Reporting Act?
3       A.  Let me answer -- let me answer the
4   question, Mr. Francis, in terms of the general nature
5   of a retention agreement like the one that we have
6   here on the screen.
7           Very often the retentions begin with
8   consultation on a privileged basis to counsel and --
9   and the retention changes from a privileged
10  consulting to an expert -- to an expert witness
11  consulting at a particular point in time, and so
12  almost every engagement that I'm involved in begins
13  that way.  I can't imagine any that I have done in --
14  in the last 20 years that began as I will serve as an
15  expert witness.
16          And so it's understood that to the
17  extent that I accumulate knowledge and the evidence
18  is such that -- that counsel selects me to present it
19  through a report or -- or in a forum, then the answer
20  is that, as a long preface to your question, I am
21  working on other matters involving the Fair Credit
22  Reporting, involving my design of statistical
23  analyses in relation to those matters that are
24  separate from this matter with TransUnion.

9 (Pages 33 to 36)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 37

1    Q.   Okay.  Prior to June of 2021, had you ever
2  submitted an expert report on behalf of a client in
3  connection with a Fair Credit Reporting Act matter?
4    A.   I have not signed a report, no, sir.
5    Q.   Okay.  Is it your testimony that while you
6  have not signed a report involving a Fair Credit
7  Reporting Act case, you have consulted with clients
8  for -- in cases which involved Fair Credit Reporting
9  Act claims; is that -- do I have that correctly?
10    A.   Yes, I -- I design -- I designed the work
11  that engagement teams do where others may testify,
12  may develop reports and may testify, and so to the
13  extent that my work is -- is part of those teams or a
14  supplement to those teams, the answer is yes.
15         I have not been asked to sign a
16  report, but it is also possible in the future that I
17  could --
18    Q.   Okay.
19    A.   -- but I'm -- but I'm involved in matters
20  right now that involve the FCRA.
21    Q.   Matters in which you're not serving as a
22  retained expert; is that right?
23    A.   Once again, the retentions -- the
24  retentions are not usually designated as you are

---

Page 38

1  retained as an expert.  You are retained as a
2  consulting -- privileged consulting expert, but
3  not -- but not initially as a reporting or testifying
4  expert.  It's rare that --
5    Q.   All right.
6    A.   -- it's rare that we have retentions that
7  designate that.
8    Q.   Okay.  Prior to June of 2021, when you
9  first signed your retention agreement in this case,
10  am I correct that you had never testified in a Fair
11  Credit Reporting Act case; is that right?
12    A.   That would be fair.
13    Q.   Okay.  And in terms of the trial testimony
14  and deposition testimony listed on pages 33 and 34 of
15  your resume, am I correct that none of those cases
16  involved FCRA matters?
17    A.   That would be correct.
18    Q.   Okay.  Now, since June of 2021, have you
19  submitted any other reports, expert reports, in a
20  Fair Credit Reporting Act case, other than this case?
21    A.   Submitted to the process that would lead to
22  a deposition, the answer is no.
23    Q.   Okay.  And currently, do you have any other
24  depositions scheduled or on the horizon in which you

---

Page 39

1  will be testifying in connection with a Fair Credit
2  Reporting Act case?
3    A.   None scheduled.
4    Q.   Okay.  Currently, are there any other cases
5  in which you've been retained to serve as a
6  testifying expert in a Fair Credit Reporting Act
7  case?
8    A.   No, again, because -- because of the
9  nature -- the nature of the usual retention
10  agreement, there is not a -- there is not an ex-ante
11  designation of expert in those retentions usually.
12         MR. O'NEIL:  Mr. Francis, we've
13  been going for a little bit over an hour.
14  Would this be a good time to take a short
15  break?
16         MR. FRANCIS:  Sure.  Why don't
17  we take, I don't know, seven to ten
18  minutes.
19         MR. O'NEIL:  Thank you.
20         MR. FRANCIS:  Okay.
21         MR. O'NEIL:  Off the record.
22         THE VIDEOGRAPHER:  Off the
23  video record, 11:02 a.m.
24         (Brief recess.)

---

Page 40

1         THE VIDEOGRAPHER:  We are back
2  on the video record, 11:13 a.m.
3  BY MR. FRANCIS:
4    Q.   Before we took a short break, Dr. Lasater,
5  I was asking you about the retention agreement at
6  Lasater-2.
7         On the first page of that document,
8  there are a series of hourly rates that are listed,
9  with the senior managing director being at 775 and a
10  consultant being at 320.
11         Do you see that?
12    A.   Yes, sir.
13    Q.   And am I correct that you are -- for your
14  work in this case, you are billing at the 775 rate;
15  is that right?
16    A.   That would be correct.
17    Q.   Okay.  And I didn't ask you before, but
18  with your title as senior managing director, how many
19  people do you manage or direct?
20    A.   As many as necessary for the completion of
21  an engagement.
22    Q.   Okay.
23    A.   Anywhere between two and 100.
24    Q.   And based upon your CV, CV or resume,

---

10  (Pages 37 to 40)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 41

1  however you want to designate it, am I correct that
2  FTI does litigation consulting?
3      A.  Yes, sir.
4      Q.  And what percentage of the company's work
5  is assisting companies with litigation?
6      MR. O'NEIL:  Objection, lack of
7  foundation.
8      THE WITNESS:  That's a really
9  hard question, Mr. Francis, because we
10  are a 2.8 billion-dollar company --
11  BY MR. FRANCIS:
12      Q.  Okay.
13      A.  -- with 650 senior managing directors --
14      Q.  Okay.
15      A.  -- in a wide variety of practices, where we
16  are in legal forums or reporting to legal forums
17  regularly, and so I can't say what percentage.
18      Q.  The company --
19      A.  -- I would have -- I would have no idea.
20      Q.  Okay.  The company does things other than
21  provide expert witness services for litigation;
22  correct?
23      A.  I would say that most of our work is not
24  with respect to expert witness.  As -- as I had

Page 42

1  mentioned at the top of the -- at the top of the
2  discussion about the retention agreement, most of our
3  work is with respect to data analysis, advising --
4  advising clients in a wide variety of circumstances,
5  and only occasionally -- only occasionally are we
6  asked to expertize with that.
7      Q.  Okay.  What percentage of your work is
8  devoted to serving as an expert witness in litigation
9  matters like this one?
10      A.  Once again, if we limit the discussion to
11  that part which is once -- once there has been a
12  determination that I would testify, it's probably
13  five percent.
14      Q.  Okay.  And how about the first situation,
15  where it hasn't been decided whether you're going to
16  testify, but you're still helping out, what
17  percentage of your work relates to assisting
18  companies with litigation in a situation like that?
19      A.  Well, we do a lot of investigative work,
20  Mr. Francis, and so the -- the preparation for that,
21  the development of the -- the development of the
22  evidence, the evaluation of the object of the
23  investigation is -- is wide ranging in a wide variety
24  of forums, in a wide variety of geographies.

Page 43

1      Q.  Okay.  So are you saying you don't know
2  what percentage of your time is devoted to working as
3  an expert witness for a company in connection with
4  litigation for which it hasn't been decided whether
5  or not you're going to provide a report?
6      A.  We are -- we are a -- we are a company that
7  addresses all kinds of crisis matters, and so I can't
8  begin to -- I can't begin to put a percentage on it.
9      MR. FRANCIS:  Okay.  Rayne,
10  let's pull up now Lasater-3, which is
11  the -- the invoices.
12  BY MR. FRANCIS:
13      Q.  Okay.  Dr. Lasater, I put up as Exhibit
14  Lasater-3 a series of pages, beginning with a letter
15  from you to Mr. O'Neil dated July 28th, 2021, which
16  appears to include an invoice for your services -- or
17  for FTI services in this case.
18      Do you see that?
19      A.  I do.  Would you scroll down to -- you can
20  see that it is not from me, it is from Lisa
21  Harrington.
22      Q.  Okay.  And do you recognize this as an
23  invoice that would have been sent by FTI to Mr.
24  O'Neil back then?

Page 44

1      A.  Yes, it's the FTI form, yes, sir.
2      Q.  Okay.  And there are a series of pages of
3  bills in here.
4      Do you have any idea to date what FTI
5  has billed TransUnion for this case?
6      A.  I have no idea.
7      Q.  Do you have any idea to date how many hours
8  FTI has spent on this case?
9      A.  I could find out, Mr. Francis, but it's
10  not -- it's not a statistic that I know or care
11  about.
12      Q.  And does Lasater-3 generally represent the
13  appearance and format of the invoices that FTI sends
14  to its clients?
15      A.  Yes, sir.
16      Q.  Okay.  And in this case, on this page on
17  the screen, there are -- there's a reference to other
18  individuals, a Steven McNew, Lisa Harrington and
19  Michael Kreppel.
20      Do you see that?
21      A.  I do.
22      Q.  Are those all individuals who work for FTI
23  under your supervision in this matter?
24      A.  They work -- they work beside me.  Mr.

11  (Pages 41 to 44)

Page 45

1    McNew and Mr. Kreppel work in a different -- in a
2    different subgroup of our practice.  Ms. Harrington
3    works for me on this matter.
4        Q.   Okay.  Are there any other individuals at
5    FTI who have rendered services for TransUnion in this
6    case, other than you and those three other
7    individuals?
8        A.   Yes, sir.  They would be on any -- any
9    other invoices that you might have received.
10       Q.   Okay.  Okay.  Do you know whether you or
11   anyone else -- strike that.
12           MR. FRANCIS:  Okay.  Rayne, you
13       can take that down, and then let's just
14       go back to Lasater-1, which is the -- his
15       first report.
16   BY MR. FRANCIS:
17       Q.   And so, Dr. Lasater, one of the things I
18   try to do to move the deposition along is tell you
19   where I'm going and what I'm looking at, so that we
20   can kind of be on the same page.
21           So right now I'm going to move into
22   your report, it's dated March 11th, 2022, and feel
23   free to use your paper copy or -- or if you want
24   something put up on the screen, I might do a

Page 46

1    combination of both, but let me just ask you
2    generally about this report that's dated March 11th,
3    2022.
4           So am I correct that you were asked by
5    TransUnion in this case to render the -- the March
6    11th, 2022 report; is that right?
7        A.   Yes, sir.
8        Q.   Okay.  And do you recall when you first
9    began doing work in connection with that assignment?
10       A.   When I began working on the analysis that
11   is reflected in this report --
12       Q.   Yeah, any -- when was the first time you
13   began doing any work in connection with the
14   assignment that TransUnion gave you that led to the
15   March '22 report?
16       A.   It would be reflected on the first invoice
17   that you would have in your hands --
18       Q.   Okay.
19       A.   -- which I -- which I don't have in front
20   of me.
21       Q.   In terms of the analysis that you
22   performed, in your report you identify certain
23   documents that you considered; correct?
24       A.   Yes, sir.

Page 47

1           MR. FRANCIS:  Okay.  And then,
2       let's put up, Rayne, it's page 37 of his
3       report, that's what he identifies as
4       Annex -- well, it's in Annex 5.2.
5    BY MR. FRANCIS:
6        Q.   And one quick question, Dr. Lasater, at --
7    at paragraph 8 of your report, you reference that --
8    that a copy of your resume is attached as an annex,
9    6.1.
10       A.   Oh, that would probably be an error.
11       Q.   Yeah, and I was going to ask you if that
12   was an error, because the 6.1 that I have is a list
13   of the sampled letters and coding.
14           So that's incorrect; right?
15       A.   Yes.
16       Q.   You mean 5.1; right?
17       A.   That would be -- that would be a typo, yes,
18   sir.
19       Q.   Okay.  All right.  Now, let's look at what
20   you defined as Annex 5.2.
21           Does Annex 5.2 accurately capture the
22   documents that you reviewed in connection with the
23   analysis -- or an analyses set forth in your report?
24       A.   Yes.

Page 48

1        Q.   Okay.  Are there any documents that you
2    reviewed and/or relied upon in connection with
3    rendering the opinions that are set forth in your
4    March '22 report that are not captured in 5.2?
5           MR. O'NEIL:  Objection to form,
6       compound.
7           THE WITNESS:  When you say
8       relied on, Mr. Francis, you will have to
9       appreciate that the -- the practice that
10      I do is a four -- a four decades' old
11      development of -- of experience and
12      knowledge that has a whole library of
13      documents behind it, and so -- and when
14      we say documents, I mean -- I mean
15      textbooks, journal articles,
16      experiences -- experiences with
17      conferences.
18          And so it would -- when we say
19      relied on, we have an indirect reliance
20      on a vast -- on a vast amount of
21      material; direct reliance is here.
22   BY MR. FRANCIS:
23       Q.   When you say direct reliance is here, do
24   you mean the documents in 5.2?

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 49

1    A.  I do.

2    Q.  Okay.  Are there any documents that you

3  directly relied upon that are not captured in 5.2?

4    A.  For purposes of -- for purposes of

5  Lasater-1, answer, no.

6    Q.  Okay.  For example, did you review any of

7  the responses to interrogatories or supplemental

8  responses to interrogatories that TransUnion served

9  in this case?

10    A.  No, sir.

11    Q.  Have -- have you ever seen to date any of

12  the written responses to interrogatories or responses

13  to supplemental interrogatories of TransUnion that

14  were exchanged or served in this case?

15    A.  Not to my recollection, no, sir.

16    Q.  All right.  Have you ever reviewed any of

17  the deposition transcripts in this case?

18    A.  No, sir.

19    Q.  Okay.  Putting aside documents -- well,

20  strike that.

21       Have you ever reviewed any of the

22  TransUnion consumer relations system documents that

23  pertain to the -- named plaintiff, Duane Norman,

24  in this case?

Page 50

1    A.  No, sir.

2    Q.  Okay.  Have you ever reviewed any documents

3  from the TransUnion consumer relations system?

4       MR. O'NEIL:  Objection, lack of

5  foundation, vague.

6       THE WITNESS:  Well, to the

7  extent that the 502 letters are part of

8  that system, the answer would be yes.

9  BY MR. FRANCIS:

10    Q.  Okay.  So you did read the 502 letters?

11    A.  I have seen 502 letters within the --

12  within the documents that I have handled that were

13  part of the files that were made available to me.

14    Q.  Okay.  And when you refer to 502 letters,

15  are you referring to the letter that TransUnion would

16  send after somebody disputed an inquiry?

17    A.  Yes, sir.

18    Q.  Okay.  Other than the actual text of the

19  502 letters, have you reviewed any internal consumer

20  relations system's records that pertained to any of

21  the class members in this case?

22    A.  No, sir.

23       MR. O'NEIL:  Objection, vague,

24  lack of foundation.

Page 51

1  BY MR. FRANCIS:

2    Q.  Okay.

3    A.  Once -- once again, Mr. Francis, the --

4  the -- the data that I have handled may fall into

5  that category of part of that system, but I don't

6  know.

7       I don't -- I don't want to be -- I

8  don't want to represent that I haven't handled an

9  awful lot of individual consumer data that was

10  presented to me for analysis.  Where it came from, I

11  don't know.

12    Q.  Okay.  And in connection with rendering

13  your opinion, the opinion set forth in your March

14  22nd (sic) report, did you review any internal

15  TransUnion policy and procedure manuals?

16    A.  No, sir.

17    Q.  Okay.  And did you review any manuals or

18  memos or any other type of written instruction that

19  TransUnion internally used in connection with its

20  mail room or its consumer relations department?

21    A.  No, sir.

22    Q.  Okay.  And putting aside records or

23  documents, have you ever spoken to any TransUnion

24  employees who either worked in the mail room or

Page 52

1  worked in the consumer relations department in Crum

2  Lynne, Pennsylvania?

3       MR. O'NEIL:  Objection, lack of

4  foundation.

5       THE WITNESS:  Well, for

6  instance, Ms. Reader, is -- I think was

7  on -- was on -- may be on this.  I can't

8  tell because the screen's -- I don't know

9  where she's based.

10  BY MR. FRANCIS:

11    Q.  Okay.  Other than Ms. Reader, can you

12  identify any other TransUnion employees that you

13  spoke to prior to rendering the opinions set forth in

14  your March 22nd report?

15    A.  Yes, sir, another -- another member of the

16  general counsel staff and --

17    Q.  Okay.  Anybody who is not a lawyer?

18    A.  There was a -- there was a call early on to

19  describe the -- the exchange, it was -- it was a --

20  that person was on very briefly, to describe the

21  exchange between TransUnion and the -- and the

22  consumer with respect to the documents that I was

23  going to be handling.

24    Q.  Okay.  And who was that person?

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 53

1    A. I don't -- I don't -- I don't recall a
2    name, it was such a -- it was a very short call.
3    Q. Do you know what procedures TransUnion's
4    mail room followed with regard to the process of
5    handling written disputes?
6         MR. O'NEIL: Objection, vague,
7    as to the term "disputes."
8         THE WITNESS: And when you say
9    know, based on -- based on that one --
10   based on that one call, I understand that
11   the communications are received, there is
12   a group that processes the
13   communications, just basically scans
14   them, that those scans -- those scans are
15   the basis of the documents that I have
16   handled, and that is all.
17   BY MR. FRANCIS:
18   Q. Okay. You're not aware specifically of
19   what guidance the mail room employees were given in
20   terms of how to handle consumer correspondence; is
21   that correct?
22   A. When you say guidance, I think the -- I
23   think the answer is no, but I would say that we -- we
24   encountered -- we encountered within the population

Page 54

1    of documents a few instances of redundant scanning,
2    same -- basically at the same -- at the same -- with
3    the same timestamp, and my understanding is that
4    that's atypical.
5    Q. Okay. And is that understanding that you
6    have, is that from counsel?
7    A. No, that's from the person who described
8    the process to me.
9    Q. Okay. And that person described the
10   process in terms of how these disputes were -- were
11   handled generally?
12   A. Again, when you say disputes, how the
13   communications to the company were scanned into a
14   database that I handled. I don't -- that is -- that
15   is the description that I was given; it was not
16   presented to me as disputes, to my recollection.
17   Q. Okay. Have you ever seen anything in
18   writing which outlined the process by which the mail
19   room or the consumer relations department, what
20   procedures they were supposed to follow in connection
21   with processing consumer communications?
22   A. No, sir.
23   Q. Okay. And do you know whether or not the
24   mail room was instructed to look to see whether

Page 55

1    certain consumer communications were from credit
2    repair organizations?
3    A. I'm not aware of -- I'm not aware of that.
4    Q. Are you aware that a TransUnion witness in
5    this case testified that the mail room individuals
6    were instructed to determine whether or not a piece
7    of a communication was from a credit repair
8    organization?
9         MR. O'NEIL: Objection, assumes
10   facts not in evidence.
11        THE WITNESS: I'm not aware of
12   that, Mr. Francis.
13   BY MR. FRANCIS:
14   Q. Have you ever seen any TransUnion form
15   letters that it would send out if it believed that a
16   consumer communication was from a credit repair
17   organization?
18   A. Not to my knowledge.
19   Q. Okay. Have you ever seen any TransUnion
20   form letters or written communications which would be
21   sent to a consumer advising the consumer that
22   TransUnion considered the communication or dispute to
23   be frivolous?
24   A. No, sir.

Page 56

1    Q. Okay. And do you know whether or not
2    TransUnion's system would record a situation when the
3    mail room considered a consumer communication to be
4    from a credit repair organization?
5    A. I'm not aware of any direction to the mail
6    room.
7    Q. And are you aware of whether or not the
8    TransUnion system would document or capture if
9    TransUnion considered a consumer communication to be
10   frivolous?
11   A. Again, I've seen no -- I've seen nothing
12   from an internal policies or operations with respect
13   to the mail room operation, other than what I
14   described.
15   Q. Okay. And in connection with your
16   assignment and the preparation of your March '22
17   report, did you talk to or interview any of the class
18   members who were referenced in the letters that you
19   reviewed?
20   A. No, sir.
21   Q. And, likewise, did you talk to or interview
22   any of the creditors or users who created the inquiry
23   that the consumers were disputing?
24   A. No, sir.

14 (Pages 53 to 56)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 57

1    Q.   Okay.  In connection with your assignment
2  and preparation of your March 22nd report, have you
3  spoken to or consulted with any credit repair
4  organizations?
5    A.   No, sir.
6    Q.   And in connection with your assignment and
7  your report, did you undertake to obtain any template
8  letters used by any credit repair organizations?
9    A.   If you mean directly from the credit repair
10  organization, the answer is no.
11    Q.   Okay.  That's what I meant.  Thank you.
12      In connection with your -- the
13  preparation of your March 22nd report and your
14  assignment, did you ever inquire as to whether the
15  mail room or the consumer relations staff at
16  TransUnion had determined whether any of the letters
17  that you reviewed were from credit repair
18  organizations?
19    A.   I'm not aware.
20    Q.   All right.  And in connection with your
21  March 22nd report and your assignment, did you ever
22  inquire with anyone in the mail room or the consumer
23  relations system (sic), whether any of the letters
24  that you reviewed or that were the subject of the

Page 58

1  class members were frivolous or that TransUnion
2  considered them to be frivolous?
3    A.   Once again, I haven't had any -- any --
4  any -- any documents or any communications about
5  that, no, sir.
6    Q.   Okay.  In connection with your -- the
7  preparation of your March 22nd report, did you
8  consult with anybody from United States -- the United
9  States Postal Service?
10    A.   No, sir.
11    Q.   Did you seek any type of guidance or
12  information regarding how the United States Postal
13  Service processes consumer mail?
14      MR. O'NEIL:  Objection, vague
15  as to time.
16      Do you mean prior to the
17  issuance of his March '22 report?
18      MR. FRANCIS:  Yep.
19      THE WITNESS:  No, sir.
20  BY MR. FRANCIS:
21    Q.   And prior to your -- your March 22nd
22  report, had you ever opined as an expert on how the
23  U.S. Postal Service works and processes mail?
24    A.   Ask the question again, please, sir.

Page 59

1    Q.   Sure.  Prior to your March 22nd report, had
2  you ever opined as an expert in terms of how the
3  United States Postal Service works?
4    A.   Directly; no; in reliance, yes.
5    Q.   Do you consider yourself to be an expert
6  witness on matters involving the United States Postal
7  Service?
8    A.   No, sir.
9      MR. O'NEIL:  Objection, vague.
10      Objection, vague.
11  BY MR. FRANCIS:
12    Q.   Okay.  Do you consider yourself to have any
13  knowledge, beyond the average person, regarding how
14  the United States Postal Service works?
15    A.   I don't know what the average person means.
16    Q.   Okay.  Do you consider yourself having any
17  expertise in matters involving how the United States
18  Postal Service works?
19    A.   I do not hold myself out as an expert in
20  the operation of the U.S. Postal Service.
21    Q.   Okay.  Do you -- do you hold yourself out
22  as having any particular expertise in that area,
23  regardless of whether or not you've been qualified as
24  an expert?

Page 60

1    A.   Only with respect to what can be expected
2  from delivery schedules that are part of the
3  circularization that often -- that often accompanies
4  auditor communications with creditors, a company's
5  creditors, or its customers.
6    Q.   And that knowledge is anecdotal from your
7  work experience; right?
8    A.   Anecdotal as opposed to empirical?
9    Q.   Yes.
10    A.   And by empirical, I mean -- I mean with
11  respect to recognizing delivery schedules,
12  evaluating -- evaluating whether or not something has
13  been -- has been -- can be expected to be received
14  if, in fact, a creditor or a customer says that it
15  has been put in the mail, that would be empirical; to
16  the extent that it is -- it is an individual
17  experience, it's anecdotal.
18    Q.   Okay.  Other than that, you don't have any
19  particularized knowledge of how the United States
20  Postal Service works in terms of processing mail on a
21  national basis; is that right?
22    A.   I think -- I think at one point I
23  understood key operators -- key operators working at
24  the machines that are doing the processing are -- are

15  (Pages 57 to 60)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 61

1    presented with a need to deal with illegible --
2    illegible zip codes for the -- for the processing,
3    but beyond that, the answer is no.
4        Q.   And have you ever spoken to or interviewed
5    anybody from the United States Postal Service in
6    terms of how it works and functions in terms of
7    processing mail?
8        A.   Again, with respect -- with respect to
9    earlier on, in terms of circularization that auditors
10   do, I don't know that any of those extend to
11   communications with the Postal Service directly.
12       Q.   Okay.  Let's -- let's turn to page 4 of
13   your report.  At paragraph 9, you state that:  I've
14   been retained by Reed Smith, which represents
15   TransUnion.  The scope of my assignment was to
16   evaluate the population of letters received by
17   TransUnion from members of the certified class in
18   this case and which may have led TransUnion to send
19   class members the Form 502 letter with particular
20   attention to two arch -- overarching topics.
21           Do you see that?
22       A.   Yes, sir.
23       Q.   The language which may have led -- my
24   question is, isn't it the case that the sending of a

Page 62

1    502 letter was the only circumstance that the -- was
2    sent anytime TransUnion considered somebody to be
3    disputing an inquiry?
4           MR. O'NEIL:  Objection, lack --
5    objection, lack of foundation.
6           THE WITNESS:  Mr. Francis, you
7    asked me earlier on with respect to my
8    knowledge about how the mail room worked,
9    and so I have to put a caveat in there
10   because I can't speak with certainty
11   about how the mail room works, so the
12   "may" is in that sentence to -- to
13   provide a contingency with respect to the
14   operation of the mail room, but that is
15   all.
16   BY MR. FRANCIS:
17       Q.   Okay.  You're not aware of any other
18   circumstances by which TransUnion would send a 502
19   letter, except when it considered somebody as
20   disputing an inquiry; correct?
21           MR. O'NEIL:  Objection, assumes
22   facts not in evidence and lack of
23   foundation.
24           THE WITNESS:  Mr. -- Mr.

Page 63

1    Francis, you're making it more
2    complicated, I think, than -- than what
3    I've tried to write here and there may
4    be -- there may be elements of this case
5    that are important to you with respect to
6    that, but I've tried to write this in
7    terms of where these letters came from,
8    they came from the -- they came from
9    TransUnion, though -- that is, the 502
10   letters, and my understanding is that the
11   502 letter comes in response to a -- a
12   consumer's communication with TransUnion
13   and -- and that is all.
14   BY MR. FRANCIS:
15       Q.   Do you know of any other circumstances by
16   which a 502 letter would be sent, other than a
17   consumer's dispute of an inquiry?
18       A.   I --
19           MR. O'NEIL:  Objection.
20   Objection, assumes facts not in evidence
21   and lack of foundation.
22           THE WITNESS:  Once again, my
23   knowledge about this is -- is limited to
24   what I learned in that very short call

Page 64

1    almost a year ago.
2    BY MR. FRANCIS:
3        Q.   Okay.  All right.  And then subparagraph
4    9(a) you write:  Do the letters reflect more than one
5    context for their complaints, assertions, questions
6    or demands.
7           Do you see that?
8        A.   Yes, sir.
9        Q.   What's your definition for context?
10          What's your objective definition for
11   context?
12       A.   Well --
13          MR. O'NEIL:  Objection.
14   Objection, vague.
15          Generally, or how he's using it
16   in this sentence?
17          MR. FRANCIS:  How he's using it
18   right here.
19          THE WITNESS:  We could -- we
20   could equate a basis with context.
21   BY MR. FRANCIS:
22       Q.   Okay.  I guess my question is, is you say
23   the question is, do the letters reflect more than one
24   context for their complaints, assertions questions,

16  (Pages 61 to 64)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 65

1    or demands.
2         My question to you is, if I wanted to
3    check your analysis, what definition of context would
4    I apply?
5         MR. O'NEIL:  Objection, vague.
6         THE WITNESS:  Context is
7    circumstances or basis.  Now we're
8    getting -- now we're getting into -- into
9    linguistics, Mr. Francis, and -- and
10   we're -- and so I write a word that I
11   understand to be -- to be an English
12   language word that -- that describes
13   basis or a circumstance for the
14   complaint, and within a -- within the
15   direction that I have here are the -- are
16   the complaints or the assertions or the
17   questions or the demands that they're
18   making.
19        Are they -- are they mono -- do
20   they have a monolithic basis?  Do they
21   have a monolithic circumstance?  Are they
22   similarly situated as the -- as the
23   caption of the case describes it?
24        We could say -- we could say

Page 66

1    one situation; right?  Or situation,
2    basis, context, circumstance are all
3    synonyms for me in that sentence.
4    BY MR. FRANCIS:
5         Q.  Okay.  Basis, context and circumstance.
6         A.  A situation, and there may be -- there may
7    be other -- others that we could use the thesaurus to
8    replace.
9         Q.  Well, I guess what I'm asking is, in terms
10   of the analysis you performed, what did you instruct
11   the individuals reviewing the letters to determine
12   whether something had more than one context or not?
13        MR. O'NEIL:  Objection, calls
14   for a narrative.
15        THE WITNESS:  It is a long
16   narrative.
17   BY MR. FRANCIS:
18        Q.  Okay.  All right.  So -- all right.  And
19   then you say:  One context for their complaints,
20   assertions, questions or demands.
21        What was the definition you used to
22   determine whether a letter contained a complaint?
23        A.  I think the best -- I think the best way to
24   answer that is to look at the categories that

Page 67

1    eventually were developed from the initial reading
2    and final reading of these -- of these letters so
3    that we don't -- it might be more efficient, I guess,
4    Mr. Francis, is my -- is my suggestion.
5         Q.  Well, we'll get there.  I can't get there
6    until I know exactly what it is that you're searching
7    for.
8         So my question is, what would meet the
9    definition of a complaint in connection with 9(a)?
10        MR. O'NEIL:  Objection, calls
11   for a narrative.
12        THE WITNESS:  A complaint could
13   be I don't like this -- I don't like
14   the -- the situation that I -- that I
15   find myself in with respect to my credit
16   score.
17   BY MR. FRANCIS:
18        Q.  Okay.  Is that an example or is that the
19   definition that would govern complaint?
20        A.  Well, you're asking me now to turn into a
21   Webster dictionary with respect to -- with respect to
22   definitions.
23        I'm giving you an example because I
24   did not -- I did not categorize the -- the

Page 68

1    individuals' letters into -- into these four -- into
2    these four categories.  That -- these are overarch --
3    these are sort of overarching descriptions of -- of
4    what -- what I saw in the letters.
5         Q.  I guess maybe my -- the better question is,
6    did you utilize an objective definition for
7    complaints, assertions, questions or demands, or not?
8         MR. O'NEIL:  Objection, vague.
9         THE WITNESS:  Objective with
10   respect to the use of -- the use of
11   English language words.
12   BY MR. FRANCIS:
13        Q.  Are you saying that it would be based upon
14   what the reviewer thought or did you give the
15   reviewer objective criteria or definitions to work
16   with?
17        A.  I gave the reviewer examples of -- examples
18   of categories and -- and tried to provide assistance
19   to the lawyer reviewers who are skilled in the nuance
20   of the English language, guidance with respect to
21   reading the letters and categorizing them.
22        Q.  Okay.  A couple things.  Other than
23   examples, did you provide the reviewers with any
24   objective criteria or definition for the words

17 (Pages 65 to 68)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 69

1    "complaints," "assertions," "questions" or "demands"?
2    A.  Well, I think the answer is yes --
3    Q.  Okay.
4    A.  -- but we'd have -- we would have to -- we
5    would have to do it category by category.
6    Q.  All right.  Well, let's do that.  So let's
7    start with -- if I were your reviewer and you said,
8    hey, I want you to look to see whether there's a
9    complaint in these ten letters, what's the definition
10    that you -- you gave me?
11    MR. O'NEIL:  Objection, assumes
12    facts not in evidence, vague.
13    THE WITNESS:  For example,
14    category 14, if we look at the -- if we
15    look at the code -- if we look at the
16    coding manual, I'm looking at the word
17    "claim," but a claim could be an
18    assertion or it could be a complaint, but
19    we could --
20    BY MR. FRANCIS:
21    Q.  And the question --
22    A.  -- we could -- we could -- we could talk
23    about the category 14.
24    Q.  Okay.  So my question, again, is what would

Page 70

1    constitute a complaint?
2    A.  Once again, when the consumer doesn't
3    like -- doesn't like the situation they're in, that
4    they go to the trouble to communicate with TransUnion
5    or engage someone else to do it.
6    Q.  Okay.  How would you determine or how would
7    the reader who performed this analysis referenced in
8    your report determine whether a consumer didn't like
9    their situation that they were in?
10    A.  Once again, we have to go to the categories
11    and the direction that the reviewers got, and that
12    is -- that is summarized in Table 2 of the report and
13    is in -- in great detail with respect to examples in
14    the coding manual that was developed.
15    Q.  You mentioned that the reviewers were
16    skilled in the nuance of the English language.
17    Were any of the reviewers experts in
18    linguistics?
19    A.  To the extent that -- to the extent that
20    the use of the English language is taught in law
21    school, I respect the -- I respect the use of the
22    English language to be a little bit different in the
23    hands of lawyers.
24    Q.  Okay.  Other than the fact that they had

Page 71

1    legal training, did any of the reviewers have any
2    training in linguistics?
3    A.  I have no idea.
4    Q.  Okay.  And other than going to law school,
5    did any of the reviewers have any training in
6    communications or communication studies?
7    A.  Once again, I have no idea.
8    Q.  Okay.  Is it your testimony that they were
9    skilled in the nuance of the English language because
10    they went to law school?
11    A.  That is why -- that is why contract lawyers
12    are usually engaged to do this kind of bibliographic
13    and lexicographic work.
14    Q.  Do you know if any of the reviewers in this
15    case, that you utilized, had any prior experience in
16    evaluating or interpreting commuter -- consumer
17    communications in general?
18    A.  I do not know.
19    Q.  Okay.
20    A.  It is -- it is possible because they are --
21    they are working for Logility, and my understanding
22    is that Logility works with TransUnion.
23    Q.  Okay.  All right.  Next, so I asked you
24    about what the objective definition for complaint

Page 72

1    was.
2    Same question, "assertions," what was
3    the objective definition for whether a commuter --
4    consumer communication constitute -- constituted an
5    assertion?
6    A.  A factual statement.
7    Q.  Okay.  And the reviewer would determine
8    whether there was a factual statement; is that
9    correct?
10    A.  To the -- to the extent that it was
11    necessary for purposes of trying to identify the
12    features of a letter.
13    Q.  And next, "questions," what was the
14    objective definition or criteria that you used or the
15    reviewers used in terms of determining whether a
16    consumer communication contained a question?
17    A.  Once again, it's a -- it's -- it's the use
18    of the English language, Mr. Francis, in terms of the
19    consumer asking something of TransUnion in terms of a
20    fact.
21    Q.  How would you determine whether a consumer
22    was asking something of TransUnion?
23    A.  Well, generally -- generally speaking, if
24    the word "please" is used.

18  (Pages 69 to 72)

Page 73

1      Q.   Okay.
2      A.   "Please" can head off in a couple of
3  different directions --
4      Q.   Okay.   Use of the word --
5      A.   -- it can be -- it could be a demand or it
6  could be a question.
7      Q.   So "please" would be a --
8      A.   You're asking me --
9      Q.   -- way to identify -- a way to identify if
10  there -- if the consumer was communicating a
11  question.
12      A.   Once again, Mr. Francis, the -- the
13  specific direction that the -- that the reviewers got
14  is embodied in the coding manual that is very lengthy
15  for each of the categories, it provides examples and
16  provides some description that we can -- that we can
17  talk about in terms of the use of the English
18  language.
19      Q.   Well, I guess my question, then, is, are
20  you telling me that if we look at that manual, which
21  we're going to get to in a little bit, are you
22  telling me that there is an objective definition
23  and/or criteria for complaints, assertions, questions
24  or demands, or just examples?

Page 74

1           MR. O'NEIL:   Objection, form,
2  compound.
3           THE WITNESS:   I think there
4       is -- I think there is direction to the
5       reviewer with respect to a category and
6       then there are examples, and to the
7       extent that that direction includes a
8       search for a particular -- for a
9       particular meaning from the -- the words
10       that are reflected in that communication,
11       that may satisfy your -- your need for
12       definition.
13  BY MR. FRANCIS:
14      Q.   Are you saying that some portion of the
15  reviewers' analysis depended upon their subjective
16  interpretation of the letters?
17      A.   Well, so, let's -- let's talk about
18  subjective, because as we all read each word, each
19  word, if we interpret it -- if we interpret that word
20  the same way, Mr. Francis, is that subjective or is
21  that objective?   And --
22      Q.   Well, I'm asking -- I'm asking you whether
23  in your view was -- were any of the reviewers left
24  with the discretion to interpret the letters

Page 75

1  subjectively or were they to follow objective
2  criteria and definitions.
3      A.   The objective criteria --
4           MR. O'NEIL:   Objection.
5  Objection, Dr. Lasater.
6           Mr. Francis, please do not
7  interrupt the witness when he's answering
8  your question.
9           I'm sorry, go ahead, Dr.
10  Lasater, and if you need to have the
11  question read back, I'm sure the court
12  reporter can do that.
13           THE WITNESS:   The direction to
14  the reviewers is intended to give them
15  objective criteria for identifying
16  attributes of communications written in
17  the English language, and their
18  compliance with that is reflected in
19  their ability to categorize a group of
20  letters to different groups of letters in
21  virtually the same way.
22           To the extent that that -- that
23  they agree, that agreement is obtained on
24  the use of the English language with

Page 76

1  respect to the features of the letters,
2  it is objective.
3  BY MR. FRANCIS:
4      Q.   Okay.   So just to be clear, then, my
5  question was, did any of the review of the letters
6  involve any subjective interpretation of the
7  reviewers?
8           MR. O'NEIL:   Objection, vague.
9           THE WITNESS:   To the extent
10  that a letter could not be categorized
11  into one or more of the objective
12  features of the letter, then, at that
13  point, the reviewer was advised to
14  indicate that the letter does not assert
15  or describe any of the language outlined
16  in categories four through 17.   That's
17  category number 18.
18  BY MR. FRANCIS:
19      Q.   Okay.
20      A.   That would be where -- that would be where
21  a subjective determination outside the direction that
22  they had gotten with respect to the categories would
23  fall.
24      Q.   All right.   Okay.   So let me just go back

19 (Pages 73 to 76)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 77

1    where I was.  So I was asking you about the
2    definition or criteria for whether something --
3    whether a consumer communication posed a question.
4    One criterion that you mentioned was if it used the
5    word "please."
6              Are there any other criterion for
7    whether the consumer letter contained a question?
8              MR. O'NEIL:  Objection,
9    misstates his testimony.
10             THE WITNESS:  The context --
11   the context, the language of the --
12   lack of the statement, the language of
13   the sentence, whether or not there is
14   punctuation that -- that follows it are
15   all elements of determining whether
16   something is a question.
17   BY MR. FRANCIS:
18       Q.  Right, but what were the reviewers supposed
19   to apply and not apply?
20       A.  Ones --
21       Q.  In other words -- let me ask you a
22   different hypothetical; okay?
23             If we wanted to see whether the
24   letters contained the number ten, you could ask a

Page 78

1    reviewer, look to see whether or not there is the
2    Figure 10 in the letter.  If there is, put it in this
3    category, if it's not, put it in another category.
4              You could do that; right?
5        A.  Sure.
6        Q.  Okay.  And the objective criteria there
7    would be the presence of the number ten.
8              My question to you is, with regard to
9    these consumer letters that you had looked at, what
10   were your in-or-out criteria that no matter what,
11   they were followed, so we could test to see if your
12   numbers are correct?
13       A.  So in a lot of this kind of work, Mr.
14   Francis, the question is, is whether or not a --
15   whether or not a sentence, a paragraph or the
16   document that contains those is responsive to a set
17   of criteria.
18             That -- that practice, insofar as it
19   is applied in -- in American juris prudence, has
20   developed across the last 25 years, and to the extent
21   that the direction to the reviewers who are reading
22   the English language here with respect to whether or
23   not a letter is responsive to a particular criterion
24   is embodied in the training manual, the coding

Page 79

1    manual, that was developed and trained to the
2    reviewers.
3        Q.  Okay.  Were there any other materials,
4    other than the training manual appended to your
5    report, which outlined the definitions or criteria
6    that the reviewers were supposed to follow in
7    connection with analyzing the class members' letters?
8        A.  Only the training that they were
9    provided --
10       Q.  Okay.
11       A.  -- beyond their -- beyond their -- their
12   widely presumed and widely agreed understanding that
13   they understand the English language.
14       Q.  Going back to paragraph 9, we're in 9(b),
15   and 9(b) reads:  Do the letters reflect the use of
16   agents in their assertions to or questions of
17   TransUnion?
18             What is the definition of agents that
19   you used in connection with your report?
20       A.  Well, the question was -- the question, as
21   it's described here in paragraph 9, is, is there any
22   indicia of a letter being sent to TransUnion not from
23   the purported addressee -- addressor --
24       Q.  I understand --

Page 80

1        A.  Or address -- I should say addressee, I'm
2    sorry, I've misspoken.
3        Q.  Sorry.  Okay.  Sorry, I didn't mean to
4    interrupt you.  I understand that was the intention.
5              My question is, in order for me to
6    determine whether or not a letter reflects the use of
7    an agent, we have to know what the -- what an agent
8    is; right?
9        A.  Once again, if it is not from the -- if
10   it's not from the addressee, then, again, using the
11   English language, it would have to be from someone
12   else or somewhere else, and I have -- I have used the
13   English language word "agent" as the -- as the
14   catchall for that.
15       Q.  Okay.  So are you saying that for the
16   purposes of the analysis within your report, if a
17   letter was sent from an address that was different
18   than the consumer's address, you would presume that's
19   from an agent?
20             I just want to make sure I have it
21   correctly.
22       A.  I don't make that presumption.  I said it
23   may be.  It's sent from -- and so do the letters
24   reflect the use of or indicia of.  Perhaps, instead

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 81

1   of use, I could substitute the word "indicia" and
2   answer your -- and answer your question better.
3        Q.   Okay.  What is the objective indicia for
4   whether a letter was sent from -- by an agent?
5             MR. O'NEIL:  Objection, calls
6        for a narrative.
7             THE WITNESS:  The difference
8             between where a letter is sent and the --
9             and the addressee's location, purported
10            location, can provide a signal about the
11            potential that someone else sent the
12            letter on behalf of the addressee.
13   BY MR. FRANCIS:
14       Q.   And was it up to the reviewer to determine
15   whether or not that indicia was present?
16       A.   No, we capture that objectively.
17       Q.   That piece of data objectively or all of
18   the data objectively?
19            MR. O'NEIL:  Objection, vague.
20            THE WITNESS:  I'm not sure what
21       you mean, all of the data, Mr. Francis.
22   BY MR. FRANCIS:
23       Q.   Well, you mean -- you just said that you
24   capture the -- that data objectively.

Page 82

1             Do you mean that the address, that
2    from where it was sent, versus the consumer's
3    address, you capture that objectively; is that right?
4        A.   I did for the sample -- for the samples
5    that were taken for our analysis.
6        Q.   Okay.  So, there was no interpretation
7    necessary for those particular -- for that particular
8    inquiry; correct?
9        A.   I don't know what you mean by no
10   interpretation necessary.
11       Q.   Well, you would just see and compare two
12   addresses, if it's -- if the addresses are different,
13   then there's a presumption or indicia that it's
14   not -- it's from an agent.
15       A.   Distance -- distance matters.
16       Q.   Okay.  And when you say distance matters,
17   what do you mean?
18       A.   Well, the report reflects and we discovered
19   that a lot of letters are sent from locations far
20   distant from the addressee and the --
21       Q.   And when you say -- go ahead.
22       A.   And so the question -- the question arises,
23   was that letter sent by an agent for the addressee,
24   and --

Page 83

1        Q.   Okay.
2        A.   -- I can't answer -- I can't answer whether
3    it was or wasn't.
4             What I can say is that it raises a
5    question about whether or not the letter was a bona
6    fide letter from the addressee or whether it was --
7    whether it was mailed to TransUnion on behalf of the
8    addressee by someone else far distant.
9        Q.   All right.  When you say far distance, what
10   was your objective distance to determine whether or
11   not something met that indicia?
12       A.   Sixty miles.
13       Q.   Okay.  And to be clear for the record, you
14   are saying that in terms of the analysis that your
15   reviewers did, the determination as to -- one
16   determination as to whether or not a letter was sent
17   by an agent was whether or not it was sent 60 or more
18   miles from where the consumer resided; is that what
19   you're saying?
20       A.   Yes, sir, the 60-mile threshold.
21       Q.   Okay.  And where did you get the 60-mile
22   threshold?
23       A.   The 60-mile threshold is my direction.
24       Q.   When you say your direction, you mean it

Page 84

1    was supplied to you by counsel?
2        A.   No, it was my direction.
3        Q.   Oh.  Where did you get 60 miles?
4        A.   I had to choose between some number, some
5    real number, and 60 miles -- 60 miles was on the
6    basis of my experience with different postal regions.
7        Q.   What was your experience with different
8    postal regions which led you to choose 60 miles as
9    the threshold for --
10       A.   Having -- having -- having lived and
11   mailed -- having lived and mailed documents for most
12   of my life in different places around the United
13   States.
14       Q.   Okay.  Just being an American and living as
15   an American, that's what you based your -- your
16   60-mile threshold on.
17            MR. O'NEIL:  Objection,
18       misstates his testimony.
19   BY MR. FRANCIS:
20       Q.   Is that correct?
21       A.   Based on both my experience as -- as a --
22   as a -- also as a consumer of the -- of the -- of the
23   Postal Service.
24       Q.   Okay.  And, again, I think, as you said

21 (Pages 81 to 84)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 85

1  before, you didn't consult any materials or anybody
2  from the U.S. Postal Service to determine whether 60
3  miles had any relevance in terms of determining
4  whether or not something was sent by -- from a
5  consumer directly versus not; correct?
6      A.  At the time that this first report was
7  written, you're -- the answer is correct.
8      Q.  Okay.
9      A.  If we get to the supplemental report, we
10  can have a different -- a different conversation.
11     Q.  Now, all right, I was asking you about what
12  the criteria was that you defined as indicia for
13  agency, and you mentioned the 60-mile marker.
14         Were there any other criteria, other
15  than the 60-mile marker, which the reviewers used to
16  determine whether or not a letter was sent by an
17  agent or not?
18     A.  No, sir.
19     Q.  Okay.  In terms of your assignment, were
20  you ever asked to determine the number of letters
21  which disputed an inquiry?
22             MR. O'NEIL:  Objection, vague
23         as to what assignment and what time
24         period.

Page 86

1             THE WITNESS:  I was not asked
2         for -- for any number, I was asked
3         whether or not there was more than one --
4         more than one context.  I was not asked
5         for a -- I was not asked for a particular
6         number.  I reported the results of my
7         study, but I was not asked for a number.
8  BY MR. FRANCIS:
9      Q.  Were you asked to determine whether a
10  letter contained a dispute of an inquiry?
11             MR. O'NEIL:  Objection, vague
12         as to dispute.
13         Go ahead and answer if you can.
14             THE WITNESS:  Could I have the
15         question read back either by the court
16         reporter or would you repeat it, Mr.
17         Francis.
18             MR. FRANCIS:  Andrea, could you
19         read it back, please.
20         (Pertinent portion of the
21  record read back.)
22             THE WITNESS:  A dispute.  Well,
23         I think the -- the criteria associated
24         with the categories include contexts or

Page 87

1  situations that the consumer is in that
2  could be characterized as a dispute.
3  BY MR. FRANCIS:
4      Q.  A dispute of an inquiry.
5      A.  Yes.
6      Q.  Okay.  But my question was, is you weren't
7  tasked with that assignment.
8         Tell me if a letter has a dispute of
9  an inquiry in it or tell me the number of letters
10  that have -- you would consider to have a dispute of
11  an inquiry.
12             MR. O'NEIL:  Objection, form,
13         compound.
14         You can answer.
15             THE WITNESS:  Well, Mr.
16         Francis, if we look at category number
17         four in Table 2 --
18  BY MR. FRANCIS:
19      Q.  Okay.
20      A.  -- the -- you know, the question -- you
21  know, the question is, is that -- is that a -- is
22  that a statement about a -- is that a statement about
23  a dispute.
24         If we can look at category seven, the

Page 88

1  letter centers on a consumer's assertion that the
2  consumer did not authorize the end user's inquiry.
3         In -- in the categories seven,
4  eight -- seven, by contrast to six, seven, eight,
5  ten, 11 and 12, which I identify in footnote 17, are
6  circumstances that are features of the letter that --
7  that -- that I have identified as reflecting a
8  complaint, assertion or question about the accuracy
9  of the account, and the -- and the -- and the coders
10  were directed to attend to those features with very
11  objective criteria.
12     Q.  Okay.  I was simply asking what you were
13  asked to do.  You identified two inquiries as to the
14  scope and the overview of your assignment in 1.2,
15  paragraph 9.
16         My question was, were you ever asked
17  or assigned by TransUnion to tell us something
18  different, tell us the number of letters which
19  contain a dispute of an inquiry?
20             MR. O'NEIL:  Objection,
21         misstates the prior question.
22             THE WITNESS:  I was not -- I
23         was not asked or directed to produce any
24         particular number.  My question was --

22  (Pages 85 to 88)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 89

1  the question that was asked of me at the
2  beginning was do the letters reflect more
3  than one context for their complaints,
4  assertions, questions or demands.
5      The fact that I did analysis
6  and provided those numbers to counsel is
7  consistent with the quantitative methods
8  that I am -- that I am competent to
9  deliver with respect to advising counsel,
10  the client, you and the Court as to -- as
11  to what a sample says about the features
12  of these letters, and so I quantify from
13  objective criteria the features of these
14  letters.
15  BY MR. FRANCIS:
16      Q.  Correct.  And if -- if you had been asked
17  to include as a feature the simple feature that the
18  letter includes a dispute of an inquiry, you could
19  have done that; right?
20      MR. O'NEIL:  Objection, assumes
21  facts not in evidence.
22      THE WITNESS:  I could have, but
23  the -- but the challenge with respect to
24  that, Mr. Francis, is that now I'm

Page 90

1      handing -- now I'm handing a reader a
2  criterion that is vague, and so to
3  avoid -- to avoid a vague interpretation
4  of a letter, I've tried to provide more
5  granular direction with respect to
6  specific features.
7  BY MR. FRANCIS:
8      Q.  Okay.  So did you ever supply the reviewers
9  with search terms to run against the letters?
10      A.  Yes.
11      MR. O'NEIL:  Objection.
12  BY MR. FRANCIS:
13      Q.  Yes.  Okay.
14      A.  The search terms -- the search terms are --
15  are cognitive.  When you say run, they're cognitive
16  with respect to look for these particular words and
17  phrases, and -- and all of those are spelled out in
18  the coding manual.
19      Q.  Okay.
20      A.  It's very objective.
21      Q.  And did -- did any of the reviewers utilize
22  a search-and-find function or query electronically
23  against the letters, where certain terms and/or words
24  were run against the letters?

Page 91

1      A.  I would not know.
2      Q.  Okay.  And when you say you would not know,
3  you mean you don't know whether or not any type of
4  electronic search query utilizing search terms or
5  words were run against these letters.
6      A.  I don't.  I can say that the amount of time
7  between the time that the letters were delivered each
8  day to the reviewers and the amount of time that --
9  that it took for them to provide their answers
10  suggested that they did not shortcut the cognitive
11  process of reading the English language, comparing it
12  to the objective criteria and putting proper
13  categories on the letters as they were -- as they
14  were read in -- read twice; that is, independently by
15  the reviewers.
16      Q.  Okay.  But to be clear, they're reviewing
17  the letters manually with their own eyes.
18      You're not aware of any analysis of
19  the letters that was conducted electronically by use
20  of search terms run against terms within the letters;
21  correct?
22      A.  Let's see.  Let's -- let's be -- let's be
23  careful about timing here.
24      If you're talking about the way the

Page 92

1  reviewers read the letters?
2      Q.  Correct.
3      A.  I'm not aware of the reviewers using
4  electronic -- electronic support for their analysis.
5      Q.  Right.  You're not aware, for example, of a
6  situation where run this phrase against the letters,
7  I write to dispute an inquiry on my TransUnion file,
8  find that phrase.
9      That was never done; correct?
10      A.  I didn't say that it wasn't done, I said I
11  wasn't aware of whether any reviewer used any kind
12  of -- any kind of search criteria.
13      What I can say is that the -- that the
14  results were provided -- that results were provided
15  to me -- because they're working independently, the
16  results were provided to me to evaluate their -- the,
17  I'll call it, the concordance or accordance of their
18  review.  The -- the methods by which they did that
19  were -- were -- were specifically directed in the
20  coding manual.
21      If they used any kind of electronic
22  supplement to their compliance with that coding
23  manual, I would have no idea.
24      Q.  Okay.  But before you issued your report

23  (Pages 89 to 92)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 93

1    and you signed off on this, did you make an attempt
2    to figure out exactly what the reviewers did so you
3    could state with confidence the opinions that you set
4    forth?
5        A.   The reviewers were -- were directed to read
6    and to describe, per the criteria of the coding
7    manual, the features of the letters.  That is a --
8    that is a cognitive process, any -- it -- just --
9    just as -- just as we are all looking at the printed
10   word today and drawing -- drawing meaning from it, so
11   there is no -- no -- nothing fancier than that with
12   respect to this, and it's a -- it's such a generally
13   accepted practice in American juris prudence across
14   the last 20 years that it doesn't -- it doesn't bear
15   any suspicion.
16       Q.   Are you opining on American juris prudence
17   today?
18       A.   I said this practice of doing bibliographic
19   work within American juris prudence.
20       Q.   You don't have any law degrees, do you?
21       A.   No, sir.
22       Q.   And you don't consider yourself to be an
23   expert witness in terms of the legal field, do you?
24            MR. O'NEIL:  Objection, vague.

Page 94

1            THE WITNESS:  I'm not sure what
2    you mean by the legal field.
3            With respect to using
4    bibliographic evidence in the course of
5    developing evidence for litigation, I
6    have a lot of expertise.
7    BY MR. FRANCIS:
8        Q.   Do you -- are you able to opine today about
9    what happens in American juris prudence?
10           MR. O'NEIL:  Objection, vague.
11           THE WITNESS:  Again, with
12   respect to -- with respect to my
13   understanding of that term and the use of
14   the -- the use of bibliographic search in
15   it, then I'm speaking to that particular
16   practice of using bibliographic --
17   bibliographic search and analysis
18   within -- within the course of bringing
19   evidence into -- into litigation.
20   BY MR. FRANCIS:
21       Q.   All right.  Let's turn to the next page,
22   which is the summary of opinions at 1.4.
23           At opinion one, you -- at opinion one,
24   you state that:  On the basis of a statistically

Page 95

1    valid random sample of over 800 letters from the
2    population of letters submitted to TransUnion, the
3    population of letters present a wide variety of
4    complaints, assertions, questions or demands, period.
5            First question for you is,
6    objectively, what constitutes a wide variety versus a
7    non-wide variety?
8        A.   Many versus fewer.
9        Q.   How many?
10       A.   It's a judgment call, Mr. Francis.
11       Q.   I'm asking what you mean, a -- is a wide
12   variety ten, 20, 40 or 100?
13       A.   Well, in this case -- in this case, because
14   we were able to describe almost the entirety of the
15   features within approximately 15 objective
16   categories, 15 seems -- 15 seems wide to me, in
17   relation to one.
18       Q.   Okay.  And, again, you didn't -- other than
19   the features of complaints, assertions, questions and
20   demands, you didn't render any opinion regarding
21   whether those letters contained disputes of
22   inquiries; correct?
23       A.   Once again, the -- the categories seven,
24   eight, ten, 11 and 12 subsume complaints, assertions,

Page 96

1    questions or demands.
2        Q.   Okay.  Is it your opinion and testimony
3    today, Dr. Lasater, that the letter categories in
4    your Table 2 of seven, eight, ten, 11 and 12 all
5    included some type of evidence of a dispute of an inquiry?
6            MR. O'NEIL:  Objection, vague.
7            THE WITNESS:  I think that
8    the -- the categories seven, eight, ten,
9    11 and 12 reflect complaints, assertions,
10   questions or demands.
11           I was not -- I was not asked to
12   address the issue of dispute.
13   BY MR. FRANCIS:
14       Q.   Okay.  Let me break that down.
15           But is it your testimony that seven,
16   eight, ten, 11 and 12 address the complaint,
17   assertion, question or demand about an inquiry?
18       A.   That is the feature of the inquiry.
19       Q.   Okay.  But you weren't asked to determine
20   whether an inquiry -- whether a letter had a feature
21   of a dispute; correct?
22       A.   None of my -- none of -- well, first of
23   all, all of these categories are -- are categories
24   that are developed from the letters.  I was not asked

24  (Pages 93 to 96)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 97

1    to develop evidence on any of these specific
2    categories.  This is 100 -- this is 100 percent FTI
3    work.
4            Secondly -- secondly, I was not asked
5    to -- asked by counsel to read a letter or to
6    evaluate it with respect to whether it was a dispute.
7        Q.  Gotcha.  But you could have done that and
8    looked at that -- for that feature, as well as the
9    other features you looked for; correct?
10        A.  That would require -- that would require an
11    understanding of the word "dispute" as it might be
12    used in -- in the context of this case, it would
13    require, I think, a -- maybe even a legal
14    determination of what is a dispute.
15            I was not asked to do that and -- and
16    to use that word without any specific direction of it
17    from -- from counsel or that I would -- that I would
18    understand from the documents that I read would be --
19    would be different from what I captured in this
20    analysis.
21        Q.  So you're saying that you couldn't
22    determine whether a letter had the feature of a
23    dispute, but you could determine that it had the
24    feature of a complaint, assertion, question or

Page 98

1    demand.
2        A.  It would require -- it would require a -- a
3    morphos understanding of the communication and the
4    exchange between the consumer and TransUnion, and I
5    didn't --
6        Q.  Why -- why --
7        A.  Go ahead.
8        Q.  Why is a dispute more -- that word more a
9    morphos than the words, "complaints," "assertions,"
10    "questions" or "demands"?
11            MR. O'NEIL:  Objection.  Please
12        stop interrupting the witness when he's
13        trying to answer your questions, that way
14        you will not get complete answers.
15    BY MR. FRANCIS:
16        Q.  Go ahead, sir, please answer my question.
17        A.  The word "dispute" may mean different
18    things to me and to you.  I understand that dispute
19    as you're -- as you're using it can be subsumed in
20    more granular -- more granular features of the
21    communication, and that's what I sought to do.
22            Rather than to deal with some
23    overarching term, I tried to use the letters as they
24    were presented to me and as the -- as -- as objective

Page 99

1    readers understood the letters to have features, and
2    was focused on that; it was not about the broader
3    question of dispute.
4        Q.  Okay.  You just stated that the word
5    "dispute" could be different things to you and me.
6            Isn't that the same for complaints,
7    assertions, questions and demands?  Couldn't those
8    words mean different things to different people?
9        A.  Once again, I did not ask the reader --
10    evidently, they do because -- because you and I are
11    having a long -- a long dialogue about it, but what's
12    important are the features of the letters that are
13    reflected in Table 2 and the analysis that the
14    readers did of those features.
15        Q.  Wouldn't you agree with me that whether a
16    letter contained a dispute would be a feature of the
17    letter?
18        A.  Once again, there -- there -- there could
19    be a -- there could be a feature that is a feature of
20    a dispute, and I tried to capture that in granular
21    fashion in the -- in the categories, and I -- and
22    I -- and I write to that in footnote 17.
23        Q.  Okay.  Let's go to opinion number two.  You
24    state, among other things:  On the basis of a

Page 100

1    systematic analysis of the random sample of letters,
2    43.7 percent do not complain directly about the
3    accuracy of an inquiry on a consumer's TransUnion
4    file, period.
5            Do you see that?
6        A.  Yes, sir.
7        Q.  If I'm a reviewer looking at the letters,
8    what objective criteria would instruct me as to
9    whether a letter complained directly or not directly?
10            MR. O'NEIL:  Objection, assumes
11        facts not in evidence, that that was the
12        job of the reviewer.
13            THE WITNESS:  The reviewer
14        was -- the reviewer was asked to evaluate
15        the features of the letter that was put
16        before them.
17    BY MR. FRANCIS:
18        Q.  And what were the criteria that the
19    reviewers would use to determine whether a letter
20    complained directly or not about the accuracy of an
21    inquiry?
22            MR. O'NEIL:  Same objection --
23        same objection, assumes facts not in
24        evidence.

25  (Pages 97 to 100)

Page 101

1      Go ahead and answer, Dr.
2   Lasater.
3      THE WITNESS:  The direct is --
4   is my interpretation of the -- and
5   summary of the -- the more granular data
6   that is developed from the reviewer's
7   work.
8   BY MR. FRANCIS:
9      Q.  How were you able to state in opinion two
10  that 43.7 percent of the random sample of the letters
11  did not complain directly about the accuracy of an
12  inquiry?
13     A.  Well, a -- a direct -- a direct complaint,
14  again, is -- is granularly -- is granularly available
15  from categories -- and I don't want to misstate it.
16  We've said it over and over.  The categories that are
17  indicated in footnote 17, which are seven, eight,
18  ten, 11 and 12.
19     Q.  Okay.  What about category seven, eight,
20  ten, 11 or 12 tell us what criteria was used to
21  determine whether someone complained directly about a
22  dispute or not?
23     A.  Once again, we would have to go to the
24  coding manual to look at the -- to look at the

Page 102

1   direction and the examples, and the word "direct" has
2   to do with focus on a particular -- a -- a particular
3   element of their account with TransUnion.
4      Q.  Okay.  Right.  You just used the word
5   "focus."  I was going to ask you about the language,
6   which we'll get to in a little bit, "centers on" is
7   also used as focus.
8      What determined whether a letter had a
9   focus on a particular element versus not a particular
10  element?
11     MR. O'NEIL:  Objection, vague.
12     THE WITNESS:  Because it makes
13  specific reference to an entry on the
14  credit report.
15  BY MR. FRANCIS:
16     Q.  Okay.  If a letter included disputes of
17  four different items, one of which was a dispute of
18  an inquiry, would that fall within your category of
19  directly complained?
20     A.  Once again -- once again, we're talking
21  about features of the letters, and we have to look at
22  whether or not the -- whether or not the feature,
23  the -- the notion of direct here, has to do with --
24  has -- and where -- where the footnote 17 comes into

Page 103

1   play is with respect to the accuracy of the report,
2   and -- and a focus on the accuracy of the report is
3   reflected potentially in categories seven, eight,
4   ten, 11 and 12 specifically.
5      Q.  Okay.  And I'm looking at your Table 2.
6   Let's -- I may as well ask this while we're on it.
7      Category number seven -- category
8   number eight references, and this -- this is from the
9   training manual flow chart, the, quote, unquote:
10  Letter centers on the consumer's assertion.
11     Both of them use that language.  Do
12  you see that?
13     A.  I do.
14     Q.  What was -- what was the objective criteria
15  for determining whether a letter centered on
16  something?
17     A.  I think we need to be -- be careful here,
18  Mr. Francis.  The -- the specific criteria that was
19  used by the reviewers is in the coding manual.
20     This -- this table is intended to
21  provide a -- a useful summary, but it is -- it is --
22  it is not and can't be seen as standalone of the
23  reviewers' decisions and processes that they used to
24  determine whether or not a letter had a category

Page 104

1   eight feature --
2      Q.  Okay.
3      A.  -- and so we'd have to look -- we -- to --
4   to answer your question better, we need to look in
5   each instance at the coding manual to see whether or
6   not we would agree or disagree that reading a letter
7   would -- whether -- whether there is sufficient
8   direction in that coding manual to allow an objective
9   reader to decide that that letter had a feature eight
10  category.
11     Q.  Okay.  If you want to, why don't you take
12  us to the manual which would outline and/or address
13  the objective criteria for determining whether a
14  letter centered on a particular assertion.  I've
15  never seen it, but if you want to find it, that's
16  fine.
17     MR. O'NEIL:  Mr. Francis, we've
18  been going over 90 minutes since our last
19  break, so can you let us know when is a
20  good time to take a short break.
21     MR. FRANCIS:  Sure.  Let me --
22  let's just finish this question or so,
23  and then my -- my recommendation is we
24  take a lunch break.

26  (Pages 101 to 104)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 105

```
 1          MR. O'NEIL:  Okay.
 2          MR. FRANCIS:  But let's just,
 3      while we're on this --
 4  BY MR. FRANCIS:
 5      Q.   So, sir, can you point me or us to anyplace
 6  in the manual that you're referencing which
 7  identifies the criteria for determining whether a
 8  letter centered on a particular assertion or not.
 9      A.   All right.  So I don't have Bates-stamped
10  pages.
11      Q.   Okay.
12      A.   Perhaps your -- perhaps your associate
13  could bring up the -- if you have them Bates stamped,
14  the -- well, since you've used centers -- centers,
15  that is part of category eight or bucket eight in the
16  coding manual.
17      Q.   When you say bucket eight in the
18  coding manual, you're not referring -- referring to
19  the flow chart; right?
20      A.   Well, we want to look at the specific
21  criteria and examples.
22      Q.   Okay.  And where is -- what -- what section
23  would that be?
24      A.   Again, it's in -- it's in the -- it's in
```

Page 106

```
 1  the Exhibit 6.2 --
 2      Q.   Okay.
 3      A.   -- training manual.
 4      Q.   Yep.  And then you want to go to bucket
 5  seven or eight?
 6      A.   We're talking about -- yeah, well, because
 7  you used the word "centers," and centers is part of
 8  the general description of category eight and centers
 9  is -- is -- is just a verb that is really going to
10  the -- the characteristic of the letter insofar as
11  the -- the use of the term "permissible purpose."
12      Q.   Okay.  Just to be clear, Dr. Lasater, I had
13  asked you before about categories seven and eight,
14  because they both use the phrase, "letter centers on
15  the consumer's assertion."
16      A.   That's good.  If you -- if you want, we can
17  do seven.
18          MR. FRANCIS:  Let's look at
19      bucket number seven.  Okay.  Rayne, on
20      there --
21          THE WITNESS:  So -- and so
22      we -- we could change the word "center"
23      to "contains the feature of" and
24      accomplish exactly the same analysis.
```

Page 107

```
 1  BY MR. FRANCIS:
 2      Q.   Okay.  Are you telling me the page that
 3  begins at 6.2, bucket number seven --
 4      A.   Yes.
 5      Q.   -- includes all of the criteria for -- for
 6  the reviewer to determine whether or not a letter
 7  centers on a consumer's assertion that she did not
 8  authorize the end user's inquiry?
 9      A.   No, sir.  I'm saying that you have to go
10  into the training manual --
11      Q.   Okay.
12      A.   -- and -- and --
13      Q.   Where in -- where in the training manual
14  would it --
15      A.   So -- so the training -- I -- I don't have
16  a Bates -- I don't have a Bates-stamped copy, so your
17  associate is going to have to scroll from -- I
18  suspect it's -- she -- he or she is going to have to
19  scroll from the flow chart back about, looks like,
20  about 50 pages.
21      Q.   Before the flow chart or after?
22      A.   It would be after the flow chart.
23      Q.   And your page begins at the top -- what
24  begins at the top of your page?
```

Page 108

```
 1      A.   You can see -- you can see how -- how the
 2  associate is identifying that was most recently
 3  bucket three, and they are in numerical order, so we
 4  go to bucket seven.
 5      Q.   Oh, okay.  We're going over the examples;
 6  right?
 7      A.   Bucket seven is -- is there.
 8      Q.   Yeah, okay, I'm there, we're at bucket
 9  number seven.
10          I see for bucket number seven, five
11  pages, beginning with the heading, Bucket Number 7?
12      A.   Yes.
13      Q.   And then going to bucket number eight;
14  correct?
15      A.   Yes.
16      Q.   Okay.
17      A.   And so --
18      Q.   So my question to you is, in these five
19  pages, would you tell me what the criteria is for
20  determining whether a letter centered upon a
21  consumer's assertion.
22      A.   "Centers," again, can be used as -- as a
23  synonym for "contains the feature of."
24      Q.   Okay.  And then, assuming you use that
```

27 (Pages 105 to 108)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 109

1  synonym, what would be the objective criteria for the
2  reviewer to determine whether the letter centered
3  upon something or contained the feature?
4          How do I know yes, it's in; no, it's
5  out?
6      A.  You can see on that page the first bullet.
7      Q.  Okay.  And what would determine whether the
8  consumer specifically cited authorization?
9          My question to you is, it's the word
10 "authorization" appearing there?
11         What -- what objective method would
12 determine whether or not that a consumer's
13 specifically citing an authorization?  And if it's
14 just the word "authorization," that's fine.
15         MR. O'NEIL:  Objection to form.
16         THE WITNESS:  "Authorization"
17 here is -- is -- is the -- is the keyword
18 that the reviewer is going to be looking
19 for, but the context of the use of that
20 keyword is going to be important.
21         MR. FRANCIS:  All right.  Let's
22 go off the video.
23         THE VIDEOGRAPHER:  Off the
24 video record, 12:56 p.m.

Page 110

1          (Luncheon recess.)
2          THE VIDEOGRAPHER:  Back on the
3  video record, 1:46 p.m.
4  BY MR. FRANCIS:
5      Q.  All right.  Dr. Lasater, before we took a
6  lunch break, I was asking you about bucket seven
7  within what you referred to as the training manual,
8  which appears at 6.2 of your report, and I was asking
9  you, and I'm going to ask you again, so does -- does
10 the page bucket seven and the following four pages
11 that precede bucket eight of your report -- or the
12 training manual, does it document the entire criteria
13 that the reviewers were applying when determining if
14 a letter fell into bucket seven?
15         MR. O'NEIL:  Objection, vague.
16         THE WITNESS:  This is the
17 direction that I gave them.
18 BY MR. FRANCIS:
19     Q.  Okay.  Is there any other direction that
20 you gave them regarding criteria or definitions,
21 objective, subjective or otherwise, other than what's
22 set forth here in the training manual?
23     A.  With respect to providing them with ex-ante
24 guidance, where -- where any differences between the

Page 111

1  first and second reviewer occurred with respect to
2  reading in a letter with -- with this feature or not,
3  that was resolved between the reviewers and the
4  quality assurance person at Logility.  So to --
5      Q.  And are you saying that --
6      A.  -- to the -- pardon me.  So to the extent
7  that there is a -- a confluence of understanding
8  about how a letter would be read with respect to this
9  criteria, that confluence has to be added to the
10 training manual that preceded the reading.
11     Q.  Okay.  But in terms of written criteria, am
12 I correct that what we're looking at here in bucket
13 seven, at 6.2 of your report, this is the only
14 written criteria they were provided with?
15     A.  Yes, sir.
16     Q.  Okay.  Now, I had asked you and you had
17 pointed me to bullet point number one of bucket
18 seven, the first page, which reads:  A letter should
19 be tagged bucket seven if the consumer specifically
20 sites authorization as an issue.
21         And I asked you what would the
22 reviewer -- how would the reviewer determine whether
23 a letter specifically cited authorization as an issue
24 versus generally cited or implicitly cited?

Page 112

1          What would be the -- the objective
2  element that would satisfy that criteria?
3      A.  Well, the use of the word "authorize," and
4  "authorize" -- "authorize" within the context of
5  sentences within the letter are reflected in the
6  examples that are provided.
7      Q.  Okay.  And what would they use to determine
8  whether there were other sentences in context which
9  would indicate that a consumer specifically cited
10 authorization as an issue?
11     A.  I -- once again, we're talking about words
12 within the general usage in the English language
13 as -- as -- as processed by lawyers who are trained
14 to read the English language and understand the
15 nuance of words within sentences and the legal --
16 and the -- and the linguistics associated with it.
17     Q.  Okay.  Would you agree with me that that
18 process or endeavor by the reviewers involved some
19 degree of subjective review?
20     A.  I would agree that it involves judgment and
21 that the judgment -- the variety of judgment can be
22 evaluated with respect to the divergence of
23 understanding of the words within the context that
24 they are provided and whether or not that divergence

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 113

1　is -- is something that is specific to the quality of
2　the document that is being -- and by quality, I mean
3　the characteristics of the document that is being
4　evaluated, and so it involves judgment, cognitive
5　analysis by trained lawyers, independent trained
6　lawyers, with respect to reading English language.
7　　　Q.　Okay.  And I think you said before -- would
8　the word "authorization" have to be present in the
9　letter in order for the -- the reviewer to determine
10　and code it as a bucket seven?
11　　　A.　I don't know -- I don't know whether
12　authorization is -- is specifically required, but I
13　believe that in most every instance, and I can't -- I
14　can't cite -- I can't cite an example outside it,
15　but -- but we see both of these letters -- both of
16　these letters from different consumers, and by the
17　way, I would point out that they are the same letter,
18　but -- but one of them is emphasizing other -- other
19　features of the letter as well, the highlighted and
20　yellow is using the word "authorize" within
21　sentences.
22　　　Q.　Is there a search query that could be
23　designed as applied to the population of letters that
24　your team reviewed which would identify all of the

Page 114

1　bucket seven letters that your team identified?
2　　　A.　I don't know.
3　　　Q.　Okay.  Do you know -- do you know any way
4　to test whether the criteria that's outlined here on
5　page bucket seven and in the accompanying pages was
6　correctly applied to the sample of letters that your
7　team reviewed?
8　　　A.　Yes, I mentioned it earlier.
9　　　Q.　Okay.  But you're not aware of any
10　electronic method for doing that?
11　　　A.　Well, the electronic -- the electronic --
12　the electronic method is when the letter was coded
13　and if there was a -- if there was a difference in
14　the coding for a letter, that -- that triggered a --
15　that -- that -- that triggered a difference, because
16　all of the letters were -- were read simultaneously
17　by two independent contract -- contract lawyers.
18　　　Q.　So are you saying that they -- all the --
19　the two contract lawyers reviewed all of the letters?
20　　　A.　What I'm saying is the letters were -- were
21　read by two -- by two contract lawyers in the employ
22　of Logility.
23　　　Q.　Okay.  I guess my --
24　　　A.　I don't know -- I don't know whether they

Page 115

1　were the same -- whether they were the same persons
2　or different persons, but what I can say is that --
3　that we got coding for the letters simultaneously
4　from two different, independent reviews of the
5　letters.
6　　　Q.　So are you saying each letter was reviewed
7　by two separate people?
8　　　A.　Yes.
9　　　Q.　Okay.
10　　　A.　And then -- and then the -- and then the
11　coding -- and then the coding after that was
12　evaluated with respect to its agreement.  If there
13　was disagreement, there was a resolution of that as
14　between -- as between the reviewers.
15　　　　　And then -- then subsequent to
16　that, once -- once we got the coding and we looked at
17　especially letters that had -- that had a template
18　characteristic, whether within the two samples, that
19　characteristic was treated similarly in the two as
20　samples, and so there were at least two layers of
21　quality assurance associated with the interpretation
22　of the -- of the characteristics of the letters.
23　　　Q.　Okay.  Are you saying that there were times
24　when the reviewers had conflicting views of what was

Page 116

1　stated in the letter such that they would have put
2　them in different buckets?
3　　　A.　The answer is -- the answer is -- is
4　conflicting generally in the sense of one not --
5　one -- one reviewer seeing more in a letter than
6　another reviewer.
7　　　Q.　So was your answer yes, that there were
8　situations where the reviewers would have differing
9　or conflicting buckets?
10　　　A.　Again, I'm not going to -- I'm not going to
11　suggest that they are conflicting, I'm going to
12　suggest that there were different -- when there was
13　different coding, then it was subject to a quality
14　assurance analysis, so that the -- that the coding
15　could be agreed between the quality assurance person
16　and the -- and the readers.  I think that's described
17　in the report.
18　　　Q.　Okay.  And how many different instances
19　were there where there was a differing reading or
20　a -- what I call a conflict between the two
21　reviewers?
22　　　A.　I -- I can't speak to that, I don't know.
23　　　Q.　Okay.  In terms of the criteria, so maybe
24　you answered this, maybe not, it was unclear to me,

29 (Pages 113 to 116)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 117

1    was the word "authorization" required in order for a
2    letter to be coded as bucket seven?
3                MR. O'NEIL:  Object, asked and
4        answered.
5                THE WITNESS:  I'm not sure I
6        would -- I would agree that -- that
7        authorization was required, but I
8        would -- I would anticipate that since
9        the issue has to do with authorization,
10       that the word should appear in the
11       letter.
12   BY MR. FRANCIS:
13       Q.   Okay.
14       A.   I'm using the word -- and I'm using
15   "should" as a normative; right?
16               That it would -- that we would
17   anticipate that if the letter had the word
18   "authorize," that bucket seven would be considered as
19   to whether or not the letter had a bucket seven
20   feature.
21       Q.   Okay.  But you're not certain whether the
22   word "authorization" was required in order for bucket
23   seven to be applied.
24       A.   It's not -- it's -- there is no -- there is

Page 118

1    no requirement.  A -- if you look at the first
2    bullet, there is the normative:  A letter should be
3    tagged bucket seven if the consumer specifically
4    cites authorization as an issue.
5                However, with respect to the category
6    where the -- the consumer asserts that they did not
7    authorize the end user's inquiry, then we have to
8    look at -- at the context in which the word
9    "authorize" appears.
10       Q.   Okay.  All right.  Are you saying, then,
11   that there were no required magic words, the presence
12   of which had to be there in order for bucket seven to
13   apply?
14       A.   Once again, a letter should be tagged
15   bucket seven, but it has to be -- the -- the
16   authorization has to be manually evaluated within its
17   context in order to determine whether the feature of
18   the assertion that the consumer's making with respect
19   to the authorization of the end user's inquiry is --
20   is a correct -- is a -- is a correct coding of that
21   feature.
22       Q.   Were there any required magic words for any
23   of the buckets?
24       A.   Once again, "should" is a normative, which

Page 119

1    sounds to me like it is a first criterion of
2    consideration by the reviewers.
3        Q.   If the consumer had stated, I never applied
4    for credit with company X, would that satisfy bucket
5    seven?
6        A.   We have to look at -- at any of the
7    other -- any of the other features; right?
8        Q.   How about just that sentence, I never
9    applied for credit with Capital One, does that --
10   does that get a bucket seven or did it not?
11       A.   I would have to look back at the sample to
12   know the answer to that question.
13       Q.   Okay.  If you want to, it should be right
14   there.  Why don't you look at the sample.
15       A.   What I'm saying is I'd have to look at
16   the -- I would have to look at the letters that fall
17   into the -- fall into the sample and look at the hard
18   copy of the letters themselves to see -- to see
19   whether or not there are any that have -- that are
20   exclusively -- exclusively the language that you are
21   using to see how those were coded.  I can't answer
22   your question without that.
23       Q.   Okay.  Okay.
24       A.   And that -- and that highlights -- that

Page 120

1    highlights the importance of -- of the need to look
2    at each letter independently.
3        Q.   Okay.  And if the consumer said, I never
4    gave Capital One permission to pull my credit, would
5    that be coded as -- have been coded as a bucket
6    seven?
7        A.   Once again, we would have to look at the
8    individual -- at the individual letters to see
9    whether or not permission and authorization are --
10   are viewed as equivalent in the hands of the -- in
11   the hands and in the brains of the contract
12   reviewers.
13       Q.   Would the presence of the language
14   "permission" or "I never gave me permission to run my
15   credit," would that be language which would trigger
16   the coding of bucket seven or not --
17       A.   Well, that's --
18       Q.   -- or would that depend on the reading of
19   the reviewer?
20       A.   Once again, I didn't insert myself into the
21   interpretation, Mr. Francis.  This was -- these were
22   contract lawyers reading -- reading these letters and
23   agreeing on their inclusion -- inclusion with respect
24   to a category.  We would have to look at each and

30 (Pages 117 to 120)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 121

1    every letter to be able to answer your question.
2        Q.   Okay.  Well, I'm just -- well, I'm just
3    asking whether or not that was a rule, that if the
4    word "permission" were included or a phrase
5    mentioning permission, whether that would be a rule
6    which would cause the reviewer to assign bucket
7    seven, regardless of what they did.
8        A.   Yeah, the answer -- yeah, the answer -- the
9    answer to that is -- the answer to that is there is
10   not -- there is not a rule, but that is -- that is
11   one of the elements of needing to read the letters
12   individually because of the wide variety of English
13   language within context in sentences and paragraphs
14   in -- in -- in any -- in any correspondence between
15   the consumer and TransUnion.  That is why -- that is
16   why human intervention in this is important, and
17   we --
18       Q.   Do you know -- go ahead.
19       A.   -- we would have to look at the variety of
20   the letters and the languages that were -- the
21   languages that were -- that were, I'll say,
22   affirmed -- because of the quality assurance --
23   quality assurance that went on, that were affirmed,
24   that went into those categories.

Page 122

1        Q.   Do you know why TransUnion considered the
2    letters that you reviewed to be disputes of inquiries
3    such that it sent a 502 letter?
4            MR. O'NEIL:  Excuse me, Dr.
5        Lasater.
6            Objection.  Once again,
7        misstates the record.
8            THE WITNESS:  Mr. Francis, you
9        want to take me into -- into an arena
10       of -- of dispute.  My -- my direction was
11       not with respect to the word "dispute,"
12       my -- that was simply not my direction,
13       and so I'm -- I'm -- I'm hesitant -- I'm
14       hesitant to -- to try to answer your
15       question because it's foreign to -- it's
16       foreign to the objective of my work.
17   BY MR. FRANCIS:
18       Q.   Okay.  Let me ask it a little different,
19   maybe I'll -- we'll bypass that concern of yours.
20           Do you know what features of the
21   letters from class members, including the ones that
22   your team reviewed, that led TransUnion to send them
23   a 502 letter?
24       A.   You asked me early on in this deposition if

Page 123

1    I understood what the processes were at TransUnion
2    with respect to the correspondence between the
3    consumers and -- and the company, and I said I didn't
4    know what that -- what that process was, and so I --
5    I simply can't answer your question.
6        Q.   Okay.  So I think my question's a little
7    bit different, just to be clear.
8            You're not aware of what features in
9    the letters caused TransUnion to send the class
10   members a 502 letter; right?
11       A.   No, I'm not aware.
12       Q.   Okay.  Okay.  Okay.  Let's go back.  We
13   were at the summary of your opinions, Section 1.4, we
14   had left off at opinion two, I had asked you some
15   questions about your statement about 43.7 percent of
16   the letters do not complain directly about the
17   accuracy of an inquiry on a consumer's TransUnion
18   file.
19           What data did you rely upon to
20   conclude that figure?
21       A.   It should be the confluence of the union of
22   the categories seven, eight, ten, 11 and 12.
23       Q.   Okay.  And the reason I ask that question
24   is because in your opinion, you mention several times

Page 124

1    about the question about a consumer complaining
2    directly, but I don't see "complaining directly" in
3    any of the letter categories, so for -- you were the
4    one that supplied the analysis that 43.7 percent of
5    the letters did not complain directly; correct?
6        A.   I am.
7        Q.   Okay.  None -- and would you agree with me
8    that none of the letter categories in Table 2 contain
9    a category for whether or not a letter complained
10   directly about the accuracy; correct?
11       A.   That is correct.
12       Q.   Okay.  Now, prior to applying whatever
13   analysis you applied, what was the definition of
14   "directly" that you used in connection with Table 2
15   to determine that 43.7 percent number?
16       A.   Whether or not a letter -- whether or not a
17   letter had -- had been coded as seven, eight, ten, 11
18   or 12.  It is that simple.
19       Q.   And why -- why does "directly" apply only
20   to those categories?
21       A.   It has to do with accuracy.  We're talking
22   about accuracy.
23       Q.   Okay.
24       A.   I could have -- I could have -- I could

31 (Pages 121 to 124)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 125

1    have omitted the word "directly" and accomplished
2    the -- accomplished the same -- the same meaning.
3           You -- you seem to be focused on the
4    word "directly," and if we strike "directly" and read
5    the sentences with respect to accuracy, we come to
6    the same conclusion.
7           I guess, in other words, I'm urging --
8    I'm urging that "directly" is, perhaps, being given
9    more meaning in the way you are trying to evaluate my
10   decision process than I intended it.
11       Q.  Okay.  And can you give me an example of a
12   letter which would complain indirectly about the
13   accuracy of an inquiry?
14       A.  Once again, you're -- you're -- you're
15   putting an emphasis on "directly" and I'm suggesting
16   that you can strike "directly" and accomplish exactly
17   the same conclusion that I am describing with respect
18   to complaining about the accuracy of the --
19   complaining about the accuracy of their account,
20   where they make a specific reference to an entry on
21   the account within the categories of seven, eight,
22   ten, 11 and 12.
23       Q.  Okay.  All right.  I've asked you about
24   some of the facts or assumptions for opinion three.

Page 126

1           Let's go to opinion four.  You write
2    that:  On the basis of a systematic analysis of the
3    439,618 letters, more than 45 percent of the letters
4    reflect at least 16 different apparent templates used
5    to shape the letters, period.
6           Do you see that?
7       A.  Yes.
8       Q.  Okay.  Why the reference to templates?
9       A.  We want to put a label -- we want to put a
10   label on letters that appear to be nearly identical.
11   I had to choose a label and so I chose the word
12   "template."
13       Q.  Okay.  And what's the relevance of looking
14   at -- what was the relevance for you, in terms of
15   your opinions, as to the relevance of whether or not
16   a letter appeared to have come from a template?
17       A.  The relevance is to simply advise -- advise
18   counsel originally, advise the client and -- and
19   report, for purposes of -- of this litigation matter,
20   that many of the letters seemed to be different only
21   in the name of the addressee and the identification
22   of the creditor who is -- who is identified or
23   creditors who are identified in the letter, that the
24   question -- the question is, does the letter seem to

Page 127

1    be -- does the letter seem to be a unique -- a unique
2    piece -- a unique piece of correspondence or is it a
3    correspondence that follows a particular, specific
4    pattern.
5       Q.  And what did you -- what criteria did you
6    use or apply to determine whether or not a letter was
7    a template?
8       A.  The process -- the process for that, Mr.
9    Francis, is -- is -- is described in -- in detail
10   within the report.
11       Q.  Okay.  I'm asking you to -- if you recall
12   it, if you don't recall it, we can look at it --
13       A.  Well --
14       Q.  -- if you can recall what the process was?
15       A.  -- I'm going to describe it generally, and
16   if we want to go into the specifics, then we would
17   also have to go into all of the -- all of the
18   computer programming that was used --
19       Q.  Okay.
20       A.  -- to -- to implement two different
21   software packages that are generally accepted within
22   bibliographic search in -- in American litigation --
23       Q.  Okay.  What record --
24       A.  -- and we can -- we can look -- we can look

Page 128

1    at Figure 3 as the -- as the description.
2       Q.  Okay.  Fine.  Okay.
3       A.  -- and so two --
4       Q.  Now --
5       A.  -- two different software packages were
6    used --
7       Q.  Okay.
8       A.  -- and the process that -- the process that
9    was activated within each of those softwares is -- is
10   described graphically in Figure 3 and in text in the
11   report in paragraphs surrounding Figure 3 and in
12   detail in -- in attachments to the report.
13       Q.  Okay.  To be clear, for the record, are you
14   referring to the section of your report that begins
15   with Section 3, at page 23, and ends at page 29,
16   paragraph 63?
17       A.  Yes, sir.
18       Q.  Okay.  Great.  Now, did you or anybody from
19   the team make any determination or assessment as to
20   which, if any, of the templates related to templates
21   used by credit repair organizations?
22       A.  First of all, your question assumes that I
23   would know if or whether templates are used at credit
24   repair organizations.  I don't know, and so I can't

32  (Pages 125 to 128)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 129

1   answer your question.
2       Q.  Okay.
3       A.  What I --
4       Q.  You are --
5       A.  What I -- but what I can tell you is that
6   we have -- we have discovered 16 varieties of near
7   identical letters within the population of 400,000 or
8   so letters.  There are --
9       Q.  All right.  And --
10      A.  There are more -- there are more, but we --
11  but we stopped at -- we stopped at 16 because the --
12  the number of identicals was starting to decline
13  as -- as you can see.
14      Q.  Did you, in your analysis, make any attempt
15  to determine whether the templates that you
16  identified were templates that came from a credit
17  repair organization versus a consumer using a
18  template online to submit a dispute?
19      A.  No.
20      Q.  Okay.  Am I correct that your analysis and
21  report does not distinguish between those two type of
22  templates; correct?
23      A.  Assuming that -- assuming that credit
24  repair shops use templates, the answer is no.

Page 130

1       Q.  Okay.  So if credit repair organizations
2   use certain templates and there are also templates
3   that exist on the Internet that consumers can use to
4   make disputes, does your analysis in any way
5   distinguish between those two types of templates or
6   those types of templates?
7       A.  This particular section of the -- this
8   particular section of the report does not make any
9   attempt to distinguish between this -- distinguish or
10  identify the source of the templates.
11      Q.  Okay.  Is there a portion of this report
12  which does?
13      A.  No, there's -- there is a portion of the
14  report that addresses the -- the question, and one
15  would have to -- one would have begin to do a
16  confluence of -- of distant -- distant sends and
17  templates in order to begin to do that from a
18  quantitative analysis perspective.
19      Q.  Okay.  So would you agree with me that the
20  portions of your opinion which relate to the
21  percentage of letters which you deemed to be
22  templates would include templates that consumers
23  could obtain online by themselves if such -- if such
24  things existed?

Page 131

1       A.  Yes, I acknowledge that in the report.
2       Q.  All right.  If -- now, let's turn to the
3   top of page 6, we're still at opinion four.  You
4   state:  This observation creates uncertainty that the
5   complaints, assertions, demands -- excuse me, the
6   complaints, assertions, questions or demands in the
7   letters reflect bona fide points of view or
8   perspectives of the consumers whose names are
9   associated with the letters.
10              Do you see that?
11      A.  Yes, sir.
12      Q.  What do you mean by bona fide in that
13  sentence?
14      A.  Original, valid, self-determined.
15      Q.  And what do you mean that the observation
16  creates uncertainty that the complaints, assertions,
17  questions or demands were not valid?
18              What do you mean by valid?
19      A.  Valid as the Court would define it, valid
20  as that term might be used in -- in using this
21  information in this -- in this litigation matter.
22      Q.  What do you mean?
23              How would the Court, in your
24  understanding, define valid?

Page 132

1       A.  Once again, whether or not -- whether or
2   not a consumer is part of the class is a -- is a
3   legal determination.
4               All I am saying is if the letter is --
5   is sent distant and seems to be from a template, that
6   creates uncertainty as to whether or not that letter
7   is -- is -- is an authentic, original,
8   self-determined assertion, question, demand by the --
9   by the consumer themself.
10      Q.  And what do you mean by self-determined?
11      A.  Original.
12      Q.  So when you say original, you mean it comes
13  from the consumer, the consumer -- or that the
14  consumer wrote it specifically?
15      A.  Well, one can hire an agent.  The question
16  is whether or not the agent took direction from the
17  consumer.  If the agent --
18      Q.  How about if the --
19      A.  If the -- if the agent takes direction from
20  the consumer, then I would say that the consumer is
21  the originator of the idea that is reflected in the
22  letter.
23              If, on the other hand, the consumer
24  just turns over a credit report to -- to an agent and

33 (Pages 129 to 132)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 133

1    the agent conceives of a -- of a basis for creating a
2    correspondence with TransUnion, I would describe that
3    as originating from the -- the agent and not from the
4    consumer.
5        Q.   What about if the consumer asks someone,
6    please draft a letter for me, then the consumer sends
7    it, would that be an original and valid dispute for
8    you?
9        A.   There is -- now you're -- now you're
10   getting into -- now you're getting into the law of
11   agency, and all I'm saying is that this -- this
12   observation of distance and templates creates
13   uncertainty that has to be resolved on a
14   letter-by-letter basis within this -- within this
15   file of 400,000 letters.
16       Q.   And that's because, in your view, you can't
17   write a program to look for search terms; right?
18       A.   One can write a program to look for search
19   terms, but one cannot make -- make a definitive
20   determination of a letter ex-ante without looking at
21   the -- the complete letter.
22       Q.   Why not?
23       A.   Because the English language is complex and
24   meaning is complex, and here we have -- here we

Page 134

1    have -- also, we're adding -- we're adding players to
2    the use of the language as that -- as that language
3    might be developed in or around enforcement of a --
4    of a regulation.
5        Q.   Do you think a query could be designed that
6    would look for the sentence, I write to dispute an
7    inquiry on my TransUnion credit report?
8            Do you think you could search
9    400-and-some-thousand letters for that sentence?
10       A.   For that exact sentence?  Of course.
11       Q.   Okay.  And do you agree with me that within
12   the 400,000 letters that you were tasked with
13   providing an analysis of, you could write one or many
14   queries -- word searches and queries of those letters
15   and search them?
16       A.   Well, when you say many, we have to have an
17   objective, and the question is, within -- within the
18   malleability of the English language, can -- can we
19   assign yet, within current computer technology, an
20   ability to interpret meaning by -- by meaning --
21   by -- by program language, and the answer is, if we
22   were able to do that, we would have done that through
23   these single -- these single softwares, but, in fact,
24   the best we can do is say that it just creates

Page 135

1    uncertainty about -- about the bona fide points of
2    view.
3            Even -- even in the -- even in the
4    handling of -- of highly sophisticated and very
5    expensive software that -- that has as its -- as its
6    objective the ability to -- to sift and sort the
7    English language, it still has to be evaluated on a
8    letter-by-letter basis to discern the meaning --
9    discern the meaning that is intended or that -- that
10   at least objectively is evaluated in that letter.
11           We can't --
12       Q.   Are you saying you need a human being to
13   read the letter in order to render a decision as to
14   what the letter -- what words are stated in the
15   letter?
16       A.   As -- as pertains -- as pertains to the way
17   the letter would be applied, the letter would need to
18   be included as evidence of a consumer's communication
19   in this -- in this litigation matter.
20       Q.   So it's your view that you would need a
21   human being's interpretation or judgment in looking
22   at the letter to make a determination what it was
23   saying or what category it was in.
24       A.   Definitively?  Yes.

Page 136

1        Q.   Okay.  And would you also agree that --
2    that human intervention could introduce human error
3    and human judgment?
4        A.   That is where -- that is where the -- the
5    role of the dictionary and the use of -- the use of
6    words within a culture become important.
7        Q.   The use of words within a culture, what do
8    you mean by within a culture?
9        A.   Within -- within -- within ordinary --
10   ordinary use as a -- as a dictionary that would be
11   used in the United States would understand it.
12       Q.   Do you consider yourself an expert in
13   semiotics?
14           MR. O'NEIL:  Objection, vague.
15           THE WITNESS:  I think you asked
16       me -- you didn't ask me that specific
17       question, but you asked me about
18       linguistics, and the answer is no.
19   BY MR. FRANCIS:
20       Q.   All right.  But you would agree with me
21   that if what we wanted to see was whether there were
22   certain words or sentences in these letters, it could
23   be done electronically through a search query, you
24   agree with that; right?

34  (Pages 133 to 136)

**Norman, Sr. v. Trans Union, LLC**                          **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 137

1    A. Ask -- again, ask the question again,
2  because it sounds to me like it's misstating what I
3  said.
4    Q. Okay. Well, then, let's get it clear.
5        Would you agree with me that you could
6  design a search query that looked for whether a
7  letter contained certain words or certain sentences
8  and run that against the -- the class letters?
9    A. You asked me that earlier on and I said
10 yes --
11   Q. Okay.
12   A. -- but what it doesn't -- but what it --
13 but what it doesn't do is -- is address the question
14 specifically unless the computer is programmed to
15 interpret the -- the language as the Court would
16 require it or as the jury would require it to be
17 interpreted.
18   Q. Well, are you saying that a human being
19 interpreting the letter would be how the jury
20 interprets the letter?
21   A. What I'm saying is independent lawyers
22 reading these letters have categorized them and put
23 features on them. I offer that -- I offer that as --
24 as evidence that there are multiple contexts for the

---

Page 139

1  used in artificial intelligence and know that they
2  are fallible.
3    Q. Are you saying that you have expertise in
4  the capabilities and the current capacities of AI
5  technology?
6    A. No. What I'm saying is AI technology has
7  not gotten to a point where, as a lay observer and as
8  a professional user of decision rules in -- in
9  algorithms, that replace the -- the -- the human
10 interpretation of the English language with respect
11 to the kinds of things that are the subject of this
12 litigation, as I understand.
13   Q. You think that you are knowledgeable about
14 the full capacities and capabilities of AI technology
15 in terms of searching documents and words?
16   A. Well, so -- so the answer is, once again,
17 there is no artificial intelligence that is offered
18 to the legal community that processes responsiveness
19 of features of -- of any documents infallibly.
20   Q. How do you know?
21       Do you know what the market is out
22 there for artificial intelligence technology?
23   A. Again, we're talking -- we're -- Mr.
24 Francis, we're talking about -- we're talking about

---

Page 138

1  complaints, assertions, questions and demands in
2  these letters.
3    Q. When you say multiple contexts, do you mean
4  the other sentences or do you mean other complaints
5  or something different?
6    A. Once again, we talked about context at the
7  beginning of this -- of this deposition; the
8  situation or the circumstances in which the -- in
9  which the communications are being written.
10       If we had -- if we had sufficient
11 automated intelligence to discern all of this meaning
12 that -- that you are asking me about within a
13 computer, none of us would be on this call.
14   Q. I don't know what that means, but let me
15 ask you a follow-up question.
16       Do you consider yourself an expert or
17 having expertise in automated intelligence, or AI?
18   A. To the extent -- the -- the answer is, to
19 the extent that decision rules are -- are developed
20 so that inputs can be processed and developed into
21 subsequent inputs statistically speaking, then --
22 then there is an element -- the statistical element
23 of that is something that I can address. I'm aware
24 of -- of recursive -- recursive algorithms that are

---

Page 140

1  using bibliographic -- bibliographic data as -- as we
2  have it here in the correspondence between these
3  consumers and TransUnion, and what has gone on in the
4  legal community with respect to trying to process the
5  huge volumes of it, that began with the -- that began
6  with Judge Peck's decision in the Southern District
7  and are part of the Sedona Conference protocols that
8  have developed across the last 15 years, some of
9  which I was a part.
10   Q. All right. Going down further, Section
11 1.6, proportions and sampling, page 6, there is an
12 indented paragraph, which is not consistent with the
13 indent under that, but that begins: We frequently
14 collect data on categorical variables, such as
15 whether or not a person is employed, the brand name
16 of a cell phone or the country where a college
17 student studies abroad. When we record categorical
18 variables, our data consists of counts or percent
19 obtained from counts, period.
20       Do you see that?
21   A. Yes.
22   Q. Is that something excerpted from another
23 place, or why is it indented there?
24       Is this a quotation from somewhere

---

35 (Pages 137 to 140)

Page 141

1  else?
2      A.  It should be a quote directly from Moore,
3  McCabe & Craig --
4      Q.  Okay.
5      A.  -- which is -- which is cited as footnote
6  1.
7      Q.  All right.  Going to page 7, paragraph 17,
8  you write that:  When the goal is to evaluate the
9  proportion or rate of occurrence of a characteristic
10  in the population, a small random sample of the
11  population is generally accepted when the proportion
12  or rate is assumed to be uniformly distributed
13  throughout the population, period.
14          Do you see that?
15      A.  Yes, sir.
16      Q.  Okay.  And would you agree with me that a
17  small random sample is not necessarily generally
18  accepted when the proportion rate is not uniformly
19  distributed throughout the population?
20          Do you agree with that premise?
21      A.  Not necessarily.  At that point -- at that
22  point, would -- the population can be -- can be
23  stratified, so that that which is not -- that rate
24  which is discoverable -- discoverable different

Page 142

1  within the -- within the strata can be combined with
2  the -- with the -- with the rate of a different
3  strata and you can still get a very small -- you can
4  still get a very small sample.
5      Q.  Not within the same five percent --
6      A.  You have -- you have -- you have to
7  stratify it.
8      Q.  But it's not within the same five percent
9  margin of error; right?
10      A.  Oh, yes, you certainly can.
11      Q.  Even if it's not uniformly distributed?
12      A.  That's correct, as long as you have -- as
13  long as the strata are uniformly -- as long as the
14  rate within the strata is uniformly distributed.
15      Q.  Okay.
16      A.  And then you speak to an average rate
17  across the population as -- as a -- as an average or
18  a weighted average of the results from the strata.
19      Q.  Okay.  Paragraph 19, you write:  Similarly,
20  if the rate of a binary characteristic of a letter is
21  uniformly distributed throughout the population of
22  letters in this matter -- excuse me -- we can use
23  binomial sampling to discover the rate, period.
24          Do you see that?

Page 143

1      A.  Yes.
2      Q.  What do you mean by binary characteristic?
3      A.  Binary is one or zero.
4      Q.  Okay.  All right.  And is it your testimony
5  that you used the type of binomial sampling in this
6  case for the letters -- the sample of letters that
7  you looked at in accordance with paragraph 19?
8      A.  Yes.
9      Q.  Okay.  Let's turn to paragraph -- well,
10  strike -- strike -- let's -- let's go to page 8.
11          MR. O'NEIL:  Mr. Francis --
12          MR. FRANCIS:  Yes.
13          MR. O'NEIL:  -- we've been
14  going for about an hour.  Do you mind if
15  we just take a quick break, like a couple
16  minutes.
17          MR. FRANCIS:  Sure.  How about
18  five, five, seven, whatever you want.
19          MR. O'NEIL:  Thank you.
20          Off the record.
21          THE VIDEOGRAPHER:  Off the
22  video record, 2:42 p.m.
23          (Brief recess.)
24          THE VIDEOGRAPHER:  Back on the

Page 144

1  record, 2:49 p.m.
2  BY MR. FRANCIS:
3      Q.  Dr. Lasater, picking up from where we were
4  in your report, page 8, there's a heading in bold
5  which reads:  Analysis of the letter population.  Do
6  the letters reflect more than one context for their
7  complaints, assertions, questions and -- or demands.
8          Do you see that?
9      A.  Yes, sir.
10      Q.  Why would it be relevant whether the
11  letters had one or more context?
12      A.  I was asked to evaluate that.
13      Q.  Okay.  And would -- if a letter contained a
14  dispute of an inquiry, but also disputed other items
15  and other creditor accounts, would that be a letter
16  that reflected more than one context, according to
17  your view?
18      A.  Please ask -- please ask the question again
19  or ask the court reporter to read it back, please.
20      Q.  Sure.  If a letter contained a dispute of
21  an inquiry and, also, a dispute of other accounts or
22  tradelines and/or other inquiries, would that fall
23  within the definition of more than one context,
24  according to your view?

36  (Pages 141 to 144)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 145

1    A.  I don't understand the second -- the second
2    part of your question.
3    Q.  If somebody was -- if the consumer was
4    disputing multiple things, some inquiries, some
5    tradelines, some accounts, the consumer was disputing
6    multiple things, would that be multiple contexts?
7    A.  Once again, I don't understand your word
8    "tradeline."
9    Q.  Okay.  Do you understand that on a credit
10   report, in addition to inquiries, a consumer can have
11   tradelines or accounts?
12          MR. O'NEIL:  Objection.
13          Objection.  Obviously, vague as to the
14          term "tradelines."
15          THE WITNESS:  I do not
16          understand the word "tradeline," Mr.
17          Francis.
18   BY MR. FRANCIS:
19   Q.  Okay.  That's okay.
20          Have you ever seen a credit report?
21   A.  I have.
22   Q.  Okay.  And do you understand that credit
23   reports often contain accounts that that consumer
24   has?

Page 146

1    A.  Where there are -- there have been
2    inquiries -- inquiries of creditors that are
3    reflected on that account, as well as -- as well as
4    the continuing existence of, I guess, of a creditor
5    of that consumer, that is what I understand and
6    remember from the -- the image of the accounts that
7    I've seen.
8    Q.  Okay.  And the accounts that you've seen,
9    weren't there times where a person is -- was
10   disputing multiple items on their report, not just
11   one inquiry?
12   A.  If you're asking disputing more than one
13   inquiry, I understand that question.
14   Q.  Okay.  Would that be a situation that
15   involved multiple contexts, according to your view?
16   A.  It depends on what the nature of the -- the
17   nature of the question that they're asking, the
18   demand that they're making, the assertion that
19   they're making with respect to one or a group of --
20   of items.
21          That would -- would this
22   methodology -- would this methodology be flexible
23   enough to observe that?  And the answer is yes.
24   Q.  Not quite my question.

Page 147

1    My question is, is if a consumer were
2    disputing multiple items, would that satisfy your
3    view of more than one context?
4          MR. O'NEIL:  Objection,
5          incomplete hypothetical.
6          THE WITNESS:  I think the --
7          the context or the situation or the
8          circumstance has to do with the nature of
9          the -- the question, the complaint, the
10         demand that the consumer is making.  That
11         is what I mean by -- that is what I mean
12         by context.
13         The situation that the consumer
14         finds themself in with respect to one or
15         more entries can -- can have multiple
16         features, and that is one of the benefits
17         of the individual letter-by-letter
18         analysis and the list of features and
19         characteristics that -- that this
20         analysis intends to identify.
21   BY MR. FRANCIS:
22   Q.  Are you telling me that you can't tell from
23   my question if a consumer disputed more than one
24   inquiry, you don't know whether that would be an --

Page 148

1    an example of more than one context?
2    A.  I did not think of it in those terms, Mr.
3    Francis.
4    Q.  Can you give me an example of a letter
5    which would present more than one context?
6    A.  We have -- we have many, many, many, many
7    contexts, that is with respect to the categories that
8    are identified, and so if you were to look in the
9    report on I believe it's Annex 5.4 --
10   Q.  Okay.  I'm there.
11   A.  -- you can -- you can see the summary of
12   coding and the frequencies of combinations of -- of
13   questions, assertions, demands by category and -- and
14   the -- and the differences run for multiple pages,
15   and so each of those could be characterized as a
16   context for the communication between the consumer
17   and TransUnion in the way that this analysis was
18   performed.
19   Q.  Okay.  To be clear, we're looking at 5.4,
20   heading, Category Combinations; correct?
21   A.  Yes, sir.
22   Q.  Page 39 of your report; correct?
23   A.  Yes, sir.
24   Q.  All right.  And the first column is

37 (Pages 145 to 148)

**Norman, Sr. v. Trans Union, LLC**                                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 149

```
 1    Category Combinations; correct?
 2       A.  Yes.
 3       Q.  And am I correct that the numbers under
 4    that -- in that column are numbers that pertain to
 5    the various buckets that you've testified about
 6    today?
 7       A.  Yes, sir.
 8       Q.  Okay.  Is it your testimony that when we
 9    see multiple buckets, that would be a situation of
10    more than one context?
11       A.  That would be a set; that is, where we
12    had -- where we had multiple features from a -- from
13    a quantitative analysis perspective, each of those
14    combinations becomes a context or a situation for
15    those particular -- those -- those particular
16    consumers, and you can see the frequency of those
17    combinations across the -- across the two samples.
18       Q.  Okay.  Gotcha.  Now, going back to your
19    sampling, I was asking you earlier about the small
20    sample size using the binomial sampling that you
21    mentioned before.
22          At paragraph 21, Figure 1 and at
23    paragraph 25, Figure 2, you identify letters and
24    documents by certain time periods; correct?
```

Page 150

```
 1       A.  Yes.
 2       Q.  Okay.  And in paragraph -- in Figure 1, you
 3    break down the letters -- number of letters for each
 4    month for the year reflected there; correct?
 5       A.  Yes, with the -- with the exception, I
 6    think of the front and the back end, where we
 7    combine, I think, January, February and -- and
 8    October, if memory serves.
 9       Q.  Okay.  And then in Figure 2, you break down
10    the documents in the class period into different time
11    periods or chronological segments; is that right?
12       A.  Yes, sir.
13       Q.  So my first question is, why in Figure 1
14    are you using months, Figure 2 you're using these
15    other time periods?
16       A.  Well, the -- well, let's look at January --
17    let's look at 20 -- 2018.  I think we have -- we
18    have 30 -- we have 34 months, and I think we combined
19    the 34 months into -- into 16 -- into 16
20    chronological segments for -- for the benefit of --
21    of dealing with fewer -- fewer chronological segments
22    from which we would take a meaningful random sample.
23       Q.  Okay.  So did the -- the random sample that
24    you took, again, this is the 800 letters; right?
```

Page 151

```
 1       A.  Two -- two sets of -- two sets of 400,
 2    totaling 800, yes, sir.
 3       Q.  Okay.  Now, were they taken from the
 4    chronological segments in Figure 2 or the month
 5    segments in Figure 1?
 6       A.  They would have been taken from the
 7    chronological segments in Figure 2.
 8       Q.  Okay.  So let's look at -- let's look at
 9    Figure No. 2.
10          What time period does each
11    chronological segment pertain to?  How long is it?
12       A.  I don't -- I don't recall the -- the
13    specific start and end dates.  I would have to go
14    back to -- and it may be in the -- in the data that
15    we have provided.
16       Q.  Okay.  And then, do I understand correctly
17    that what you did is you pulled 25 letters from each
18    of the chronological segments?
19       A.  That is correct.
20       Q.  Okay.  Now, do you know whether or not the
21    letters that TransUnion received that are at issue in
22    this class were uniformly distributed evenly across
23    all the segments?
24          MR. O'NEIL:  Objection, vague.
```

Page 152

```
 1          THE WITNESS:  For purposes of
 2    doing sampling, uniform -- a uniform rate
 3    or a homogeneous rate across strata was
 4    assumed for purposes of developing the
 5    sampling.
 6    BY MR. FRANCIS:
 7       Q.  Correct, so -- so that was going to be my
 8    next question.
 9          You assumed a uniform distribution
10    over the 16 chronological segments; correct?
11       A.  No, sir.  The uniform -- there is no --
12    there is no necessary requirement of a uniform
13    distribution, there is an assumption about a
14    homogeneous rate of a characteristic across the
15    population, across these chronological segments.
16       Q.  Okay.  Fine.
17       A.  And the --
18       Q.  Well --
19       A.  -- and the -- the sample design -- and the
20    sample design follows from that.
21       Q.  You assume, then, a uniform homogenous rate
22    across the various 16 segments; correct?
23       A.  For -- for each and every characteristic
24    which could have a different rate across the
```

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 153

1      population.
2          Q.   So did your -- did your model and -- and
3      sample -- sampling take into account that there might
4      have been different distributions of the types of
5      characteristics at different chronological segments?
6          A.   The -- the going-in assumption was that
7      that would be discoverable in the course of the
8      analysis, and -- and the expectation was not
9      disproved, as I report in the histograms in my
10     supplemental report.
11         Q.   What did you do specifically to test
12     whether or not the characteristics were homogeneously
13     distributed across the 16 different chronological
14     segments?
15         A.   I think we looked at the -- I think we
16     looked at the -- the hit rates within the -- within
17     the categories.
18         Q.   Okay.  And what part of the report is that?
19         A.   That would be reflected in the supplemental
20     report.
21         Q.   Which supplemental report, the first one or
22     the one that just came in yesterday?
23         A.   The one that came in yesterday.
24         Q.   All right.  Turning your attention to page

---

Page 154

1      12, paragraph 21, you write:  A preliminary reading
2      with counsel of the letters from approximately 20 of
3      the randomly selected documents initially disproves
4      the hypothesis that there was a single category of
5      complaint, assertion, question or demand
6      characteristic of the letters across the population.
7              Do you see that?
8          A.   Yes, sir.
9              You're reading in -- you're reading in
10     paragraph 21?
11         Q.   Twenty-seven.
12         A.   I'm sorry.  Yes, sir.
13         Q.   Okay.  Who is the counsel that is
14     identified there in paragraph 27?
15         A.   Mr. O'Neil and Mr. Hartmann.
16         Q.   And when was that reading done with them?
17         A.   In June of 2021.
18         Q.   And how long was that reading that you did
19     with them?
20         A.   Well, when I say reading with counsel, let
21     me expand -- let me expand the process that was
22     performed.
23         Q.   Sure.
24         A.   Within the -- within the population of

---

Page 155

1      letters, 20 were randomly selected, and if memory
2      serves, we used a random number generator to do it,
3      and those 20 were read by Ms. Harrington and then by
4      me with Ms. Harrington and then a discussion with
5      the -- follow-up with counsel with respect to the
6      reading that we -- that we did with respect to those
7      letters.
8              So we did independent reading and then
9      I had a discussion with counsel about the -- about
10     the variety of contexts or situations or
11     circumstances that we were seeing in the letters as
12     those -- as those communications were between the
13     consumers and TransUnion, and that discussion
14     probably lasted 90 minutes.
15         Q.   Okay.  Are you saying that you sat there
16     with Mr. O'Neil and Mr. Hartmann and looked through
17     these letters or you guys had read the letters
18     separately, got together and talked about it for 90
19     minutes or something different?
20         A.   The -- the latter.  Not -- not something
21     different, the latter, in that Ms. Harrington and I
22     read the letters independently --
23         Q.   Right.
24         A.   -- and then we had a conversation with

---

Page 156

1      counsel about those with the letters being presented
2      on the screen and -- and -- and having a discussion
3      about them.
4          Q.   Okay.  The reference to the hypothesis that
5      there was a single category of complaint, where did
6      that hypothesis come from?
7              Who hypothesized that, that these
8      letters had a single complaint?
9          A.   I think that was -- that was part of the
10     original question to me, do these reflect more than
11     one context.
12         Q.   Okay.  That's what you're referring to.
13     Okay.
14             Okay.  And then further -- paragraph
15     28, you provide more detail regarding this reading
16     with counsel.  Halfway down you state that:  Based on
17     the actual testing of the target samples described
18     below, 93.5 percent of the letters eventually
19     evaluated to the two waves of sampling were
20     attributed with one or more of the 15 substantive
21     categories from the pilot, period.  See Table 6 here
22     in, footnote 9, period.
23             Do you see that?
24         A.   Yes, sir.

---

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 157

1    Q.  Okay.  And, again, all of that's with you,
2    Mr. O'Neil and Hartmann?
3        A.   When you say all of that, what do you mean?
4        Q.   Well, you talked about this reading in
5    paragraph 27.  I'm asking whether this further
6    analysis of the 93.5 percent, the 15 substantive
7    categories, is this all still part of that reading
8    with Mr. O'Neil and Mr. Hartmann?
9        A.   No, sir, that would be a -- it would be a
10   misunderstanding and -- and a -- and a faulty
11   development of the report by me.  I would have
12   opened up a new paragraph that would have begun with
13   "based on."
14       Q.   I see.  Okay.  So the involvement of Mr.
15   O'Neil and Mr. Hartmann end at halfway through
16   paragraph 28, three geographical categories; is that
17   right?
18       A.   That would be correct.
19       Q.   Okay.  And the independent readers that
20   you're referencing there, who are the independent
21   readers that are being referred to there?
22       A.   These are employees -- they were employed
23   by or contracted by Logility.
24       Q.   Okay.  And they were -- Logility was paid

---

Page 158

1    by TransUnion; correct?
2        A.   I -- I would assume so, yes, sir.
3        Q.   All right.  Have you ever seen either of
4    the dispute letters from the representative
5    plaintiff, Mr. Norman, in this case?
6        A.   I don't think so, no, sir.
7        Q.   Okay.  If I were to show you those two
8    letters and give you 20 minutes, half-hour to look at
9    them, would you be able to assign them to one of your
10   buckets?
11       A.   I could, but I'm not sure that my -- it's
12   not my determination that is important here, it's the
13   determination of the independent readers.
14              I am not a -- I am not a -- I'm not a
15   quality control filter on this, but, rather, the
16   reporter of a process, and so in order for it to be
17   fair, it would have to go through -- it would have to
18   go through that process at Logility to make that
19   determination.
20       Q.   Oh, so you're saying if I gave you these
21   letters, you could not apply the criteria that you
22   set forth in your report and testified about today to
23   determine which buckets Mr. Norman's letters would
24   fall within?

---

Page 159

1        A.   I didn't say that I couldn't do that, I
2    said that it would -- it would be different -- it
3    would -- it would -- it would -- it would not be fair
4    for my judgment, with respect to -- with respect to
5    this, to be the full and complete reading (sic) of
6    that letter.
7        Q.   So are you saying that the opinions you're
8    rendering here are -- you're just relying on what was
9    done by the -- the reviewers --
10       A.   It is --
11       Q.   -- you're not endorsing that review?
12       A.   It is -- it is a result of the process and
13   I'm endorsing it as a matter of process.
14       Q.   But you couldn't represent yourself --
15       A.   It doesn't -- it doesn't -- they don't
16   stand -- they don't stand in my shoes with respect to
17   that.  I am reporting the result of a process.  I
18   could read the letters and categorize them just as
19   easily as you could with the -- with the manual in
20   front of us.
21       Q.   Okay.  Now, moving along, paragraph 31,
22   page 13, you write:  We've developed a training
23   manual with exemplar letters to standardize the
24   reading and coding decisions process.

---

Page 160

1              Is that the training manual we looked
2    at before that's at paragraph -- that's Annex or
3    Exhibit 6.2?
4        A.   Yes, sir.
5        Q.   Okay.  And Exhibit 6.2 is the only training
6    manual that you're referring to there; right?
7        A.   Yes, sir.
8        Q.   Okay.  And would I be correct in stating
9    that within that training manual, like we looked at
10   for bucket seven, there's guidance and/or criteria
11   for each bucket?
12       A.   And exemplars.
13       Q.   And exemplars, okay.
14              All right.  Paragraph 32 you
15   reference:  Each letter was read by two contract
16   lawyers and a quality assurance reader.
17              What are the names of the two contract
18   lawyers?
19       A.   I have no idea.
20       Q.   And what was the name of the quality
21   assurance reader?
22       A.   I don't -- I don't know that I know.
23       Q.   Okay.  Did you ever speak to the three of
24   them?

---

40  (Pages 157 to 160)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 161

1    A.  I did not speak to the lawyers.  I spoke to
2    the quality assurance reader, but I don't have a
3    recollection of that person's name.
4       Q.  Okay.  Do you have a recollection of
5    speaking to that person?
6       A.  Yes.
7       Q.  Okay.  And on how many different occasions
8    did you speak to him or her?
9       A.  It was -- it was a her and it was probably,
10   through the course of this process, six to eight
11   times.
12      Q.  You don't remember her name?
13      A.  I do not.
14      Q.  All right.  Moving along, page 14, 2.4,
15   paragraph 34, you write:  The most essential result
16   from the analysis of the initial sample of 413
17   letters is that the letters do not reflect a
18   monolithic, singular category of complaint,
19   assertion, question or demand, period.
20          Do you see that?
21      A.  Yes.
22      Q.  All right.  What is your definition of
23   monolithic that you use there?
24      A.  Singular or unique, one.  Any -- any number

---

Page 162

1    of -- any number of synonyms for monolithic.
2       Q.  All right.  Let's jump ahead to page 22 of
3    your report.  You write in paragraph 48:  Based on
4    direction from counsel, I understand that a
5    consumer's communication with TransUnion must allege
6    or identify some inaccuracy in the information
7    maintained by TransUnion as a first step in
8    triggering an investigation of the -- of the
9    communication by TransUnion, period.
10          Do you see that?
11      A.  Yes, sir.
12      Q.  All right.  And have you ever actually seen
13   the statutory language at issue here?
14          MR. O'NEIL:  Objection, vague.
15          THE WITNESS:  I may have.  I
16      don't recall.  It would not -- it would
17      not have been in the context -- or within
18      the bounds of -- of this particular
19      engagement, probably on my prior or
20      existing engagements.
21   BY MR. FRANCIS:
22      Q.  Okay.  And have you ever seen the class
23   certification decision in this case?
24      A.  I did, yes, sir.

---

Page 163

1       MR. FRANCIS:  Okay.  All right.
2    Off the video.  Let's take a short break,
3    say ten minutes.
4       MR. O'NEIL:  Off the -- Mr. --
5    off the record.
6       MR. FRANCIS:  Yes.
7       MR. O'NEIL:  Mr. Francis --
8       THE VIDEOGRAPHER:  Off the
9    video record, 3:19 p.m.
10      (Brief recess.)
11      THE VIDEOGRAPHER:  Back on the
12   video record, 3:36 p.m.
13   BY MR. FRANCIS:
14      Q.  Dr. Lasater, I'm turning to Section A of
15   6.2 of your report, which is the flow chart.  Just a
16   couple quick questions here.  Let me know, sir, when
17   you have the flow chart in front of you.
18      A.  I do.
19      Q.  Great.  Okay.  And would you tell me how
20   this flow chart was used?
21          What was the purpose of it?
22      A.  As initial -- as an initial description of
23   the process that was going to be necessary, it was an
24   introduction to the readers of the steps that would

---

Page 164

1    be taken in terms of sequentially evaluating a letter
2    for its potential different features.
3       Q.  Okay.
4       A.  The main -- the main impetus of this was
5    that the -- the process would continue throughout the
6    features, testing as -- testing as many of the
7    categories as we had -- as we had indicated in the
8    training manual.
9       Q.  Okay.  And each of the various questions
10   would yield a tag for a bucket depending upon whether
11   the reviewer answered it yes or no; correct?
12      A.  That would be a mistake, in that the flow
13   chart is intended to be the first guidance of -- of
14   the process, and so each of these is intended to be a
15   summary categorical description that would have to
16   be -- would have to be fleshed out by reading --
17   reading the letter in conjunction with the
18   descriptions, the advisories and the examples that
19   are in the training manual.
20      Q.  Got it.  Okay.  So one question that I have
21   is, where did the initial questions come from?
22      A.  The initial questions arise from the -- the
23   iterative categorical -- the iterative categorical
24   development from the -- from the -- the two samples,

---

41 (Pages 161 to 164)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 165

1    the 20 and then the 50, and then the -- the manual
2    was developed from that iterative process, and then
3    as part of the training, we wanted to advise the
4    readers and their -- their quality assurance
5    controller about the general process that was going
6    to be followed, and that is why the flow chart was
7    developed.
8         We did not want the reader to be
9    handed a training manual and not understand that --
10   that the letters could have one or more features or
11   characteristics, and we wanted to reinforce that so
12   that the -- the questions are -- are or should be, in
13   effect, summaries of what -- what is reflected in
14   the -- in the descriptions of the -- of the so-called
15   buckets or the categories that are -- that I think
16   are described in -- in Table 2 of my report.
17        Q.  Okay.  So, then, do I understand that
18   correctly to mean that there was the initial
19   iterative review of the smaller sample, which --
20   which led to the development of these questions, and
21   then these questions, along with the training manual,
22   were used by the reviewers to come up with the
23   numbers they came up with?
24        A.  That is correct.

Page 166

1        Q.  And what was that initial sample that was
2    used to develop these questions?  Was that 20, 50,
3    200?  What was that?
4        A.  The first -- the first -- the first pilot
5    was 20, the second pilot was 50, and then, from that
6    point, we moved on with the -- complete sample in
7    others' hands.
8        Q.  So am I correct, then, based upon what
9    you've testified earlier, that the questions for
10   determining buckets were derived from the two pilots,
11   the 20 and the 50?
12        A.  Correct.
13        Q.  And that those pilots were developed with
14   counsel, Mr. O'Neil and Mr. Hartmann; correct?
15        A.  Those -- those were developed by us and --
16   and then discussed with Mr. O'Neil and Mr. Hartmann.
17        Q.  Gotcha.  Okay.
18        A.  It's a very -- it's a very standard -- it's
19   a very standard development of bibliographic coding.
20        Q.  Okay.  Am I correct that there is no
21   question in the flow chart for "does the letter
22   contain a dispute of an inquiry"?
23        A.  We've -- we've talked about that over and
24   over again, and the issue of -- the issue of dispute

Page 167

1    has to do with -- with a more granular -- a more
2    granular feature of the communication between the
3    consumer and TransUnion --
4        Q.  Okay.  And so --
5        A.  -- and so -- and so those features --
6    those -- as I had said -- as I had said earlier in
7    this deposition, there is not a -- there is not a
8    category that says dispute.
9         When -- when we talk about is the
10   consumer -- does a consumer have a -- have a question
11   or a comment about the accuracy of their -- of
12   their -- of their account, that is -- that is
13   captured in the -- the five categories that I had
14   described earlier, which are seven, eight, ten, 11
15   and 12.
16        Q.  Okay.  But none of the questions contain a
17   question -- query as to whether the consumer is
18   stating a dispute using the word "dispute"; correct?
19        A.  I think -- I think the answer to that is
20   that is correct, and I understand that word to have a
21   lot of freighted meaning within the context of this
22   litigation.
23        Q.  All right.  Based upon your analysis and
24   your review of the data that you've testified about

Page 168

1    today, do you have any opinion regarding how many of
2    the 800 sample -- letter samples that you reviewed
3    contained a dispute of an inquiry?
4        A.  Once again, that's a -- whether or not it's
5    a dispute, it seems to me is a -- is a -- is a
6    determination for the Court.
7         What I have is features, features of
8    the letter that are -- are described or captured
9    in -- in Table 2.
10        MR. FRANCIS:  All right.
11        Rayne, let's mark as Lasater-4, his
12        rebuttal report, and as 5, his
13        supplemental rebuttal report of
14        yesterday.
15   BY MR. FRANCIS:
16        Q.  And all I'm going to ask you to do, Dr.
17   Lasater, is identify that Exhibits 4 and 5 are your
18   two rebuttal reports.
19        A.  If we could see them, please.
20        Q.  Yes.
21        A.  Could we -- could we just scroll to the
22   last page?
23         I'm going to assume that the
24   individual pages are -- what is on the screen is

42 (Pages 165 to 168)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 169

1    consistent with the -- with the last -- the last page
2    of Exhibit 6, which is an attachment to the rebuttal
3    report.  That is --
4        Q.   Right.  And just to be --
5        A.   That -- that -- that looks like my report.
6        Q.   And just to be clear for the record, you
7    submitted a rebuttal expert report dated April 15th,
8    2022 in this case; is that right?
9        A.   I did.
10       Q.   And you submitted a supplemental rebuttal
11   expert report dated May 4th, 2022?
12       A.   Well, it should be dated May 3rd, unless --
13       Q.   May 3rd.  Okay.  May -- yep, May 3rd.
14       A.   Yes, sir.
15            MR. FRANCIS:  Okay.  Dr.
16       Lasater, thank you for your time, I have
17       no further questions.
18            THE WITNESS:  Very well, Mr.
19       Francis.  Thank you.
20            - - -
21            EXAMINATION
22            - - -
23   BY MR. O'NEIL:
24       Q.   Dr. Lasater, if you don't mind, I have a

Page 170

1    few follow-up questions.
2        A.   Yes, sir.
3        Q.   As you know, Mr. Francis spent some time
4    going over portions of your initial report that was
5    submitted in March of this year; correct?
6        A.   Yes, sir.
7        Q.   But to be fair, he didn't show you or ask
8    you questions about all of the content of that
9    lengthy report; correct?
10       A.   No, he didn't.
11       Q.   When you prepared that report, did you make
12   every effort to ensure that it accurately captured
13   and reported on your opinions and the bases for those
14   opinions?
15       A.   Yes, sir.
16       Q.   And if you were called to testify under
17   oath at trial in this case, would your testimony be
18   consistent with the opinions and the bases for your
19   opinions and your methodology results that are
20   contained in your March 2022 disclosure?
21       A.   Yes, sir.
22            MR. FRANCIS:  Objection,
23       compound and leading.
24   BY MR. O'NEIL:

Page 171

1        Q.   And I'll ask the same series of questions
2    for the rebuttal report that you finalized on April
3    15, 2022.
4             When you prepared that report, did you
5    make every effort to accurately describe the opinions
6    and the bases for your opinions in that rebuttal
7    report?
8        A.   Yes, sir, and, again, based on -- based on
9    what I had received up to that point at that -- and
10   at that stage from Mr. Jaffe's original report, yes,
11   sir.
12       Q.   And that's because although Mr. Jaffe filed
13   a rebuttal report commenting on your opinions, you
14   did not have Mr. Jaffe's rebuttal report in hand when
15   you finalized your rebuttal report on April 15, 2022;
16   correct?
17       A.   Well, no, I had his -- I had his -- I did
18   not have his rebuttal report, I had his original
19   report.
20       Q.   Right.  And if called to testify under oath
21   at trial in this case, would your testimony as to
22   your opinions and the bases for those opinions in
23   your rebuttal report, would that testimony at trial
24   be consistent with the opinions and bases for your

Page 172

1    opinions in your April 15, 2022 report?
2        A.   Yes, up -- up to the point of -- up to the
3    point of the receipt, at that point, of the original
4    report by Mr. Jaffe.
5        Q.   And then after you finalized your rebuttal
6    report, you had an opportunity to review Mr. Jaffe's
7    rebuttal report; correct?
8        A.   Correct.
9        Q.   And is it fair to say that you took issue
10   with at least a couple of the points that Mr. Jaffe
11   made with regard to your earlier opinions?
12       A.   I take issue with -- with, in particular,
13   his -- his criticisms of the statistical methodology
14   that is used, and I -- and I write reply opinions
15   directly to the two most glaring ones from his
16   rebuttal report.
17       Q.   And when you prepared your supplemental
18   rebuttal report, did you make every effort to
19   accurately describe the opinions and the bases for
20   your opinions in that May 3rd supplemental report?
21       A.   Yes, sir, I did.
22       Q.   And if called to testify at trial in this
23   case under oath, would your trial testimony be
24   consistent with the opinions and bases for your

43 (Pages 169 to 172)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

Page 173

1  opinions in your supplemental rebuttal report?
2     A.  Yes, sir.
3        MR. O'NEIL:  Can I ask Ms.
4  Bennett to put on the screen the
5  supplemental rebuttal report, which I
6  believe is Exhibit 5.  Thank you, Ms.
7  Bennett.
8        Can I have control of the
9  document, Ms. Bennett?  Thank you.
10 BY MR. O'NEIL:
11    Q.  How many opinions are in the supplemental
12 rebuttal report, Dr. Lasater?
13    A.  Two are written.
14    Q.  Are there other opinions?
15    A.  Embedded in -- embedded especially in
16 opinion one are -- are several opinions with respect
17 to Mr. Jaffe's misuse of the sampling methodology as
18 he criticizes the methodology that I used.
19    Q.  What was the criticism that Mr. Jaffe had
20 that you're trying to respond to in supplemental
21 reply opinion one?
22    A.  Fundamentally, Mr. Jaffe misunderstands or
23 misreads or intentionally avoids the -- the fact that
24 the sampling that was at the basis of the -- my

Page 174

1  original report and the work that I have done was a
2  stratified sample.
3        Stratified sampling is a generally
4  accepted tool, it is a -- it is a -- it is a
5  methodology that I use, if not widely, every other
6  week in forums -- in forums that include the
7  Department of Justice and -- and especially the
8  Office of the Inspector General in health care cases
9  where populations of -- of challenges with respect to
10 Medicare charges are stratified by year.
11       And the purpose of the -- the purpose
12 of the stratification is to make sure that the
13 sampling provides complete coverage with respect to
14 the amount of time that is the basis for the --
15 the -- either the challenge by DOJ, OIG or by the
16 self-reporting of a client to -- to the Department of
17 Justice and OIG relative to Medicare and Medicaid
18 billing.
19       The use of time periods with respect
20 to stratification is so generally accepted that
21 even -- even from textbooks from 1953 reflect the
22 fact that a single sample can be allocated among --
23 among many strata and, in fact, within the Cochran
24 book that Mr. Jaffe references, there is not only

Page 175

1  calculations for the variance of -- the variance
2  calculation that leads to the -- the confidence
3  interval around any estimate from a stratified
4  sample, but also reflects the ability to do ex-post
5  calculation or even an ex-ante calculation of an
6  optimal allocation of a small sample number to strata
7  in order to accomplish the sampling objective.
8        Mr. Jaffe seems to misread,
9  misunderstand or intentionally avoid the -- the --
10 the issue of a stratified sample in this case and the
11 ability to use a small, and by small I mean a
12 relatively small, 400 or 800 versus -- versus several
13 hundred thousand observations.
14       What's more, is that work has been
15 done in statistics, beginning with a paper that was
16 published in 1987 in Biometrika, that is just part of
17 the -- that is just a part of the lore, but is
18 reflected in -- in -- in a section, in a table, in --
19 in a textbook that I have already cited in this case
20 by -- I think it's in the first -- I think it's in
21 the very first report, which talks about
22 multi-category sampling.
23       And the multi-category sampling where
24 one has -- it's Steven Thompson's text, where --

Page 176

1  where -- where if you wanted to evaluate multiple
2  categories and, interestingly, including up to 15
3  categories, the samples -- the necessary sample size
4  would be 510, and he says, and that 510, once the
5  sampling is done, might end up being too large to
6  accomplish the sampling objective.
7        And so Mr. Jaffe is plainly wrong and
8  is -- is misrepresenting the -- the statistical
9  literature and what is generally accepted with
10 respect to attribute sampling across the strata.
11    Q.  On the screen is paragraph 6 of your
12 supplemental rebuttal report.
13       Could you read aloud the first
14 sentence from paragraph 6, that begins with "random
15 selection."
16    A.  Random selection for a desired sample size
17 of 400 from across periodic strata to accomplish a
18 random sample from a population is a generally
19 accepted statistical practice, period.
20    Q.  And the fact that Mr. Jaffe did not
21 understand or, perhaps, acknowledge that stratified
22 sampling is a generally accepted statistical
23 practice, does that impact your opinion of Mr.
24 Jaffe's experience with and understanding of

44 (Pages 173 to 176)

**Norman, Sr. v. Trans Union, LLC**                    **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 177

1  statistical sampling?
2      A.  I can't speak to his -- his experience, but
3  he seems to not recognize it here, and I'll leave it
4  to others to make that evaluation.
5      Q.  In particular, to demonstrate, Doctor -- or
6  to support Mr. Jaffe's attack on your use of a
7  generally accepted statistical practice, he
8  hypothesized that letters in category three may have
9  been concentrated in certain periods vastly different
10  from other periods; correct?
11      A.  Correct.
12      Q.  But nothing in his report indicates that he
13  ever tested that hypothesis; correct?
14      A.  Correct.
15      Q.  Did you read his deposition in this case,
16  Mr. -- Dr. Lasater?
17      A.  I wasn't aware that he had been deposed.
18      Q.  Okay.  Did you test Mr. --
19      A.  Oh, I'm sorry, I'm sorry, I'm sorry, yes, I
20  did read his deposition.  I'm sorry.
21      Q.  Okay.
22      A.  I did read the -- the -- read the rough
23  transcript, yes, sir.
24      Q.  And nothing in that transcript indicated

Page 178

1  that Mr. Jaffe did anything to test his hypothesis as
2  to the rates of category three showing up in each
3  temporal sample; correct?
4      A.  I think he answered a question from Mr.
5  Hartmann that he had not.
6      Q.  Did you do anything -- once you received
7  his report and you read his criticism of your use of
8  a generally acceptable statistical practice, did you
9  do anything to test Mr. Jaffe's hypothesis?
10      A.  Well, what I did was -- what I did was
11  basically spread the categories for each and every
12  category for purposes of including in a supplemental
13  report an analysis that we had -- we had looked at
14  early on with respect to the issue of uniform
15  distribution across the -- or uniform rate across
16  the -- the periodic categories.
17          And -- and so what I wanted to do was
18  formalize that review of the representativeness of
19  the -- the strata across the population with the --
20  with the -- with the analysis that you see in Annex
21  3.2 of the supplemental report.
22      Q.  And what were the results of that analysis?
23      A.  That Mr. Jaffe's assertion, his
24  hypothetical, his -- his strawman, had no empirical

Page 179

1  basis at all in the data in this case.
2      Q.  Is it fair to say that you couldn't have
3  responded to Mr. Jaffe's criticism of your use of
4  generally accepted -- acceptable statistical
5  practices before you actually got his report; is that
6  fair to say?
7      A.  Well, it's fair to say that I didn't think
8  it was -- I didn't think it was necessary to -- to
9  provide that analysis, because it is so -- it is so
10  generally accepted, and he had the data himself to --
11  to challenge the use of the -- the binomial, to
12  use -- challenge the use of any of the categories
13  across any of these -- any of these periodic strata,
14  and he hadn't done it up to his rebuttal report.
15      Q.  I direct your attention to paragraph 9 of
16  Exhibit 5, your supplemental rebuttal report, and
17  that references your second supplemental reply
18  opinion; correct?
19      A.  Yes, sir.
20      Q.  And you -- you're directing that opinion at
21  Mr. Jaffe's -- well, you call it an unexplained and
22  untested statement that the 60-mile filter that you
23  used to identify letters potentially written by
24  others, then the consumer is unreliable, because,

Page 180

1  according to Mr. Jaffe, quote:  A considerable
2  percentage of the U.S. population would be more than
3  60 miles from a U.S. Postal Service postal and
4  distribution center, close quote; correct?
5      A.  That is correct.
6      Q.  And what, if anything, did you and/or your
7  staff do to test Mr. Jaffe's opinion about U.S.
8  population?
9      A.  Well, first of all, Mr. Jaffe uses a -- a
10  map that would -- that would have us looking in the
11  desert of Arizona for the nearest -- the nearest
12  postal distribution center to send -- to send a
13  letter.
14          He uses the entire map without
15  recognition that the vast majority, and I don't mean
16  60 percent, but a vast majority of these letters come
17  from -- from urban areas, and so all of that extra
18  space that Mr. -- Mr. Jaffe intends to use to
19  apparently make his statements is simply not
20  relevant.
21          And so what -- what I then did was
22  direct -- direct Ms. Harrington to look at the 137
23  letters in -- in the first sample as an exemplar of
24  an evaluation of Mr. Jaffe's assertion, and in -- in

45 (Pages 177 to 180)

**Norman, Sr. v. Trans Union, LLC**                          **DAVID B. LASATER, Ph.D., 5/5/22**

---

Page 181

1    two steps evaluated whether or not -- whether or not
2    a -- a postal -- a U.S. Postal distribution center
3    was near the addressee.
4            And -- and what we find is that,
5    indeed, 16 of the 137 do not have a postal and
6    distribution center within 60 miles, 16 of the 137,
7    all of the rest -- all of the rest do.
8        Q.  So unlike Mr. Jaffe, you actually looked at
9    the data and compared the data to his conclusions
10   about where the U.S. population is located; correct?
11       A.  I did that with respect to the -- the
12   representative sample of four -- my first sample of
13   400.
14       Q.  Okay.  And what were the results of that
15   analysis?
16       A.  Once again, among the -- among -- among the
17   remaining 33 letters that were sent not crossing
18   state lines, only 16 had the nearest processing and
19   distribution center farther than 60 miles from the
20   consumer's mailing address.
21       Q.  And as part of your first report, you and
22   your team considered what percentage of the two
23   samples of 400 letters were mailed 60 or more miles
24   from the consumer's address; correct?

Page 182

1        A.  Yes, sir.
2        Q.  And did you and your team do any analysis
3    as to the locations from which those letters were
4    mailed?
5        A.  Locations with respect to the --
6    postmarks, yes, sir.
7        Q.  And do you recall that your opinion in
8    Exhibit 1, paragraph 5.6 noted that of the letters
9    postmarked in the city geographically distant from
10   the individual consumer, within the sample of 835
11   letters, that 44 percent of such letters were
12   postmarked from Denver; correct?
13           MR. FRANCIS:  Objection,
14       leading.
15   BY MR. O'NEIL:
16       Q.  It's page 46 of your first report.
17       A.  Yes, sir, that is -- I think it's Annex --
18   Annex 5.6?
19       Q.  Correct.
20       A.  And of those -- of those 262 letters that
21   were more than 60 miles distant from the address of
22   the consumer, 44 percent of them were from Denver.
23       Q.  Okay.  Shifting gears, Mr. Francis asked
24   you today if you made any attempt to determine

Page 183

1    whether any of the template letters that were
2    identified in your report originated from credit
3    repair organizations.
4            Do you recall that question?
5        A.  I do.
6        Q.  And do you recall that you said that --
7    that you didn't do that analysis?
8        A.  That's correct.
9            MR. FRANCIS:  Objection,
10       leading.
11           You can answer.
12           MR. O'NEIL:  Just refreshing
13       his recollection, Mr. Francis.
14           THE WITNESS:  I remember
15       that -- I remember that question and
16       answer.
17   BY MR. O'NEIL:
18       Q.  Are you aware that TransUnion has retained
19   another expert in this case named John Ulzheimer?
20       A.  In conversation with you since my report,
21   since my initial report, I understand that a Mr.
22   Ulzheimer has been engaged.
23       Q.  Did you happen to review his rebuttal
24   report in this case?

Page 184

1        A.  I -- I did look at it, and I think it -- I
2    hope that it is -- I hope that it is written into my
3    documents considered.  If not, then that is a
4    mistake, because that is documents considered in
5    the -- in the supplemental rebuttal report, because I
6    received it -- I received those reports after my -- I
7    think I received those reports after my first
8    supplemental report, and so I have looked at the
9    sections of Mr. Ulzheimer's report that address
10   credit repair.
11           MR. FRANCIS:  Objection,
12       non-responsive, move to strike.
13   BY MR. O'NEIL:
14       Q.  Do you recall whether Mr. Ulzheimer, in his
15   rebuttal report, identified letters from class
16   members here which he was certain originated with
17   credit repair organizations?
18       A.  I saw that he had.
19       Q.  Aside from this engagement, Dr. Lasater,
20   have you ever been asked to review documents and use
21   statistical sampling to surmise as to the content of
22   those documents?
23       A.  Many, many times.
24       Q.  And you have been qualified as an expert to

46  (Pages 181 to 184)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 185

1    offer those types of opinions; isn't that correct?
2        A.  Well, so --
3            MR. FRANCIS:  Objection,
4    leading, misstates prior testimony.
5            THE WITNESS:  So I have not --
6    I have not testified with the results of
7    that.  What I -- what I would -- what I
8    would point to is the experience that I
9    have with the development of FTI's
10   capabilities in the document processing
11   and technology marketplace, beginning in
12   2007 with the senior managing director
13   who led that initiative, named Joe Looby,
14   and through Mr. -- through Mr. Looby, I
15   assisted him in developing position
16   papers and doing analysis for the Sedona
17   Conference.
18           I -- I made statements at a
19   Bank One conference on probabilistic
20   coding in or about 2008 or 2009, if
21   memory serves, with respect to the
22   quality -- the quality assurance elements
23   of -- of testing probabilistic coding,
24   and -- and so I am deeply familiar with

Page 186

1    it.
2            Since that time, I have advised
3    dozens of engagements from our technology
4    group with respect to quality assurance
5    testing and the statistics associated
6    with probabilistic coding, as we are
7    using it here.
8            And so I have a vast experience
9    without ever having to -- ever having to
10   testify.  It's usually -- it's usually
11   developing the responsiveness of the
12   document production in cases, especially
13   antitrust cases and -- and other major
14   cases where there is a lot of both
15   electronic and -- and OCR documentation,
16   and so the development of the -- the
17   development of the sampling, especially
18   with -- especially with respect to the
19   quality assurance is -- is -- is
20   fundamental to my experience.
21   BY MR. O'NEIL:
22       Q.  You testified earlier today that when the
23   contract lawyers were reviewing each of the letters,
24   of the 835 letters in the two samples, that you had

Page 187

1    not one, but two lawyers reviewing each letter;
2    right?
3            MR. FRANCIS:  Objection,
4    leading.
5            THE WITNESS:  That is correct,
6    and it's a -- it's a generally accepted
7    practice for quality assurance.
8    BY MR. O'NEIL:
9        Q.  Okay.  Well, you --
10           MR. FRANCIS:  Objection,
11   non-responsive, move to strike.
12   BY MR. O'NEIL:
13       Q.  You -- actually, that was going to be my
14   next question.
15           Why did you make the decision to use
16   two reviewers instead of one?
17       A.  Because it's a generally accepted practice.
18       Q.  In statistical sampling?
19       A.  With respect to -- with respect
20   to bibliographic --
21           THE COURT REPORTER:  I'm sorry,
22   did you say something, Mr. Francis?
23           MR. FRANCIS:  Yes, I objected
24   as leading.

Page 188

1            THE WITNESS:  With respect --
2    with respect to bibliographic coding.
3    BY MR. O'NEIL:
4        Q.  Okay.  And then you used not one but two
5    samples of letters to come up with your opinions in
6    this case; right?
7        A.  Yes, sir.
8            MR. FRANCIS:  Objection,
9    leading.
10   BY MR. O'NEIL:
11       Q.  Why did you decide to use two samples
12   instead of one?
13       A.  Two reasons.  Given the size of the
14   population of letters, to a lay jury or to a judge
15   who is not experienced in -- in statistical sampling
16   or especially attribute sampling within statistical
17   sampling, a sample size of 400 can have optics that
18   make it appear that it is too small to be believable,
19   in spite of the fact that the -- the mathematics and
20   all of the empirics support that assertion.
21           And so the -- the -- the design of
22   this, which is, again, a very standard, generally
23   accepted design with respect to waves of sampling, to
24   be sure that there is nothing -- there is nothing

47 (Pages 185 to 188)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 189

1   biased in the first set of results and, in
2   particular, what is known in survey sampling as
3   non-response bias, would be able to be evaluated by a
4   second sample, and that second sample is -- is just
5   the next 400 in the sequence of the random 800,
6   which, again, ensures that there is no repetition or
7   no bias with respect to the selection of the letters
8   that would be in the second sample, and so there were
9   two -- two reasons.  One was optics, the other was
10  testing for bias.
11          And -- and -- and I'd like to be able
12  to speak to -- speak to the question of bias and the
13  challenge to bias and the misuse of that term in Mr.
14  Jaffe's report, but that's not a question on the
15  table.
16      Q.  Well, Mr. Jaffe characterized your opinions
17  as -- as having a bias; correct?
18      A.  He did.
19      Q.  And what was -- what bias or biases was he
20  referring to?
21      A.  What he was -- what he was somehow or
22  another proposing was that the -- that, number one,
23  that there was not a -- there was not some sort of a
24  uniform rate or discoverable uniform rate across the

Page 190

1   periodic strata.  We addressed that.  We addressed
2   that.  But even the example that he used with respect
3   to bias is -- is in error.
4          There are three types of biases in
5   statistical sampling.  One is estimation bias, the
6   other is selection bias and the other is measurement
7   bias, and if there was any question with respect to
8   selection or measurement, it would have to do with
9   the sampling methodology.
10          There is another bias that is -- that
11  is embedded in -- in all of the methodologies that is
12  the testing for that bias, embedded in the
13  methodologies using two waves of statistics --
14  statistical samples, and that is estimation bias.
15          The definition of estimation bias is,
16  does the statistic that is derived from the
17  population -- from the estimate using the methodology
18  that is proposed, does it vary from that which would
19  be discoverable if we knew the -- if we knew or had
20  access on the entire population of -- of -- in this
21  case, of letters.
22          And so we get some insight to whether
23  or not it's biased by doing a second sample, and what
24  we find, and Mr. Jaffe affirmed, is that the second

Page 191

1   sample effectively proves the first sample; there is
2   no bias.
3              MR. FRANCIS:  Objection,
4       non-responsive, move to strike.
5   BY MR. O'NEIL:
6       Q.  So, Mr. Jaffe agreed with you on that
7   point.
8       A.  He agreed --
9              MR. FRANCIS:  Objection,
10      leading.
11             THE WITNESS:  Mr. Jaffe agreed
12      that there is no difference in the
13      results between the second sample and the
14      first sample with respect to the
15      categories that were identified by the
16      reviewers of the samples of letters.
17             MR. O'NEIL:  I have nothing
18      further.  Thank you very much, Dr.
19      Lasater.
20                   - - -
21             FURTHER EXAMINATION
22                   - - -
23  BY MR. FRANCIS:
24      Q.  Just a couple quick follow-ups.

Page 192

1          Dr. Lasater, Mr. O'Neil asked you a
2   few minutes ago about why you chose to not just use a
3   400-person sample, but, instead, use the second 400
4   sample.
5          Do you recall those questions?
6       A.  Yes, sir.
7       Q.  And you said one of the reasons was the
8   optics of it; correct?
9       A.  Yes, sir.
10      Q.  And you said one of the reasons was a jury
11  or a layperson might find that not to be reliable
12  from an optical standpoint.
13          Do you recall that?
14      A.  Yes, sir.
15      Q.  Which judge or jury have you ever
16  experienced who found that a 400-person sample was
17  insufficient?
18      A.  I deal with -- I deal with lay users of the
19  statistical work that I do every -- every couple of
20  weeks, Mr. Francis, including -- including having to
21  educate lawyers who didn't have -- who didn't take
22  the course on statistics for lawyers at law school
23  about --
24      Q.  Okay.

48  (Pages 189 to 192)

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

Page 193

1    A.  -- about -- about the size of the sample in
2    relation to what we are trying to accomplish, and
3    that --
4    Q.  And that was --
5    A.  -- and that -- and, frankly, that is why --
6    that is why, for example, I put the table in my
7    original report that shows sample sizes with respect
8    to various sampling criteria, showing that -- that
9    when we use a binomial sample, we can have sample
10   sizes, depending on our criteria, as small as nine or
11   as big as 1,000, depending on the criteria that we
12   are using.
13          And so -- and so if -- if a -- if a
14   judge or a jury or -- or legal counsel were to be
15   concerned about the size of the sample, what I am
16   able to show is -- and using the formula that -- that
17   Mr. Jaffe uses and that I use as well to develop the
18   sample size of 400, that 400 is adequate for purposes
19   of deriving inferences about the population.
20   Q.  Doesn't the sample size depend upon the
21   total population?
22   A.  It does not.
23   Q.  Okay.  And so it's your testimony the judge
24   and the jury in this case, they would find 400

Page 194

1    insufficient, but an extra 400 they would find to be
2    acceptable; is that your testimony?
3    A.  No, sir.  What I'm saying is that the --
4    the second 400, number one, enlarges the sample size
5    by twice; secondly, subsumes any multi-category --
6    any multi-category challenges with respect to the
7    categories, as I mentioned in my testimony a few
8    minutes ago; and then -- and then, third, the second
9    sample is intended to evaluate whether or not there
10   is any non-response bias from the -- from the first
11   sample.
12          It is a -- it is a generally accepted
13   tool in -- in marketing, it's a generally accepted
14   tool in testing whether or not a sample is
15   representative.
16          I most recently used it in an
17   arbitration involving the Canadian Navy in testimony
18   I gave in December of 2021 and looking at multiple
19   waves of -- of samples as to whether or not the --
20   whether or not the samples were representative of the
21   population.
22   Q.  Okay.  And I asked you a bunch of questions
23   before about your expertise, education and the
24   subject matter for which you have knowledge as an

Page 195

1    expert witness.
2          Do you consider yourself an expert in
3    marketing?
4    A.  I consider myself an expert in the
5    development of the statistics around survey sampling.
6    Q.  Okay.  But -- but in terms of -- you don't
7    consider yourself an expert in marketing.
8    A.  Marketing --
9          MR. O'NEIL:  Objection, vague
10   as to the term "marketing."
11          THE WITNESS:  Marketing is --
12   marketing is a -- is a discipline that
13   uses statistics, and I am bringing the
14   discipline to the evaluation of waves of
15   random samples, which is a generally
16   acceptable practice in marketing and in
17   many other -- in many other business
18   disciplines.
19   BY MR. FRANCIS:
20   Q.  Sir, you don't have any degrees in
21   marketing, do you?
22   A.  No, sir.  This was not focused on
23   marketing.  I'm using it as an example of how the --
24   how multiple waves of sampling can be used to test

Page 196

1    the reliability of earlier random samples.
2          MR. FRANCIS:  All right.  No
3    further questions.  Thank you.
4          MR. O'NEIL:  Thank you, Dr.
5    Lasater.
6          We will reserve signature.
7          THE COURT REPORTER:  And would
8    you like a copy, Mr. O'Neil?
9          MR. O'NEIL:  Sure, if Mr.
10   Francis will pay for the first copy,
11   I'll -- I'll take a copy as well.
12          MR. FRANCIS:  I guess I'll pay
13   for the copy.
14          THE VIDEOGRAPHER:  This
15   concludes the video deposition of David
16   Lasater, Ph.D., the time is 4:26 p.m. and
17   we are going off the record.
18          (Deposition concluded at 4:26
19   p.m.)
20          (Lasater-1 through Lasater-5
21   marked for identification.)
22
23
24

Page 197

```
1              CERTIFICATION
2                  - - -
3          I hereby certify that the testimony
4   and the proceedings in the aforegoing matter
5   are contained fully and accurately in the
6   stenographic notes taken by me, subject to the
7   quality of the Internet/telephone connection,
8   and that the copy is a true and correct
9   transcript of the same.
10
11
12
13
14        ----------------------------
15          Andrea M. Brinton, Professional
            Court Reporter and Notary Public
16
17
18
19          The foregoing certification does
20  not apply to any reproduction of the same by
21  any means, unless under the direct control
22  and/or supervision of the certifying
23  reporter.
24
```

Page 198

```
1    INSTRUCTIONS TO WITNESS FOR READING & SIGNING
2          Read your deposition over carefully.  It is
3    your right to read your deposition and make changes
4    in form or substance.  You should assign a reason in
5    the appropriate column on the errata sheet for any
6    change made.
7          After making any changes in form or
8    substance which have been noted on the following
9    errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11         Then sign your deposition at the end of
12   your testimony in the space provided.  You are
13   signing it subject to the changes you have made in
14   the errata sheet, which will be attached to the
15   deposition before filing.  You must sign it in front
16   of a witness.  Have the witness sign in the space
17   provided.  The witness need not be a notary public.
18   Any competent adult may witness your signature.
19         Return the original errata sheet to your
20   counsel promptly.  Court rules require filing within
21   30 days after you receive the deposition.  Counsel is
22   asked to send a copy of the errata sheet to Summit
23   Court Reporting for our records.
24
```

Page 199

```
1                    ERRATA SHEET
2    Attach to Deposition of:  DAVID B. LASATER, Ph.D.
3    Taken on:  May 5, 2022
4    In the Matter of:  Duane E. Norman, Sr. vs.
                        TransUnion LLC
5
6    PAGE   LINE NO.  CHANGE           REASON
7    -------------------------------------------------
8    -------------------------------------------------
9    -------------------------------------------------
10   -------------------------------------------------
11   -------------------------------------------------
12   -------------------------------------------------
13   -------------------------------------------------
14   -------------------------------------------------
15   -------------------------------------------------
16   -------------------------------------------------
17   -------------------------------------------------
18   -------------------------------------------------
19   -------------------------------------------------
20   -------------------------------------------------
21   -------------------------------------------------
22   -------------------------------------------------
23   -------------------------------------------------
24
```

Page 200

```
1                  SIGNATURE PAGE
2
3                      - - -
4
5          I hereby acknowledge that I have
6    read the aforegoing transcript, dated May 5, 2022,
7    and the same is a true and correct transcription of
8    the answers given by me to the questions propounded,
9    except for the changes, if any, noted on the errata
10   sheet.
11
12                     - - -
13
14
15
16   SIGNATURE: ----------------------------
17         DAVID B. LASATER, Ph.D.
18   DATE: ------------------
19
20   WITNESSED BY: -----------------------
21
22
23
24
```

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

**A**

**a.m** 1:14 4:2 39:23 40:2
**abbreviate** 10:15
**ability** 7:13 27:6 75:19 134:20 135:6 175:4,11
**able** 8:7 20:21 94:8 95:14 101:9 121:1 134:22 158:9 189:3,11 193:16
**abreast** 17:20
**abroad** 140:17
**acceptable** 178:8 179:4 194:2 195:16
**accepted** 29:10,11 30:17 93:13 127:21 141:11,18 174:4,20 176:9,19 176:22 177:7 179:4,10 187:6,17 188:23 194:12,13
**access** 190:20
**accompanies** 60:3
**accompanying** 114:5
**accomplish** 106:24 125:16 175:7 176:6,17 193:2
**accomplished** 125:1,2
**account** 88:9 102:3 125:19,21 146:3 153:3 167:12
**accounting** 13:13 13:15,15,19 14:2 14:10,21 24:23,23
**accounts** 144:15,21 145:5,11,23 146:6 146:8
**accumulate** 36:17
**accuracy** 88:8 100:3,20 101:11 103:1,2 123:17 124:10,21,22 125:5,13,18,19 167:11
**accurately** 20:9 47:21 170:12 171:5 172:19 197:5
**acknowledge** 4:21 5:1,11 131:1 176:21 200:5
**Act** 27:21 31:12

35:20 36:2 37:3,7 37:9 38:11,20 39:2,6
**ACTION** 1:3
**actions** 28:12,12,13 28:14,15,16
**activated** 128:9
**actual** 50:18 156:17
**added** 111:9
**adding** 134:1,1
**addition** 145:10
**address** 80:1,17,18 82:1,3 96:12,16 104:12 137:13 138:23 181:20,24 182:21 184:9
**addressed** 190:1,1
**addressee** 79:23 80:1,10 81:12 82:20,23 83:6,8 126:21 181:3
**addressee's** 81:9
**addresses** 43:7 82:12,12 130:14
**addressor** 79:23
**adequate** 193:18
**administered** 5:2
**administration** 27:17
**adult** 198:18
**advise** 8:11 126:17 126:17,18 165:3
**advised** 76:13 186:2
**advising** 42:3,4 55:21 89:9
**advisories** 164:18
**affirm** 8:8
**affirmed** 121:22,23 190:24
**aforegoing** 197:4 200:6
**agency** 85:13 133:11
**agent** 80:7,7,13,19 81:4 82:14,23 83:17 85:17 132:15,16,17,19 132:24 133:1,3
**agents** 79:16,18
**ago** 23:6 26:18 33:10 64:1 192:2 194:8
**agree** 5:11,17,23 75:23 99:15 104:6 112:17,20 117:6

124:7 130:19 134:11 136:1,20 136:24 137:5 141:16,20
**agreed** 79:12 116:15 191:6,8,11
**agreeing** 120:23
**agreement** 3:12 5:16 33:9 34:16 36:5 38:9 39:10 40:5 42:2 75:23 115:12
**ahead** 13:7 30:4,6 75:9 82:21 86:13 98:7,16 101:1 121:18 162:2
**AI** 138:17 139:4,6 139:14
**ALBERT** 2:13
**albert.hartmann@** 2:16
**algorithms** 15:1 138:24 139:9
**allege** 162:5
**allocated** 174:22
**allocation** 175:6
**allow** 104:8
**aloud** 176:13
**American** 78:19 84:14,15 93:13,16 93:19 94:9 127:22
**amm@consumer@** 2:10
**amount** 48:20 91:6 91:8 174:14
**analyses** 36:23 47:23
**analysis** 17:22 26:20 27:13 30:16 30:17 32:1 42:3 46:10,21 47:23 51:10 65:3 66:10 70:7 74:15 80:16 82:5 83:14 89:5 91:18 92:4 94:17 97:20 99:13 100:1 106:24 113:5 116:14 124:4,13 126:2 129:14,20 130:4,18 134:13 144:5 147:18,20 148:17 149:13 153:8 157:6 161:16 167:23 178:13,20,22 179:9 181:15

182:2 183:7 185:16
**analytic** 17:21
**analyzing** 79:7
**and/or** 11:14 48:2 73:23 90:23 104:12 144:22 160:10 180:6 197:22
**Andersen** 17:13 19:11
**Andrea** 1:15 4:18 10:7 86:18 197:15
**ANDREW** 2:8
**anecdotal** 60:6,8,17
**Anne** 2:18
**annex** 47:4,4,8,20 47:21 148:9 160:2 178:20 182:17,18
**annexes** 10:4 12:4
**answer** 10:21,23 15:24 18:14 20:21 21:8 27:9,14 28:5 32:2,7,14 33:4,6 36:3,3,19 37:14 38:22 49:5 50:8 53:23 57:10 61:3 66:24 69:2 81:2,2 83:2,2 85:7 86:13 87:14 98:13,16 101:1 104:4 116:3 116:3,7 119:12,21 121:1,8,8,9,9 122:14 123:5 129:1,24 134:21 136:18 138:18 139:16 146:23 167:19 183:11,16
**answered** 22:7 116:24 117:4 164:11 178:4
**answering** 7:12 11:7 75:7
**answers** 91:9 98:14 200:8
**anti-fraud** 25:9
**anticipate** 117:8,17
**antitrust** 186:13
**anybody** 35:11 52:17 58:8 61:5 85:1 128:18
**anyplace** 105:5
**anytime** 62:2
**apparent** 126:4
**apparently** 180:19
**appear** 117:10

126:10 188:18
**appearance** 44:13
**APPEARANCES** 2:2
**appeared** 126:16
**appearing** 109:10
**appears** 7:2 12:13 34:19 43:16 110:8 118:9
**appended** 79:4
**applicant** 27:5
**applicants** 26:1,1,2
**application** 27:3 32:16 33:2
**applications** 26:3,3 26:6,10,17,23
**applied** 78:19 113:23 114:6 117:23 119:3,9 124:13 135:17
**apply** 65:4 77:19,19 118:13 124:19 127:6 158:21 197:20
**applying** 110:13 124:12
**appreciate** 8:7,13 8:17 9:6,6 48:9
**appropriate** 33:2 198:5
**approximately** 95:15 154:2
**April** 169:7 171:2 171:15 172:1
**arbitration** 13:3 194:17
**arch** 61:20
**area** 26:2 30:8,23 31:3,7,15 32:10 32:12,21 59:22
**areas** 30:12 180:17
**arena** 122:9
**arises** 82:22
**Arizona** 180:11
**arrangement** 5:7
**Arthur** 17:12 19:11
**articles** 48:15
**artificial** 139:1,17 139:22
**aside** 18:20 35:6,10 49:19 51:22 184:19
**asked** 15:23 22:6 27:11 37:15 42:6 46:4 62:7 71:23 85:20 86:1,2,4,5,7

86:9 88:13,16,23
89:1,16 96:11,19
96:24 97:4,5,15
100:14 106:13
111:16,21 117:3
122:24 123:14
125:23 136:15,17
137:9 144:12
182:23 184:20
192:1 194:22
198:22
**asking** 11:6 40:5
66:9 67:20 72:19
72:22 73:8 74:22
74:22 77:1 85:11
88:12 95:11 110:6
110:8 121:3
127:11 138:12
146:12,17 149:19
157:5
**asks** 133:5
**assert** 76:14
**assertion** 69:18
72:5 88:1,8 96:17
97:24 103:10
104:14 105:8
106:15 107:7
108:21 118:18
132:8 146:18
154:5 161:19
178:23 180:24
188:20
**assertions** 64:5,24
65:16 66:20 68:7
69:1 72:2 73:23
79:16 89:4 95:4
95:19,24 96:9
98:9 99:7 131:5,6
131:16 138:1
144:7 148:13
**asserts** 118:6
**assessment** 128:19
**assign** 121:6
134:19 158:9
198:4
**assigned** 88:17
**assignment** 21:20
24:13,13 26:15
46:9,14 56:16
57:1,6,14,21
61:15 85:19,23
87:7 88:14
**assistance** 68:18
**assistant** 34:2
**assisted** 185:15
**assisting** 41:5

42:17
**associate** 105:12
107:17 108:2
**associated** 18:1
86:23 112:16
115:21 131:9
186:5
**assume** 7:11
152:21 158:2
168:23
**assumed** 141:12
152:4,9
**assumes** 55:9
62:21 63:20 69:11
89:20 100:10,23
128:22
**assuming** 7:5
108:24 129:23,23
**assumption** 152:13
153:6
**assumptions**
125:24
**assurance** 111:4
115:21 116:14,15
121:22,23 160:16
160:21 161:2
165:4 185:22
186:4,19 187:7
**Attach** 199:2
**attached** 47:8
198:14
**attachment** 169:2
**attachments** 10:8
128:12
**attack** 177:6
**attempt** 93:1
129:14 130:9
182:24
**attend** 88:10
**attended** 14:14
18:7
**attention** 10:20
12:7 61:20 153:24
179:15
**attorneys** 4:20 6:19
**attribute** 176:10
188:16
**attributed** 156:20
**attributes** 75:16
**atypical** 54:4
**audio** 11:4,9
**auditing** 24:23
**auditor** 60:4
**auditors** 61:9
**Austin** 14:11
**authentic** 132:7

**authorization** 109:8
109:10,13,14,16
111:20,23 112:10
113:8,12 117:1,7
117:9,22 118:4,16
118:19 120:9
**authorize** 88:2
107:8 112:3,4,4
113:20 117:18
118:7,9
**automated** 138:11
138:17
**available** 50:13
101:14
**Avenue** 2:9
**average** 59:13,15
142:16,17,18
**avoid** 90:3,3 175:9
**avoids** 173:23
**aware** 10:17 11:12
11:15 28:22 29:12
29:24 32:4,18
53:18 55:3,3,4,11
56:5,7 57:19
62:17 91:18 92:3
92:5,11 114:9
123:8,11 138:23
177:17 183:18
**awful** 51:9

---

### B

**B** 1:13 3:3,8,10,14
3:16 6:10 11:23
199:2 200:16
**BA** 13:19
**back** 15:23 22:4
24:6 40:1 43:24
45:14 75:11 76:24
79:14 86:15,19,21
107:19 110:2
119:11 123:12
143:24 144:19
149:18 150:6
151:14 163:11
**Bank** 185:19
**banking** 26:23,24
**banks** 27:4
**based** 13:5 28:8,8,8
40:24 52:9 53:9,9
53:10 68:13 84:15
84:21 156:16
157:13 162:3
166:8 167:23
171:8,8
**bases** 170:13,18
171:6,22,24

172:19,24
**basic** 7:7
**basically** 53:13
54:2 178:11
**basis** 36:8 53:15
60:21 64:20 65:7
65:13,20 66:2,5
84:6 94:24 99:24
126:2 133:1,14
135:8 173:24
174:14 179:1
**Bates** 33:16 105:13
107:16
**Bates-stamped**
105:9 107:16
**bear** 93:14
**began** 36:14 46:9
46:10,13 140:5,5
**beginning** 5:18
26:12 43:14 89:2
108:11 138:7
175:15 185:11
**begins** 36:12 107:3
107:23,24 128:14
140:13 176:14
**begun** 157:12
**behalf** 1:3 4:7 6:2
28:1,17 37:2
81:12 83:7
**being's** 135:21
**believable** 188:18
**believe** 14:5 113:13
148:9 173:6
**believed** 55:15
**benefit** 150:20
**benefits** 147:16
**Bennett** 2:20 34:3
173:4,7,9
**best** 7:12 66:23,23
134:24
**better** 20:21 68:5
81:2 104:4
**beyond** 59:13 61:3
79:11,11
**bias** 189:3,7,10,12
189:13,17,19
190:3,5,6,7,10,12
190:14,15 191:2
194:10
**biased** 189:1
190:23
**biases** 189:19
190:4
**bibliographic** 71:12
93:18 94:4,14,16
94:17 127:22

140:1,1 166:19
187:20 188:2
**big** 193:11
**billed** 44:5
**billing** 40:14 174:18
**billion-dollar** 41:10
**bills** 44:3
**binary** 142:20 143:2
143:3
**binder** 9:12,16,19
9:21 10:1
**binomial** 142:23
143:5 149:20
179:11 193:9
**Biometrika** 175:16
**bit** 39:13 70:22
73:21 102:6 123:7
**blank** 9:10
**bold** 30:14 144:4
**bona** 83:5 131:7,12
135:1
**book** 174:24
**bottom** 12:15
**bounds** 162:5
**box** 21:16 32:13,24
**brains** 120:11
**brand** 140:15
**Brazilian** 13:4
**break** 39:15 40:4
96:14 104:19,20
104:24 110:6
143:15 150:3,9
163:2
**Brief** 39:24 143:23
163:10
**briefly** 52:20
**bring** 105:13
**bringing** 32:16
94:18 195:13
**Brinton** 1:15 4:18
197:15
**broader** 99:2
**bucket** 105:15,17
106:4,19 107:3
108:3,4,7,8,10,11
108:13 110:6,10
110:11,14 111:12
111:17,19 113:10
114:1,5 117:2,18
117:19,22 118:3
118:12,15 119:4
119:10 120:5,16
121:6 160:10,11
164:10
**buckets** 116:2,9
118:23 149:5,9

DAVID B. LASATER, Ph.D., 5/5/22

158:10,23 165:15
  166:10
**bullet** 109:6 111:17
  118:2
**bunch** 28:20 194:22
**business** 14:20
  195:17
**bypass** 122:19

**C**

**calculation** 175:2,5
  175:5
**calculations** 175:1
**call** 12:7 21:16
  52:18 53:2,10
  63:24 92:17 95:10
  116:20 138:13
  179:21
**called** 170:16
  171:20 172:22
**calls** 66:13 67:10
  81:5
**Canadian** 194:17
**capabilities** 139:4
  139:14 185:10
**capacities** 139:4,14
**Capital** 119:9 120:4
**caption** 65:23
**capture** 47:21 56:8
  81:16,24 82:3
  99:20
**captured** 48:4 49:3
  97:19 167:13
  168:8 170:12
**care** 44:10 174:8
**career** 26:7,8
**careful** 91:23
  103:17
**carefully** 198:2
**case** 4:6 6:20,24
  11:15 28:24 30:20
  34:17 35:8,19,24
  36:1 37:7 38:9,11
  38:20,20 39:2,7
  40:14 43:17 44:5
  44:8,16 45:6 46:5
  49:9,14,17,24
  50:21 55:5 61:18
  61:24 63:4 65:23
  71:15 95:13,13
  97:12 143:6 158:5
  162:23 169:8
  170:17 171:21
  172:23 175:10,19
  177:15 179:1
  183:19,24 188:6

190:21 193:24
**cases** 28:13,21
  29:9,16 32:19
  37:8 38:15 39:4
  174:8 186:12,13
  186:14
**catchall** 80:14
**categorical** 140:14
  140:17 164:15,23
  164:23
**categories** 66:24
  68:2,18 70:10
  73:15 76:16,22
  86:24 88:3 91:13
  95:16,23 96:3,8
  96:23,23 97:2
  99:21 101:15,16
  103:3 106:13
  121:24 123:22
  124:3,8,20 125:21
  148:7 153:17
  156:21 157:7,16
  164:7 165:15
  167:13 176:2,3
  178:11,16 179:12
  191:15 194:7
**categorize** 67:24
  75:19 159:18
**categorized** 76:10
  137:22
**categorizing** 68:21
**category** 51:5 69:5
  69:5,14,23 74:5
  76:17 78:3,3
  87:16,24 101:19
  102:18 103:7,7,24
  104:10 105:15
  106:8 118:5
  120:24 124:9
  135:23 148:13,20
  149:1 154:4 156:5
  161:18 167:8
  177:8 178:2,12
**cause** 121:6
**caused** 123:9
**caveat** 62:9
**cell** 13:4 140:16
**center** 106:22 180:4
  180:12 181:2,6,19
**centered** 103:15
  104:14 105:8
  108:20 109:2
**centers** 88:1 102:6
  103:10 105:14,14
  106:7,8,14
  107:7 108:22

**certain** 46:22 55:1
  90:23 117:21
  130:2 136:22
  137:7,7 149:24
  177:9 184:16
**certainly** 29:18
  142:10
**certainty** 62:10
**certification** 162:23
  197:1,19
**certifications** 20:5
  27:20
**certified** 1:23 4:16
  5:22 6:20 61:17
**certify** 197:3
**certifying** 197:22
**CFPB** 25:24 27:1
**challenge** 89:23
  174:15 179:11,12
  189:13
**challenges** 174:9
  194:6
**change** 15:23
  106:22 198:6,9
  199:6
**changes** 17:21 36:9
  198:3,7,13 200:9
**characteristic**
  106:10 115:18,19
  141:9 142:20
  143:2 152:14,23
  154:6
**characteristics**
  113:3 115:22
  147:19 153:5,12
  165:11
**characterized** 87:2
  148:15 189:16
**charges** 174:10
**Charles** 17:12
  19:12
**chart** 103:9 105:19
  107:19,21,22
  163:15,17,20
  164:13 165:6
  166:21
**check** 65:3
**Chicago** 2:14 19:15
**choose** 84:4,8
  126:11
**chose** 126:11 192:2
**chronological**
  150:11,20,21
  151:4,7,11,18
  152:10,15 153:5
  153:13

**circularization** 60:3
  61:9
**circumstance** 62:1
  65:13,21 66:2,5
  147:8
**circumstances**
  42:4 62:18 63:15
  65:7 88:6 138:8
  155:11
**cite** 113:14,14
**cited** 109:8 111:23
  111:24,24 112:9
  141:5 175:19
**cites** 118:4
**citing** 109:13
**city** 182:9
**CIVIL** 1:3
**claim** 69:17,17
**claims** 35:20 36:1
  37:9
**class** 5:23 6:20
  28:12,12,13,14,15
  28:16 50:21 56:17
  58:1 61:17,19
  79:7 122:21 123:9
  132:2 137:8
  150:10 151:22
  162:22 184:15
**clean** 8:5 13:9
**clear** 11:6 76:4
  83:13 91:16
  106:12 123:7
  128:13 137:4
  148:19 169:6
**client** 37:2 89:10
  126:18 174:16
**clients** 37:7 42:4
  44:14
**close** 180:4
**Cochran** 174:23
**code** 69:15 113:10
  **coded** 114:12 117:2
  119:21 120:5,5
  124:17
**coders** 88:9
**codes** 61:2
**coding** 47:13 69:16
  70:14 73:14 78:24
  90:18 92:20,22
  93:6 101:24
  103:19 104:5,8
  105:16,18 114:14
  115:3,11,11,16
  116:13,14 118:20
  120:16 148:12
  159:24 166:19

185:20,23 186:6
  188:2
**cognitive** 90:15,15
  91:10 93:8 113:4
**collect** 140:14
**college** 140:16
**column** 148:24
  149:4 198:5
**combination** 46:1
**combinations**
  148:12,20 149:1
  149:14,17
**combine** 150:7
**combined** 142:1
  150:18
**come** 125:5 126:16
  156:6 164:21
  165:22 180:16
  188:5
**comes** 63:11
  102:24 132:12
**commencing** 1:14
**comment** 167:11
**commenting**
  171:13
**communicate** 70:4
**communicating**
  73:10
**communication**
  23:23 24:3 31:7
  55:7,16,22 56:3,9
  63:12 71:6 72:4
  72:16 74:10 77:3
  98:3,21 135:18
  148:16 162:5,9
  167:2
**communications**
  23:9,12,16,23
  24:3 31:8 53:11
  53:13 54:13,21
  55:1,20 58:4 60:4
  61:11 71:6,17
  75:16 138:9
  155:12
**community** 139:18
  140:4
**commuter** 71:16
  72:3
**companies** 41:5
  42:18
**company** 13:5
  21:10 22:1 34:16
  41:10,18,20 43:3
  43:6 54:13 119:4
  123:3
**company's** 41:4

**Norman, Sr. v. Trans Union, LLC**                    DAVID B. LASATER, Ph.D., 5/5/22

60:4
compare 82:11
compared 181:9
comparing 91:11
competent 89:8
  198:18
complain 100:2
  101:11 123:16
  124:5 125:12
complained 100:9
  100:20 101:21
  102:19 124:9
complaining 124:1
  124:2 125:18,19
complaint 65:14
  66:22 67:9,12,19
  69:9,18 70:1
  71:24 88:8 96:16
  97:24 101:13
  147:9 154:5 156:5
  156:8 161:18
complaints 64:5,24
  65:16 66:19 68:7
  69:1 73:23 89:3
  95:4,19,24 96:9
  98:9 99:6 131:5,6
  131:16 138:1,4
  144:7
complete 98:14
  133:21 159:5
  166:6 174:13
completion 14:6
  40:20
complex 133:23,24
compliance 25:9
  31:12 75:18 92:22
complicated 63:2
components 30:16
compound 48:6
  74:2 87:13 170:23
computer 14:14,18
  14:19,23 15:5,9
  17:9,11,18,18
  18:8,17,22,24
  19:8,21,22 20:5
  31:15,21,22 32:4
  32:7 127:18
  134:19 137:14
  138:13
computers 32:1
conceives 133:1
concentrate 7:19
concentrated 177:9
concern 122:19
concerned 193:15
concerns 11:9

conclude 123:20
concluded 196:18
concludes 196:15
conclusion 125:6
  125:17
conclusions 181:9
concordance 92:17
concurrently 14:4
conducted 91:19
conference 1:12
  2:1 140:7 185:17
  185:19
conferences 48:17
conferencing 4:13
conferred 14:5
confidence 93:3
  175:2
conflict 116:20
conflicting 115:24
  116:4,9,11
confluence 111:7,9
  123:21 130:16
conjunction 164:17
connection 14:12
  18:8,18 19:8
  20:12 21:19 22:20
  23:7 26:9,16
  27:23 32:18 34:4
  34:5 35:12 37:3
  39:1 43:3 46:9,13
  47:22 48:2 51:12
  51:19 54:20 56:15
  57:1,6,12,20 58:6
  67:9 79:7,19
  124:14 197:7
consent 5:7,23 6:4
consider 9:20
  20:13 59:5,12,16
  87:10 93:22
  136:12 138:16
  195:2,4,7
considerable 180:1
consideration
  119:2
considered 46:23
  55:22 56:3,9 58:2
  62:2,19 117:18
  122:1 181:22
  184:3,4
consistent 89:7
  140:12 169:1
  170:18 171:24
  172:24
consists 140:18
constitute 70:1
  72:4

constituted 72:4
constitutes 95:6
consult 58:8 85:1
consultant 40:10
consultation 36:8
consulted 37:7
  57:3
consulting 36:10
  36:11 38:2,2 41:2
consumer 25:17,18
  25:20 26:9,16,22
  28:1,5 49:22 50:3
  50:19 51:9,20
  52:1,22 53:20
  54:19,21 55:1,16
  55:21,21 56:3,9
  57:15,22 58:13
  70:2,8 71:16 72:4
  72:16,19,21 73:10
  77:3,7 78:9 83:18
  84:22 85:5 87:1
  88:2 98:4 109:8
  111:19 112:9
  118:3,6 119:3
  120:3 121:15
  124:1 129:17
  132:2,9,13,13,14
  132:17,20,20,23
  133:4,5,6 145:3,5
  145:10,23 146:5
  147:1,10,13,23
  148:16 167:3,10
  167:10,17 179:24
  182:10,22
consumer's 63:12
  63:17 80:18 82:2
  88:1 100:3 103:10
  106:15 107:7
  108:21 109:12
  118:18 123:17
  135:18 162:5
  181:20,24
consumers 56:23
  113:16 123:3
  130:3,22 131:8
  140:3 149:16
  155:13
contain 88:19 124:8
  145:23 166:22
  167:16
contained 66:22
  72:16 77:7,24
  86:10 95:21 99:16
  109:3 137:7
  144:13,20 168:3
  170:20 197:5

contains 12:4 78:16
  106:23 108:23
content 170:8
  184:21
context 64:5,9,11
  64:20,24 65:3,6
  66:2,5,12,19
  77:10,11 86:4
  89:3 97:12 109:19
  112:4,8,23 118:8
  118:17 121:13
  138:6 144:6,11,16
  144:23 147:3,7,12
  148:1,5,16 149:10
  149:14 156:11
  162:17 167:21
contexts 86:24
  137:24 138:3
  145:6 146:15
  148:7 155:10
contingency 62:13
continue 164:5
continued 24:24
continuing 146:4
contract 71:11
  114:17,17,19,21
  120:11,22 160:15
  160:17 186:23
contracted 157:23
contrast 88:4
control 34:6,10
  158:15 173:8
  197:21
controller 165:5
conversation 85:10
  155:24 183:20
copy 8:5,18,23 9:3
  34:20 45:23 47:8
  107:16 119:18
  196:8,10,11,13
  197:8 198:22
corporations 20:23
correct 7:3,4 18:3
  20:3 27:14,15
  38:10,15,17 40:13
  40:16 41:1,22
  46:4,23 53:21
  62:20 72:9 78:12
  82:8 84:20 85:5,7
  89:16 91:21 92:2
  92:9 95:22 96:21
  97:9 108:14
  111:12 118:20,20
  124:5,10,11
  129:20,22 142:12
  148:20,22 149:1,3

149:24 150:4
  151:19 152:7,10
  152:22 157:18
  158:1 160:8
  164:11 165:24
  166:8,12,14,20
  167:18,20 170:5,9
  171:16 172:7,8
  177:10,11,13,14
  178:3 179:18
  180:4,5 181:10,24
  182:12,19 183:8
  185:1 187:5
  189:17 192:8
  197:8 200:7
correctly 11:5
  34:22 37:9 80:21
  114:6 151:16
  165:18
correspondence
  53:20 121:14
  123:2 127:2,3
  133:2 140:2
counsel 2:11,16,18
  5:6,15 9:2 10:18
  29:9,22 35:16
  36:8,18 52:16
  54:6 84:1 89:6,9
  97:5,17 126:18
  154:2,13,20 155:5
  155:9 156:1,16
  162:4 166:14
  193:14 198:20,21
count 23:20
country 140:16
counts 140:18,19
couple 7:7 68:22
  73:2 143:15
  163:16 172:10
  191:24 192:19
course 10:18 18:9
  23:5,20 94:4,18
  134:10 153:7
  161:10 192:22
courses 14:14,17
  14:19,23 15:1,2,3
  15:19,21 16:3,5
  16:18 19:13 22:5
  22:15,17,19,24
  23:1,1,2,11
coursework 15:15
  16:1,10,13 17:9
  17:11 23:8,23
  24:7
court 1:1,15,22,23
  4:10,15,18,23

5:13 6:6 11:10
28:22 29:6,10,20
30:17,23 32:19
75:11 86:15 89:10
131:19,23 137:15
144:19 168:6
187:21 196:7
197:15 198:20,23
**courtroom** 11:13
32:17
**coverage** 174:13
**Craig** 141:3
**created** 56:22
**creates** 131:4,16
132:6 133:12
134:24
**creating** 133:1
**credit** 24:9,14 27:21
31:11 35:20 36:2
36:21 37:3,6,8
38:11,20 39:1,6
55:1,7,16 56:4
57:3,8,9,17 67:15
102:14 119:4,9
120:4,15 128:21
128:23 129:16,23
130:1 132:24
134:7 145:9,20,22
183:2 184:10,17
**creditor** 60:14
126:22 144:15
146:4
**creditors** 56:22
60:4,5 126:23
146:2
**crisis** 43:7
**criteria** 68:15,24
72:14 73:23 75:2
75:3,15 77:2 78:6
78:10,17 79:5
85:12,14 86:23
88:11 89:13 91:12
92:12 93:6 100:8
100:18 101:20
103:14,18 104:13
105:7,21 107:5
108:19 109:1
110:12,20 111:9
111:11,14 112:2
114:4 116:23
127:5 158:21
160:10 193:8,10
193:11
**criterion** 77:4,6
78:23 90:2 119:1
**criticism** 173:19

178:7 179:3
**criticisms** 172:13
**criticizes** 173:18
**crossing** 181:17
**Crum** 52:1
**culture** 136:6,7,8
**current** 134:19
139:4
**currently** 38:23
39:4
**cursor** 34:7
**customer** 60:14
**customers** 27:5
60:5
**CV** 7:2 9:19 12:5,19
20:9 25:19 28:10
28:19 40:24,24

─────────
**D**
─────────

**D** 3:1
**data** 17:22,23 21:14
21:15 31:20 42:3
51:4,9 81:17,18
81:21,24 101:5
123:19 140:1,14
140:18 151:14
167:24 179:1,10
181:9,9
**database** 54:14
**databases** 31:19,20
**date** 44:4,7 49:11
198:10 200:18
**dated** 11:22 43:15
45:22 46:2 169:7
169:11,12 200:6
**dates** 151:13
**David** 1:13 3:3,10
3:14,16 4:5 6:7,10
11:23 196:15
199:2 200:16
**day** 25:5 91:8
**days** 33:10 198:21
**deal** 61:1 98:22
192:18,18
**dealing** 14:24
150:21
**deals** 32:6
**decades'** 48:10
**December** 13:21
194:18
**decide** 104:9
188:11
**decided** 42:15 43:4
**decision** 16:20,21
29:15 125:10
135:13 138:19

139:8 140:6
162:23 187:15
**decisions** 28:23
29:21 30:2 103:23
159:24
**declare** 5:3
**decline** 129:12
**deemed** 130:21
**deeply** 185:24
**Defendant** 1:8 2:16
**define** 21:12 131:19
131:24
**defined** 47:20 85:12
**definition** 64:9,10
65:3 66:21 67:9
67:19 68:6,24
69:9 71:24 72:3
72:14 73:22 74:12
77:2 79:18 124:13
144:23 161:22
190:15
**definitions** 30:14
67:22 68:15 75:2
79:5 110:20
**definitive** 133:19
**Definitively** 135:24
**degree** 13:13,14
14:3,4 15:8 25:1
112:19
**degrees** 14:8,13
15:12,16,22 16:7
16:24 17:4 23:8
24:2 93:20 195:20
**Delhi** 13:5
**deliver** 89:9
**delivered** 91:7
**delivery** 60:2,11
**demand** 73:5 96:17
98:1 132:8 146:18
147:10 154:5
161:19
**demands** 64:6 65:1
65:17 66:20 68:7
69:1 73:24 89:4
95:4,20 96:1,10
98:10 99:7 131:5
131:6,17 138:1
144:7 148:13
**demonstrate** 177:5
**Denver** 182:12,22
**department** 15:5
21:1 51:20 52:1
54:19 174:7,16
**departments** 20:24
**depend** 120:18
193:20

**depended** 74:15
**depending** 164:10
193:10,11
**depends** 146:16
**deposed** 7:3 177:17
**deposition** 1:13 4:5
4:12 5:24 6:5,22
7:17 8:1 10:18
11:3 34:5 38:14
38:22 45:18 49:17
122:24 138:7
167:7 177:15,20
196:15,18 198:2,3
198:11,15,21
199:2
**depositions** 38:24
**derived** 166:10
190:16
**deriving** 193:19
**describe** 52:19,20
76:15 93:6 95:14
127:15 133:2
171:5 172:19
**described** 54:7,9
56:14 79:21
116:16 127:9
128:10 156:17
165:16 167:14
168:8
**describes** 65:12,23
**describing** 125:17
**description** 3:9
54:15 73:16 106:8
128:1 163:22
164:15
**descriptions** 68:3
164:18 165:14
**desert** 180:11
**design** 36:22 37:10
137:6 152:19,20
188:21,23
**designate** 38:7 41:1
**designated** 30:9
37:24
**designation** 39:11
**designations** 30:20
**designed** 37:10
113:23 134:5
**desired** 176:16
**despite** 10:22
**detail** 70:13 127:9
128:12 156:15
**detect** 27:6
**detection** 24:18,21
24:22 25:3,6,11
25:17,21,24 30:24

**detectors** 27:18
**determination**
42:12 76:21 83:15
83:16 97:14
128:19 132:3
133:20 135:22
158:12,13,19
168:6
**determine** 55:6
66:11,22 70:6,8
72:7,21 80:6
81:14 83:10 85:2
85:16,20 86:9
96:19 97:22,23
100:19 101:21
103:24 107:6
109:2,7,12 111:22
112:7 113:9
118:17 124:15
127:6 129:15
158:23 182:24
**determined** 57:16
102:8
**determining** 72:15
77:15 85:3 103:15
104:13 105:7
108:20 110:13
166:10
**develop** 37:12 97:1
166:2 193:17
**developed** 67:1
70:14 78:20 79:1
96:24 101:6 134:3
138:19,20 140:8
159:22 165:2,7
166:13,15
**developing** 94:5
152:4 185:15
186:11
**development** 17:17
42:21,21 48:11
157:11 164:24
165:20 166:19
185:9 186:16,17
195:5
**devoted** 42:8 43:2
**dialogue** 99:11
**dictionary** 67:21
136:5,10
**difference** 81:7
114:13,15 191:12
**differences** 110:24
148:14
**different** 15:1,2
16:16 20:18 23:11
45:1,2 70:22 73:3

DAVID B. LASATER, Ph.D., 5/5/22

75:20 77:22 80:17
82:12 84:6,7,12
85:10,10 88:18
97:19 98:17 99:5
99:8,8 102:17
113:16 115:2,4
116:2,12,13,18
122:18 123:7
126:4,20 127:20
128:5 138:5
141:24 142:2
150:10 152:24
153:4,5,13 155:19
155:21 159:2
161:7 164:2 177:9
**differently** 25:15
**differing** 116:8,19
**dimensions** 22:22
22:22
**direct** 40:19 48:21
48:23 101:3,13,13
102:1,23 179:15
180:22,22 197:21
**directed** 88:10,23
92:19 93:5
**directing** 179:20
**direction** 35:11
56:5 65:15 70:11
73:13 74:4,7
75:13 76:21 78:21
83:23,24 84:2
90:5 97:16 102:1
104:8 110:17,19
122:10,12 132:16
132:19 162:4
**directions** 73:3
**directly** 49:3 57:9
59:4 61:11 85:5
100:2,9,9,20
101:11,21 102:19
123:16 124:2,2,5
124:10,14,19
125:1,4,4,8,15,16
141:2 172:15
**director** 40:9,18
185:12
**directors** 41:13
**disagree** 104:6
**disagreement**
115:13
**discern** 135:8,9
138:11
**discipline** 195:12
195:14
**disciplines** 195:18
**disclosure** 12:8

170:20
**discover** 141:8
142:23
**discoverable**
141:24,24 153:7
189:24 190:19
**discovered** 82:18
129:6
**discretion** 74:24
**discussed** 166:16
**discussion** 30:12
31:23,23 42:2,10
155:4,9,13 156:2
**disproved** 153:9
**disproves** 154:3
**dispute** 55:22 63:17
86:10,12,22 87:2
87:4,8,10,23
88:19 89:18 92:7
96:5,12,21 97:6
97:11,14,23 98:8
98:17,18 99:3,5
99:16,20 101:22
102:17 122:10,11
129:18 133:7
134:6 144:14,20
144:21 158:4
166:22,24 167:8
167:18,18 168:3,5
**disputed** 50:16
85:21 144:14
147:23
**disputes** 53:5,7
54:10,12,16 95:21
102:16 122:2
130:4
**disputing** 56:23
62:3,20 145:4,5
146:10,12 147:2
**dissertation** 14:6
**distance** 82:15,15
82:16 83:9,10
133:12
**distant** 82:20 83:8
130:16,16 132:5
182:9,21
**distinguish** 129:21
130:5,9,9
**distributed** 141:12
141:19 142:11,14
142:21 151:22
153:13
**distribution** 152:9
152:13 178:15
180:4,12 181:2,6
181:19

**distributions** 153:4
**District** 1:1,1 4:9,10
140:6
**divergence** 112:22
112:24
**DL1** 33:17
**DL10** 33:17
**Doctor** 6:6 177:5
**doctoral** 16:6,22
25:2
**document** 10:5,10
33:16 34:3,7,14
34:15 40:7 56:8
78:16 110:12
113:2,3 173:9
185:10 186:12
**documentation**
186:15
**documents** 8:21
9:9 46:23 47:22
48:1,13,14,24
49:2,19,22 50:2
50:12 51:23 52:22
53:15 54:1 58:4
84:11 97:18
139:15,19 149:24
150:10 154:3
184:3,4,20,22
**doing** 46:9,13 60:24
93:18 114:10
152:2 185:16
190:23
**DOJ** 174:15
**domestic** 25:8
**doubt** 10:17
**dozens** 186:3
**Dr** 6:17 10:14 12:2
33:15 34:2 40:4
43:13 45:17 47:6
75:5,9 96:3 101:1
106:12 110:5
122:4 144:3
163:14 168:16
169:15,24 173:12
177:16 184:19
191:18 192:1
196:4
**draft** 133:6
**drawing** 93:10,10
**Drive** 2:13
**Duane** 1:3 4:6
49:23 199:4
**duly** 6:11

---
**E**
---
**E** 1:3 2:13 3:1,8 4:6

199:4
**earlier** 11:10 12:2
61:9 62:7 114:8
137:9 149:19
166:9 167:6,14
172:11 186:22
196:1
**early** 52:18 122:24
178:14
**easily** 159:19
**Eastern** 1:1 4:10
**economy** 30:12
**educate** 192:21
**education** 12:20
13:10 18:20 24:17
24:18,24 27:12
194:23
**educational** 17:4
**effect** 165:13
**effectively** 191:1
**efficiency** 8:4
**efficient** 67:3
**effort** 170:12 171:5
172:18
**eight** 88:4,4 95:24
96:4,8,16 101:17
101:19 103:3,8
104:1,9 105:15,15
105:17 106:5,8,13
108:13 110:11
123:22 124:17
125:21 161:10
167:14
**either** 15:9,12,16
16:8,11,13 17:1
17:21 19:7 24:16
26:1 51:24 86:15
158:3 174:15
**electronic** 91:4
92:4,4,21 114:10
114:11,11,12
186:15
**electronically**
90:22 91:19
136:23
**element** 24:23 25:4
25:6 102:3,9,10
112:2 138:22,22
**elements** 21:14
63:4 77:15 121:11
185:22
**embedded** 173:15
173:15 190:11,12
**embodied** 73:14
78:24
**emphasis** 125:15

**emphasizing**
113:18
**empirical** 60:8,10
60:15 178:24
**empirics** 188:20
**employ** 114:21
**employed** 17:13
28:17 140:15
157:22
**employee** 22:9,23
**employees** 51:24
52:12 53:19
157:22
**employer** 19:7
**employers** 23:3,5
**employment** 22:21
28:12,15
**encountered** 53:24
53:24
**endeavor** 112:18
**endorsing** 159:11
159:13
**ends** 128:15
**enforcement** 134:3
**engage** 16:10 70:5
**engaged** 71:12
183:22
**engagement** 36:12
37:11 40:21
162:19 184:19
**engagements**
162:20 186:3
**engineering** 15:13
21:23,24
**English** 65:11
68:11,20 70:16,20
70:22 71:9 72:18
73:17 75:17,24
78:22 79:13 80:11
80:13 91:11
112:12,14 113:6
121:12 133:23
134:18 135:7
139:10
**enlarges** 194:4
**ensure** 170:12
**ensures** 189:6
**entire** 110:12
180:14 190:20
**entirety** 95:14
**entries** 147:15
**entry** 30:13 102:13
125:20
**environment** 18:12
25:23,24 26:23
27:1

equate 64:20
equivalent 120:10
errata 198:5,9,10
  198:14,19,22
  199:1 200:9
error 47:10,12
  136:2 142:9 190:3
especially 11:9
  16:19,19 115:17
  173:15 174:7
  186:12,17,18
  188:16
Esquire 2:3,4,8,12
  2:13,18
essential 25:3
  161:15
estimate 175:3
  190:17
estimation 190:5
  190:14,15
evaluate 61:16
  92:16 97:6 100:14
  125:9 144:12
  176:1 194:9
evaluated 112:22
  113:4 115:12
  118:16 135:7,10
  156:19 181:1
  189:3
evaluating 60:12,12
  71:16 164:1
evaluation 42:22
  177:4 180:24
  195:14
evenly 151:22
eventually 67:1
  156:18
everyday 19:2
evidence 32:17
  36:17 42:22 55:10
  62:22 63:20 69:12
  89:21 94:4,5,19
  97:1 100:11,24
  135:18 137:24
evidential 31:24
evidently 9:24
  99:10
ex-ante 39:10
  110:23 133:20
  175:5
ex-post 175:4
exact 134:10
exactly 67:6 93:2
  106:24 125:16
EXAMINATION 3:4
  6:14 169:21

191:21
examined 6:11
example 49:6 67:18
  67:23 69:13 92:5
  113:14 125:11
  148:1,4 190:2
  193:6 195:23
examples 68:17,17
  68:23 70:13 73:15
  73:24 74:6 102:1
  105:21 108:5
  112:6 164:18
exception 150:5
excerpted 140:22
excerpts 9:1
exchange 52:19,21
  98:4
exchanged 49:14
excluding 23:17
exclusively 119:20
  119:20
excuse 28:21 122:4
  131:5 142:22
exemplar 159:23
  180:23
exemplars 160:12
  160:13
exhibit 3:9 9:15
  12:3,3 43:13
  106:1 160:3,5
  169:2 173:6
  179:16 182:8
exhibits 9:14,15,21
  10:4,9 168:17
exist 130:3
existed 130:24
existence 146:4
existing 162:20
expand 154:21,21
expect 10:23
expectation 153:8
expected 60:1,13
expensive 135:5
experience 10:16
  12:20 21:7 25:11
  27:16 28:11,16
  48:11 60:7,17
  71:15 84:6,7,21
  176:24 177:2
  185:8 186:8,20
experienced
  188:15 192:16
experiences 48:16
  48:16
expert 3:10,14,15
  6:22 11:22 27:23

28:1,24 29:7,10
  29:22 30:23 31:3
  31:11,15 32:10,20
  35:13,19 36:1,10
  36:10,15 37:2,22
  38:1,2,4,19 39:6
  39:11 41:21,24
  42:8 43:3 58:22
  59:2,5,19,24
  93:23 136:12
  138:16 169:7,11
  183:19 184:24
  195:1,2,4,7
expertise 30:8
  59:17,22 94:6
  138:17 139:3
  194:23
expertize 42:6
experts 70:17
exposed 17:16
exposure 18:16,17
  18:21 19:3,3 21:6
extend 61:10
extensive 10:15
  22:16
extent 16:21 17:20
  36:17 37:13 50:7
  60:16 70:19,19
  72:10 74:7 75:22
  76:9 78:20 111:6
  138:18,19
extra 180:17 194:1
eyes 91:17

_____

**F**

facility 17:12 19:12
  19:14
fact 8:19 10:22
  60:14 70:24 72:20
  89:5 134:23
  173:23 174:22,23
  176:20 188:19
facts 55:10 62:22
  63:20 69:12 89:21
  100:11,23 125:24
factual 72:6,8
faculty 17:14
fair 27:1,2,20 31:11
  35:20 36:2,21
  37:3,6,8 38:10,12
  38:20 39:1,6
  158:17 159:3
  170:7 172:9 179:2
  179:6,7
faithfully 25:7
fall 51:4 76:23

102:18 119:16,17
  144:22 158:24
fallible 139:2
familiar 7:6 185:24
fancier 93:11
far 82:19 83:8,9
farther 181:19
fashion 99:21
faulty 157:10
FCRA 37:20 38:16
feature 89:17,17
  96:18,20 97:8,22
  97:24 99:16,19,19
  102:22 104:1,9
  106:23 108:23
  109:3 111:2
  117:20 118:17,21
  167:2
features 72:12 76:1
  76:12 88:6,10
  89:11,13 90:6
  93:7 95:15,19
  97:9 98:20 99:1
  99:12,14 100:15
  102:21 113:19
  119:7 122:20
  123:8 137:23
  139:19 147:16,18
  149:12 164:2,6
  165:10 167:5
  168:7,7
February 150:7
feel 45:22
fell 110:14
fewer 95:8 150:21
  150:21
fide 83:6 131:7,12
  135:1
field 93:23 94:2
figure 78:2 93:2
  123:20 128:1,10
  128:11 149:22,23
  150:2,9,13,14
  151:4,5,7,9
file 92:7 100:4
  123:18 133:15
filed 4:9 171:12
files 50:13
filing 198:15,20
filter 158:15 179:22
final 67:2
finalized 171:2,15
  172:5
financial 13:16 25:6
  25:12
find 44:9 67:15 92:8

104:15 181:4
  190:24 192:11
  193:24 194:1
finding 29:5,15,21
finds 147:14
fine 34:11 104:16
  109:14 128:2
  152:16
finish 104:22
first 3:9 6:11 10:3
  20:8 34:13,23
  38:9 40:7 42:14
  45:15 46:8,12,16
  85:6 95:5 96:22
  109:6 111:1,18
  118:1 119:1
  128:22 148:24
  150:13 153:21
  162:7 164:13
  166:4,4,4 175:20
  175:21 176:13
  180:9,23 181:12
  181:21 182:16
  184:7 189:1 191:1
  191:14 194:10
  196:10
five 42:13 108:10
  108:18 142:5,8
  143:18,18 167:13
fleshed 164:16
flexible 146:22
FLITTER 2:8
Floor 2:14
flow 103:9 105:19
  107:19,21,22
  163:15,17,20
  164:12 165:6
  166:21
focus 14:21 102:2,5
  102:7,9 103:22
focused 99:2 125:3
  195:22
follow 54:20 75:1
  79:6
follow-up 138:15
  155:5 170:1
follow-ups 191:24
followed 53:4 78:11
  165:6
following 110:10
  198:8
follows 6:12 77:14
  127:3 152:20
footnote 88:5 99:22
  101:17 102:24
  141:5 156:22

Norman, Sr. v. Trans Union, LLC                                    DAVID B. LASATER, Ph.D., 5/5/22

foregoing 197:19
foreign 25:8 122:15
    122:16
form 44:1 48:5
    55:14,20 61:19
    74:1 87:12 109:15
    198:4,7
formal 19:7,22 22:5
    22:13,17,19 24:7
    24:23 26:19 27:12
formalize 178:18
formally 35:24
format 44:13
formula 193:16
forth 47:23 48:3
    51:13 52:13 93:4
    110:22 158:22
Fortran 14:21
forum 36:19
forums 41:16,16
    42:24 174:6,6
found 30:9 31:2,6
    31:10,14 32:19
    192:16
foundation 41:7
    50:5,24 52:4 62:5
    62:23 63:21
four 48:10,10 68:1
    68:2 76:16 87:17
    102:17 110:10
    126:1 131:3
    181:12
Francis 2:3,3 3:5
    5:20,21 6:16,18
    7:16 9:22 10:6,12
    11:20 12:1 19:2,5
    19:19 20:17,22
    21:11 22:12 26:21
    28:3 30:11 32:8
    32:12 33:7,14,23
    34:1,21 35:22
    36:4 39:12,16,20
    40:3 41:9,11
    42:20 43:9,12
    44:9 45:12,16
    47:1,5 48:8,22
    50:9 51:1,3 52:10
    53:17 55:12,13
    58:18,20 59:11
    62:6,16 63:1,14
    64:2,17,21 65:9
    66:4,17 67:4,17
    68:12 69:20 72:18
    73:12 74:13,20
    75:6 76:3,18
    77:17 78:14 81:13

81:21,22 84:19
    86:8,17,18 87:3
    87:16,18 89:15,24
    90:7,12 94:7,20
    95:10 96:13 98:15
    100:17 101:8
    102:15 103:18
    104:17,21 105:2,4
    106:18 107:1
    109:21 110:4,18
    117:12 120:21
    122:8,17 127:9
    136:19 139:24
    143:11,12,17
    144:2 145:17,18
    147:21 148:3
    152:6 162:21
    163:1,6,7,13
    168:10,15 169:15
    169:19 170:3,22
    182:13,23 183:9
    183:13 184:11
    185:3 187:3,10,22
    187:23 188:8
    191:3,9,23 192:20
    195:19 196:2,10
    196:12
frankly 193:5
fraud 24:18,20,22
    25:3,5,11,15,17
    25:18,21 26:8,9
    26:16 30:23
free 45:23
freighted 167:21
frequencies 148:12
frequency 149:16
frequently 140:13
frivolous 55:23
    56:10 58:1,2
front 9:2,2,9 11:14
    12:11,13 20:2
    46:19 150:6
    159:20 163:17
    198:15
FTI 19:18 41:2
    43:17,23 44:1,4,8
    44:13,22 45:5
    97:2
FTI's 185:9
full 26:6 139:14
    159:5
fully 197:5
function 21:2 90:22
functions 61:6
fundamental 17:19
    19:1 186:20

Fundamentally
    173:22
further 5:1 18:21
    140:10 156:14
    157:5 169:17
    191:18,21 196:3
future 5:8 37:16

_____

**G**

gears 182:23
general 36:4 52:16
    71:17 106:8
    112:12 165:5
    174:8
generally 7:6 29:12
    32:21 44:12 46:2
    54:11 64:15 72:23
    72:23 93:12
    111:24 116:4
    127:15,21 141:11
    141:17 174:3,20
    176:9,18,22 177:7
    178:8 179:4,10
    187:6,17 188:22
    194:12,13 195:15
generator 155:2
geographical
    157:16
geographically
    182:9
geographies 42:24
getting 65:8,8
    133:10,10
give 7:7 11:16
    20:19 34:6 68:14
    75:14 125:11
    148:4 158:8
given 53:19 54:15
    125:8 188:13
    200:8
giving 10:13 67:23
glaring 172:15
go 10:11 13:7,18
    14:7 30:4,6 45:14
    70:4,10 75:9
    76:24 82:21 86:13
    98:7,16 99:23
    101:1,23 106:4
    107:9 108:4
    109:22 121:18
    123:12 126:1
    127:16,17 143:10
    151:13 158:17,18
goal 141:8
goes 20:24 23:20
going 6:21 8:13,24

9:3 10:3,3,14
    21:11 29:14 34:6
    39:13 42:15 43:5
    45:19,21 47:11
    52:23 71:4 73:21
    79:14 102:5
    104:18 106:9
    107:17,18 108:5
    108:13 109:18,20
    110:9 116:10,10
    116:11 127:15
    140:10 141:7
    143:14 149:18
    152:7 163:23
    165:5 168:16,23
    170:4 187:13
    196:17
going-in 153:6
good 5:20 6:1,17
    9:5,7 10:11 12:10
    39:14 104:20
    106:16
Gotcha 15:8 97:7
    149:18 166:17
gotten 76:22 139:7
govern 67:19
graduated 23:21
graduating 17:7
    18:5 22:3 24:5
granted 14:4
granular 90:5 98:20
    98:20 99:20 101:5
    167:1,2
granularly 101:14
    101:14
graphically 128:10
great 6:17 8:19 9:18
    11:19 12:18 70:13
    128:18 163:19
group 53:12 75:19
    146:19 186:4
groups 75:20
guess 64:22 66:9
    67:3 68:5 73:19
    114:23 125:7
    146:4 196:12
guidance 53:19,22
    58:11 68:20
    110:24 160:10
    164:13
guys 155:17

_____

**H**

H 3:8
half-hour 158:8
halfway 156:16

157:15
hand 132:23 171:14
handed 165:9
handing 90:1,1
handle 53:20
handled 50:12 51:4
    51:8 53:16 54:11
    54:14
handling 52:23
    53:5 135:4
hands 46:17 70:23
    120:10,11 166:7
handwriting 26:20
    27:13
happen 183:23
happens 94:9
happy 7:23
hard 8:5,18,20,23
    17:10 41:9 119:17
hardware 21:13
Harrington 43:21
    44:18 45:2 155:3
    155:4,21 180:22
Hartmann 2:13
    154:15 155:16
    157:2,8,15 166:14
    166:16 178:5
head 73:2
heading 12:23
    108:11 144:4
    148:20
health 174:8
hear 11:8,15
heard 6:18
held 4:12 28:23
helping 42:16
hesitant 122:13,14
hey 69:8
highlighted 113:19
highlights 119:24
    120:1
highly 135:4
hire 132:15
histograms 153:9
history 20:9,11,12
    21:4,4,24 24:17
    28:4
hit 153:16
hold 17:5 59:19,21
homogeneous
    152:3,14
homogeneously
    153:12
homogenous
    152:21
hope 184:2,2

**Norman, Sr. v. Trans Union, LLC**                    DAVID B. LASATER, Ph.D., 5/5/22

horizon 38:24
hour 39:13 143:14
hourly 40:8
hours 44:7
household 28:5
Houston 13:14,20
  13:23,24 14:20
  15:4,6 16:5
huge 140:5
human 121:16
  135:12,21 136:2,2
  136:3 137:18
  139:9
hundred 175:13
hypothesis 154:4
  156:4,6 177:13
  178:1,9
hypothesized
  156:7 177:8
hypothetical 77:22
  147:5 178:24

I

idea 41:19 44:4,6,7
  71:3,7 92:23
  132:21 160:19
ideas 20:20
identical 126:10
  129:7
identicals 129:12
identification
  126:21 196:21
identified 11:10
  17:5 88:7,13
  114:1 126:22,23
  129:16 148:8
  154:14 183:2
  184:15 191:15
identifies 47:3
  105:7
identify 13:10 20:9
  21:2 34:15 46:22
  52:12 72:11 73:9
  73:9 88:5 113:24
  130:10 147:20
  149:23 162:6
  168:17 179:23
identifying 75:15
  108:2
illegible 61:1,2
Illinois 2:14
image 146:6
imagine 36:13
impact 176:23
impetus 164:4
implement 127:20

implemented 19:16
implicitly 111:24
importance 120:1
important 7:8 16:20
  63:5 99:12 109:20
  121:16 136:6
  158:12
In-House 2:18
in-or-out 78:10
inaccuracy 162:6
include 23:19 43:16
  86:24 89:17
  130:22 174:6
included 19:12
  33:12 96:5 102:16
  121:4 135:18
includes 28:11 74:7
  89:18 107:5
including 122:21
  176:2 178:12
  192:20,20
inclusion 120:23,23
incomplete 147:5
incorrect 47:14
indent 140:13
indented 140:12,23
independent 113:5
  114:17 115:4
  137:21 155:8
  157:19,20 158:13
independently
  91:14 92:15 120:2
  155:22
indicate 5:16,18
  30:11 76:14 112:9
indicated 101:17
  164:7 177:24
indicates 177:12
indicia 79:22 80:24
  81:1,3,15 82:13
  83:11 85:12
indirect 48:19
indirectly 125:12
individual 51:9
  60:16 120:8,8
  147:17 168:24
  182:10
individually 121:12
individuals 44:18
  44:22 45:4,7 55:5
  66:11
individuals' 68:1
infallibly 139:19
inferences 193:19
information 58:12
  131:21 162:6

initial 67:1 161:16
  163:22,22 164:21
  164:22 165:18
  166:1 170:4
  183:21
initially 38:3 154:3
initiative 185:13
inputs 138:20,21
inquire 57:14,22
inquiries 88:13
  95:22 122:2
  144:22 145:4,10
  146:2,2
inquiry 50:16 56:22
  62:3,20 63:17
  82:8 85:21 86:10
  87:4,9,11 88:2,19
  89:18 92:7 96:5
  96:17,18,20 100:3
  100:21 101:12
  102:18 107:8
  118:7,19 123:17
  125:13 134:7
  144:14,21 146:11
  146:13 147:24
  166:22 168:3
insert 120:20
insight 190:22
insofar 78:18
  106:10
Inspector 174:8
instance 52:6 104:5
  113:13
instances 54:1
  116:18
institutions 14:13
  15:9,13,16 16:8
  18:7
instruct 66:10
  100:8
instructed 54:24
  55:6
instruction 51:18
instructions 7:7
  10:14 198:1
instructs 10:21
insufficient 192:17
  194:1
intelligence 138:11
  138:17 139:1,17
  139:22
intended 75:14
  103:20 125:10
  135:9 164:13,14
  194:9
intends 147:20

180:18
intention 80:4
intentionally
  173:23 175:9
interestingly 176:2
internal 50:19
  51:14 56:12
internally 51:19
international 13:3
Internet 130:3
Internet/telephone
  197:7
interpret 74:19,19
  74:24 134:20
  137:15
interpreting
  71:16
interpretation
  74:16 76:6 82:6
  82:10 90:3 101:4
  115:21 120:21
  135:21 139:10
interpreted 137:17
interpreting 137:19
interprets 137:20
interrogatories
  49:7,8,12,13
interrupt 75:7 80:4
interrupting 98:12
interval 175:3
intervention 121:16
  136:2
interview 56:17,21
interviewed 61:4
introduce 136:2
introduction
  163:24
investigation 42:23
  162:8
investigative 42:19
invoice 43:16,23
  46:16
invoices 3:13 33:11
  43:11 44:13 45:9
involve 37:20 76:6
involved 22:10
  24:12,14 31:19,21
  35:19,20 36:1,12
  37:8,19 38:16
  112:18 146:15
involvement 35:2
  157:14
involves 112:20
  113:4
involving 36:21,22
  37:6 59:6,17

194:17
issuance 58:17
issue 96:12 111:20
  111:23 112:10
  117:9 118:4
  151:21 162:13
  166:24,24 172:9
  172:12 175:10
  178:14
issued 92:24
item 12:21,23
items 102:17
  144:14 146:10,20
  147:2
iterative 164:23,23
  165:2,19

J

Jaffe 171:12 172:4
  172:10 173:19,22
  174:24 175:8
  176:7,20 178:1
  180:1,9,18 181:8
  189:16 190:24
  191:6,11 193:17
Jaffe's 171:10,14
  172:6 173:17
  176:24 177:6
  178:9,23 179:3,21
  180:7,24 189:14
JAMES 2:3
January 150:7,16
jfrancis@consu...
  2:6
Jim 5:21 6:18
job 100:12
Joe 185:13
John 183:19
JORDAN 2:4
journal 48:15
jsartell@consum...
  2:7
judge 11:14 140:6
  188:14 192:15
  193:14,23
judgment 95:10
  112:20,21,21
  113:4 135:21
  136:3 159:4
July 43:15
jump 162:2
June 34:24 35:4,15
  35:18,23 37:1
  38:8,18 154:17
juris 78:19 93:13,16
  93:19 94:9

Page 209

jury 11:14 137:16
  137:19 188:14
  192:10,15 193:14
  193:24
Justice 174:7,17

**K**

key 60:23,23
keyword 109:17,20
kind 45:20 71:12
  78:13 92:11,12,21
kinds 43:7 139:11
knew 190:19,19
know 7:10 8:1,16
  11:5,8 21:4 29:20
  29:23 39:17 43:1
  44:10 45:10 51:6
  51:11 52:8 53:3,9
  54:23 56:1 59:15
  61:10 63:15 67:6
  71:14,18 80:7
  82:9 87:20,21
  91:1,2,3 104:19
  109:4 113:11,11
  114:2,3,3,24,24
  116:22 119:12
  121:18 122:1,20
  123:4 128:23,24
  138:14 139:1,20
  139:21 147:24
  151:20 160:22,22
  163:16 170:3
knowledge 24:11
  24:15 30:9 36:17
  48:12 55:18 59:13
  60:6,19 62:8
  63:23 194:24
knowledgeable
  139:13
known 189:2
Kreppel 44:19 45:1

**L**

label 126:9,10,11
labeled 33:17
lack 41:6 50:4,24
  52:3 62:4,5,22
  63:21 77:12
language 14:21,24
  16:18,19,21 21:19
  61:23 65:12 68:11
  68:20 70:16,20,22
  71:9 72:18 73:18
  75:17,24 76:15
  77:11,12 78:22
  79:13 80:11,13

91:11 102:5
  103:11 112:12,14
  113:6 119:20
  120:13,15 121:13
  133:23 134:2,2,18
  134:21 135:7
  137:15 139:10
  162:13
languages 17:22
  121:20,21
large 31:19 176:5
Lasater 1:13 3:3,11
  3:14,16 4:5 6:7,10
  6:17 10:14 11:23
  12:2 33:15 34:2
  40:4 43:13 45:17
  47:6 75:5,10 96:3
  101:2 106:12
  110:5 122:5 144:3
  163:14 168:17
  169:16,24 173:12
  177:16 184:19
  191:19 192:1
  196:5,16 199:2
  200:16
Lasater-1 3:10
  11:24 45:14 49:5
  196:20
Lasater-2 3:12 33:8
  33:13,15 40:6
Lasater-3 3:13
  43:10,14 44:12
Lasater-4 3:14
  168:11
Lasater-5 3:15
  196:20
lasted 155:14
law 70:20 71:4,10
  93:20 133:10
  192:22
lawyer 52:17 68:19
lawyers 70:23
  71:11 112:13
  113:5,6 114:17,19
  114:21 120:22
  137:21 160:16,18
  161:1 186:23
  187:1 192:21,22
lay 139:7 188:14
  192:18
layers 115:20
layperson 192:11
lead 38:21
leading 170:23
  182:14 183:10
  185:4 187:4,24

188:9 191:10
leads 175:2
learned 19:23 63:24
leave 177:3
led 46:14 61:18,23
  84:8 122:22
  165:20 185:13
left 74:23 123:14
legal 4:16 41:16,16
  71:1 93:23 94:2
  97:13 112:15
  132:3 139:18
  140:4 193:14
lending 27:1,2
lengthy 73:14 170:9
let's 13:18 33:12,24
  43:10 45:13 47:2
  47:19 61:12,12
  69:6,6 74:17,17
  91:22,22,22,22
  94:21 99:23 103:6
  104:22 105:2
  106:18 109:21
  123:12 126:1
  131:2 137:4 143:9
  143:10,10 150:16
  150:17 151:8,8
  162:2 163:2
  168:11
letter 43:14 50:15
  61:19 62:1,19
  63:11,16 66:22
  72:12 76:10,12,14
  77:7 78:2,23
  79:22 80:6,17
  81:4,8,12 82:23
  83:5,6,16 85:16
  86:10 87:8 88:1,6
  89:18 90:4 96:3
  96:20 97:5,22
  99:16,17 100:9,15
  100:19 102:8,16
  103:10,15,24
  104:6,9,14 105:8
  106:10,14 107:6
  108:20 109:2
  110:14 111:2,8,18
  111:23 112:5
  113:9,17,19
  114:12,14 115:6
  116:1,5 117:2,11
  117:17,19 118:2
  118:14 120:2
  121:1 122:3,23
  123:10 124:3,8,9
  124:16,17 125:12

126:16,23,24
  127:1,6 132:4,6
  132:22 133:6,20
  133:21 135:10,13
  135:14,15,17,17
  135:22 137:7,19
  137:20 142:20
  144:5,13,15,20
  148:4 159:6
  160:15 164:1,17
  166:21 168:2,8
  180:13 187:1
letter-by-letter
  133:14 135:8
  147:17
letters 47:13 50:7
  50:10,11,14,19
  55:15,20 56:18
  57:8,16,23 61:16
  63:7,10 64:4,23
  66:11 67:2 68:1,4
  68:21 69:9 74:16
  74:24 75:20,20
  76:1,5 77:24 78:9
  79:7,15 80:23
  82:19 85:20 87:9
  88:18 89:2,12,14
  90:9,23,24 91:5,7
  91:13,17,19,20
  92:1,6 93:7 95:1,2
  95:3,21 96:24
  98:23 99:1,12
  100:1,7 101:10
  102:21 113:15,16
  113:23 114:1,6,16
  114:19,20 115:3,5
  115:17,22 119:16
  119:18 120:8,22
  121:11,20 122:2
  122:21 123:9,16
  124:5 126:3,3,5
  126:10,20 129:7,8
  130:21 131:7,9
  133:15 134:9,12
  134:14 136:22
  137:8,22 138:2
  142:22 143:6,6
  144:6,11 149:23
  150:3,3,24 151:17
  151:21 154:2,6
  155:1,7,11,17,17
  155:22 156:1,8,18
  158:4,8,21,23
  159:18,23 161:17
  161:17 165:10
  177:8 179:23

180:16,23 181:17
  181:23 182:3,8,11
  182:11,20 183:1
  184:15 186:23,24
  188:5,14 189:7
  190:21 191:16
lexicographic
  71:13
liability 28:13,15
library 48:12
lie 27:18
lieu 5:2
life 84:12
light 11:9
likewise 24:2 56:21
limit 42:10
limited 63:23
line 12:21,23,23
  199:6
lines 9:8 181:18
linguistics 16:11,15
  17:2 24:7 31:4
  65:9 70:18 71:2
  112:16 136:18
Lisa 43:20 44:18
list 47:12 147:18
listed 38:14 40:8
literature 176:9
litigation 25:23
  26:12 28:11 32:5
  32:6 34:24 35:3,6
  41:2,5,21 42:8,18
  43:4 94:5,19
  126:19 127:22
  131:21 135:19
  139:12 167:22
little 8:21 39:13
  70:22 73:21 102:6
  122:18 123:6
lived 84:10,11
living 84:14
LLC 1:7 2:18 4:8
  199:4
LLP 2:12
loans 26:24
located 181:10
location 81:9,10
locations 82:19
  182:3,5
Logility 71:21,22
  111:4 114:22
  157:23,24 158:18
long 20:10,11 28:4
  36:20 66:15 99:11
  99:11 142:12,13
  142:13 151:11

154:18
**Looby** 185:13,14
**look** 47:19 54:24
66:24 69:8,14,15
69:15 73:20 78:1
87:16,24 90:16
101:24,24 102:21
104:3,4 105:20
106:18 118:1,8
119:6,11,14,15,16
119:17 120:1,7,24
121:19 127:12,24
127:24 133:17,18
134:6 148:8
150:16,17 151:8,8
158:8 180:22
184:1
**looked** 78:9 97:8,9
115:16 137:6
143:7 153:15,16
155:16 160:1,9
178:13 181:8
184:8
**looking** 26:8,15
27:1 45:19 69:16
93:9 100:7 103:5
109:18 111:12
126:13 133:20
135:21 148:19
180:10 194:18
**looks** 107:19 169:5
**lore** 175:17
**lot** 17:16,16 29:23
42:19 51:9 78:13
82:19 94:6 167:21
186:14
**lunch** 104:24 110:6
**Luncheon** 110:1
**Lynne** 52:2

**M**

**M** 1:15 2:4,8 197:15
**machine** 14:24
**machines** 60:24
**magic** 118:11,22
**mail** 51:20,24 53:4
53:19 54:18,24
55:5 56:3,5,13
57:15,22 58:13,23
60:15,20 61:7
62:8,11,14
**mailed** 83:7 84:11
84:11 181:23
182:4
**mailing** 181:20
**MAILMAN** 2:3

**main** 164:4,4
**maintained** 162:7
**maintenance** 21:14
21:17 32:13 33:1
33:5
**major** 186:13
**majority** 180:15,16
**making** 25:6 63:1
65:18 118:18
146:18,19 147:10
198:7
**malleability** 134:18
**manage** 40:19
**management** 21:14
**managing** 40:9,18
41:13 185:12
**manner** 5:9
**manual** 12:5 69:16
70:14 73:14,20
78:24 79:1,4
90:18 92:20,23
93:7 101:24 103:9
103:19 104:5,8,12
105:6,16,18 106:3
107:10,13 110:7
110:12,22 111:10
159:19,23 160:1,6
160:9 164:8,19
165:1,9,21
**manually** 91:17
118:16
**manuals** 51:15,17
**map** 180:10,14
**March** 11:22 45:22
46:2,5,15 48:4
51:13 52:14 56:16
57:2,13,21 58:7
58:17,21 59:1
170:5,20
**margin** 142:9
**marginalia** 8:9
**mark** 10:2,3 11:22
33:8 168:11
**marked** 33:15
196:21
**marker** 85:13,15
**market** 2:4 139:21
**marketing** 23:17,19
194:13 195:3,7,8
195:10,11,12,16
195:21,23
**marketplace**
185:11
**markets** 13:16
**master's** 13:14 14:1
14:3,4,9,9 16:5,22

23:14 25:1
**material** 48:21
**materials** 79:3 85:1
**mathematics**
188:19
**matter** 5:4 35:7,16
36:24 37:3 44:23
45:3 78:10 126:19
131:21 135:19
142:22 159:13
194:24 197:4
199:4
**matters** 36:21,23
37:19,21 38:16
42:9 43:7 59:6,17
82:15,16
**McCabe** 141:3
**McNew** 44:18 45:1
**mean** 18:10 34:22
47:16 48:14,14,24
57:9 58:16 60:10
60:10 80:3 81:21
81:23 82:1,9,17
83:24 91:3 94:2
95:11 98:17 99:8
113:2 131:12,15
131:18,22 132:10
132:12 136:8
138:3,4 143:2
147:11,11 157:3
165:18 175:11
180:15
**meaning** 74:9 93:10
125:2,9 133:24
134:20,20 135:8,9
138:11 167:21
**meaningful** 150:22
**means** 27:7 59:15
138:14 197:21
**meant** 57:11
**measurement**
190:6,8
**Medicaid** 174:17
**Medicare** 174:10,17
**meet** 67:8
**member** 52:15
**members** 50:21
56:18 58:1 61:17
61:19 122:21
123:10 184:16
**members'** 79:7
**memory** 150:8
155:1 185:21
**memos** 51:18
**mention** 28:20
123:24

**mentioned** 17:1
18:15,16,19 22:21
42:1 70:15 77:4
85:13 114:8
149:21 194:7
**mentioning** 8:17
121:5
**met** 83:11
**method** 109:11
114:10,12
**methodologies**
13:16 190:11,13
**methodology**
146:22,22 170:19
172:13 173:17,18
174:5 190:9,17
**methods** 13:17
89:7 92:18
**Michael** 2:12 6:2
44:19
**michael.oneil@r...**
2:15
**Michigan** 17:15
**miles** 83:12,18 84:3
84:5,5,8 85:3
180:3 181:6,19,23
182:21
**MILZ** 2:8,8
**mind** 143:14 169:24
**mine** 20:18
**minutes** 39:18
104:18 143:16
155:14,19 158:8
163:3 192:2 194:8
**misread** 175:8
**misreads** 173:23
**misrepresentation**
26:1
**misrepresentatio...**
26:6 27:6
**misrepresenting**
176:8
**missing** 12:18 13:8
**misspoken** 80:2
**misstate** 101:15
**misstates** 77:9
84:18 88:21 122:7
185:4
**misstating** 137:2
**mistake** 164:12
184:4
**misunderstand**
175:9
**misunderstanding**
157:10
**misunderstands**

173:22
**misuse** 173:17
189:13
**model** 153:2
**mono** 65:19
**monolithic** 65:20
65:21 161:18,23
162:1
**month** 150:4 151:4
**months** 23:6 26:18
150:14,18,19
**Moore** 141:2
**morning** 5:21 6:1
6:17 8:9 9:14
**morphos** 98:3,9
**mortgage** 26:9,16
**mortgage-backed**
25:23 26:12
**mortgages** 26:2,3
26:24
**mouse** 34:6
**move** 45:18,21
184:12 187:11
191:4
**moved** 166:6
**moving** 159:21
161:14
**multi-category**
175:22,23 194:5,6
**multiple** 137:24
138:3 145:4,6,6
146:10,15 147:2
147:15 148:14
149:9,12 176:1
194:18 195:24

**N**

**N** 3:1
**name** 4:14 5:17
6:18 53:2 126:21
140:15 160:20
161:3,12 198:10
**named** 13:4 49:23
183:19 185:13
**names** 30:20 131:8
160:17
**Narberth** 2:9,9
**narrative** 66:14,16
67:11 81:6
**national** 60:21
**nature** 6:4 36:4
39:9,9 146:16,17
147:8
**Navy** 194:17
**near** 129:6 181:3
**nearest** 180:11,11

DAVID B. LASATER, Ph.D., 5/5/22

181:18
**nearly** 126:10
**necessarily** 141:17
141:21
**necessary** 40:20
72:11 82:7,10
152:12 163:23
176:3 179:8
**need** 7:18,24 61:1
74:11 75:10
103:17 104:4
120:1 135:12,17
135:20 198:17
**needing** 121:11
**neither** 4:21
**never** 21:15,16
38:10 92:9 104:15
119:3,8 120:3,14
**new** 15:3 19:15
157:12
**newly** 8:8 9:14
**nine** 193:10
**non-response**
189:3 194:10
**non-responsive**
184:12 187:11
191:4
**non-wide** 95:7
**Norman** 1:3 4:6
49:23 158:5 199:4
**Norman's** 158:23
**normative** 117:15
118:2,24
**North** 2:9
**notary** 1:16 197:15
198:17
**noted** 182:8 198:8
200:9
**notes** 8:9,14,16
197:6
**notion** 102:23
**nuance** 68:19 70:16
71:9 112:15
**number** 76:17
77:24 78:7 84:4,5
85:20 86:2,6,7
87:9,16 88:18,24
99:23 103:7,8
106:19 107:3
108:9,10,11,13
111:17 124:15
129:12 150:3
155:2 161:24
162:1 175:6
189:22 194:4
**numbers** 78:12

89:6 149:3,4
165:23
**numerical** 108:3
**numerous** 10:8

___

**O**

**O'Neil** 2:12 3:5 6:1
6:2 18:23 19:9
20:15 22:6 31:17
32:22 34:18 39:12
39:19,21 41:6
43:15,24 48:5
50:4,23 52:3 53:6
55:9 58:14 59:9
62:4,21 63:19
64:13 65:5 66:13
67:10 68:8 69:11
74:1 75:4 76:8
77:8 81:5,19
84:17 85:22 86:11
87:12 88:20 89:20
90:11 93:24 94:10
96:6 98:11 100:10
100:22 102:11
104:17 105:1
109:15 110:15
117:3 122:4
136:14 143:11,13
143:19 145:12
147:4 151:24
154:15 155:16
157:2,8,15 162:14
163:4,7 166:14,16
169:23 170:24
173:3,10 182:15
183:12,17 184:13
186:21 187:8,12
188:3,10 191:5,17
192:1 195:9 196:4
196:8,9
**oath** 5:2 170:17
171:20 172:23
**object** 42:22 117:3
**objected** 187:23
**objection** 10:19,23
18:23 19:9 20:15
22:6 29:22 31:17
32:22 34:18 41:6
48:5 50:4,23 52:3
53:6 55:9 58:14
59:9,10 62:4,5,21
63:19,20 64:13,14
65:5 66:13 67:10
68:8 69:11 74:1
75:4,5 76:8 77:8
81:5,19 84:17

85:22 86:11 87:12
88:20 89:20 90:11
93:24 94:10 96:6
98:11 100:10,22
100:23 102:11
109:15 110:15
122:6 136:14
145:12,13 147:4
151:24 162:14
170:22 182:13
183:9 184:11
185:3 187:3,10
188:8 191:3,9
195:9
**objections** 5:8
**objective** 64:10
68:6,9,15,24
71:24 72:3,14
73:22 74:21 75:1
75:3,15 76:2,11
78:6 81:3 83:10
88:11 89:13 90:20
91:12 95:15 98:24
100:8 103:14
104:8,13 109:1,11
110:21 112:1
122:16 134:17
135:6 175:7 176:6
**objectively** 81:16
81:17,18,24 82:3
95:6 135:10
**observation** 131:4
131:15 133:12
**observations**
175:13
**observe** 146:23
**observer** 139:7
**obtain** 57:7 130:23
**obtained** 14:13
75:23 140:19
**Obviously** 145:13
**occasionally** 7:20
42:5,5
**occasions** 161:7
**occurred** 111:1
**occurrence** 141:9
**occurs** 26:21
**OCR** 186:15
**October** 150:8
**offer** 30:23 137:23
137:23 185:1
**offered** 18:12 19:13
23:2 139:17
**Office** 174:8
**official** 5:12
**Oh** 21:21 26:18

47:10 84:3 108:5
142:10 158:20
177:19
**OIG** 174:15,17
**okay** 7:5 10:2,10
11:3,10,19 12:11
12:18 13:1,7,9,18
14:1,7,12,17 15:2
15:8,15 16:1,7,24
17:7 18:2,5,15
19:6,20 21:18
22:3,13,19,24
23:4,7,11,15,18
23:21 24:12,16,20
25:10,16,19 26:7
26:14,19 27:8,16
28:7,10 29:3,19
30:3,22 31:14
32:15,18 33:7,23
34:2,22 35:2,6,10
35:15 37:1,5,18
38:8,13,18,23
39:4,20 40:17,22
41:12,14,20 42:7
42:14 43:1,9,13
43:22 44:2,16
45:4,10,10,12
46:8,18 47:1,19
48:1 49:2,6,19
50:2,10,14,18
51:2,12,17,22
52:11,17,24 53:18
54:5,9,17,23
55:19 56:1,15
57:1,11 58:6
59:12,16,21 60:18
61:12 62:17 64:3
64:22 66:5,18
67:18 68:22 69:3
69:24 70:6,24
71:4,8,19,23 72:7
73:1,4 76:4,19,24
77:22 78:6 79:3
79:10 80:3,15
81:3 82:6,16 83:1
83:13,21 84:14,24
85:8,19 87:6,19
88:12 90:8,13,19
91:2,16 92:24
95:18 96:2,14,19
99:4,23 101:19
102:4,16 103:5
104:2,11 105:1,11
105:17,22 106:2
106:12,19 107:2
107:11 108:5,8,16

108:24 109:7
110:19 111:11,16
112:7,17 113:7
114:3,9,23 115:9
115:23 116:18,23
117:13,21 118:10
119:13,23,23
120:3 121:2
122:18 123:6,12
123:12,12,23
124:7,12,23
125:11,23 126:8
126:13 127:11,19
127:23 128:2,2,7
128:13,18 129:2
129:20 130:1,11
130:19 134:11
136:1 137:4,11
141:4,16 142:15
142:19 143:4,9
144:13 145:9,19
145:19,22 146:8
146:14 148:10,19
149:8,18 150:2,9
150:23 151:3,8,16
151:20 152:16
153:18 154:13
155:15 156:4,12
156:13,14 157:1
157:14,19,24
158:7 159:21
160:5,8,13,23
161:4,7 162:22
163:1,19 164:3,9
164:20 165:17
166:17,20 167:4
167:16 169:13,15
177:18,21 181:14
182:23 187:9
188:4 192:24
193:23 194:22
195:6
**old** 48:10
**omitted** 125:1
**once** 19:10 26:11
31:18 32:11,23
37:23 42:10,11,11
51:3,3 58:3 63:22
70:2,10 71:7
72:17 73:12 80:9
95:23 99:9,18
101:23 102:20,20
112:11 115:16,16
118:14,24 120:7
120:20 122:6
125:14 132:1

**Norman, Sr. v. Trans Union, LLC**                              **DAVID B. LASATER, Ph.D., 5/5/22**

138:6 139:16
145:7 168:4 176:4
178:6 181:16
**ones** 17:5 77:20
122:21 172:15
**online** 129:18
130:23
**opened** 157:12
**operation** 56:13
59:20 62:14
**operations** 56:12
**operators** 60:23,23
**opine** 94:8
**opined** 58:22 59:2
**opining** 93:16
**opinion** 51:13,13
94:23,23 95:20
96:2 99:23 101:9
123:14,24 125:24
126:1 130:20
131:3 168:1
173:16,21 176:23
179:18,20 180:7
182:7
**opinions** 48:3
52:13 93:3 94:22
123:13 126:15
159:7 170:13,14
170:18,19 171:5,6
171:13,22,22,24
172:1,11,14,19,20
172:24 173:1,11
173:14,16 185:1
188:5 189:16
**opportunity** 172:6
**opposed** 60:8
**opposing** 29:22
**optical** 192:12
**optics** 188:17 189:9
192:8
**optimal** 175:6
**order** 8:14 13:18
80:5 108:3 113:9
117:1,22 118:12
118:17 130:17
135:13 158:16
175:7
**ordinary** 136:9,10
**organization** 24:10
24:14 55:8,17
56:4 57:10 129:17
**organizations**
22:10 55:2 57:4,8
57:18 128:21,24
130:1 183:3
184:17

**original** 131:14
132:7,11,12 133:7
156:10 171:10,18
172:3 174:1 193:7
198:19
**originally** 126:18
**originated** 183:2
184:16
**originating** 133:3
**originator** 132:21
**others'** 166:7
**outline** 104:12
**outlined** 27:24
54:18 76:15 79:5
114:4
**outside** 76:21
113:14
**overarch** 68:2
**overarching** 61:20
68:3 98:23
**overview** 88:14

———————
**P**
———————
**P.C** 2:3,8
**p.m** 109:24 110:3
143:22 144:1
163:9,12 196:16
196:19
**packages** 127:21
128:5
**page** 3:2,9 12:14
20:8 28:7,10 29:5
30:8 40:7 44:16
45:20 47:2 61:12
94:21 107:2,23,24
109:6 110:10
111:18 114:5
128:15,15 131:3
140:11 141:7
143:10 144:4
148:22 153:24
159:22 161:14
162:2 168:22
169:1 182:16
199:6 200:1
**pages** 12:14,16
28:19 38:14 43:14
44:2 105:10
107:20 108:11,19
110:10 114:5
148:14 168:24
**paid** 21:9 157:24
**paper** 7:20,22,24
9:3,10 45:23
175:15
**papers** 185:16

**paragraph** 47:7
61:13 78:15 79:14
79:21 88:15
128:16 140:12
141:7 142:19
143:7,9 149:22,23
150:2 154:1,10,14
156:14 157:5,12
157:16 159:21
160:2,14 161:15
162:3 176:11,14
179:15 182:8
**paragraphs** 121:13
128:11
**Paralegal** 2:20
**pardon** 111:6
**parent** 13:5
**part** 9:19,21 14:20
16:21 23:2 24:22
37:13 42:11 50:7
50:13 51:5 60:2
105:15 106:7
132:2 140:7,9
145:2 153:18
156:9 157:7 165:3
175:16,17 181:21
**participating** 4:20
**particular** 9:1 28:24
33:3 36:11 59:22
61:19 74:8,9
78:23 82:7,7 86:5
88:24 90:16 94:15
102:2,2,9,9
104:14 105:8
127:3 130:7,8
149:15,15 162:18
172:12 177:5
189:2
**particularized**
60:19
**parties** 2:1 5:6 13:3
**party** 35:8
**patent** 32:5
**pattern** 127:4
**pausing** 28:3
**pay** 10:20 196:10
196:12
**Peck's** 140:6
**penalty** 5:5 11:17
**Pennsylvania** 1:1
2:5,9 4:11 52:2
**people** 40:19 99:8
115:7
**percent** 42:13 97:2
100:2 101:10
123:15 124:4,15

126:3 140:18
142:5,8 156:18
157:6 180:16
182:11,22
**percentage** 41:4,17
42:7,17 43:2,8
130:21 180:2
181:22
**perfect** 9:18
**performed** 46:22
66:10 70:7 148:18
154:22
**performs** 21:1
**period** 85:24 95:4
100:4 126:5
140:19 141:13
142:23 150:10
151:10 156:21,22
161:19 162:9
176:19
**periodic** 176:17
178:16 179:13
190:1
**periods** 149:24
150:11,15 174:19
177:9,10
**perjury** 5:5 11:17
**permissible** 106:11
**permission** 120:4,9
120:14,14 121:4,5
**person** 5:2 52:20
52:24 54:7,9
59:13,15 111:4
116:15 140:15
146:9 161:5
**person's** 161:3
**personal** 7:17
**persons** 26:5 115:1
115:2
**perspective** 130:18
149:13
**perspectives** 131:8
**pertain** 49:23 149:4
151:11
**pertained** 50:20
**pertains** 32:24
135:16,16
**Pertinent** 86:20
**Ph.D** 1:13 3:3,11,14
3:16 4:5 6:7,10
11:23 13:15 14:4
14:5,10 17:8 18:6
22:4 24:6 196:16
199:2 200:16
**Philadelphia** 2:5
**phone** 13:4 140:16

**phrase** 7:21 92:6,8
106:14 121:4
**phrases** 90:17
**physically** 4:22
**picking** 144:3
**piece** 7:21,24 55:6
81:17 127:2,2
**pilot** 156:21 166:4,5
**pilots** 166:10,13
**place** 25:15 140:23
**places** 84:12
**plain** 7:19
**plainly** 176:7
**plaintiff** 1:5 2:11
5:19,22 6:19 28:2
28:17 49:23 158:5
**platforms** 17:21
**play** 103:1
**players** 134:1
**please** 5:15,17 7:10
13:11 15:24 33:8
35:21 58:24 72:24
73:2,7 75:6 77:5
86:19 98:11,16
133:6 144:18,18
144:19 168:19
**Plintron** 13:6
**point** 11:3 24:16
26:7 36:11 60:22
76:13 105:5
111:17 113:17
139:7 141:21,22
166:6 171:9 172:2
172:3,3 185:8
191:7
**pointed** 111:17
**points** 131:7 135:1
172:10
**policies** 56:12
**policy** 51:15
**polygraph** 27:17
**population** 53:24
61:16 95:2,3
113:23 129:7
141:10,11,13,19
141:22 142:17,21
144:5 152:15
153:1 154:6,24
176:18 178:19
180:2,8 181:10
188:14 190:17,20
193:19,21 194:21
**populations** 174:9
**portion** 74:14 86:20
130:11,13
**portions** 130:20

**Norman, Sr. v. Trans Union, LLC**                    DAVID B. LASATER, Ph.D., 5/5/22

170:4
**posed** 77:3
**position** 185:15
**possible** 37:16
    71:20
**postal** 58:9,12,23
    59:3,6,14,18,20
    60:20 61:5,11
    84:6,8,23 85:2
    180:3,3,12 181:2
    181:2,5
**postmarked** 182:9
    182:12
**postmarks** 182:6
**potential** 27:5
    81:11 164:2
**potentially** 103:3
    179:23
**practice** 7:17 45:2
    48:9 78:18 93:13
    93:18 94:16
    176:19,23 177:7
    178:8 187:7,17
    195:16
**practices** 41:15
    179:5
**precede** 30:20
    110:11
**preceded** 111:10
**preface** 36:20
**prefer** 8:19
**preliminary** 154:1
**premise** 141:20
**preparation** 25:12
    42:20 56:16 57:2
    57:13 58:7
**prepared** 170:11
    171:4 172:17
**presence** 78:7
    118:11 120:13
**present** 2:1,17 4:22
    36:18 81:15 95:3
    113:8 148:5
**presented** 25:7
    51:10 54:16 61:1
    98:24 156:1
**presenting** 20:2
**presume** 80:18
**presumed** 79:12
**presumption** 80:22
    82:13
**printed** 8:8 9:14,22
    93:9
**prior** 17:14 35:3,8
    35:15,18,23 37:1
    38:8 52:13 58:16

58:21 59:1 71:15
    88:21 124:12
    162:19 185:4
**privileged** 36:8,9
    38:2
**probabilistic**
    185:19,23 186:6
**probably** 20:4
    23:20 26:18 42:12
    47:10 155:14
    161:9 162:19
**problem** 8:14
**procedure** 51:15
**procedures** 53:3
    54:20
**proceeding** 4:17,21
    4:24
**proceedings** 197:4
**process** 7:6 8:11
    38:21 53:4 54:8
    54:10,18 91:11
    93:8 112:18 123:4
    125:10 127:8,8,14
    128:8,8 140:4
    154:21 158:16,18
    159:12,13,17,24
    161:10 163:23
    164:5,14 165:2,5
**processed** 112:13
    138:20
**processes** 53:12
    58:13,23 103:23
    123:1 139:18
**processing** 17:23
    31:20 54:21 60:20
    60:24 61:2,7
    181:18 185:10
**produce** 88:23
**product** 28:12,15
**production** 186:12
**professional** 1:15
    13:15 14:10 18:12
    24:13 139:8
    197:15
**proffered** 29:9
**program** 14:21 16:4
    16:6,22 17:17
    18:8 23:14 25:1,2
    25:2 133:17,18
    134:21
**programmed**
    137:14
**programming**
    14:22 17:16,19
    21:19 127:18
**programs** 23:3

**promptly** 198:20
**proper** 91:12
**proportion** 141:9
    141:11,18
**proportions** 140:11
**proposed** 190:18
**proposing** 189:22
**propounded** 200:8
**protocols** 140:7
**proves** 191:1
**provide** 30:14
    41:21 43:5 62:13
    68:18,23 81:10
    90:4 91:9 103:21
    156:15 179:9
**provided** 16:19
    33:16 79:9 89:6
    92:14,14,16
    111:14 112:6,24
    151:15 198:12,17
**provider** 13:4
**provides** 73:15,16
    174:13
**providing** 110:23
    134:13
**provision** 21:12,13
**prudence** 78:19
    93:13,16,19 94:9
**psychology** 15:17
    15:22 16:2,8,18
    22:5,20 23:5
**public** 1:16 197:15
    198:17
**published** 175:16
**pull** 43:10 120:4
**pulled** 151:17
**punctuation** 77:14
**pure** 32:3,6
**purported** 79:23
    81:9
**purportedly** 6:23
**purpose** 106:11
    163:21 174:11,11
**purposes** 49:4,4
    72:11 80:16
    126:19 152:1,4
    178:12 193:18
**put** 8:24 33:24 34:3
    43:8,13 45:24
    47:2 60:15 62:9
    78:2,3 100:15
    116:1 126:9,9
    137:22 173:4
    193:6
**putting** 18:20 35:6
    35:10 49:19 51:22

91:12 125:15

_____

**Q**

**qualified** 28:23 29:6
    29:21 30:10,22
    31:2,6,10,14 32:9
    59:23 184:24
**quality** 31:24 111:4
    113:1,2 115:21
    116:13,15 121:22
    121:23 158:15
    160:16,20 161:2
    165:4 185:22,22
    186:4,19 187:7
    197:7
**quantify** 89:12
**quantitative** 13:17
    89:7 130:18
    149:13
**queries** 134:14,14
**query** 90:22 91:4
    113:22 134:5
    136:23 137:6
    167:17
**question** 7:9,10,12
    7:18,20,21 10:24
    11:7 21:1,8,22
    27:2,10 29:14
    32:11 34:13 35:21
    36:4,20 41:9 47:6
    58:24 61:24 64:22
    64:23 65:2 67:8
    68:5 69:21,24
    72:2,16 73:6,11
    73:19 75:8,11
    76:5 77:3,7,16
    78:8,14 79:20,20
    80:5 81:2 82:22
    82:22 83:5 86:15
    87:6,20,21 88:8
    88:16,21,24 89:1
    95:5 96:17 97:24
    98:16 99:3 104:4
    104:22 108:18
    109:9 119:12,22
    121:1 122:15
    123:5,23 124:1
    126:24,24 128:22
    129:1 130:14
    132:8,15 134:17
    136:17 137:1,13
    138:15 144:18
    145:2 146:13,17
    146:24 147:1,9,23
    150:13 152:8
    154:5 156:10

161:19 164:20
    166:21 167:10,17
    178:4 183:4,15
    187:14 189:12,14
    190:7
**question's** 123:6
**questions** 8:15
    12:9 34:8,11 64:5
    64:24 65:17 66:20
    68:7 69:1 72:13
    73:23 79:16 89:4
    95:4,19 96:1,10
    98:10,13 99:7
    123:15 131:6,17
    138:1 144:7
    148:13 163:16
    164:9,21,22
    165:12,20,21
    166:2,9 167:16
    169:17 170:1,8
    171:1 192:5
    194:22 196:3
    200:8
**quick** 47:6 143:15
    163:16 191:24
**quite** 146:24
**quotation** 140:24
**quote** 103:9 141:2
    180:1,4

_____

**R**

**R** 30:19
**raises** 83:4
**random** 95:1 100:1
    101:10 141:10,17
    150:22,23 155:2
    176:14,16,18
    189:5 195:15
    196:1
**randomly** 154:3
    155:1
**ranging** 42:23
**rare** 38:4,6
**rate** 40:14 141:9,12
    141:18,23 142:2
    142:14,16,20,23
    152:2,3,14,21,24
    178:15 189:24,24
**rates** 40:8 153:16
    178:2
**Rayne** 2:20 11:21
    33:7,23 34:3 43:9
    45:12 47:2 106:19
    168:11
**read** 34:22 50:10
    74:18 75:11 86:15

**Norman, Sr. v. Trans Union, LLC**

**DAVID B. LASATER, Ph.D., 5/5/22**

86:19,21 91:14,14
92:1 93:5 97:5,18
111:8 112:14
114:16,21 121:11
125:4 135:13
144:19 155:3,17
155:22 159:18
160:15 176:13
177:15,20,22,22
178:7 198:2,3
200:6
**reader** 2:18 52:6,11
70:7 90:1 99:9
104:9 160:16,21
161:2 165:8
**readers** 99:1,14
116:16 157:19,21
158:13 163:24
165:4
**reading** 67:1,2
68:21 78:21 91:11
104:6 111:2,10
113:6 116:19
120:18,22,22
137:22 154:1,9,9
154:16,18,20
155:6,8 156:15
157:4,7 159:5,24
164:16,17 198:1
**reads** 79:15 111:18
144:5
**ready** 10:11
**real** 84:5
**really** 19:3 41:8
106:9
**reason** 123:23
198:4,9 199:6
**reasons** 188:13
189:9 192:7,10
**rebuttal** 3:14,15
168:12,13,18
169:2,7,10 171:2
171:6,13,14,15,18
171:23 172:5,7,16
172:18 173:1,5,12
176:12 179:14,16
183:23 184:5,15
**recall** 28:4 46:8
53:1 127:11,12,14
151:12 162:16
182:7 183:4,6
184:14 192:5,13
**receipt** 172:3
**receive** 15:8,12,16
15:22 16:7,24
24:17 198:21

**received** 19:6,20,23
19:24 25:16 26:19
33:9 45:9 53:11
60:13 61:16
151:21 171:9
178:6 184:6,6,7
**recess** 39:24 110:1
143:23 163:10
**recognition** 180:15
**recognize** 43:22
177:3
**recognizing** 60:11
**recollection** 28:9
28:18 35:9 49:15
54:16 161:3,4
183:13
**recommendation**
104:23
**record** 4:2 5:15
10:19 13:10,11
39:21,23 40:2
56:2 83:13 86:21
109:24 110:3
122:7 127:23
128:13 140:17
143:20,22 144:1
163:5,9,12 169:6
196:17
**recording** 4:17
**records** 50:20
51:22 198:23
**recursive** 15:1
138:24,24
**redundant** 54:1
**Reed** 2:12 35:12
61:14
**refer** 50:14
**reference** 25:20
28:10,20 29:5
44:17 47:7 102:13
125:20 126:8
156:4 160:15
**referenced** 3:9 30:8
56:18 70:7
**references** 29:2
103:8 174:24
179:17
**referencing** 105:6
157:20
**referred** 110:7
157:21
**referring** 12:3 18:2
21:3 30:19 50:15
105:18,18 128:14
156:12 160:6
189:20

**reflect** 64:4,23
79:15 80:24 89:2
96:9 126:4 131:7
144:6 156:10
161:17 174:21
**reflected** 46:11,16
74:10 75:18 99:13
103:3 112:5
132:21 144:16
146:3 150:4
153:19 165:13
175:18
**reflecting** 88:7
**reflects** 80:6 82:18
175:4
**refreshing** 183:12
**regard** 21:22 53:4
78:8 172:11
**regarding** 58:12
59:13 95:20
110:20 156:15
168:1
**regardless** 59:23
121:7
**regions** 84:6,8
**regularly** 25:18
41:17
**regulation** 134:4
**regulations** 25:9
**reinforce** 165:11
**relate** 130:20
**related** 128:20
**relates** 25:11 42:17
36:23 95:17 193:2
**relation** 16:17,17
36:23 95:17 193:2
**relations** 22:9,23
49:22 50:3,20
51:20 52:1 54:19
57:15,23
**relative** 174:17
**relatively** 175:12
**relevance** 85:3
126:13,14,15,17
**relevant** 144:10
180:20
**reliability** 196:1
**reliable** 192:11
**reliance** 48:19,21
48:23 59:4
**relied** 48:2,8,19
49:3
**rely** 123:19
**relying** 159:8
**remaining** 181:17
**remember** 146:6
161:12 183:14,15

**remote** 1:12 4:4
5:24 6:4
**remotely** 4:13,17
4:24
**render** 46:5 95:20
135:13
**rendered** 45:5
**rendering** 48:3
51:12 52:13 159:8
**repair** 24:9,14 55:2
55:7,16 56:4 57:3
57:8,9,17 128:21
128:24 129:17,24
130:1 183:3
184:10,17
**repeat** 86:16
**repetition** 189:6
**replace** 66:8 139:9
**reply** 172:14 173:21
179:17
**report** 3:10,14,16
6:23 9:20 10:2,3,4
11:22 36:19 37:2
37:4,6,16 43:5
45:15,22 46:2,6
46:11,15,22 47:3
47:7,23 48:4
51:14 52:14 56:17
57:2,7,13,21 58:7
58:17,22 59:1
61:13 70:8,12
79:5,19 80:16
82:18 85:6,9
92:24 102:14
103:1,2 110:8,11
111:13 116:17
126:19 127:10
128:11,12,14
129:21 130:8,11
130:14 131:1
132:24 134:7
144:4 145:10,20
146:10 148:9,22
153:9,10,18,20,21
157:11 158:22
162:3 163:15
165:16 168:12,13
169:3,5,7,11
170:4,9,11 171:2
171:4,7,10,13,14
171:15,18,19,23
172:1,4,6,7,16,18
172:20 173:1,5,12
174:1 175:21
176:12 177:12
178:7,13,21 179:5

179:14,16 181:21
182:16 183:2,20
183:21,24 184:5,8
184:9,15 189:14
193:7
**reported** 86:6
170:13
**reporter** 1:15 4:18
4:23 5:14 6:6
11:10 75:12 86:16
144:19 158:16
187:21 196:7
197:15,23
**Reporters** 1:23
**reporting** 1:22 4:15
4:24 5:9 27:21
31:12 35:20 36:2
36:22 37:3,7,8
38:3,11,20 39:2,6
41:16 159:17
198:23
**reports** 6:24 8:3,6
8:18,24 9:11,15
9:17 37:12 38:19
38:19 145:23
168:18 184:6,7
**represent** 5:18,22
44:12 51:8 159:14
**representation**
25:14
**representations**
26:5 30:18
**representative**
158:4 181:12
194:15,20
**representativene...**
178:18
**represents** 6:19
61:14
**reproduction**
197:20
**require** 97:10,10,13
98:2,2 137:16,16
198:20
**required** 30:17
113:12 117:1,7,22
118:11,22
**requirement** 118:1
152:12
**requirements**
31:22
**research** 13:16
**reserve** 196:6
**resided** 83:18
**residential** 26:11
**resolution** 115:13

**Norman, Sr. v. Trans Union, LLC**

DAVID B. LASATER, Ph.D., 5/5/22

**resolved** 111:3
133:13
**respect** 8:3 22:8
25:13,13 26:5,11
26:22 27:2 31:23
33:3,4 41:24 42:3
52:22 56:12 60:1
60:11 61:8,8 62:7
62:13 63:5 67:15
67:21,21 68:10,20
70:13,21,21 74:5
76:1,22 78:22
89:9,23 90:5,16
93:12 94:3,12,12
97:6 103:1 110:23
111:1,8 112:22
113:6 115:12
118:5,18 120:23
122:11 123:2
125:5,17 139:10
140:4 146:19
147:14 148:7
155:5,6 159:4,4
159:16 173:16
174:9,13,19
176:10 178:14
181:11 182:5
185:21 186:4,18
187:19,19 188:1,2
188:23 189:7
190:2,7 191:14
193:7 194:6
**respond** 173:20
**responded** 179:3
**response** 63:11
**responses** 49:7,8
49:12,12
**responsive** 78:16
78:23
**responsiveness**
139:18 186:11
**rest** 181:7,7
**result** 159:12,17
161:15
**results** 86:6 92:14
92:14,16 142:18
170:19 178:22
181:14 185:6
189:1 191:13
**resume** 12:7,8,19
20:8 25:20 27:24
38:15 40:24 47:8
**retained** 34:23
35:24 37:22 38:1
38:1 39:5 61:14
183:18

**retention** 3:12 33:9
34:16 36:5,9 38:9
39:9 40:5 42:2
**retentions** 36:7
37:23,24 38:6
39:11
**Return** 198:19
**review** 7:2 49:6
51:14,17 76:5
92:18 112:19
159:11 165:19
167:24 172:6
178:18 183:23
184:20
**reviewed** 47:22
48:2 49:16,21
50:2,19 56:19
57:17,24 113:24
114:7,19 115:6
122:2,22 168:2
**reviewer** 68:14,15
68:17 69:7 72:7
74:5 76:13 78:1
81:14 92:11 100:7
100:12,13,14
107:6 109:2,18
111:1,22,22 113:9
116:5,6 120:19
121:6 164:11
**reviewer's** 101:6
**reviewers** 68:19,23
70:11,15,17 71:1
71:5,14 72:15
73:13 74:23 75:14
76:7 77:18 78:21
79:2,6 83:15
85:15 90:8,21
91:8,15 92:1,3
93:2,5 100:19
103:19 110:13
111:3 112:18
115:14,24 116:8
116:21 119:2
120:12 159:9
165:22 187:16
191:16
**reviewers'** 74:15
103:23
**reviewing** 66:11
91:16 186:23
187:1
**reviews** 115:4
**right** 8:5,12 10:13
11:12,20,21 12:6
13:9 14:2 20:24
21:22 23:7 37:20

37:22 38:5,11
40:15 45:21 46:6
47:14,16,19 49:16
57:20 60:7,21
64:3,18 66:1,18
66:18 69:6 71:23
76:24 77:18 78:4
80:8 82:3 83:9
85:11 89:19 92:5
94:21 102:4 105:9
105:19 108:6
109:21 110:5
117:15 118:10
119:7,13 123:10
125:23 129:9
131:2 133:17
136:20,24 140:10
141:7 142:9 143:4
148:24 150:11,24
153:24 155:23
157:17 158:3
160:6,14 161:14
161:22 162:2,12
163:1 167:23
168:10 169:4,8
171:20 187:2
188:6 196:2 198:3
**ring** 9:16 10:1
**role** 20:13,14,17
21:10,16,17,24
22:21 26:15 27:23
136:5
**room** 20:2 51:20,24
53:4,19 54:19,24
55:5 56:3,6,13
57:15,22 62:8,11
62:14
**rough** 177:22
**rule** 12:8 121:3,5,10
**rules** 16:20,21
138:19 139:8
198:20
**run** 90:9,15,24 91:5
91:20 92:6 120:14
137:8 148:14

─────────────
**S**

**S** 3:8 30:19
**S-U-R-F** 13:4
**sample** 82:4 89:11
95:1 100:1 101:10
114:6 119:11,14
119:17 141:10,17
142:4 143:6
149:20 150:22,23
152:19,20 153:3

161:16 165:19
166:1,6 168:2
174:2,22 175:4,6
175:10 176:3,16
176:18 178:3
180:23 181:12,12
182:10 188:17
189:4,4,8 190:23
191:1,1,13,14
192:3,4,16 193:1
193:7,9,9,15,18
193:20 194:4,9,11
194:14
**sampled** 47:13
**samples** 82:4
115:18,20 149:17
156:17 164:24
168:2 176:3
181:23 186:24
188:5,11 190:14
191:16 194:19,20
195:15 196:1
**sampling** 140:11
142:23 143:5
149:19,20 152:2,5
153:3 156:19
173:17,24 174:3
174:13 175:7,22
175:23 176:5,6,10
176:22 177:1
184:21 186:17
187:18 188:15,16
188:17,23 189:2
190:5,9 193:8
195:5,24
**Samuel** 2:19 4:14
**SARTELL** 2:4
**sat** 155:15
**satisfy** 74:11 112:2
119:4 147:2
**saw** 68:4 184:18
**saying** 11:4 25:10
43:1 68:13 74:14
80:15 83:14,19
97:21 107:9 111:5
114:18,20 115:6
115:23 118:10
119:15 132:4
133:11 135:12,23
137:18,21 139:3,6
155:15 158:20
159:7 194:3
**says** 60:14 89:11
167:8 176:4
**scanned** 54:13
**scanning** 54:1

**scans** 53:13,14,14
**scenes** 29:24
**scheduled** 38:24
39:3
**schedules** 60:2,11
**school** 23:13 70:21
71:4,10 192:22
**schools** 18:7,10
**science** 14:15,18
14:19,23 15:5,10
17:9,11,18,18
18:8,17,22 19:1,8
19:21,22 20:6
31:16 32:4,7
**scope** 61:15 88:14
**score** 67:16
**screen** 8:20 9:1,10
20:2 33:24 34:3
36:6 44:17 45:24
156:2 168:24
173:4 176:11
**screen's** 52:8
**scroll** 8:20 34:8,11
43:19 107:17,19
168:21
**search** 74:8 90:9,14
90:14 91:4,4,20
92:12 94:14,17
113:22 127:22
133:17,18 134:8
134:15 136:23
137:6
**search-and-find**
90:22
**searches** 134:14
**searching** 67:6
139:15
**second** 111:1 145:1
145:1 166:5
179:17 189:4,4,8
190:23,24 191:13
192:3 194:4,8
**secondly** 97:4,4
194:5
**section** 105:22
123:13 128:14,15
130:7,8 140:10
163:14 175:18
**sections** 184:9
**securities** 25:23
26:12 28:11,14
**Sedona** 140:7
**see** 9:22 12:22
30:13,19 40:11
43:18,20 44:20

54:24 61:21 64:7
69:8 77:23 78:1
78:11 82:11 91:22
100:5 103:12
104:5 108:1,1,10
109:6 113:15
119:18,18,21
120:8 124:2 126:6
129:13 131:10
136:21 140:20
141:14 142:24
144:8 148:11
149:9,16 154:7
156:21,23 157:14
161:20 162:10
168:19 178:20
**seeing** 116:5
155:11
**seek** 58:11
**seen** 49:11 50:11
54:17 55:14,19
56:11,11 103:22
104:15 145:20
146:7,8 158:3
162:12,22
**segment** 151:11
**segments** 150:11
150:20,21 151:4,5
151:7,18,23
152:10,15,22
153:5,14
**selected** 154:3
155:1
**selection** 176:15,16
189:7 190:6,8
**selects** 36:18
**self-determined**
131:14 132:8,10
**self-reporting**
174:16
**semiotics** 136:13
**send** 50:16 55:15
61:18 62:18
122:22 123:9
180:12,12 198:22
**sending** 61:24
**sends** 44:13 130:16
133:6
**senior** 40:9,18
41:13 185:12
**sense** 116:4
**sent** 43:23 55:21
62:2 63:16 79:22
80:17,23 81:4,8
81:11 82:2,19,23
83:16,17 85:4,16

122:3 132:5
181:17
**sentence** 62:12
64:16 66:3 77:13
78:15 119:8
131:13 134:6,9,10
176:14
**sentences** 112:5,8
112:15 113:21
121:13 125:5
136:22 137:7
138:4
**separate** 9:16,16
18:11 26:24 30:1
30:1 36:24 115:7
**separately** 155:18
**sequence** 189:5
**sequentially** 164:1
**series** 40:8 43:14
44:2 171:1
**serve** 21:9 28:23
29:6,21 31:3,10
31:15 32:9,20
35:24 36:14 39:5
**served** 21:23 28:1
34:5 49:8,14
**serves** 150:8 155:2
185:21
**Service** 58:9,13,23
59:3,7,14,18,20
60:20 61:5,11
84:23 85:2 180:3
**services** 41:21
43:16,17 45:5
**serving** 35:12 37:21
42:8
**set** 47:23 48:3
51:13 52:13 78:16
93:3 110:22
149:11 158:22
189:1
**sets** 151:1,1
**seven** 39:17 87:24
88:3,4,4 95:23
96:4,8,15 101:17
101:19 103:3,7
106:5,13,17,19
107:3 108:4,7,9
108:10 110:6,10
110:14 111:13,18
111:19 113:10
114:1,5 117:2,18
117:19,23 118:3
118:12,15 119:5
119:10 120:6,16
121:7 123:22

124:17 125:21
143:18 160:10
167:14
**shape** 126:5
**sheet** 198:5,9,10,14
198:19,22 199:1
200:10
**Shifting** 182:23
**shoes** 159:16
**shops** 129:24
**short** 39:14 40:4
53:2 63:24 104:20
163:2
**shortcut** 91:10
**show** 8:15 25:19
158:7 170:7
193:16
**showed** 9:10
**showing** 178:2
193:8
**shows** 193:7
**sic** 51:14 57:23
159:5
**side** 27:3
**sift** 135:6
**sign** 37:15 198:10
198:11,15,16
**signal** 81:10
**signature** 196:6
198:18 200:1,16
**signed** 37:4,6 38:9
93:1
**signing** 198:1,13
**similar** 16:14,15,15
21:22
**similarly** 1:4 4:8
65:22 115:19
142:19
**simple** 89:17
124:18
**simply** 88:12
122:12 123:5
126:17 180:19
**simultaneously**
114:16 115:3
**single** 29:1 134:23
134:23 154:4
156:5,8 174:22
**singular** 161:18,24
**sir** 11:12 13:12 16:3
16:9 17:3,6 18:4
22:2 27:19,22
29:8 30:21 31:1,5
31:9,13 33:22
34:20 35:1 37:4
40:12 41:3 44:1

44:15 45:8 46:7
46:24 47:18 49:10
49:15,18 50:1,17
50:22 51:16,21
52:15 54:22 55:24
56:20,24 57:5
58:5,10,19,24
59:8 61:22 64:8
83:20 85:18 93:21
98:16 100:6 105:5
107:9 111:15
128:17 131:11
141:15 144:9
148:21,23 149:7
150:12 151:2
152:11 154:8,12
156:24 157:9
158:2,6 160:4,7
162:11,24 163:16
169:14 170:2,6,15
170:21 171:8,11
172:21 173:2
177:23 179:19
182:1,6,17 188:7
192:6,9,14 194:3
195:20,22
**sites** 111:20
**sitting** 11:13
**situated** 1:4 4:8
65:22
**situation** 8:12 33:3
42:14,18 56:2
66:1,1,6 67:14
70:3,9 92:6 138:8
146:14 147:7,13
149:9,14
**situations** 18:2,18
26:9,16 87:1
116:8 155:10
**six** 23:6,20 88:4
161:10
**Sixty** 83:12
**size** 149:20 176:3
176:16 188:13,17
193:1,15,18,20
194:4
**sizes** 193:7,10
**skilled** 68:19 70:16
71:9
**slash** 12:19 20:8
**small** 141:10,17
142:3,4 149:19
175:6,11,11,12
188:18 193:10
**smaller** 165:19
**Smith** 2:12 35:12

61:14
**so-called** 165:14
**soft** 19:3
**software** 21:13,17
32:13 33:1,2,5
127:21 128:5
135:5
**softwares** 128:9
134:23
**solely** 5:12
**somebody** 20:24
50:16 62:2,19
145:3
**sophisticated**
135:4
**sorry** 15:20,20,20
15:21 27:10 75:9
80:2,3,3 154:12
177:19,19,19,20
187:21
**sort** 15:13 68:3
135:6 189:23
**sought** 19:23 98:21
**Soumilas** 2:12
**sounds** 119:1 137:2
**source** 130:10
**South** 2:13
**Southern** 140:6
**space** 180:18
198:12,16
**speak** 62:10 116:22
142:16 160:23
161:1,8 177:2
189:12,12
**speaking** 72:23
94:15 138:21
161:5
**specific** 73:13 90:6
97:1,16 102:13
103:18 105:20
113:1 125:20
127:3 136:16
151:13
**specifically** 28:19
53:18 92:19 103:4
109:8,13 111:19
111:23 112:9
113:12 118:3
132:14 137:14
153:11
**specifics** 127:16
**spelled** 90:17
**spent** 44:8 170:3
**spite** 188:19
**spoke** 52:13 161:1
**spoken** 51:23 57:3

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

61:4
**spread** 178:11
**Sr** 1:3 4:6 199:4
**St** 17:12 19:11
**staff** 52:16 57:15
  180:7
**stage** 171:10
**stamped** 105:13
**stand** 159:16,16
**stand-alone** 18:11
**standalone** 103:22
**standard** 166:18,19
  188:22
**standardize** 159:23
**standpoint** 8:10
  192:12
**start** 33:12 69:7
  151:13
**starting** 129:12
**state** 10:18 17:15
  61:13 93:3 94:24
  99:24 101:9 131:4
  156:16 181:18
**stated** 99:4 116:1
  119:3 135:14
**statement** 72:6,8
  77:12 87:22,22
  123:15 179:22
**statements** 25:7,12
  180:19 185:18
**States** 1:1 4:9 58:8
  58:9,12 59:3,6,14
  59:17 60:19 61:5
  84:13 136:11
**stating** 5:16 160:8
  167:18
**statistic** 44:10
  190:16
**statistical** 17:23
  36:22 138:22
  172:13 176:8,19
  176:22 177:1,7
  178:8 179:4
  184:21 187:18
  188:15,16 190:5
  190:14 192:19
**statistically** 94:24
  138:21
**statistics** 175:15
  186:5 190:13
  192:22 195:5,13
**statutory** 162:13
**stay** 17:20
**stenographic** 197:6
**step** 17:24 162:7
**steps** 163:24 181:1

**Steven** 44:18
  175:24
**stop** 98:12
**stopped** 129:11,11
**strata** 142:1,3,13,14
  142:18 152:3
  174:23 175:6
  176:10,17 178:19
  179:13 190:1
**stratification**
  174:12,20
**stratified** 141:23
  174:2,3,10 175:3
  175:10 176:21
**stratify** 142:7
**strawman** 178:24
**Street** 2:4
**strike** 45:11 49:20
  125:4,16 143:10
  143:10 184:12
  187:11 191:4
**student** 140:17
**studies** 16:11 23:24
  24:3 31:7 71:6
  140:17
**study** 86:7
**subgroup** 45:2
**subject** 11:16 57:24
  116:13 139:11
  194:24 197:6
  198:13
**subjective** 74:15,18
  74:20 76:6,21
  110:21 112:19
**subjectively** 75:1
**submit** 129:18
**submitted** 6:22
  37:2 38:19,21
  95:2 169:7,10
  170:5
**subparagraph** 64:3
**subpoena** 34:4
**subsequent** 17:7
  18:5 115:15
  138:21
**substance** 198:4,8
**substantive** 156:20
  157:6
**substitute** 81:1
**subsume** 95:24
**subsumed** 98:19
**subsumes** 194:5
**sufficient** 104:7
  138:10
**suggest** 116:11,12
**suggested** 91:10

**suggesting** 125:15
**suggestion** 67:4
**Suite** 2:5
**summaries** 165:13
**summarized** 70:12
**summarizes** 20:10
**summary** 94:22
  101:5 103:21
  123:13 148:11
  164:15
**Summit** 1:22 4:15
  4:19 198:22
**supervision** 44:23
  197:22
**supplement** 37:14
  92:22
**supplemental** 3:15
  49:7,13 85:9
  153:10,19,21
  168:13 169:10
  172:17,20 173:1,5
  173:11,20 176:12
  178:12,21 179:16
  179:17 184:5,8
**supplied** 34:4 84:1
  124:4
**supply** 90:8
**support** 92:4 177:6
  188:20
**supposed** 54:20
  77:18 79:6
**sure** 9:23 20:23
  25:6 34:13 39:16
  59:1 75:11 78:5
  80:20 81:20 94:1
  104:21 117:5
  143:17 144:20
  154:23 158:11
  174:12 188:24
  196:9
**Surf** 13:4
**surmise** 184:21
**surrounding**
  128:11
**survey** 189:2 195:5
**suspect** 107:18
**suspicion** 93:15
**swearing** 5:9
**sworn** 6:11
**synonym** 108:23
  109:1
**synonyms** 66:3
  162:1
**system** 49:22 50:3
  50:8 51:5 56:2,8
  57:23

**system's** 50:20
**systematic** 100:1
  126:2

---

**T**

**T** 3:8
**table** 70:12 87:17
  96:4 99:13 103:5
  103:20 124:8,14
  156:21 165:16
  168:9 175:18
  189:15 193:6
**tag** 164:10
**tagged** 111:19
  118:3,14
**take** 14:14,17 15:15
  15:19,21 16:1,10
  16:13 22:20 23:8
  23:12 25:14 34:7
  34:10 39:14,17
  45:13 104:11,20
  104:24 122:9
  143:15 150:22
  153:3 163:2
  172:12 192:21
  196:11
**taken** 1:13 17:9,10
  22:4 23:22 24:6
  82:5 151:3,6
  164:1 197:6 199:3
**takes** 8:21 132:19
**talk** 10:7 56:17,21
  69:22 73:17 74:17
  167:9
**talked** 138:6 155:18
  157:4 166:23
**talking** 32:12 91:24
  102:20 106:6
  112:11 124:21
  139:23,24,24
**talks** 175:21
**target** 156:17
**tasked** 87:7 134:12
**taught** 70:20
**team** 113:24 114:1
  114:7 122:22
  128:19 181:22
  182:2
**teams** 17:20 37:11
  37:13,14
**technologies** 19:16
  19:17
**technology** 134:19
  139:5,6,14,22
  185:11 186:3
**tell** 24:20 45:18

**system's** 52:8 87:8,9 88:17
  88:18 101:20
  108:19 129:5
  147:22 163:19
**telling** 73:20,22
  107:2 147:22
**template** 57:7
  115:17 126:12,16
  127:7 129:18
  132:5 183:1
**templates** 126:4,8
  128:20,20,23
  129:15,16,22,24
  130:2,2,5,6,10,17
  130:22,22 133:12
**temporal** 178:3
**ten** 39:17 69:9
  77:24 78:7 88:5
  95:12,24 96:4,8
  96:16 101:18,20
  103:4 123:22
  124:17 125:22
  163:3 167:14
**term** 19:4 53:7
  94:13 98:23
  106:11 131:20
  145:14 189:13
  195:10
**terms** 9:19 12:19
  21:12 25:17 26:15
  26:20 27:13,17
  31:11 32:3,3 36:4
  38:13 46:21 53:20
  54:10 59:2 60:20
  61:6,6,9 63:7 66:9
  72:15,18,19 73:17
  83:14 85:3,19
  90:9,14,14,23
  91:4,20,20 93:23
  111:11 116:23
  126:14 133:17,19
  139:15 148:2
  164:1 195:6
**test** 78:11 114:4
  153:11 177:18
  178:1,9 180:7
  195:24
**tested** 177:13
**testified** 6:11 13:2
  28:21 38:10 55:5
  149:5 158:22
  166:9 167:24
  185:6 186:22
**testify** 30:10 31:7
  32:20 37:11,12
  42:12,16 170:16

171:20 172:22
186:10
**testifying** 10:16
38:3 39:1,6
**testimony** 5:4
11:16 12:24 29:1
29:3,4,11 30:7,16
30:23 37:5 38:13
38:14 71:8 77:9
84:18 96:2,15
143:4 149:8
170:17 171:21,23
172:23 185:4
193:23 194:2,7,17
197:3 198:12
**testing** 156:17
164:6,6 185:23
186:5 189:10
190:12 194:14
**Texas** 13:17 14:11
14:24 15:3,7 16:6
16:23 17:8 18:6
22:4 23:22 24:6
**text** 50:18 128:10
175:24
**textbook** 175:19
**textbooks** 48:15
174:21
**thank** 39:19 57:11
143:19 169:16,19
173:6,9 191:18
196:3,4
**themself** 132:9
147:14
**thesaurus** 66:7
**thing** 13:8 19:18,18
**things** 18:16 41:20
45:17 68:22 98:18
99:5,8,24 130:24
139:11 145:4,6
**think** 6:24 8:19
16:15 17:10 21:3
21:6 26:4 27:11
27:14 30:13 52:6
53:22,23 60:22,22
63:2 66:23,23
69:2 74:3,4 84:24
86:23 96:7 97:13
103:17 113:7
116:16 123:6
134:5,8 136:15
139:13 147:6
148:2 150:6,7,17
150:18 153:15,15
156:9 158:6
165:15 167:19,19

175:20,20 178:4
179:7,8 182:17
184:1,7
**thinking** 20:20
**third** 194:8
**Thompson's**
175:24
**thought** 68:14
**thousand** 175:13
**three** 6:24 8:6,18
9:11 16:5 45:6
108:3 125:24
157:16 160:23
177:8 178:2 190:4
**threshold** 83:20,22
83:23 84:9,16
**Thursday** 1:14
**time** 5:8 19:20 23:4
26:14 36:11 39:14
43:2 46:12 58:15
85:6,23 91:6,7,8
104:20 149:24
150:10,15 151:10
169:16 170:3
174:14,19 186:2
196:16
**times** 7:3 115:23
123:24 146:9
161:11 184:23
**timestamp** 54:3
**timing** 91:23
**title** 16:12,16 22:2
40:18
**today** 6:21 11:13,16
93:10,17 94:8
96:3 149:6 158:22
168:1 182:24
186:22
**tool** 174:4 194:13
194:14
**top** 42:1,1 107:23
107:24 131:3
**topics** 61:20
**total** 193:21
**totaling** 151:2
**tradeline** 145:8,16
**tradelines** 144:22
145:5,11,14
**trained** 19:17 79:1
112:13 113:5,5
**training** 12:4 17:12
17:24 19:7,11,21
19:22 23:2 24:18
24:20 25:16 26:20
27:12 71:1,2,5
78:24 79:4,8

103:9 106:3
107:10,13,15
110:7,12,22
111:10 159:22
160:1,5,9 164:8
164:19 165:3,9,21
**TRANS** 1:7
**transaction** 25:14
27:4
**transactions** 25:8
**transcribe** 11:5
**transcribed** 5:13
**transcript** 5:12
29:17,20 177:23
177:24 197:9
200:6
**transcription** 200:7
**transcripts** 49:17
**TransUnion** 2:18
4:8 6:3,22 34:17
34:23 35:3,7,8,10
36:24 44:5 45:5
46:5,14 49:8,13
49:22 50:3,15
51:15,19,23 52:12
52:21 55:4,14,19
55:22 56:8,9
57:16 58:1 61:15
61:17,18 62:2,18
63:9,12 70:4
71:22 72:19,22
79:17,22 83:7
88:17 92:7 95:2
98:4 100:3 102:3
121:15 122:1,22
123:1,9,17 133:2
134:7 140:3
148:17 151:21
155:13 158:1
162:5,7,9 167:3
183:18 199:4
**TransUnion's**
35:16 53:3 56:2
**treated** 115:19
**trial** 12:24 29:1,4,20
30:7 38:13 170:17
171:21,23 172:22
172:23
**tried** 30:11,14 63:3
63:6 68:18 90:4
98:23 99:20
**trigger** 120:15
**triggered** 114:14,15
**triggering** 162:8
**trouble** 70:4
**true** 197:8 200:7

**try** 34:14 45:18
122:14
**trying** 21:7,7 28:4
72:11 98:13 125:9
140:4 173:20
193:2
**turn** 12:7 61:12
67:20 94:21 131:2
143:9
**turning** 153:24
163:14
**turns** 132:24
**Twenty-seven**
154:11
**twice** 91:14 194:5
**two** 15:1,2,6 16:3
18:18 21:14 23:13
33:10 40:23 61:20
82:11 88:13 99:23
101:9 114:17,19
114:21,21 115:4,7
115:18,19,20
116:20 123:14
127:20 128:3,5
129:21 130:5
149:17 151:1,1,1
156:19 158:7
160:15,17 164:24
166:10 168:18
172:15 173:13
181:1,22 186:24
187:1,16 188:4,11
188:13 189:9,9
190:13
**type** 21:23 51:18
58:11 91:3 96:5
129:21 143:5
**types** 28:13 130:5,6
153:4 185:1 190:4
**typo** 47:17

---
**U**

**U.S** 58:23 59:20
85:2 180:2,3,7
181:2,10
**ultimately** 11:15
**Ulzheimer** 183:19
183:22 184:14
**Ulzheimer's** 184:9
**uncertainty** 131:4
131:16 132:6
133:13 135:1
**unclear** 116:24
**undergraduate**
13:12,13 16:4
23:13 25:1

**understand** 7:10,14
7:18 11:1,4 21:11
53:10 65:11 79:13
79:24 80:4 97:18
98:18 112:14
136:11 139:12
145:1,7,9,16,22
146:5,13 151:16
162:4 165:9,17
167:20 176:21
183:21
**understanding**
11:6 20:17 54:3,5
63:10 71:21 79:12
94:13 97:11 98:3
111:7 112:23
131:24 176:24
**understood** 7:11
36:16 60:23 99:1
123:1
**undertake** 57:7
**unexplained**
179:21
**uniform** 152:2,2,9
152:11,12,21
178:14,15 189:24
189:24
**uniformly** 141:12
141:18 142:11,13
142:14,21 151:22
**union** 1:7 123:21
**unique** 127:1,1,2
161:24
**United** 1:1 4:9 58:8
58:8,12 59:3,6,14
59:17 60:19 61:5
84:12 136:11
**universities** 16:14
17:1
**university** 13:14,17
13:22,24 14:11,20
14:24 15:3,4,6,7
16:4,6,11,23 17:8
17:15 18:6 22:3
23:22 24:5
**unquote** 103:9
**unreliable** 179:24
**unsigned** 34:20
**untested** 179:22
**urban** 180:17
**urging** 125:7,8
**usage** 21:15 112:12
**use** 8:7 16:18 27:17
32:16 45:23 66:7
68:10,10 70:20,21
72:17 73:4,17

**Norman, Sr. v. Trans Union, LLC**                              DAVID B. LASATER, Ph.D., 5/5/22

75:24 79:15 80:6
80:24 81:1 91:19
94:13,14 97:16
98:23 100:19
103:11 106:11,14
108:24 109:19
112:3,7 127:6
129:24 130:2,3
134:2 136:5,5,7
136:10 142:22
161:23 174:5,19
175:11 177:6
178:7 179:3,11,12
179:12 180:18
184:20 187:15
188:11 192:2,3
193:9,17
**useful** 103:21
**user** 139:8
**user's** 88:2 107:8
118:7,19
**users** 56:22 192:16
**uses** 180:9,14
193:17 195:13
**usual** 39:9
**usually** 37:24 39:11
71:12 186:10,10
**utilize** 68:6 90:21
**utilized** 71:15
**utilizing** 91:4

_____
**V**

**V** 30:20
**vague** 18:23 19:9
20:15 31:17 32:11
32:22 34:18 50:5
50:23 53:6 58:14
59:9,10 64:14
65:5 68:8 69:12
76:8 81:19 85:22
86:11 90:2,3
93:24 94:10 96:6
102:11 110:15
136:14 145:13
151:24 162:14
195:9
**valid** 95:1 131:14
131:17,18,19,19
131:24 133:7
**variables** 140:14,18
**variance** 175:1,1
**varieties** 129:6
**variety** 41:15 42:4
42:23,24 95:3,6,7
95:12 112:21
121:12,19 155:10

**various** 149:5
152:22 164:9
193:8
**vary** 190:18
**vast** 24:19 48:20,20
180:15,16 186:8
**vastly** 177:9
**verb** 106:9
**verbally** 5:3
**versus** 82:2 85:5
95:6,8 102:9
111:24 129:17
175:12,12
**video** 1:12 2:1 4:4
4:13 39:23 40:2
109:22,24 110:3
143:22 163:2,9,12
196:15
**videographer** 2:19
4:1,16 39:22 40:1
109:23 110:2
143:21,24 163:8
163:11 196:14
**Videographers**
1:23
**videotaped** 1:12
**view** 74:23 131:7
133:16 135:2,20
144:17,24 146:15
147:3
**viewed** 120:10
**views** 115:24
**virtually** 75:21
**volumes** 140:5
**vs** 1:6 4:8 199:4

_____
**W**

**Wacker** 2:13
**waive** 5:7
**want** 7:24 8:1 9:1
34:10 41:1 45:23
51:7,8 69:8 80:20
101:15 104:11,15
105:20 106:4,16
119:13 122:9
126:9,9 127:16
143:18 165:8
**wanted** 8:11 65:2
77:23 136:21
165:3,11 176:1
178:17
**wasn't** 83:3 92:10
92:11 177:17
**waves** 156:19
188:23 190:13
194:19 195:14,24

**way** 17:24 36:13
66:23 73:9,9
74:20 75:21 91:24
98:13 113:17
114:3 125:9 130:4
135:16 148:17
**we'll** 67:5 102:6
122:19
**we're** 10:10 11:13
32:12 65:7,8,10
73:21 79:14
102:20 103:6
105:3 106:6 108:5
108:8 111:12
112:11 124:21
131:3 134:1,1
139:23,23,24,24
148:19
**we've** 39:12 101:16
104:17 143:13
159:22 166:23,23
**Webster** 67:21
**week** 174:6
**weekly** 174:5
**weeks** 192:20
**weighted** 142:18
**went** 71:10 121:23
121:24
**weren't** 87:6 96:19
146:9
**west** 19:14,15
**wide** 41:15 42:4,23
42:23,24 95:3,6
95:11,16 121:12
**widely** 79:12,12
**wires** 21:16 32:13
32:24
**witness** 3:2 4:23
5:3,10 6:3,8 18:24
19:10 20:16 22:8
27:24 28:1,24
29:7 31:3,11,15
31:18 32:10,20,23
34:19 35:13,19
36:1,10,15 41:8
41:21,24 42:8
43:3 48:7 50:6
52:5 53:8 55:4,11
58:19 59:6 62:6
62:24 63:22 64:19
65:6 66:15 67:12
68:9 69:13 74:3
75:7,13 76:9
77:10 81:7,20
86:1,14,22 87:15
88:22 89:22 93:23

94:1,11 96:7
98:12 100:13
101:3 102:12
106:21 109:16
110:16 117:5
122:8 136:15
145:15 147:6
152:1 162:15
169:18 183:14
185:5 187:5 188:1
191:11 195:1,11
198:1,16,16,17,18
**WITNESSED**
200:20
**word** 65:10,12
69:16 72:24 73:4
74:18,19,19 77:5
80:13 81:1 93:10
97:11,16 98:8,17
99:4 102:1,4
106:7,22 109:9,14
112:3 113:8,20
117:1,10,14,17,22
118:8 121:4
122:11 125:1,4
126:11 134:14
145:7,16 167:18
167:20
**words** 7:19 68:11
68:24 74:9 77:21
90:16,23 91:5
98:9 99:8 112:11
112:15,23 118:11
118:22 125:7
135:14 136:6,7,22
137:7 139:15
**work** 17:19 18:2,18
19:2 20:9,12 21:4
21:19,24 24:13,17
25:4,18 28:4
37:10,13 40:14
41:4,23 42:3,7,17
42:19 44:22,24,24
45:1 46:9,13 60:7
68:15 71:13 78:13
93:19 97:3 101:7
122:16 174:1
175:14 192:19
**worked** 20:13 24:9
35:7,7,11,16
51:24 52:1 62:8
**working** 9:3 25:20
35:3 36:21 43:2
46:10 60:23 71:21
92:15
**works** 29:13 45:3

58:23 59:3,14,18
60:20 61:6 62:11
71:22
**Wouldn't** 99:15
**write** 7:20 63:3,6
64:4 65:10 92:7
99:22 126:1
133:17,18 134:6
134:13 141:8
142:19 154:1
159:22 161:15
162:3 172:14
**writing** 54:18
**written** 21:18 28:22
29:5,15,20 49:12
51:18 53:5 55:20
75:16 85:7 111:11
111:14 138:9
173:13 179:23
184:2
**wrong** 176:7
**wrote** 132:14
**www.summitrep...**
1:24

_____
**X**

**X** 3:1,8 119:4

_____
**Y**

**yeah** 46:12 47:11
106:6 108:8 121:8
121:8
**year** 25:4,5 64:1
150:4 170:5
174:10
**years** 36:14 78:20
93:14 140:8
**yellow** 113:20
**yep** 58:18 106:4
169:13
**yesterday** 7:1 33:10
153:22,23 168:14
**yield** 164:10
**Yvette** 2:19 4:14

_____
**Z**

**zero** 143:3
**zip** 61:2
**Zoom** 4:13 8:20

_____
**0**

_____
**1**

**1** 12:3 28:10 34:24
141:6 149:22
150:2,13 151:5

Page 220

Norman, Sr. v. Trans Union, LLC                                         DAVID B. LASATER, Ph.D., 5/5/22

182:8
**1,000** 193:11
**1.2** 88:14
**1.4** 94:22 123:13
**1.6** 140:11
**1:46** 110:3
**10** 2:13 78:2
**10:06** 1:14 4:2
**100** 40:23 95:12
　97:2,2
**11** 88:5 95:24 96:4
　96:9,16 101:18,20
　103:4 123:22
　124:17 125:22
　167:14
**11:02** 39:23
**11:13** 40:2
**11th** 11:23 45:22
　46:2,6
**12** 3:10 88:5 95:24
　96:4,9,16 101:18
　101:20 103:4
　123:22 124:18
　125:22 154:1
　167:15
**12:56** 109:24
**13** 159:22
**137** 180:22 181:5,6
**14** 69:14,23 161:14
**15** 95:15,16,16
　140:8 156:20
　157:6 171:3,15
　172:1 176:2
**15th** 169:7
**16** 126:4 129:6,11
　150:19,19 152:10
　152:22 153:13
　181:5,6,18
**1600** 2:4
**168** 3:14,15
**169** 3:5
**17** 76:16 88:5 99:22
　101:17 102:24
　141:7
**18** 26:18 76:17
**19** 142:19 143:7
**19072** 2:9
**19103** 2:5
**192** 3:5
**1953** 174:21
**1973** 13:21
**1979** 14:5
**1980** 17:15
**1982** 14:6 18:6 22:4
　23:21 24:6
**1987** 175:16

**1988** 17:13,15
　18:22 19:6
**1999** 20:4

_____
**2**
**2** 70:12 87:17 96:4
　99:13 103:5 124:8
　124:14 149:23
　150:9,14 151:4,7
　151:9 165:16
　168:9
**2.4** 161:14
**2.8** 41:10
**2:18-CV-052225-...**
　1:8
**2:18-CV-05225-G...**
　4:11
**2:42** 143:22
**2:49** 144:1
**20** 36:14 93:14
　95:12 150:17
　154:2 155:1,3
　158:8 165:1 166:2
　166:5,11
**200** 166:3
**2000** 20:4
**2002** 17:14
**2007** 185:12
**2008** 185:20
**2009** 185:20
**2011** 26:13
**2018** 150:17
**2021** 34:24 35:4,15
　35:18,23 37:1
　38:8,18 43:15
　154:17 194:18
**2022** 1:14 4:3 11:23
　45:22 46:3,6
　169:8,11 170:20
　171:3,15 172:1
　199:3 200:6
**207-1000** 2:15
**21** 149:22 154:1,10
**215** 1:23 2:6
**22** 46:15 48:4 56:16
　58:17 162:2
**22nd** 51:14 52:14
　57:2,13,21 58:7
　58:21 59:1
**23** 128:15
**25** 78:20 149:23
　151:17
**2510** 2:5
**26** 12:8
**262** 182:20
**27** 154:14 157:5

**28** 156:15 157:16
**28th** 43:15
**29** 128:15

_____
**3**
**3** 33:11 128:1,10,11
　128:15
**3.2** 178:21
**3:19** 163:9
**3:36** 163:12
**30** 150:18 198:21
**31** 159:21
**312** 2:15
**32** 12:14 160:14
**320** 40:10
**33** 3:12,13 28:19
　29:5 30:8 38:14
　181:17
**34** 28:19 38:14
　150:18,19 161:15
**35** 12:14 28:20
**37** 47:2
**39** 148:22
**3rd** 169:12,13,13
　172:20

_____
**4**
**4** 61:12 168:17
**4:26** 196:16,18
**40** 95:12
**400** 151:1 175:12
　176:17 181:13,23
　188:17 189:5
　192:3 193:18,18
　193:24 194:1,4
**400-and-some-th...**
　134:9
**400-person** 192:3
　192:16
**400,000** 129:7
　133:15 134:12
**40th** 2:14
**413** 161:16
**43.7** 100:2 101:10
　123:15 124:4,15
**439,618** 126:3
**44** 182:11,22
**45** 126:3
**450** 2:9
**46** 182:16
**477-8648** 1:23
**48** 162:3
**4th** 169:11

_____
**5**
**5** 1:14 12:4 168:12

168:17 173:6
　179:16 199:3
　200:6
**5.1** 12:8 47:16
**5.2** 47:4,20,21 48:4
　48:24 49:3
**5.4** 148:9,19
**5.6** 182:8,18
**50** 107:20 165:1
　166:2,5,11
**502** 50:7,10,11,14
　50:19 61:19 62:1
　62:18 63:9,11,16
　122:3,23 123:10
**510** 176:4,4
**510-7310** 2:10
**567-3315** 1:23
**5th** 4:2

_____
**6**
**6** 3:5 12:4 131:3
　140:11 156:21
　169:2 176:11,14
**6.1** 47:9,12
**6.2** 106:1 107:3
　110:8 111:13
　160:3,5 163:15
**60** 83:17 84:3,5,5,8
　85:2 180:3,16
　181:6,19,23
　182:21
**60-mile** 83:20,21,23
　84:16 85:13,15
　179:22
**60606** 2:14
**609** 1:23
**610** 2:10
**63** 128:16
**650** 41:13

_____
**7**
**7** 108:11 141:7
**735-8600** 2:6
**775** 40:9,14

_____
**8**
**8** 47:7 143:10 144:4
**800** 1:23 95:1
　150:24 151:2
　168:2 175:12
　189:5
**835** 182:10 186:24

_____
**9**
**9** 61:13 79:14,21
　88:15 156:22

179:15
**9(a)** 64:4 67:9
**9(b)** 79:14,15
**90** 104:18 155:14
　155:18
**93.5** 156:18 157:6
**985-2400** 1:23

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com