**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DUANE E. NORMAN, SR.** | : | |
| *ON BEHALF OF HIMSELF AND* | : | |
| *ALL OTHERS SIMILARLY SITUATED* | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 18-5225** |
| | : | |
| **TRANS UNION, LLC** | : | |

**McHUGH, J.**                                                            **April 10, 2023**

## MEMORANDUM

I.   Relevant Background ........................................................................................... 2
    A.  Nature and Impact of Hard Inquiries .......................................................... 2
    B.  Trans Union's Procedures and Industry Practices as to Disputed Hard Inquiries ........ 5
    C.  Time and Expense Consumers Spend on Disputing a Hard Inquiry ........................... 7
    D.  Credit Repair Industry and Its Presence in Class Letters .............................. 8
    E.  Class Letters Disputing an Inaccuracy ...................................................... 12
    F.  Prevalence of Fraudulent Disputes Submitted to Trans Union ............................. 13
II.  Standard of Review ............................................................................................ 15
III. Discussion ......................................................................................................... 16
    A.  Class Decertification ......................................................................................... 17
       1.  Plaintiffs Have Sufficiently Demonstrated Standing. .................................... 17
       2.  *Bibbs v. Trans Union* Does Not Change My Conclusion that Plaintiffs
           Do Not Have to Prove the Element of Inaccuracy in the First Instance. ........ 28
       3.  Defendants Fail to Demonstrate that a Significant Portion of Class
           Disputes Were Sent Fraudulently by Credit Repair Clinics. .......................... 31
       4.  Plaintiffs' Claims Are, in Part, Capable of Common Proof at Trial. .............. 39
    B.  Summary Judgment ........................................................................................... 46
       1.  Trans Union's Reading of the FCRA is Objectively Unreasonable Under
           Safeco. .................................................................................................... 47
       2.  Trans Union's Industry Practice Defense Does Not Suffice to Prove a
           Lack of Willful or Reckless Conduct. ............................................................ 58
IV.  Conclusion ........................................................................................................ 60

* * *

On August 14, 2020, I certified a class of plaintiffs suing Trans Union under § 1681i of the

Federal Credit Reporting Act (FCRA).  The Court of Appeals declined interlocutory review.  Now,

over two years later, Defendant seeks decertification of that class and summary judgment on

Plaintiffs' claim that Trans Union willfully violated the reinvestigation provision of the FCRA. After scrutinizing the statute, new precedential case law, and the extensive record of expert reports and depositions submitted by both parties,[1] I find that decertification of this class is not warranted. Additionally, I find that, because Trans Union has not demonstrated that its reading of the FCRA is objectively reasonable, summary judgment must be denied.

## I.    Relevant Background

The relevant factual background surrounding Mr. Norman's dispute process is set forth in significant detail in my prior certification memorandum.  ECF 47 at 2-7.  The record has since been developed by the production of expert reports and the taking of expert depositions.  It would be impractical to set forth all that information here.  I therefore proceed by framing the central disputes and addressing the most relevant expert commentary.

### A.  Nature and Impact of Hard Inquiries

In his dispute letter, Mr. Norman alleged that an inaccurate hard inquiry was present on his credit report.  A hard inquiry is a notation placed on a consumer's credit file when a subscriber or end-user of Trans Union accesses that consumer's credit report.  McCawley Dep. 46:5-11, 69:18-71:24. When an end-user contacts Trans Union, it must provide identifying information for both it and the consumer, as well as a "permissible purpose" for accessing the consumer's report.  *Id.* Once Trans Union provides the report, it makes a record of the inquiry on the consumer's credit file.  *Id.* at 50:11-20; *see* Ulzheimer Report 33, Mar. 10, 2022, Ex. A to ECF 81 (describing a hard

---

[1] As is now typically the case in complex class actions, both sides have filed motions to disqualify opposing experts.  All the experts in this case can be challenged on some basis, as each is retrospectively analyzing a data set using different assumptions and models.  But none will be entirely precluded as I am persuaded that the relative strengths and weaknesses here can be properly explored on cross examination.  For present purposes, I have considered all the information submitted by the parties, making specific judgments as to the weight to be accorded to each expert's point.  The parties' respective motions, ECF 85 and 102, are therefore denied, without prejudice to appropriate motions *in limine* closer to trial.

inquiry as "simply a factual record of credit file access"); *see also* Migalski Dep. 14:4-21 (confirming that a hard inquiry indicates that the "consumer applied for credit" and gave "permission to that lender to pull their credit report"). Inquiries, as well as the end-user's "certified permissible purpose" for accessing a consumer's reports, are typically retained on consumers' credit reports for two years. Compliance Policy Statement, ECF 84-3; *see* Turner Report ¶ 27, Ex. A to ECF 80 ("While hard inquiries can stay on a person's credit reports for up to two years . . . FICO only considers them for one year.").

Experts from both parties debated the extent to which hard inquiries impact a consumer's credit score. Plaintiffs' expert Evan Hendricks[2] opines that an inaccurate hard inquiry can harm a consumer in two ways. First, "hard inquiries typically lower a consumer's credit score," as pursuit of new credit (i.e., hard inquiries) account for 10% of a consumer's FICO score. Hendricks Report 2, July 1, 2019, ECF 95-5. Second, "the appearance in a consumer's credit file of an inquiry that should not be there causes harm because it distorts the consumer's credit history by making it look like he/she applied to an account that he/she in fact did not apply." *Id.* at 2-3. According to Hendricks, even if an inquiry is merely a factual record of file access, it remains inaccurate when the "fact" of the inquiry is misassigned to a consumer who never applied for or sought credit. *Id.*

On the other hand, Defense expert Laura Migalski[3] testified that "the analysis of how (if at all) a single hard inquiry impacts a consumer's credit risk score is multivariate and complex, and requires an individualized consideration of a significant amount of information." Migalski Disc.

---

[2] Evan Hendricks has been professionally involved in credit reporting systems for several decades, including as a qualified expert witness in several cases regarding the FCRA, and is an author of a book on the subject. *See* Evan Hendricks, *Credit Scores & Credit Reports: How the System Really Works, What You Can Do* (3d ed. 2007). He offered two expert reports for the purpose of this litigation. *See* Hendricks Suppl. Report, Mar. 11, 2022, ECF 95-2; Hendricks Report, July 1, 2019, ECF 95-5.

[3] Ms. Migalski is Trans Union's Vice President of Data Science & Analytics and was provided as an expert witness under Fed. R. Civ. P. 26(a)(2)(C). She thus did not author an expert report.

¶ 6, Ex. A to ECF 78; *see* Turner Report ¶¶ 71, 74, Ex. A to ECF 80 (opining that it is "impossible to determine without individualized fact finding" the impact of a single hard inquiry on a particular credit scoring model). Describing one scoring model – the VantageScore 3.0 model – Migalski explained that a single hard inquiry, depending on other information on the consumer's file, "in most instances . . . will have no impact on the credit risk score at all." Migalski Disc. ¶¶ 8, 8(a)-(c), Ex. A to ECF 78. Defense expert Michael Turner[4] agreed, stating that a single hard inquiry "is likely to have little to no credit score impact" or have "only a minor impact on an individual's credit score." Turner Report ¶¶ 24-26, Ex. A to ECF 80. But Turner acknowledged that a larger number of inquiries in a shorter period of time communicates that the consumer represents "a higher probability of default." *Id.* Further, he notes that a hard inquiry can often have some small negative affect on one's credit score, opining that, "[f]or most people, one additional credit inquiry will take less than five points off their FICO score." *Id.* at ¶¶ 71, 74. Turner goes on to assert that even when a hard inquiry causes diminution of a consumer's credit score, it is impossible to determine that diminution's "real-world, material impact," because such an impact does not typically vary point by point but by broad bands of credit risk categories like "prime" or "subprime." *Id.* at ¶ 75.

Defense expert John Ulzheimer[5] elaborates by opining that while the pursuit of credit, as signified by the presence of hard inquiries on one's file, is one factor in credit scoring models, those models use multivariate and multi-scorecard systems to develop an individual's credit score.

---

[4] Among other qualifications, Michael Turner is the President and CEO of the Policy and Economic Research Council (PERC), an economic policy research organization that has produced a complex study of the accuracy of consumer credit reports and the consequences of inaccuracies on the credit market. Turner Report ¶¶ 2, 10-14, Ex. A to ECF 80.

[5] John Ulzheimer has worked in the consumer credit industry for many years, holding positions at Equifax and FICO, and has served as an expert witness in more than 600 lawsuits. Ulzheimer Report 2, 4, Ex. A to ECF 81.

Ulzheimer Report 7-10, Ex. A to ECF 81.  Thus, Ulzheimer asserts, although it is fair to say that any item on one's credit file that is predictive of risk, like a hard inquiry, "might have an impact on a consumer's credit score . . . [i]t would be patently false to suggest everything that a credit score considers has a measurable impact on a consumer's credit scores." *Id.* at 11.  Further, he opined that, based on his knowledge of the FICO and VantageScore scoring system, the impact of a hard inquiry on one's credit score is "generally immaterial relative to the consumer's score and credit prospects." *Id.* at 14.  In disagreement with Hendricks, Ulzheimer contends that hard inquiries "may or may not" have a measurable impact on a consumer's FICO score, and that any impact of an inquiry on a credit score "is not uniform across consumers and certainly not uniform across the hundreds of different credit scoring systems."[6] *Id.* at 32.

### B.  Trans Union's Procedures and Industry Practices as to Disputed Hard Inquiries

Hendricks notes that Trans Union, as well as the other major credit bureaus, invite consumers to dispute items in their credit files like hard inquiries.  *See* Hendricks Report 1, 9, ECF 95-5 (observing that Trans Union "advises consumers to review their credit reports for unauthorized inquiries and to dispute them," and that the major credit reporting agencies all send "a form for disputing errors" to consumers who have ordered their credit report).  Then, when Trans Union receives a consumer dispute regarding a hard inquiry, the agency determines if the dispute alleges fraudulent activity, identity theft, a mixed file,[7] or the inaccuracy of some other,

---

[6] In a similar vein, Ulzheimer later argues that there is no evidence that Mr. Norman experienced any credit related damages as a result of the Safe Home credit inquiry.  *Id.* at 28.  He explains that there is no evidence that this singular hard inquiry impacted his inability to purchase a car, and that the volume of other derogatory information on his credit report is more likely to blame.  *Id.* at 29.  Turner likewise argued that, because Mr. Norman's credit file already contained many derogatory notations, the Safe Home inquiry "had exactly zero material impact" on Mr. Norman's credit score, because even though his score went down three points after the inquiry, it remained in the same "low band" of credit as beforehand.  Turner Report ¶¶ 7, 48-49, Ex. A to ECF 80.

[7] A mixed file occurs when two different consumers or individuals have been mixed into a single Trans Union consumer file.  McCawley Dep. 57:16-58:6.  This commonly occurs with "people with same or

non-inquiry account information in the consumer's credit file.  Wagner Dep. 33:1-18, 36:9-37:5; Compliance Policy Statement, ECF 76-3.

There was conflicting testimony as to whether Trans Union screens letters upon receipt for indications of assistance from a credit repair organization.[8]  According to one Trans Union employee, the mailroom would so mark certain disputes in its system.  Tilghman Dep. 119:1-5.  According to another, it did not treat disputes it identified as credit repair any differently.  *See* Wagner Dep. 88:12-16.[9]  But the record reflects that if the dispute submitted only alleged the inaccuracy of a hard inquiry, Trans Union would send the consumer a "502 Letter" – the form letter that Mr. Norman received and which I discussed at length in my original certification opinion.  ECF 47 at 5; *see* Wagner Dep. 32:2-4, 33:1-7, 36:15-37:5.  In cases like Mr. Norman's where the consumer only disputes a hard inquiry, Trans Union witnesses testified that it never conducts a reinvestigation, and only sends the 502 Letter in response.[10]  Wagner Dep. 62:1-18, 81:4-17; *see also* McCawley Dep. 42:8-12.

Defense experts John Ulzheimer and Michael Turner opine that the three major credit reporting agencies, "do not, as a practice, reinvestigate consumer disputes of credit inquiries."  Ulzheimer Report 26, Ex. A to ECF 81; *see* Turner Report ¶¶ 5, 37, Ex. A to ECF 80.  Instead, the agencies all reply to hard inquiry disputes with a notice that is "almost identical" to Trans Union's

---

[8] similar first and same or similar last names perhaps living at the same address."  *Id.* at 57:19-22.  When a consumer disputes a hard inquiry as inaccurate due to a mixed file, Trans Union will "review by obtaining additional information from the consumer about his or her identity and make a determination of whether or not the information in the single file, in fact, belongs to some other consumer."  *Id.* at 58:16-20.

[9] A credit repair organization or clinic is a third-party company that assists consumers with repairing credit reporting errors impacting their credit scores.  These organizations are described in detail below.

[9] As discussed below, Trans Union's experts represent that disputes that are deemed to have been submitted by credit repair agencies or denied as frivolous.

[10] Despite this testimony, and its position at earlier stages of this litigation, Trans Union now maintains that receipt of a 502 Letter does not mean that the consumer has disputed the inaccuracy of a hard inquiry.

502 Letter.[11]  Ulzheimer Report 26-27, Ex. A to ECF 81.  Turner and Ulzheimer assert that this is justified on the ground that such inquiries are not the type of thing that can be readily investigated for accuracy or inaccuracy.  *Id.* at 31-33; *see* Turner Report ¶¶ 37-44, Ex. A to ECF 80.  Instead, because an inquiry is "simply a factual record of credit file access," he contends that it is "accurate" so long as the end-user actually accessed the consumer's file.  Ulzheimer Report 33, Ex. A to ECF 81; *see* Turner Report ¶¶ 21-22, 37, 42, Ex. A to ECF 80.  Thus, Ulzheimer and Turner assert that, even if Mr. Norman did not give his permission to Safe Home to access his credit report, the inquiry itself is still accurate because Safe Home did, indeed, access his report.  Ulzheimer Report 34, Ex. A to ECF 81; *see* Turner Report ¶ 22, Ex. A to ECF 80.  These experts do not address whether an entry can be factually accurate but nonetheless misleading.

### C.  Time and Expense Consumers Spend on Disputing a Hard Inquiry

The experts also debate what kind of time and resources a consumer might expend in lodging a dispute with Trans Union.  To calculate the time and expense spent on a single hard inquiry dispute, Plaintiffs' expert Evan Hendricks outlined the steps required for the dispute process.  *See* Hendricks Suppl. Report 1-2, Mar. 11, 2022, ECF 95-2.  According to Hendricks, the consumer must review his credit file, locate the inaccurate item, prepare a written dispute letter, print the letter if not handwritten and any supporting documents, and, finally, mail the letter and pay for postage.  *Id.*  "Depending on how many of these steps the consumer takes, this process can consume between 45 and 90 minutes."  *Id.* at 2.  Accounting for that range of time, and relying on the federal minimum wage and the United States Bureau of Labor Statistics, Hendricks determined that "the cost of the time spent disputing an item on a consumer's file can range – minimally –

---

[11] In support of their opinion on industry practices, both experts cite declarations from defense witnesses Kimberly Cave, Compliance and Litigation Analyst at Experian, and Celestine Gobin, Litigation Support Manager for Equifax.  *See* Ulzheimer Report 26-27, Ex. A to ECF 81; Turner Report ¶ 37 n. 31, Ex. A to ECF 80; *see also* Cave Dec., ECF 76-10; Gobin Dec., ECF 76-11.

between $5.44 and $30.26, plus out-of-pocket resources of at least another $1.00." *Id.* He concludes that consumers who make a written dispute of a hard inquiry "suffer an ascertainable economic impact in the form of wasted time and resources [] because Trans Union does not reinvestigate the consumers' disputes upon receipt." *Id.*

Mr. Ulzheimer responded on behalf of Trans Union, questioning whether consumers would actually spend between 45 and 90 minutes on drafting and mailing a dispute letter. *See* Ulzheimer Suppl. Report 2, Apr. 14, 2022, Ex. B to ECF 81. Ulzheimer argued that Hendricks' report did not account for the presence of credit repair, and that consumers who rely on credit repair clinics to dispute information in their credit files may not have participated in the dispute process whatsoever. *Id.* Likewise, Ulzheimer objects that Hendricks did not consider the high occurrence of template letters,[12] undercutting the estimate of a 45-minute dispute-drafting process, as the time to complete one of these "fill in the blank" forms requires no more than a couple of minutes. *Id.* at 2-3. These factors, Ulzheimer argues, undermine Hendricks' calculations.

### D. Credit Repair Industry and Its Presence in Class Letters

Credit repair organizations or credit repair clinics, briefly mentioned above, are companies that, in exchange for a fee, assist consumers in improving their credit record. Although some of these organizations work legitimately for their clients, Defense experts opine that many credit repair clinics operate in a deceitful manner, disputing as a matter of course all the information in a client's report that may be lowering the consumer's score even if there is no basis to believe that the information is inaccurate. Turner Report ¶¶ 59-60, Ex. A to ECF 80; Ulzheimer Report 19-20, Ex. A to ECF 81. This tactic is often called "jamming," and is "one example of a frivolous or irrelevant dispute." *See* Ulzheimer Report 19-20, Ex. A to ECF 81; Kuehn Dep. 59:4-60:4

---

[12] As will be discussed below, Defense expert Dr. Lasater's statistical study of the class letters led him to conclude that approximately 45% of disputes reflected one of 16 different template letters.

(explaining that "disputes of massive amounts of tradelines or inquiries" is evidence of credit repair that an agency may rely on to find that dispute frivolous or irrelevant).

Defense expert Ulzheimer opines that there are many ways to identify credit repair disputes; for example, credit repair disputes are frequently delivered by U.S. mail in "large, white, plastic bins, hundreds per bin." *Id.* at 20. Often times, these letters all have the same postmark, the same address format, and the same letter template. *Id.* According to Ulzheimer, "the most common and prevalent evidence" of credit repair is when a dispute displays a "mismatch between the [address of the] postmark and the consumer's actual address." *Id.* In addition, letters sent by credit repair companies are often created with "letter generating software," such that they are worded identically with only slight variations in grammar or typographical errors. As a result, Ulzheimer asserts that "a template letter can also reasonably suggest the consumer is using a credit repair company." *Id.* at 20, 23. Mr. Ulzheimer added that credit repair organizations attempt to conceal themselves because "credit reporting agencies enjoy the right to disregard disputes they believe to be frivolous, which would include more credit repair disputes." *Id.* at 21.

Using Ulzheimer's criteria, Defense expert Dr. Lasater[13] sought to determine the percent of class letters that bore some indicia of the credit repair industry, homing in on the use of template letters and on mismatched postmarks. To form his opinions based on an unbiased sample of the class members' letters, Dr. Lasater employed a methodology called stratified sampling. He divided the class letters in the 34-month class period chronologically into 16 segments of two to three months each. Lasater Report ¶ 25, Mar. 11, 2022, Ex. A to ECF 77. To achieve a 95% rate

---

[13] Dr. David Lasater is a senior managing director at a company called FTI Consulting and has provided statistical analyses in "more than 200 engagements," including in the litigation context. Lasater Report ¶¶ 1-2, Mar. 11, 2022, Ex. A to ECF 77. He filed three expert reports on behalf of Trans Union. *See* Lasater Rebuttal Report ¶ 2, Apr. 15, 2022, Ex. B to ECF 77; Lasater Suppl. Rebuttal Report ¶ 3, May 3, 2022, Ex. C to ECF 77.

of confidence in his analysis, Dr. Lasater selected a sample of about 400 letters across the temporal segments, with 25 selections coming from each. *Id.* at ¶¶ 19, 23-26. A second sample was selected using the same methodology. *Id.* at ¶ 39. After analyzing both samples, Dr. Lasater concluded – purportedly with 95% confidence – that 1) approximately 45% of disputes reflected one of 16 different template letters and 2) 29.4% to 35.8% of letters sent to Trans Union were postmarked at a location at least 60 miles away from the consumer's known residential address, both of which indicate the prevalence of credit repair. *Id.* at ¶¶ 13, 58-59.

Plaintiffs' expert Jonathan Jaffe[14] responded to Lasater's methodology and to his conclusions. First, as to his method, Jaffe argues that, if Lasater wanted to maintain a 5% margin of error, he would have needed to select 384 letters from *each* of the 16 temporal periods he defined and could not have selected 384 letters in total. Jaffe Reply Report ¶ 30, Apr. 15, 2022, ECF 95-11. Because Lasater created his sample by selecting only 25 letters per temporal strata, Jaffe concludes that his margin of error is actually 20%.[15] *Id.*

Second, Jaffe opines that, even if Dr. Lasater's sampling methodology was acceptable, the results do not support his conclusions. *Id.* at ¶¶ 33, 37, 42. As to the prevalence of credit repair, Jaffe points out that USPS postmarks are not necessarily indicators of the consumer's "local post office," but instead are "most frequently indications of the Processing Distribution Center." *Id.* at ¶ 41. Because there are only 251 Processing and Distribution Centers in the United States, Jaffe

---

[14] Jonathan Jaffe is a technology consultant retained by Plaintiffs to provide data science consulting services. *See* Jaffe Report ¶¶ 1, 4, Mar. 11, 2022, ECF 95-3. Because the parties rely most heavily on opinion stated in Mr. Jaffe's reply, I will focus on summarizing his second report. *See* Jaffe Reply Report, Apr. 15, 2022, ECF 95-11.

[15] Lasater responded to this critique in his rebuttal report, defending his strategy of randomly selecting a sample size of about 400 letters across the "period strata" to accomplish a random sample. Lasater Suppl. Rebuttal Report ¶¶ 5-8, Ex. C to ECF 77. Lasater argues that the consistency between his first and second samples, which Jaffe acknowledges were not statistically significantly different, supports the soundness of his overall method. *Id*

argues that it is likely that a consumer's residential address will not be located within a center's 60-mile radius.  *Id.* at ¶¶ 47-53.  Jaffee thus concludes that the 60-mile geographic differential between postmark and residential address is an arbitrary indicator of credit repair.  *Id.* at ¶ 52. Jaffe further argues that Lasater's report does not account for individuals who sent their dispute from their workplace, individuals who were traveling for any number of reasons, or individuals who needed assistance to print and mail their letters.  *Id.* at ¶ 53.  Likewise, Mr. Jaffe questions Dr. Lasater's conclusion on the use of template letters, noting that "substantially similar" templates to those identified by Lasater can easily be found on the internet.  *Id.* at ¶ 54-55.  The use of a template letter, Jaffe concludes, does not necessarily indicate that "an agent" sent that letter on a consumer's behalf.  *Id.* at ¶ 57.

Jaffe also offers an alternative, automated method for identifying letters from credit repair by searching for indicia of bulk rate postage.  *Id.* at ¶¶ 83-84.  Examining a large sample of letters, Jaffe identified eight categories of indicia for bulk mailing.  Based on these categories, Jaffe constructed a query to analyze a sample of 10,000 class letters.  *Id.* at ¶¶ 85-89.  The results of the query showed that 4.1% of letters included one or more categories of terms associated with bulk mailing.  *Id.* at ¶ 93.  And he noted that if the Court or parties selected another set of categories representing indicia of credit repair, he could easily run a similar query for the class.  *Id.* at ¶ 97.

Dr. Lasater responded in kind, also critiquing Jaffe's methodology for its reliance on class counsel to identify letters in his sample that bore indicia of postage.  Lasater Rebuttal Report ¶ 11, Apr. 15, 2022, Ex. B to ECF 77.[16]  Referencing Jaffe's review of the sample, Lasater noted that 128 of the 384 letters (or 33%) were mailed or faxed from a location at least 60 miles from the consumer's known residential address, raising "substantial uncertainty that those letters were sent

---

[16] In this vein, Lasater also questions how Jaffe could conduct an automated review of the letters if he relied in his report on a manual review from plaintiffs' counsel.  *Id.* at ¶¶ 19-20.

by the consumers themselves." *Id.* at ¶¶ 13-14.  Lasater added that, of the letters that were mailed at least 60 miles away from a class members' residential address, 28% were sent from Denver, Colorado.  *Id.* at ¶ 16.  Lasater argued that the disproportionate share of letters from certain cities "suggests the potential those letters are from credit repair shops in those cities."  *Id.*

### E.  Class Letters Disputing an Inaccuracy

The parties also dedicated time to determining what percent of class letters actually disputed an inaccuracy in the consumer's credit file, as opposed to raising some other concern or complaint.  Defense expert Dr. Lasater reviewed the two samples he created, as discussed above, to identify various categories of letter-type.[17]  Lasater Report ¶¶ 28-29, Ex. A to ECF 77.  A team of retained attorneys then sorted the sampled letters into the respective categories, classifying them in more than one category where appropriate.  *Id.* at ¶¶ 30-32.  Of the letter categories that he identified, Lasater determined that five categories involved "a complaint, assertion, or question about the accuracy of the consumer's account."  *Id.* at ¶¶ 49-50.  After sorting both samples, Lasater concluded (1) that the letters presented a wide variety of complaints, assertions, questions, and demands, and (2) that 40.4% to 47.1% of letters *did not* fall into a category reflecting a complaint about the inaccuracy of one's credit file.  *Id.* at ¶¶ 13, 50, 58-59.

---

[17] Those categories include: (1) Letter mentions only Experian or Equifax inquiries; (2) Letters demands an answer as to why an entry is on a credit report or file; (3) Letter asserts that an inquiry is damaging consumer's credit rating or lowering credit score; (4) Letter centers on consumer's assertion that he/she didn't authorize the end-user's inquiry; (5) Letter demands TU prove that an inquiry is permissible; (6) Consumer asserts the inquiry is "not mine" without providing proof; (7) Letter asserts inquiry is a result of fraud or identity theft without providing support; (8) Letter asserts inquiry belongs to another consumer; (9) Letter acknowledges the inquiry relates to consumer's application for credit; (10) Letter claims multiple inquiries were associated with a single transaction; (11) Letter describes an inquiry as "soft," or uses words/phrases like "account review" or "promotional"; (12) Letter claims the end user told the consumer the inquiry would not be a hard or regular inquiry or that the inquiry would be a soft or "account review" inquiry; (13) Letter references at least one inquiry two years older than the date of the postmark; (14) Letter doesn't fit into any of these categories.  Lasater Report Table 2, Ex. A to ECF 77.

Plaintiffs' expert Jonathan Jaffe offered two responses to Lasater's findings. First, he argued that Lasater "did not have his reviewers indicate whether the sampled letters were directly related to the accuracy of an inquiry despite the fact that letters not falling into one of the 5 categories were not categorically known not to have directly related." Jaffe Reply Report ¶¶ 35-37, ECF 95-11. Second, Jaffe offered an alternative methodology, which he described as automated and therefore less subjective, to determine whether consumers were disputing allegedly inaccurate inquiries in their letters. *Id.* at ¶¶ 60-64. To do so, Jaffe identified "13 categories of terms consistent with dispute letters,"[18] and "used a regular expression" to refine his searches. *Id.* at ¶¶ 66-67. From his search, which was completed in less than two minutes, Jaffe found that 96.7% of letters contained at least one of these categories of terms, and 70.4% contained at least three categories. *Id.* at ¶¶ 69, 74. Jaffe predicted that performing this process for the entire class would take just four hours and noted that he could construct a similar query with categories or characteristics agreed upon by the parties, should it be necessary. *Id.* at ¶¶ 72, 78-80.

### F.  Prevalence of Fraudulent Disputes Submitted to Trans Union

In 2019, unrelated to this lawsuit and as a part of her professional duties, Trans Union employee Ahunya Tilghman[19] observed that many consumers who disputed certain credit information in their files as fraudulent were submitting forged letters from purported creditors to support their disputes. Tilghman Discl. ¶ 6, Ex. A to ECF 79. To better understand this pattern, Tilghman selected a random sample of 75 Trans Union consumers – none of whom are in this class

---

[18] Those terms include: dispute, not mine, not or never applied, unauthorized, unauthorized inquiry, permission or permissible purpose, not authorized, inquir(ies), remove or deleted or erase, inaccurate, legal terms, do not recall, and consent. *Id.* at ¶¶ 66.

[19] Defendant has put forth Ahunya Tilghman as an expert witness who does not need to provide a written report. Tilghman Discl., Ex. A to ECF 79; *see* Fed. R. Civ. P. 26(a)(2)(C). Ms. Tilghman is employed as a Fraud Services Specialist with Trans Union. Tilghman Discl. ¶ 1.

– who successfully disputed information on their credit report "based on a purported letter from the creditor (or other documentation)" sent to the agency by the consumer. *Id.* at ¶ 7(b). Tilghman reviewed these accounts and found that 73 of the 75 randomly selected disputes involved a fraudulent or forged letter from a purported creditor. *Id.* at ¶ 8(a). To confirm her findings, Tilghman reached out to each creditor that purportedly supported the consumer's dispute and, of the 33 that responded, all confirmed that the purported creditor letters were forged. *Id.* at ¶ 8(c). Tilghman prepared a presentation of her findings, in which she also identified several hallmarks of fraud. *Id.* at ¶ 9. Later, for the purposes of this lawsuit, Tilghman reviewed the disputes and accounts of 10 class members. *Id.* at ¶ 10. She determined that eight of the 10 class members' disputes bore indicia of fraud and "were suspected of being falsified or forged," and provided her reasoning based on her observations of each of the eight letters as well. *Id.*

In response, Plaintiffs' expert Jonathan Jaffe examined Tilghman's study of fraudulent letters. First, he noted that her random sample of 75 letters was not representative of the class in this case because it was drawn from a different population – indeed, consumers from Tilghman's study actually had some information on their credit reports removed based on their disputes. Jaffe Reply Report ¶¶ 98-99, ECF 95-11. Second, Jaffe argued that, instead of relying on Tilghman's analysis of just 10 class letters, he could design a query based on her observations to search the entire population of class letters for indicia of fraud. *Id.* at ¶¶ 100-13. As an example, Jaffe examined the letters Tilghman identified as fraudulent, and observed that all but one used a variation of the phrase "apologize for any inconvenience" as a means of ingratiating themselves with the reviewer. *Id.* at ¶ 108. He used this phrase to filter a sample of 10,000 letters from the class and found that 0.14% of letters included some variation of it. *Id.* at ¶ 112. He concluded

that there is an easy process for identifying the small number of class letters that, like those that Tilghman identified, are fraudulent.  *Id.* at ¶ 111-13.

## II.    Standard of Review

The summary judgment motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).  As to decertification, although Plaintiffs maintain that Defendant carries a "heavy burden" of proof, courts are divided on who shoulders the burden of proof at the decertification stage.  *See In re Pharmacy Benefit Managers Antitrust Litig.*, No. 06-1782, 2017 WL 275398, at *34 (E.D. Pa. Jan. 18, 2017) (Jones, J.) ("The question of which party has the burden on a motion to decertify a previously certified class is not settled.").  *Compare In re Atlantic Fin. Fed. Sec. Litig.*, No. 89-645, 1992 WL 50072, at *2 (E.D. Pa. Feb. 28, 1992) (Yohn, J.) ("Consequently, when seeking decertification of a class, the defendant bears a heavy burden to show that there exist clearly changed circumstances to make continued class action treatment improper."), *with Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) ("Thus, as to the class-decertification issue, [Plaintiff], as the party seeking class certification, bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met.") (cleaned up).  Regardless of where the burden lies – and, here, my conclusion is the same in either case – decertification is an "extreme step particularly at a late stage in litigation."  *Korrow v. Aaron's Inc.*, No. 10-6317, 2015 WL 7720491, at *10 (D.N.J. Nov. 30, 2015) (cleaned up); *see Chiang v. Veneman*, 385 F.3d 256, 268 (3d Cir. 2004), *abrogated on other grounds by In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 n.18 (3d Cir. 2008) (identifying decertification as a "drastic course" and preferring modification of class definition).

The essential question, however, is whether circumstances have changed since certification. *In re Processed Egg Products Antitrust Litig.*, No. 08-md-2002, 2017 WL 3494221, at *3 (E. D. Pa. Aug. 14, 2017) ("Generally, class decertification is prompted by a change in factual circumstances or developments in applicable substantive or procedural law.").

## III.   Discussion

In my class certification memorandum, I made several pertinent findings regarding the arguments that Trans Union now raises again.  Those findings include the following:

1.  To trigger the agency's reinvestigation duty, a consumer's dispute may concern "any item of information contained in [the] consumer's file," which includes hard inquiries.  ECF 47 at 12.

2.  The "accuracy" of an item in one's file is disputed when the consumer calls into question the validity, truth, correctness, or precision of that item or when the consumer calls into question whether some item of information is free from mistake or error.[20]  *Id.* at 13-15.

3.  Trans Union's understanding of "inaccuracy" is "artificially narrow," because although it argues that inquiries are "accurate" so long as the credit report was actually provided to the creditor in question, hard inquiries do not *just* convey the fact that a credit file was provided to a creditor – they also convey the misleading impression that the consumer applied for credit.[21]  *Id.* at 15-17.

4.  The consumer need not first "show" an inaccuracy to trigger the credit reporting agency's reinvestigation duty – when a consumer lodges a dispute and the agency has not yet conducted a reinvestigation, the cost-benefit analysis of maintaining accuracy, as codified in the FCRA, places the burden of reinvestigation squarely on the credit reporting agency.[22]  *Id.* at 17-22.

---

[20] This definition of "inaccuracy" was later endorsed by the Third Circuit, which held that information that is "technically accurate but materially misleading is sufficient to trigger § 1681i(a)." *Bibbs v. Trans Union*, 43 F.4th 331, 345 (3d Cir. 2022).

[21] To use Plaintiffs' analogy, arguing that a hard inquiry is accurate because the credit report was in fact provided to a creditor is akin to arguing that a recording of the repossession of a car accurately reflects a consumer's creditworthiness when the consumer's car was repossessed wrongfully.  ECF 47 at 15; *see* Pls. Reply Br. Class Certification, ECF 38 at 20-21.

[22] *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 224-25 (3d Cir. 1997), which described the FCRA as containing two complementary provisions that account for the costs and benefits of placing various burdens

5. The reinvestigation duty is not limited to information supplied by "furnishers," as the broad language of § 1681i(a)(1)(A) is qualified only by subsections (f) and (g) of that same provision, and allows no room for ambiguity. *Id.* at 28-32.

6. The FCRA gives credit reporting agencies three options when responding to a direct dispute of an inaccurate item in a consumer's credit file – the agency may delete the disputed item, determine the dispute is frivolous and notify the consumer of that determination, or proceed with a reasonable reinvestigation.[23] So, if the agency elects not to delete the disputed item or mark it frivolous, it must reinvestigate. *Id.* at 34-35.

7. The specific language of the 502 Letter supports the reasonable inference that consumers who received the letter have disputed the inaccuracy of a hard inquiry in their credit file. *Id.* at 41-46.

Because I find that neither the law nor the facts have sufficiently changed to justify decertification, and because Trans Union's view of the law is not sufficiently reasonable to justify summary judgment, Defendant's motions will be denied.

## A. Class Decertification

The legal standard governing class certification is discussed at length in my certification memorandum. *Id.* at 9. Instead of repeating that standard and analysis here, I will address each of Defendant's arguments in favor of decertification in turn. Trans Union asserts that decertification is appropriate because Plaintiffs cannot demonstrate (1) a concrete injury, (2) inaccuracy as an essential element of the claim, or (3) a "direct" dispute for the entire class, and (4) that each failure undermines the predominance requirement of Rule 23. *See* Fed. R. Civ. P. 23(b)(3). I disagree, with one exception: as to one of Plaintiffs' theories of injury, they cannot show predominance at this stage.

### 1. *Plaintiffs Have Sufficiently Demonstrated Standing.*

---

on credit reporting agencies: § 1681e requires "maximum possible accuracy" in the first instance, and § 1681i requires a reasonable reinvestigation when consumers raise a dispute of inaccuracy.

[23] *See* 15 U.S.C. § 1681i(a)(1), (a)(3), (a)(5); ECF 47 at 34-35.

Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. At its core, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To demonstrate standing to file suit, Plaintiffs must show (1) an "injury in fact" or an "invasion of a legally protected interest," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). Plaintiffs' burden to demonstrate standing evolves as the case proceeds. At summary judgment, Plaintiffs must demonstrate standing with more than "mere allegations," and must "set forth by affidavit or other evidence specific facts, which . . . will be taken as true." *Id.* at 561 (internal quotations and citations omitted). These standing requirements also apply in the class action context. *See Trans Union v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("Every class member must have Article III standing in order to recover individual damages."); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.").

Here, Plaintiffs have alleged two central theories of injury to support standing: diminution of credit score and wasted time and resources. Defendant argues that under *Ramirez*, a decision issued after my certification memorandum, neither harm that Plaintiffs allege establishes a concrete injury that is fairly traceable to Trans Union's purported statutory violation. I disagree, and find that Plaintiffs have demonstrated two concrete injuries, both fairly traceable to Trans Union's statutory violation and neither of which is barred by the recent Supreme Court decision in *Ramirez*.

      i.    Plaintiffs Established Injury-In-Fact Under Two Theories of Standing

Plaintiffs must first demonstrate what is called an injury-in-fact. The injury-in-fact requirement is intended to "distinguish a person with a direct stake in the outcome of a litigation – even though small – from a person with a mere interest in the problem." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). This standard has been described as "not Mount Everest," *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005), and demands only that the plaintiff "allege some specific, 'identifiable trifle' of injury." *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 162 (3d Cir. 2017) (citing *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)). Even so, an injury-in-fact "must be concrete in both a qualitative and temporal sense." *Reilly v. Ceridian Corp*, 664 F.3d 38, 42 (3d Cir. 2011) (citations omitted). For this reason, "allegations of possible future injury" will not suffice, and a plaintiff "lacks standing if his 'injury' stems from an indefinite risk of future harms inflicted by unknown third parties." *Id.* (citations omitted and cleaned up).

In *Ramirez*, the United States Supreme Court elaborated on what makes a harm "concrete" under its formulation of Article III. In general, to determine if a party states a concrete injury, courts "should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." 141 S. Ct. at 2204 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Some harms are so grounded in "history and tradition" that they "readily qualify as concrete injuries under Article III." *Id.* Those injuries include the "traditional tangible harms, such as physical harms and monetary harms." *Id.* But intangible harms can also establish Article III standing – "reputational harms, disclosure of private information, and intrusion upon seclusion," for example, are the types of injuries which are "traditionally recognized as providing a basis for lawsuits in American courts" and, thus, confer standing upon injured plaintiffs. *Id.* And while courts are to "afford due respect" to

congressionally created statutory injuries, like those under the FCRA, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 2204-05 (citations omitted); *see Spokeo*, 578 U.S. at 341 ("Article III standing requires a concrete injury even in the context of a statutory violation.").

The injury at issue in *Ramirez* was an intangible one – defamation. There, approximately 8000 class members sued Trans Union after the agency's OFAC Name Screen Alert software, which flags consumers whose names appear on a list of "specially designated nationals" maintained by the United States Treasury Department's Office of Foreign Assets Control, falsely flagged consumers who share a name with someone on the list. 141 S. Ct. at 2200-02. The Court found that class members who were falsely flagged as terrorists *and* whose credit reports were actually disclosed to creditors (i.e., whose credit reports were "published") suffered a concrete injury, emphasizing that such an injury is closely related to the traditional harm of defamation. *Id.* at 2208-09. But, because publication is an essential element of the common-law cause of action for defamation, class members whose reports were never disseminated suffered no reputational – and, thereby, no concrete – injury. *See id.* at 2209-10 ("The mere presence of an inaccuracy in an internal credit file, if it not disclosed to a third party, causes no concrete harm."). Significantly, there was no allegation in *Ramirez* that the challenged information played a role in any credit scoring system; it was unflattering collateral information without quantitative effect.

For the group of plaintiffs who could not prove dissemination, the risk that the misleading OFAC alerts would be disseminated and cause those consumers harm was deemed too speculative to support standing. *Id.* at 2210-11. The Court distinguished actions for injunctive relief from actions for damages, explaining that, in actions for damages, the risk of future harm does not

evolve into a concrete harm until that risk materializes.  *See id.* at 2211 (elaborating that, if a woman drives ahead of a reckless driver, but still makes it home safely, she has not suffered a concrete harm because the risk of injury from the reckless driver never materialized).  In *Ramirez*, because the risk of dissemination of these class members' credit reports with misleading OFAC data never materialized, and because those plaintiffs otherwise failed to demonstrate a "sufficient likelihood" of dissemination, they could not establish a concrete injury.  *Id.* at 2211-12.

Unlike *Ramirez*, the harm claimed here is not an intangible one.  Turning first to Plaintiffs' theory of harm regarding the diminution of credit scores, I find that *Ramirez* poses no bar to establishing a concrete injury.  As noted above, the injury there was a classic reputational harm, independent of the quantification of the credit score.  In describing the harm claimed, the *Ramirez* Court observed that financial harms are traditional, tangible harms that "readily qualify" as concrete injuries for which publication plays no role.[24]  *Id.* at 2204.

Several courts have found that diminution of credit score confers standing as a financial harm that impacts a consumer's economic condition.  *See Coulter v. Chase Bank USA, N.A.*, No. 18-1538, 2020 WL 5820700, at *7 (E.D. Pa. Sept. 30, 2020) (Schmehl, J.) ("Moreover, many courts – including within this Circuit – have found that a lowered credit score constitutes an injury in fact for purposes of Article III standing.");  *Boone v. T-Mobile USA Inc.*, No. 17-378, 2018 WL 588927, at *8-9 (D.N.J. Jan. 29, 2018) (McNulty, J.) (explaining that "[t]he alleged negative impact on [Plaintiff's] credit score is also a concrete injury" in part because "[h]arm to one's credit

---

[24] Defendant cites *Grauman v Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 292 n.3 (E.D.N.Y. 2021), for the proposition that, after *Ramirez*, a drop in credit score is no longer a concrete injury "where plaintiffs do not allege that their reduced credit score was disseminated, or was accompanied by any other injury resembling a historically recognized harm."  *See also Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) (finding inaccurate credit information creates no injury if not disseminated and that any "chilling effect" injury is too speculative).  In my view, these decisions failed to recognize the nature of the injury in *Ramirez* and failed to account for the quantitative effect of hard inquiries.

score might make it more difficult or more expensive to obtain credit cards, auto loans, and mortgages"); *Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 330 (N.D. Ga. Mar. 30, 2022) (finding that "one or more 'hard inquiry' notations can negatively impact a consumer's credit score or his ability to obtain credit in the future"); *see also Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691, 698 (N.D. Ill. 2016) ("In short, the Court agrees with [Plaintiff] that a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing. Credit scores are of great importance in our economy, and a depleted credit score could affect a consumer in numerous ways, inflicting harm that often may be difficult to prove or quantify . . . even when the depleted score cannot be neatly tied to a financial harm").[25]   And because publication is not an essential element of a financial harm – even when that financial harm arises from an inaccuracy in a consumer's credit file – Plaintiffs' theory of harm sufficiently demonstrates a concrete injury.

Defendant's central rejoinder, as demonstrated through its experts' reports and declarations, is that hard inquiries do not necessarily decrease a consumer's credit score and, even if they did, such diminutions do not necessarily result in the denial of credit.  ECF 84 at 23-24, 57-58; *see, e.g.,* Turner Report ¶ 7, Ex. A to ECF 80 ("While a hard inquiry (a request for a credit file by an entity) can be a factor in a person's credit score, it is generally a minor one, is highly unlikely to have any material impact on an individual's credit standing and only impacts credit scores (if at all) for a short period of time."); Migalski Disc. ¶ 6, Ex. A to ECF 78 (explaining that several different variables affect how much, if at all, any singular hard inquiry will impact any individual consumer's credit score).   But these litigation opinions conflict with what Trans Union has

---

[25] *But see Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.,* 19 F.4th 58, 65 (2d Cir. 2021) (finding that a bank's delay in recording plaintiff's satisfaction of mortgage, which impacted the plaintiff's credit score and made "it difficult to obtain financing had they needed it in an emergency or for a new home," did not confer standing because the risk of harm never materialized).

otherwise represented publicly: "Because hard inquiries show that you're potentially looking for new credit, they do impact your credit score."  *Why Did I Get an Inquiry on My Credit Report?* (Dec. 11, 2019), https://www.transunion.com/blog/credit-advice/why-did-i-get-an-inquiry-on-my-credit-report.[26]  Similarly, they conflict with the caution expressed by federal regulators: "These inquiries will impact your credit score because most scoring models look at how recently and how frequently you apply for credit."  Consumer Financial Protection Bureau, *What's a Credit Inquiry?* (Sept. 4, 2020), https://www.consumerfinance.gov/ask-cfpb/whats-a-credit-inquiry-en-1317/.  Even one of Defendant's experts has acknowledged that hard inquiries typically have a "minor impact" on an individual's credit score.  Turner Report ¶ 26, Ex. A to ECF 80.

When compounded with basic consumer knowledge and experience, Plaintiffs' experts have done enough to demonstrate a concrete injury at this stage of litigation.  Evan Hendricks, for example, opines that a single hard inquiry does injure a consumer, lowering that individual's credit score and misleading future creditors about the consumer's risk of default.  *See* Hendricks Report 1, 7, ECF 95-5 ("First, it [] has been well-known for many years in the field of credit reporting and credit scoring that 'hard inquiries,' as a general rule, lower credit scores.  Second, the appearance in a consumer's credit file of an inquiry that should not be there causes harm because it misrepresents the consumer's credit history by making it look like he/she applied for an account that he/she in fact did not apply.").  The expert analysis submitted by Trans Union may suffice to raise issues as to the degree of injury, but for purposes of standing does not demonstrate an absence of injury.

---

[26] *See also Why Good Credit Habits Matter* (Apr. 10, 2019), https://www.transunion.com/blog/credit-advice/why-good-credit-scores-matter (cautioning consumers on Trans Union's website that their credit score impacts everything from their ability to obtain lower loan rates on mortgages, auto loans, and personal loans, to applications for credit and higher credit spending limits, as well as rental apartment applications).

Plaintiffs' second theory of harm also establishes a concrete injury. Plaintiffs allege that class members sustained a traditional monetary harm when they "lodge[d] disputes with Defendant which were predestined to be doomed because of Defendant's uniform corporate practice of ignoring such disputes." ECF 95 at 7, 9-12. Quantifying these harms, Plaintiffs' expert Evan Hendricks opines that the consumer dispute process, which includes reviewing one's file, drafting a dispute, and mailing that dispute to the agency, takes a consumer between 45 and 90 minutes and costs a consumer between $5.44 and $30.26, plus out-of-pocket resources of at least another $1.00. Hendricks Suppl. Report 1-2, ECF 95-2. Because wasted time and expense are concrete harms, Plaintiffs sufficiently establish injury-in-fact on this theory as well. *See Ramirez*, 141 S. Ct. at 2204 (reiterating those suffering "monetary harms" have suffered "a concrete injury in fact under Article III"); *Cortez v. Trans Union*, 617 F.3d 688, 719 (3d Cir. 2010) (explaining that "time spent trying to resolve problems with the credit reporting agency may also be taken into account" when analyzing injury); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) ("Because there is no question that wasted time is a concrete harm, [Plaintiff] has standing to pursue his claims.") (citations omitted).

Trans Union argues that it cannot be liable for time or expense incurred in filing a claim, because any such loss would be incurred pre-violation. In some contexts that argument would prevail. But the nature of the claim here is different. Because of Trans Union's blanket policy of ignoring disputes over hard inquiries – a policy unknown to consumers – any time spent in lodging the dispute was invariably in vain and therefore wasted. *See Hines v. Equifax Info. Servs., Inc.*, No. 19-6701, 2022 WL 2841909, at *8 (E.D.N.Y. July 16, 2022) (report and recommendation) ("This wasted time and expense is a traditional monetary harm that is fairly traceable to Equifax's

policy of summarily categorizing and handling such disputes without a thorough investigation and without contacting the creditor responsible for the inquiry and is redressable by judicial relief.").

The defense relies on *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995), to argue that out-of-pocket expenses incurred when lodging a dispute are not compensable.  ECF 84 at 59.  Preliminarily, it should be noted that this case did not involve standing, but the scope of recoverable damages.  It held that attorneys' fees amassed while preparing to submit a dispute were not compensable because, until the defendant credit reporting agency was on notice of the dispute, it had no duty to reinvestigate.  *Id.*  The analysis was rooted in a lack of causal connection. Indeed, in the very same opinion, the court acknowledged that "actual damages may include out-of-pocket expenses for attorney's fees incurred by a plaintiff prior to litigation of his FCRA claims."  *Id.*  Here, the causal relationship that is missing in *Casella* is present because Trans Union's policy of non-investigation applied uniformly to every hard inquiry dispute.  Moreover, keeping in mind that the present issue is standing, the Second Circuit also observed that Plaintiff could have been entitled to punitive damages had he successfully established a willful violation of the FCRA.  *Id.* at 476.

In addition, Trans Union objects that individualized investigations into this theory of injury will dominate litigation, as separate inquiries will be required to determine, for example, whether some class members paid for postage while others did not.  ECF 84 at 74.  But, again, this argument confuses injury with damages.  *See In re Lamictal Purchaser Antitrust Litig.*, 957 F.3d 184, 194-95 (3d Cir. 2020) ("We have consistently distinguished injury from damages.").  Whether a class member used a stamp or, for that matter, downloaded a template letter from the internet, does not indicate whether that class member is injured or not; instead, those inquiries seek to determine the *extent* of the class member's injury or the *amount* of damages that the consumer may be entitled

to recover should the class prevail on the merits of its claim.  Moreover, courts "apply a more lenient predominance standard for damages than for injury.  While every plaintiff must be able to show [] injury through evidence that is common to the class, damages need not be susceptible of measurement across the entire class." *Id.* at 195 (citations omitted and cleaned up).  And, because Mr. Hendricks can provide common proof of time and expense incurred for the sake of concrete injury, Defendant's argument that individualized questions of how much time and how much expense each class member sustained will dominate litigation is of no concern.  *See also In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (explaining that individualized differences "among the class members concerning the precise damages they suffered . . . are of no consequence in determining whether there are common questions concerning liability").[27]

    ii.    Plaintiffs Have Established Causation and Redressability for Both Theories of Standing

Having demonstrated injury-in-fact under both asserted theories, Plaintiffs must next show that their injuries are "fairly traceable to the challenged conduct of the defendant."  *Cottrell*, 874 F.3d at 162.  "[T]he traceability element is 'akin to 'but for' causation in tort.'"  *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284 (3d Cir. 2021) (citation omitted).  In addition, Plaintiffs must

---

[27] Trans Union also argues that Plaintiffs cannot provide common, class-wide proof of the injury for time and expense, in part because Mr. Hendricks cannot be qualified as an expert and his opinion is not reliable. The Third Circuit has made clear that Rule 702 "has a liberal policy of admissibility," and it is clear that Mr. Hendricks has "specialized expertise."  *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 244-45 (3d Cir. 2008).  Hendricks is the author of *Credit Scores & Credit Reports: How the System Really Works, What You Can Do*, in which he wrote a chapter on "Disputing Errors," which I ordered counsel to submit for review.  There, like his supplemental report, ECF 95-2, Hendricks describes in detail how to draft a dispute letter, what documentation and information to include, and what forms to fill out.  He relies on his expertise to estimate a range of time that a consumer might spend on a dispute process, and then uses the federal minimum wage and median hourly wage from the United States Bureau of Labor Statistics to calculate a range of expense incurred.  Hendricks Suppl. Report 1-2, ECF 95-2.  Much of Trans Union's arguments as to reliability are premised upon its assumption that its experts are correct, and as noted above each of their experts has their own vulnerabilities.

demonstrate that a favorable judicial decision will redress the injuries caused by Defendant's alleged statutory violation.  *Spokeo*, 578 U.S. at 338.

Analysis of Plaintiffs' first injury – diminution of class members' credit score – is relatively straightforward.  Plaintiffs have shown that the diminution of class members' credit scores is fairly traceable to Trans Union's alleged failure to conduct a reasonable reinvestigation in response to their disputes of inaccurate hard inquiries in their files.  But for Trans Union's failure to follow its statutory obligation in response to disputes, which requires it to either delete the disputed information, mark the dispute as frivolous, or reinvestigate the allegedly inaccurate item, the inaccurate hard inquiries that lowered consumers' credit scores would not have remained on consumers' credit files without any agency inspection.  *See Rivera*, 341 F.R.D. at 342-43 (finding Plaintiff's injury of a lowered credit score is "sufficiently traceable to Equifax's alleged failure to reinvestigate, consistent with its systematic practice, as required by § 1681i this particular category of complaints").  And, because Plaintiffs consequently suffered the financial harm of a lowered credit score, their injury is redressable by a favorable decision in this Court that will lead to damages.

As to Plaintiffs' second asserted injury – wasted time and expense – I noted above that the systemic policy followed by Trans Union is what supplies the causal link.  As Hendricks explains, Trans Union "advises consumers to review their credit reports for unauthorized inquiries and to dispute them," even though Trans Union systematically ignored these disputes.  Hendricks Report 1, 9, ECF 95-5.  With that understanding, I am convinced that the wasted effort of drafting a dispute over an inaccurate hard inquiry is caused by Trans Union's policy of inviting these disputes and deliberately ignoring them.  *See Hines*, 2022 WL 2841909, at *8 ("This wasted time and expense is a traditional monetary harm that is fairly traceable to Equifax's policy of summarily categorizing

and handling such disputes without a thorough investigation and without contacting the creditor responsible for the inquiry, and is redressable by judicial relief."); *Losch*, 995 F.3d at 943 (finding wasted time to be a concrete harm "so long as even a small part of the injury is attributable to Experian").  With causation established, Plaintiffs can easily demonstrate redressability, as a judgment of monetary damages will redress the class's injury of wasted time and expense.

Because Plaintiffs have shown that both theories of harm establish a concrete, financial injury that is fairly traceable to Trans Union's alleged misconduct and that can be redressed through successful litigation for damages, decertification on the basis of standing is not appropriate.

       2.  *Bibbs v. Trans Union Does Not Change My Conclusion that Plaintiffs Do Not Have to Prove of Inaccuracy as an Element in the First Instance.*

Next, Defendant argues that, under *Bibbs v. Trans Union*, 43 F.4th 331 (3d Cir. 2022), all class members must now prove as an essential element of their FCRA claim that the item of information which they complained of in their dispute letter is in fact inaccurate.  But *Bibbs* fundamentally differs from the case at hand in both the nature of the consumer disputes at issue and the nature of the statutory violations alleged, and the case has not changed the substantive law applied upon initial certification.  In *Bibbs,* a reinvestigation was conducted and the issue before the court was the reasonableness of the result of that investigation.  The statutory violation here differs.

In *Bibbs*, appellants defaulted on their loan payments, resulting in their lenders closing their accounts and transferring their balances.  *Id.* at 337.  Although appellants owed no further payments to their previous lenders once their accounts were transferred, a negative pay status remained on their credit reports because, when the loans were closed, they were in fact "120 days past due date."  *Id.*  Contending that these notations were misleading, counsel for all three

appellants sent Trans Union a letter disputing the accuracy of their credit reports.  *Id.*  Trans Union responded with a report of its "investigation results," which explained that the pay status notations properly represented the last known status of the accounts and thus were not inaccurate.  *Id.* at 338. Appellants sued, arguing in part that Trans Union violated the FCRA because it failed to conduct a good faith reinvestigation, and further failed to "permanently delete or modify inaccurate information" in appellants' credit reports.  *Id.* at 344.

The Third Circuit held that "before a court can consider whether an agency's *reinvestigation* was reasonable, it must first determine that the disputed information was in fact inaccurate."  *Id.* (emphasis added).  In short, *Bibbs* involved a case in which an agency reinvestigated a consumer's dispute, the results of the reinvestigation were before the court, and the court was tasked with determining whether that reinvestigation was reasonable.  In *Bibbs*, however, the items complained of in appellants' credit files were not actually inaccurate – they were instead accurate albeit historical notations of closed accounts.  Applying the "reasonable reader standard," the Court held that a reasonable person reading appellants' credit files in their entirety would understand that that these old accounts were closed, and that appellants had no financial obligation to their previous lenders.  *Id.* at 343-45.  In sum, appellants' credit reports were "neither inaccurate nor misleading to a reasonable reader," and, for that reason, the Court rejected their claims.  *Id.* at 345.

Significantly for purposes of this case, the Third Circuit concluded that "information that is technically accurate but materially misleading is sufficient to trigger" the credit reporting agency's reinvestigation duty.  *Id.* at 344-45.  Here, class members disputed hard inquiries in their files, which communicate to a reasonable reader of a credit file that the relevant consumer sought a form of credit.  *See* Migalski Dep. 14:12-21 (confirming that a hard inquiry indicates that the

29

"consumer has applied for credit"). So, if the consumer did not actually seek that credit or if, for some other reason, the creditor did not have a permissible purpose for accessing his or her report, then the inquiry is misleading even if "technically accurate." *See* Turner Report ¶ 22, Ex. A to ECF 80 (explaining that the inclusion of an inquiry on a consumer's file "is, strictly speaking, verified accurate" if the creditor accessed the consumer's report). It bears mention that when a consumer contests the inclusion of a hard inquiry in their file, the essence of the dispute is that a third party has accessed the consumer's credit without authorization. Ironically, Trans Union seems to acknowledge that because its uniform response – the 502 Letter – includes a sale pitch for its identity theft product.

The nature of the statutory violation alleged in *Bibbs* is also considerably different than that alleged here. In this case, Trans Union concedes that no reinvestigation of class members' disputes occurred. That is so because Trans Union never conducts a reinvestigation when it sends a consumer the 502 Letter. *See* Wagner Dep. 62:1-18; *see also* McCawley Dep. 41:19-42:12. *Bibbs* involved an analysis of the results of a reinvestigation, where Trans Union *did* reinvestigate appellants' disputes, concluding that the late payment notations were not inaccurate and merely constituted historical file notations. 43 F.4th at 338. It follows that, when a reinvestigation has *already occurred*, to successfully challenge that reinvestigation as unreasonable, consumers must demonstrate inaccuracy as an element of the claim. But when the agency performs no reinvestigation at all, requiring the consumer to prove the inaccuracy of their disputed items in the first instance would be inconsistent with the structure the FCRA, which squarely places the burden of determining accuracy on the credit reporting agency after a dispute has been lodged. There is no indication that the Circuit in *Bibbs* intended to retreat from what it held in *Cushman,* that a "reinvestigation that merely shifts the burden back to the consumer and the credit grantor cannot

fulfill the obligations contemplated by the statute." 115 F.3d at 225; *see Rivera*, 341 F.R.D. at 344

("Equifax attacks Plaintiff's class by arguing that each class member must provide up-front

absolute proof of the facts that Equifax itself was, according to Plaintiff's merits theory, duty-

bound to investigate under the plain text of the statute."). The violation alleged in this case is

upstream from that in *Bibbs*, and when the alleged statutory violation is a refusal to reinvestigate

at all, the agency cannot in the first instance shift its burden to demonstrate accuracy to the

consumer.[28]

    I thus find that *Bibbs* neither changed the substantive law nor the conclusions reached in

my certification opinion, and that class members here need not first prove the inaccuracy in their

credit files as a threshold requirement for bringing a claim.

> ### 3. Defendants Fail to Demonstrate that a Significant Portion of Class Disputes Were Sent Fraudulently by Credit Repair Clinics.

    A consumer must "notif[y] the agency directly" of their dispute to trigger the

reinvestigation duty of 15 U.S.C. § 1681i(a). Focusing on this language, Defendant argues that

consumers who utilized the assistance of credit repair organizations cannot demonstrate a "direct"

dispute under the statute and thus must be excluded from the class. Defendant further argues that

if one assumes that any involvement by a credit repair organization is disqualifying, then a large

percentage of the class lacks a cognizable claim under the FCRA, and it must be decertified under

---

[28] Defendant's other authority does not compel a different conclusion. In *Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 210, 212-13 (E.D. Pa. 2007) (McLaughlin, J.), for example, the defendant exercised one of its three statutory options by finding that plaintiff's dispute letter was sent by a credit repair clinic and rejecting it as frivolous – here, however, defendant neither deemed class letters frivolous nor conducted a reinvestigation. Likewise, *Harper v. Trans Union, LLC*, No. 04-3510, 2006 WL 3762035, at *2, *8-9 (E.D. Pa. Dec. 20, 2006), had to do with a § 1681e lawsuit, for which an element of the claim is that the "the credit reports at issue included inaccurate information," whereas, in this case, Plaintiffs need only demonstrate that they disputed the accuracy of an item in their credit files such that their complaints triggered the reinvestigation duty of § 1681i – they do not have to show that the outcome of the reinvestigation would have resulted in a finding of inaccuracy.

Rule 23(b)(3). Federal courts have not adopted the absolutist position advanced by Trans Union and, although the issue of credit repair is relevant, it is not dispositive.

A credit repair organization or clinic is a third-party company that assists consumers with repairing credit reporting errors impacting their credit scores. These entities are regulated by the Credit Repair Organization Act. *See* 15 U.S.C. § 1679(b). While some credit repair clinics assist customers overwhelmed by the world of credit reporting, according to Defense expert John Ulzheimer, some credit repair organizations resort to "frivolous attempts to have accurate information removed from consumer credit reports prematurely." Ulzheimer Report 19, Ex. A to ECF 81. Using a practice known as "jamming," some clinics may try to dispute every item of derogatory information in a consumer's credit report, even if there is no reason to believe that those items are inaccurate. Turner Report ¶ 60, Ex. A to ECF 80. For this reason, presumably, Defense experts testified that letters coming into the Trans Union mailroom that are believed to be frivolous or fraudulent disputes sent by credit repair clinics are marked accordingly in Trans Union's system. Tilghman Dep. 119:1-19; *see* Kuehn Dep. 59:4-60:4 (explaining that credit reporting agencies that identify letters as bearing indicia of credit repair will treat those disputes as frivolous).

As a preliminary matter, Defendant argues that, in granting certification, I found that letters sent by or with the assistance of credit repair should be excluded from the class. ECF 84 at 65. Not quite. In passing, I observed that "neither party devotes serious time in their pleadings discussing whether some portion of the proposed class comprises not consumers but, for example, credit repair organizations instead. Differentiating between bona fide consumers and third-party organizations does not seem like a difficult task, and certainly is not sufficient to defeat predominance." ECF 47 at 57-58. At the time of certification, I did not address the substantive

import of involvement by credit repair organizations, but only noted that any problem with the inclusion of letters sent by credit repair clinics could be solved by separating out those letters, should they exist.

Trans Union argues that when a credit repair clinic sends a dispute on a consumer's behalf, the agency's duty to reinvestigate the dispute is not triggered because the consumer has not notified the agency of their dispute "directly." *See* 15 U.S.C. § 1681i(a)(1)(A) (requiring that the consumer "notifies the agency directly" of a dispute before the agency is required to conduct a reasonable reinvestigation). It advances a grammatical argument, noting that the word "directly" is an adverb which therefore must modify the verb "notifies," such that the consumer must personally notify the agency of any dispute. ECF 193 at 42-43. Most courts, however, have refused to hold that involvement by a credit repair agency is invariably fatal to a FCRA claim. To the contrary, several lower courts agree that if a credit repair organization assists a consumer in sending a dispute, but the consumer remains at least somewhat involved in the process, the dispute is still "direct" under the statute. *See Klotz v. Trans Union, LLC*, No. 05-4580, 2008 WL 2758445, at *5 (E.D. Pa. July 16, 2008) (McLaughlin, J.) (explaining that if a plaintiff used a CRO to find problems in her credit report, but then reviewed the documents, checked them for accuracy, and sent them to the credit reporting agency, that consumer would be eligible for relief under the FCRA); *Rivera.*, 341 F.R.D. at 347 ("In assessing whether a dispute came 'directly' from a consumer, courts have generally reasoned that a consumer who was involved in either the drafting, finalizing, or sending of the dispute letter has sent the letter 'directly' even if he had assistance in doing so. Only where an individual had *no role* in preparing, reviewing, or sending the letter, does he fail to satisfy the direct requirement.") (emphasis added). As recently formulated by one district court, "[m]ere assistance in preparing a letter does not prevent the consumer from sending the letter. To hold

otherwise would impose a requirement more rigid than necessary to 'confirm[] that the disputes' are 'legitimate' – the function of the direct notification requirement." *Henry v. Freedom Mortgage Corp.*, No. CV-19-01121, 2020 WL 8921079, at *4 (D. Ariz. Apr. 27, 2020) (citing *Warner v. Experian Info. Sols., Inc.*, 931 F.3d 917, 918-19 (9th Cir. 2019)).

It is only when consumers play virtually no role in disputing their credit files that courts find the dispute not to be "direct." *See e.g., Turner v. Experian Info. Sols., Inc.*, No. 16-360, 2017 WL 2832738, at *1, *8 (N.D. Ohio June 30, 2017) (finding the dispute was not direct when nine derogatory accounts were disputed and plaintiff did not write, review, or sign the letter); *Cohen v. Equifax Info. Servs., LLC*, No. 18-6210, 2019 WL 5200759, at *6 (S.D.N.Y. Sept. 13, 2019) ("The Court is confident, however, that a consumer has not 'directly' contacted a credit reporting agency when, as here, she merely signs up for a credit repair service and then has no further involvement with, or even knowledge of, the disputes submitted putatively on her behalf.").[29]  So, for example, if a credit repair company helps a consumer draft a dispute letter, but the consumer prints that dispute letter at home, reviews it, and mails it, then that person would not be barred from relief under the FCRA or from participating in this class.  *See* Ulzheimer Report 21, Ex. A to ECF 81 (suggesting that many credit repair companies "allow their clients to print letters at home and mail them locally").

For its position, Trans Union cites a 2011 report from the Federal Trade Commission called *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations*.[30]  There, the FTC observed that a "CRA need not investigate a dispute about a

---

[29] I am only aware of one case in which a federal court held that § 1681i requires a consumer to send a dispute "without any intervening actor," and that case is not binding here.  *See In re Experian Info. Sols., Inc.*, No. 16-01888, 2017 WL 3559007, at *3-4 (D. Ariz. Aug. 17, 2017).

[30] Available at https://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations.  The 40 Years Report is described as a "compendium of interpretations" of the

consumer's file raised by a third party – such as a 'credit repair organization' – because the obligation under this section arises only where file information is disputed 'by the consumer' who notifies the agency 'directly' of such dispute." *Id.* at 78.  But the report goes on to explain what is meant by that, further observing that a "CRA is not required to respond to a dispute of information that the consumer merely conveys to others . . . ." *Id.*  The use of the word "merely" appears to mirror the distinction drawn by the reported cases, namely, that the key question is the degree of involvement by the consumer.  Consequently, I do not view the 40 Years Report as inconsistent with the consensus view discussed above.

Assuming, however, that there is a need to address some credit repair disputes, I am not persuaded that credit repair within this class is as rampant as Trans Union suggests it to be.  Trans Union relies on retrospective analysis by its experts to advance its credit repair defense.  But their conclusions are undercut by the underlying factual record.  The Defense experts agree that letters bearing indicia of credit repair are properly deemed frivolous.  *See* Kuehn Dep. 40:7-46:15, 57:4-60:23 (confirming that credit reporting agencies may treat letters sent by credit repair clinics as "frivolous"); Ulzheimer Report 19, Ex. A to ECF 81 (characterizing letters bearing some indicia of credit repair repeatedly as "frivolous disputes").  There is no evidence that any class members' disputes in this case were treated as frivolous, and Trans Union's experts conceded that they saw no evidence that they were deemed frivolous at the time.  Ulzheimer Dep. 72:13-21, 73:8-25 (verifying that he saw no evidence that Trans Union determined any class letter was from credit repair or was frivolous at the time it processed the disputes).  To the contrary, class letters were internally categorized by Trans Union as disputes warranting a 502 letter, which Trans Union

---

FCRA, created by FTC staff to assist CFPB staff in rulemaking, businesses who are subject to the FCRA, and consumers." *Id.* at 7.  It incorporates material from informal staff opinions and interpretations, as well as commission enforcement actions and rulemaking proceedings.  *Id.*

employees have stated are sent to consumers who exclusively dispute the inaccuracy of a hard inquiry in their credit files. *See* Wagner Dep. 32:2-4, 33:1-7, 36:15-37:5, 62:1-18, 81:4-17. One Trans Union witness even testified that letters showing signs of credit repair would have been noted by the Trans Union mailroom in an internal record system called OnBase. *See* Tilghman Dep. 119:1-19.

It is against this factual background that I examine the analyses provided by Trans Union's experts. Trans Union relies on two indicators of credit repair to conclude that more than one third of class letters were not sent "directly" – (1) the use of template letters and (2) the mismatch of a consumer's address with the postmark on their dispute letter. *See* Lasater Report ¶¶ 13, 58-59, Ex. A to ECF 77. But the premises on which both indicators are based are not entirely sound. First, Dr. Lasater concludes that approximately 45% of disputes reflected one of 16 identified template letters, which Trans Union argues supports the high rate of class letters sent by credit repair clinics. *Id.* But Plaintiffs' expert Jonathan Jaffe notes that dispute-letter templates are widely available on the internet for consumers to print out and fill in at home. Jaffe Reply Report ¶¶ 44, 54-57, ECF 95-11; *see* Ulzheimer Report 22, Ex. A to ECF 81 ("Many such letter templates can be easily found online . . . [and] result in a consumer being able to print the letter and mail it from their local post office."). Even Mr. Norman's letter, which has not been regarded as one from credit repair, appeared to make use of a template. *See* Ulzheimer Dep. 92:18-22 (observing that Mr. Norman's dispute "certainly bear[ed] some resemblance to letters, template letters that come from CROs" but unable to say whether "he hired a CRO to submit those"). In a digital age, the mere fact that consumers made use of template letters from the internet is hardly a basis on which to conclude that their disputes were necessarily submitted by credit repair clinics without the personal interest and involvement of the individual consumer.

Second, Dr. Lasater opined that 29.4% to 35.8% of letters sent to Trans Union were postmarked at a location at least 60 miles away from the consumer's known residential address, again indicating the prevalence of credit repair.  Lasater Report ¶ 13, Ex. A to ECF 77; *see* Ulzheimer Report 20, Ex. A to ECF 81 (explaining that the most "common and prevalent" evidence of credit repair he saw when working in the credit reporting industry was the "mismatch between the postmark and the consumer's actual address").  Once again, Jaffe responds that this metric is misleading, as postmarks are often not stamped at local post offices but at USPS Processing Distribution Centers, of which there are only 251 in the country.  *See* Jaffe Reply Report ¶¶ 41, 48, ECF 95-11 (noting the difference between local postmarks, which contains the full name of a post office, and postmarks from a Processing Distribution Center, which only include the two-letter state abbreviation and zip code).[31]  Not only that, but Jaffe points out that Lasater's analysis fails to account for consumers who may travel for personal reasons or commute long distances for work.  *Id.* at ¶ 53.  Thus, this metric sweeps too broadly.

When compared with Defendants' experts, the facts on the ground carry more weight. Indeed, the 502 Letter, showing that Trans Union initially viewed these disputes as genuine, strongly suggests that the number of class letters from credit repair is not nearly as high as Defendant suggests.

For the same reasons, Defendant's reliance on the global industry statistic that "50% of consumer disputes received by the credit reporting agencies are submitted by credit repair organizations" is misleading.  Ulzheimer Report 19, Ex. A to ECF 81; *see* Turner Report ¶ 64, Ex.

---

[31] One of Trans Union's objections to Jaffe's report is that he is not a postal expert.  That is true, but he is not offered as one.  He is offered as an expert in data analytics, and he is responding to a report from a witness who is also not a "postal" expert.  I believe it is appropriate for Jaffe to test Lasater's assumptions by looking to information of public record from the U.S. Postal System and to identify weaknesses in the model Lasater employed.

A to ECF 80.  There is no reason to believe that it logically applies to this class.  As discussed above, this proposed class is based on individuals who received a 502 Letter, which means that Trans Union already identified their letters as those disputing a hard inquiry in a credit file, and there is no evidence that Trans Union (1) identified any class members' disputes as being from credit repair at the time, or (2) treated any consumer dispute in this class as frivolous, despite the industry practice of rejecting such claims as frivolous. *See, e.g.*, Ulzheimer Dep. 72:13-21; Kuehn Dep. 40:07-46:15, 57:04-60:23 (explaining that credit repair letters are those which reporting agencies consider to be and treat as "frivolous" under the FCRA).

To the extent that there are some number of letters sent fraudulently by credit repair organizations, then there is a more logical way to weed those disputes out fairly and administratively than what is suggested by Defendant.  For example, if a consumer's letter does not identify a specific item, disputing every hard inquiry on that consumer's credit report and evincing signs of "jamming," then the letter may be excluded as a credit repair letter that likely was not sent "directly" by the consumer.  *See* Turner Report ¶ 60, Ex. A to ECF 80 (explaining that "jamming" is a tactic used by credit repair that "involves gaming the system by disputing all information in a client's credit report that may be lowering their credit score, even if accurate").[32] Such disputes can be identified on the face of the class members' letters with objective criteria. *See also Kelly v. RealPage Inc.*, 47 F.4th 202, 224-25 (3d Cir. 2022) (noting in its analysis regarding whether the class is ascertainable that "a straightforward 'yes-or-no' review of existing

---

[32] Alternatively, experts from both parties seem to agree that indicia of bulk rate postage or the inclusion of different consumer disputes within one correspondence are reliable indicators of involvement by credit repair agencies.  *See* Tilghman Decl. 122:6-12 (stating one sign of credit repair is when different consumers' complaints are sent within one correspondence); Ulzheimer Report 20, Ex. A to ECF 81 (explaining that most credit repair disputes were sent by USPS and "delivered in large, white, plastic binds, hundreds per bins"); Jaffe Reply Report ¶¶ 83-94, ECF 95-11 (identifying letters from credit repair based on categories of terms associated with bulk mailing).

records to identify class members is administratively feasible" and that the size of the class cannot impact the analysis). As discussed below, this is an ascertainable, administrative task that will not offend Trans Union's ability to defend itself, because the mechanism relies on the face of the disputes.

### 4. *Plaintiffs' Claims Are, in Part, Capable of Common Proof at Trial.*

Federal Rule of Civil Procedure 23(b)(3) requires Plaintiffs to show that "common questions of law or fact predominate" the litigation. To satisfy predominance, the plaintiff class must demonstrate that every element of the legal claim "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Lamictal*, 957 F.3d at 190 (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600 (3d Cir. 2012)). The Court must conduct a "rigorous analysis" to ensure that predominance is satisfied by (1) finding Rule 23 requirements are met by a preponderance of the evidence, (2) resolving factual or legal disputes relevant to certification, even if they overlap with the merits, which requires the court to "weigh the competing evidence and make a prediction as to how they would play out at trial," and (3) considering all relevant evidence and argument, including expert reports and testimony. *Id.* at 190-91, 194; *see In re Hydrogen Peroxide*, 552 F.3d at 311-12.

Defendant argues that Plaintiffs cannot demonstrate predominance to satisfy Rule 23(b)(3) because a substantial portion of the class either cannot show injury by common proof or cannot show one of the § 1681i(a) essential elements by common proof. ECF 84 at 71-72. I agree with Trans Union as to one of Plaintiffs' theories of injury, but I also conclude that Plaintiffs can prove class-wide injury as to their theory of wasted time. As to Trans Union's other objections, the factual record significantly undermines the expert analysis on which it relies.

i.   Plaintiffs Can Show Common, Class-Wide Disputes as to Accuracy

Defendant argues that 40.4% to 47.1% of class members' letters do not reflect complaints about an inaccuracy in a consumer's credit report, signifying that thousands of class members cannot establish an essential element of the § 1681i(a) claim.  To reach this result, Lasater took two samples of about 400 class letters, evenly distributed across 16 chronological segments. Lasater Report ¶¶ 25-26, 39, Ex. A to ECF 77.  Relying on the first sample, Lasater, with the assistance of counsel, identified a "categorical list" of 15 types of "complaints, assertions, questions, or demands reflected in the letters."  *Id.* at ¶¶ 27-28.  Then, two contracted attorneys and a quality assurance reader reviewed each letter from both samples.  *Id.* at ¶ 32.  Based on their categorizations of the letters, Lasater concluded that up to 47.1% of disputes "do not complain directly about the accuracy of an inquiry on a consumer's Trans Union file."  *Id.* at ¶ 13.  As a result, Defendant argues that receipt of a 502 Letter cannot serve as common proof of Plaintiffs' claim, because many consumers who received a 502 Letter did not actually dispute an inaccuracy in their credit file.

Plaintiffs respond by arguing that Lasater's opinion should not change my prior finding that a consumer's receipt of a 502 Letter proves by a preponderance of the evidence that the consumer disputed the completeness or accuracy of an item of information in their file.  ECF 47 at 56-57.  Indeed, regardless of any retroactive statistical analysis, the fact remains that the 502 Letter opens with Trans Union's goal to "maintain complete and accurate credit information" and that Trans Union produced the class letters in response to Mr. Norman's request for communications which "disputed a hard inquiry included in the consumer's Trans Union file." *Id.*; *see* Def.'s Objs. and Resps. to Pls.' First Set of Req. for Produc., ECF 23-13 at 8.  In addition, Plaintiffs provide expert analysis from Jonathan Jaffe, who took a random sample of 10,000 letters and identified 13 categories of terms that he believed were consistent with dispute letters.  Jaffe

40

Reply Report ¶¶ 65-66, ECF 95-11.  Using a regular expression engine to refine his search, Jaffe concluded that 96.7% of class letters contained at least one of the categories of terms associated with letters disputing an inaccuracy.  *Id.* at ¶¶ 67, 74.  Further, Jaffe argues that he can manageably sort and identify all the class letters with a similar textual analysis based on the same or similar set of categories.  *Id.* at ¶¶ 72, 78-80.

As a factual dispute relevant to certification, I must weigh the competing views to make a prediction as to how they will play out at trial and determine whether Plaintiffs have shown by a preponderance of the evidence their ability to establish their claim with common proof.  *In re Lamictal*, 957 F.3d at 191, 194.  I first observe that there remains a difference between historical facts and the retrospective perspectives on those facts that arise for the purpose of litigation.  The screening conducted by Trans Union when it received class members' letters in the first instance favors the view advanced by Plaintiffs that recipients of the 502 Letter are those who disputed the inaccuracy of a hard inquiry in their credit files.  *See* Wagner Dep. 32:2-33:7, 36:24-37:5, 38:12-19 (explaining that Trans Union sends a consumer the 502 Letter when the consumer's dispute exclusively alleges the inaccuracy of a hard inquiry); Ulzheimer Report 26-27, Ex. A to ECF (explaining that all three credit bureaus reply to hard inquiry disputes with a notice that is "almost identical" to Trans Union's 502 Letter and "do not, as a practice, reinvestigate consumer disputes of credit inquires").  The subsequent analysis of experts on both sides as to whether class members actually disputed an inaccuracy in their files results in a draw.  In that context, it is my view that more weight ought to be placed on the pre-litigation facts on the ground.  I thus find that Plaintiffs have demonstrated by a preponderance of the evidence their ability to demonstrate their FCRA claim, including the essential element of "inaccuracy," with class-wide proof.

ii.     Proof of Injury from Diminished Credit Scores Requires
        Individualized Proof, But Proof of Injury in the Form of Wasted Time
        Does Not

Although I have concluded that Plaintiffs need not prove inaccuracy as an element of their failure to investigate claim, at this stage of litigation, injury in the form of a diminution in credit score would require proof of inaccuracy. If a hard inquiry was properly made, then the credit file was accurate and any diminution in credit score would be neither misleading nor the result of a FCRA violation. That would, in turn, erode standing as to such members of the class, and I can identify no way in which to resolve that issue without individualized inquiries as to the propriety of each instance in which the file was accessed. There is a certain unfairness in this conclusion in that Trans Union has taken a blanket position as to the entire class that I am persuaded violates the FCRA, but individual consumers affected must pursue remedies separately. But injury cannot be presumed and, under the precedent that controls here, Plaintiffs cannot show common proof of injury in the form of diminished credit scores.

In contrast, the injury represented by wasted time was invariably suffered by every member of the class by virtue of Trans Union's uniform policy of refusing to investigate disputes challenging hard inquiries. The extent of such injury might differ, but the existence of injury does not. Trans Union argues that even under this theory of the case, individualized investigations will predominate litigation, using as an example whether some class members paid for postage while others did not. ECF 84 at 74. But, again, this argument improperly confuses injury with damages. *See In re Lamictal,* 957 F.3d at 194-95 ("We have consistently distinguished injury from damages."). Significantly, courts "apply a more lenient predominance standard for damages than for injury. While every plaintiff must be able to show [] injury through evidence that is common to the class, damages need not be 'susceptible of measurement across the entire class.'" *Id.* at 195 (citations omitted and cleaned up); *see Tyson Foods*, 136 S. Ct. at 1045. And – as mentioned

previously – because Mr. Hendricks can provide common proof of time and expense incurred for the sake of concrete injury, Defendant's argument that individualized questions of how much time and how much expense each class member incurred will dominate litigation is of no concern. *See also In re Suboxone*, 967 F.3d at 272 (explaining that individualized differences "among the class members concerning the precise damages they suffered . . . are of no consequence in determining whether there are common questions concerning liability").

              iii.     Presence of Credit Repair Does Not Defeat Predominance

Defendant also argues that a substantial number of class members have no injury and cannot state an essential element of their claim because a significant portion of the class was assisted by credit repair.  ECF 84 at 71-74; *see In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018) (reversing certification of class when "apparently thousands" of class members suffered no injury and the mechanism identified for removing those parties did not protect the parties' rights); *see also In re Lamictal*, 957 F.3d at 192-94 (reversing when the District Court failed to conduct a rigorous analysis of Plaintiff's proffered common proof to demonstrate that their antitrust injury could withstand predominance).  Credit repair poses some degree of threat to establishing common proof for standing and for success on the merits, as anyone who relied completely on credit repair to send disingenuous disputes (1) may not have incurred any wasted time and expense disputing an inquiry, defeating standing and (2) did not "directly" notify the agency of their dispute, failing to establish an essential element of the FCRA claim.

Preliminarily, as I discussed above, the consensus view is that assistance from a credit repair clinic does not automatically disqualify a consumer from recovering under the FCRA and does not necessarily render that consumer uninjured.  Of course, the assistance of credit repair may reduce the amount of time or expense a consumer spent on a dispute letter, but so long as the dispute is a bona fide one in which the consumer was even minimally involved in the process, that

consumer has still suffered some concrete injury and belongs in this class. *In re Lamictal*, 957 F.3d at 194-95 (distinguishing the extent of one's damages from whether one was injured). Second, as noted above, Trans Union has not convincingly shown that the use of credit repair organizations is as prevalent in this class as it suggests, as both metrics for measuring use of credit repair rest on what I identified as questionable premises. Template letters, as noted above, are widely available on the internet and thus not a definitive sign of credit repair. Likewise, excluding disputes with mismatched postmarks and residential addresses as credit repair fails to account for letters from consumers who may have been traveling or commuting or for the fact that many letters are postmarked at one of a limited number of USPS Processing Distribution Centers and not a local post office. Most importantly, as already stated, there is no evidence that Trans Union marked any of these disputes as frivolous or as from credit repair clinics at the time of receipt, despite having the ability to do so. I am thus not concerned that the number of class letters from credit repair is nearly as high as Defendant suggests. *Cf. Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at *28 (E.D. Pa. Sept. 10, 2010) (Stengel, J) (denying certification when District Court was "satisfied the defendant has shown there are a great number of uninjured class members" and when Plaintiffs failed to show that they could "exclude these uninjured consumers").

Nonetheless, if a class member's dispute appears to be an example of jamming, such that the dispute is not a bona fide one but the result of a credit repair clinic seeking to eliminate every item of derogatory information on a consumer's credit report, then such letters can be removed from the class in a way that is "administratively feasible" and "protective of defendants' Seventh Amendment and due process rights." *In re Asacol*, 907 F.3d at 52 (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015)). The ability to do so in this case can be shown by way of

comparison.  In *Asacol*, the class complained that a drug manufacturer's coordinated withdrawal of one patented drug with the entry of another precluded generic manufacturers from introducing lower cost alternatives, causing monetary injury to the class of people who purchased Defendant's drug.  *Id.* at 45-46.  Although the District Court found that about 10% of that class suffered no injury, as expert reports showed that some class members would have opted for Defendant's drug even in the presence of generic options, it still certified the class, finding that uninjured class members could be administratively removed.  *Id.* at 46-47.  The First Circuit reversed, holding that there was no pathway for the court to fairly determine which plaintiffs would have remained loyal to Defendant's brand.  *Id.* at 52-53.  The Court reasoned that the District Court's proposal of having each class member submit "unrebutted" testimony to the claims administrator for evaluation was untenable because Defendants intended to challenge any such affidavit, and there was no basis on which to conclude that "the number of affidavits to which defendants will be able to mount a genuine challenge is so small that it will be administratively feasible" to resolve them at trial.  *Id.* Moreover, any class members' affidavits would be inadmissible hearsay, precluding proof of their injuries at trial if they did not give live testimony.  *Id.* at 52-54.  And, with thousands of potentially uninjured plaintiffs, the Court held that there was no administratively manageable mechanism to remove uninjured persons from the class in a way that protected Defendant's rights.  *Id.* at 53-54, 58.

Here, however, no testimony or consumer affidavits are needed to determine which letters were the result of the credit-repair tactic of jamming.  Instead, one need only look at the face of the disputes to determine if the letter seeks to remove every piece of derogatory information in a consumer's credit file.  *See Kelly*, 47 F.4th at 224-25 (explaining that, to determine whether the class was ascertainable, "a straightforward 'yes-or-no' review of existing records to identify class

members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources" because to hold otherwise would "categorically preclude class actions where defendants purportedly harmed too many people"). Because this task can be accomplished without relying on hearsay or offending Defendant's rights, there is no need to decertify the class on the grounds of predominance.

### B. Summary Judgment

In addition to decertification, Defendant moves for summary judgment on Plaintiffs' claim that Trans Union willfully violated § 1681i.[33]  To prevail, Trans Union must demonstrate that no reasonable juror would find its reading of its statutory obligations to be "objectively unreasonable," such that it raises an unjustifiably high risk of violating the statute. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-70 (2007); *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 248-49, 251 (3d Cir. 2012).  But, because Trans Union's interpretation of the FCRA contradicts the plain language of the statute and binding Third Circuit case law, I find that there are serious questions as to whether Trans Union acted reasonably.  *See Burns v. Ford Motor Credit Co. LLC*, No. 19-1647, 2021 WL 1962856, at *5 (E.D. Pa. May 17, 2021) (Surrick, J.) ("Because questions exist as to whether Ford Motor's investigative procedures were reasonable, we cannot find as a matter of law that Ford Motor complied with its duties under the statute.").  Trans Union's only support is prevailing practice in the industry, a factor of less significance, and one that must be considered with the recognition that all credit reporting agencies have the same financial incentive to minimize their reinvestigation costs.  Because a jury could find that Trans Union's blanket policy of refusing

---

[33] Defendant only seeks summary judgment on Plaintiffs' willfulness claim and not on Plaintiffs' negligence claim; while willfulness claims under the FCRA allow plaintiffs to recover statutory and punitive damages, negligence claims only allow actual damages.  15 U.S.C. §§ 1681n, 1681o.

to reinvestigate disputes of hard inquiries is not reasonable under the law, summary judgment is inappropriate.

        1.  *Trans Union's Reading of the FCRA is Objectively Unreasonable Under* Safeco.

            i.  *Safeco* Standard

Under the FCRA, an aggrieved party can claim punitive and statutory damages when the defendant "willfully fails to comply" with the statute.  15 U.S.C. § 1681n(a); *see Fuges*, 707 F.3d at 247.  In matters of civil liability, the Supreme Court has interpreted "willful" violations to cover knowing and reckless violations as well.  *Safeco*, 551 U.S. at 68, 71.  A civil defendant's conduct is reckless when it arises from an "objectively unreasonable" reading of the controlling law.  *Fuges*, 707 F.3d at 249; *see Safeco*, 551 U.S. at 68-70 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)) (defining reckless conduct as that which presents "an unjustifiably high risk of harm that is either known or so obvious that it should be known").  Consequently, a credit reporting agency like Trans Union acts willfully when its conduct is pursuant to an "objectively unreasonable" reading of the FCRA.  *See Fuges*, 707 F.3d at 249 (citations omitted) ("[E]ven when a court disagrees with a party's reading of FCRA, it may not impose liability for a reckless, and therefore willful, violation of the statute unless that party's reading is 'objectively unreasonable.'").

To determine if a credit reporting agency's reading of the FCRA is objectively unreasonable, *Safeco* instructs courts to consider 1) whether the agency's interpretation has a "foundation in the statutory text," and whether there is 2) circuit authority or 3) regulatory guidance that "might have warned [Defendant] away from the view it took."   551 U.S. at 69-70.  Accordingly, if Trans Union's reading of § 1681i is reasonable in light of the text and other judicial and regulatory authority, then Trans Union has committed no willful violation as a matter of law.

*See e.g.*, *Fuges*, 707 F.3d at 243, 252-53 (holding that no reasonable juror could find Defendant willfully violated the FCRA because it reasonably interpreted its obligations under the statute); *Kelly v. RealPage, Inc.*, 539 F. Supp. 3d 374, 376, 380 (E.D. Pa. 2021) (Wolson, J.) (granting summary judgement when Defendant's reading of the FCRA was not objectively unreasonable and was "at least consistent with the statutory language").

> ii. Trans Union's Reading of the FCRA and its Corresponding Procedures

Trans Union seeks to give § 1681i a narrow scope, arguing that the duty of reinvestigation only requires credit reporting agencies to notify a particular furnisher when a consumer disputes information provided by that furnisher as incomplete or inaccurate. ECF 76 at 7. According to Trans Union, a hard inquiry is not furnished information, but a factual record created internally by Trans Union to indicate that an end-user accessed the consumer's credit file, and the reinvestigation provision does not require the agency to convey non-furnished information like a hard inquiry dispute to any third party or, for that matter, to take any other action. *Id.*; *see* Ulzheimer Report 33, Ex. A to ECF 81. On the facts here, Trans Union maintains that because Safe Home Security is not a furnisher and not the source of the disputed inquiry data on Mr. Norman's credit file, it had neither a statutory duty to convey Norman's dispute to Safe Home nor a duty to take any further action. ECF 76 at 7. In its view, this is a reasonable reading of the FCRA's requirements and therefore not a willful violation under *Safeco*. I cannot agree.

> iii. *Safeco* Part One: Trans Union's Interpretation of its Obligations is Unreasonable Under the FCRA's Plain Language

In my class certification memorandum, I explained at length why Trans Union's narrow reading of the reinvestigation requirement was a flawed one. ECF 47 at 28. Here, Trans Union attempts to relitigate many of the same arguments, contending that, regardless of whether I agree with its interpretation, Trans Union's reading of the FCRA has "some foundation in the text."

*Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 377 (3d Cir. 2012).   I therefore return to the language of the statute, which begins: "Subject to subsection (f) and except as provided in subsection (g), if the completeness or accuracy of any item of information contained in a consumer's file . . . ."   15 U.S.C. § 1681i(a)(1)(A).   The term "any" is all inclusive.   The term "information" is generally descriptive and not limited to specific categories of information.   And the breadth of the duty is further underscored by explicitly extending it to disputes over "completeness *or* accuracy."   Significantly, Trans Union cites nothing within § 1681i(a) to support its narrow reading.   Its interpretation of the statute is wholly dependent upon arguments derived from other provisions.   Such an approach is foreclosed by the structure and language of § 1681i(a) which begins by specifically listing the only exceptions to its scope.

To argue that the statute's express language supports its reading of the reinvestigation duty as one limited to furnisher-provided information, Trans Union observes that § 1681i(a)(1), which defines the reinvestigation duty, is followed by § 1681i(a)(2), which is titled "prompt notice of dispute to furnisher of information."   The latter section instructs credit reporting agencies to "provide notification of the [consumer's] dispute to any person who provided any item of information in dispute."   15 U.S.C. § 1681i(a)(2)(A).   Trans Union contends that when these sections are read together, the duty of reinvestigation is limited to conveying the dispute to the furnisher who provided that information.   ECF 76 at 26-27.   And, under Defendant's definition of the term "furnisher," end-users like Safe Home Security who access credit files do not qualify because they do not provide information, like detailed credit accounts, to the agency.[34]   *Id.* at 14,

---

[34] I have previously noted that the term "furnisher" is not defined anywhere in this section of the FCRA. ECF 47 at 29-31.  A separate provision, § 1681s-2(a), titled "Duty of furnishers of information to provide accurate information," sets forth duties of entities supplying information to credit agencies, while § 1681m puts other requirements on "users of consumer reports."  It is based on these provisions that Trans Union imports a strict interpretation of the word "furnisher" into § 1681i.  While I am not convinced that this interpretation is correct, I ultimately find the definition used has no influence on my decision.

17. But Congress did not include either of these sections within the specific exceptions to the scope of § 1681i(a)(1)(A).

Furthermore, I have previously noted that "the title of a statute cannot limit the plain meaning of the text." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947)) (cleaned up).  Indeed, headings are only useful when they "shed light on some ambiguous word or phrase." *Trainmen*, 331 U.S. at 529.  But here, the plain meaning of § 1681i(a)(1)(A) allows no room for ambiguity, particularly when the statute itself specifically enumerates the only exceptions to its scope, using the phrase "except for."  And because the body of the text cannot be limited by the title of a subsequent subsection, Defendant's argument about the title and content of § 1681i(a)(2) cannot provide reasonable support for its contention that "any information" is limited to that supplied by "furnishers."

Even if § 1681i(a)(2)(A) had some relevance, nothing in its text suggests that it was meant to limit the *scope* of the reinvestigation duty of § 1681i(a)(1)(A).  It simply defines the specific obligations of credit reporting agencies when the source of the disputed information is a furnisher. In fact, the term "reinvestigation," which Trans Union suggests was limited by § 1681i(a)(2), does not even appear in that subsection.

Defendant next points to the 1996 Amendment to the FCRA, which it raises for the first time in this litigation.  Those amendments reiterated the duties discussed above and required credit reporting agencies to convey disputes to furnishers,[35] introduced new obligations for furnishers,[36]

---

[35] 15 U.S.C. § 1681i(a)(2)(A); *see* S. Rep. 104-185 (1995), at 43; S. 650, 104th Cong. § 409.

[36] 15 U.S.C. § 1681s-2(b); *see* S. Rep. 104-185 (1995), at 49 ("The Committee believes that bringing furnishers of information under the provisions of the FCRA is an essential step in ensuring the accuracy of consumer report information."); S. 650, 104th Cong. § 413.

and mandated that the credit reporting agencies create an automated system to facilitate communication with furnishers about disputed information.[37]  Citing no authority or source, Trans Union summarily maintains that it was not until these amendments that "the statute clarified what a reinvestigation entailed."  ECF 76 at 27.  Further, Trans Union notes that when the three credit bureaus jointly developed the newly required automated system for communicating with furnishers, now known as E-Oscar, no individual from Trans Union, Equifax, or Experian considered enabling the program to convey disputes of inquiry data to end users.[38]  *Id.* at 28.

The 1996 Amendment, however, did not alter the broad language of § 1681i(a)(1)(A).  Had Congress intended to change or limit that language, it could have done so.  Instead, it left the sweeping language of § 1681i(a)(1)(A) untouched, offering no reason for the agencies to believe that new provisions *adding* obligations for furnishers and facilitating communication between furnishers and the bureaus also had the effect of narrowing or replacing the overall reinvestigation requirement that already existed.  These additional duties, imposed when disputes involve certain types of information, do not negate the statutory duties already present, and Trans Union's assumption to the contrary – without any statutory language or legislative history suggesting as much – is unreasonable.

Because I view Trans Union's reading of the FCRA as contorted and inconsistent with the clear language of the statutory text, I cannot find its interpretation of § 1681i to be objectively reasonable.  And although the analysis could stop here, the applicable Third Circuit case law precisely reaffirms Plaintiffs' statutory reading.  *See Cortez*, 617 F.3d at 722 (denying summary judgment when there was no judicial guidance on the issue but the "statute [was] far too clear").

---

[37] 15 U.S.C. § 1681i(a)(5)(D); *see* S. 650, 104th Cong. § 409(a)(5)(D).

[38] Trans Union here cites to the Deposition of Tracy DeMarco, but the pages it cites with relevant information on this topic are not included in the attached exhibit.  ECF 76-10.

      iv.   *Safeco* Part Two: Third Circuit Case Law Warned Trans Union Away
           From Its Interpretation

Even if the statutory text were ambiguous, judicial guidance suggesting that Trans Union's

reading of the text contradicted the statute's intended meaning should have warned Defendant

against its policy of ignoring disputes over hard inquiries. *Cf. Fuges*, 707 F.3d at 252-53 (granting

summary judgment when Defendant's reading of the FCRA had some grounding and no other

judicial or agency guidance was available). As stated in my certification opinion, *Cushman* and

*Cortez* describe the duties of the credit reporting agencies with clarity and precision and, by

implementing procedures that contradict the essential meaning of those cases, Trans Union ran an

unjustifiably high risk of violating the law. *Id.* at 248. Having analyzed these opinions now for a

second time, I further conclude that Trans Union's understanding of the FCRA was objectively

unreasonable in light of available precedent. *Safeco*, 551 U.S. at 70.

In *Cushman*, a consumer twice disputed inaccurate information in her credit file after

someone fraudulently applied for several credit accounts under her name. 115 F.3d at 222. When

Trans Union confirmed with the credit grantors that the consumer's correct verification

information was used upon application, it refused to remove the inaccurate information from the

consumer's account. *Id.* Trans Union argued that its conduct complied with its statutory

obligations because credit reporting agencies conducting reinvestigations are "obliged only to

confirm the accuracy of the information with the original source of the information" and are "never

required to go beyond the original source in ascertaining whether the information is accurate." *Id.*

at 224.

The Third Circuit disagreed and, in so doing, carefully explained the evolving duties of

credit reporting agencies under the FCRA. As an initial matter, when a credit report is prepared,

§ 1681e(b) requires credit reporting agencies to follow "reasonable procedures to assure maximum

possible accuracy." The Court explained that, at this early stage, credit reporting agencies are not expected "to go beyond the original source of information" to confirm accuracy, because the costs of doing so would far outweigh any potential benefits. *Id.* at 225. But "once a claimed inaccuracy is pinpointed" by a consumer's direct dispute, "a consumer reporting agency incurs only the cost of reinvestigating that one piece of disputed information." *Id.* Thus, once a dispute has been lodged, the cost-benefit analysis shifts, and the statute imposes upon credit reporting agencies a "grave responsibility" to ensure accuracy. *See id.* ("[W]hen one goes from the § 1681e(b) investigation to the § 1681i *re*investigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly.") (emphasis in original). This statutory structure "evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear grave responsibilities to ensure the accuracy of that information." *Id.* (internal quotation and citation omitted); *see also Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) ("The statute places the burden of investigation squarely on [the credit reporting agency].").

*Cushman* also made clear that, in some circumstances, the credit reporting agency's "grave responsibility" of reinvestigation will require the agency to "verify the accuracy of its initial source information." 115 F.3d at 225. The Court reiterated that a credit reporting agency conducting a reinvestigation may have to "go beyond the original source" and do more than "merely parrot[] information received from other sources." *Id.* (quoting *Henson v. CSC Credit Servs.*, 29 F.3d 280, 287 (7th Cir. 1994)); *see Stevenson*, 987 F.3d at 293 ("In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers."). *Cushman* thus emphasizes the breadth of the reinvestigation

requirement, specifically rejecting the proposition that an agency could meet its burden in every instance simply by conveying the dispute to the original source.

The Third Circuit took a similarly broad view of the reinvestigation requirement in *Cortez*. There, like the plaintiffs in *Ramirez*, a consumer lodged several disputes regarding the inclusion of inaccurate OFAC terrorist alerts on her consumer report. *Cortez*, 617 F.3d at 697-701. Trans Union refused to remove the inaccurate notifications because, according to Trans Union, the terrorist alerts were not covered by the FCRA and were "not part of a 'consumer report.'" *Id.* at 706. Once again, the Third Circuit disagreed, emphasizing that § 1681i(a)(1)(A) requires credit reporting agencies to "promptly reinvestigate *any information* in a consumer's file that is disputed by a consumer and either record the current status of the information in dispute or delete it." *Id.* at 712 (emphasis added). "Although the parameters of a reasonable reinvestigation will often depend on the circumstances of a particular dispute, it is clear that a reasonable reinvestigation must mean more than . . . making only a cursory investigation into the reliability of information that is reported to potential creditors." *Id.* at 713. Further, in rejecting Trans Union's argument that the terrorist alerts were not part of the consumer's credit file, the Court reiterated that "Trans Union controls the information it places on a consumer's credit report." *Id.* So, even if the information in a consumer's file is maintained by an outside agency like the OFAC, once a consumer lodged a dispute, "Trans Union was obligated to reinvestigate that information." *Id.* at 714. This effectively refutes Trans Union's contention that information it enters internally falls outside the scope of § 1681i(a)(1)(A).

*Cushman* and *Cortez* provide binding judicial guidance clarifying that an agency's reinvestigation is not limited to conveying disputed information to furnishers and warning Trans Union against its view of the FCRA. Both cases, for example, emphasize that Trans Union must

reinvestigate *any* piece of information that it controls or, in other words, places on a consumer's credit report regardless of the source of that information. *Id.* at 712-13; *Cushman*, 115 F.3d at 225. Likewise, both cases instruct the agencies that reinvestigations may have to go beyond the source of disputed information and consist of more than a "cursory investigation," directly contradicting Trans Union's reading that reinvestigations merely constitute conveying disputed information to a furnisher. [39] *Cortez*, 617 F.3d at 713; *Cushman*, 115 F.3d at 225. With such clear guidance from the Third Circuit, it is not objectively reasonable to interpret the FCRA reinvestigation requirement as narrowly as Trans Union suggests. *Cf. Safeco*, 551 U.S. at 70 ("This is not a case in which the business subject to the Act had the benefit of guidance from the courts of appeals . . . .").

Trans Union's attempts to distinguish these cases are not convincing. *See* ECF 76 at 31; ECF 100 at 20-21 (arguing, for example, that *Cortez* does not apply here because the type of information complained of in that case was not a hard inquiry, but data sourced from a third party). Indeed, *Cortez* and *Cushman* addressed the statute in broad terms, specifically analyzing its structure. In so doing, the Third Circuit recognized that the reinvestigation requirement represented an added burden and cost on credit reporting agencies, but was convinced that Congress struck an appropriate balance between an agency's initial responsibility to ensure accuracy and its "grave" responsibility once a consumer has raised a dispute. And as discussed in my certification opinion, Congress simultaneously protected reporting agencies from that

---

[39] Trans Union objects that Norman has not defined the contours of the reinvestigation it should have conducted and appears to suggest that all it *could* have done would be to convey Norman's disagreement back to Safe Home. ECF 100 at 10. *Cushman* makes clear that the nature of the reinvestigation depends on the circumstances, 115 F.3d at 225. It is not clear to me that it is Plaintiffs' burden to supply Trans Union with a reinvestigation protocol. That said, because the essence of the dispute is whether access to the credit file was authorized, in such instances the party accessing could certainly be requested to verify, with appropriate documentation, whether it had written authority, verbal authority, or some other basis on which to "pull" the consumer's report. The credit reporting agency then could, in turn, determine whether to delete the entry, depending on the response or lack thereof.

additional burden by granting them the option to delete disputed inquiries or summarily reject them as frivolous.  Because neither of those actions were taken here, the statute and case law make clear that a reinvestigation was required.

Trans Union's blanket policy of ignoring disputes over hard inquiries is thus flatly inconsistent with *Cushman* and *Cortez*.  If there were any doubts about the responsibilities imposed by § 1681i(a)(1)(A), these decisions removed them.

> v.   *Safeco* Part Three: The Absence of Regulatory Guidance Does Not Render Trans Union's Interpretation Objectively Reasonable

Turning to the third prong of *Safeco*, Defendant argues that the lack of authoritative guidance supports the reasonableness of its interpretation of the FCRA.  ECF 76 at 26-28; *see Safeco*, 551 U.S. at 70 (finding that Safeco's reading of the FCRA was not objectively unreasonable in part because "no authoritative guidance has yet come from the Federal Trade Commission").  It is not entirely clear what weight this factor carries in the face of clear statutory language and appellate precedent.  In the context of statutory violations, the Third Circuit has held that a "lack of definitive authority does not, as a matter of law, immunize [a party] from potential liability."  *Cortez*, 617 F.3d at 721.  In the context of willful violations, the Ninth Circuit has likewise held that "a lack of guidance, however, does not itself render [Defendant's] interpretation reasonable."  *Syed v. M-I, LLC*, 853 F.3d 492, 504 (9th Cir. 2017) (cleaned up).

Plaintiffs point to the following from the Federal Trade Commission's 40 Years Report as evidence of authoritative guidance:

> When a CRA receives a dispute from a consumer alleging that an inquiry that appears in his/her file was not made by a person who had a permissible purpose for obtaining the consumer report, and those allegations are supported by the CRA investigation, the CRA has two options.  It may either delete the inquiry as inaccurate, or amend the file to make the item 'complete' by reflecting clearly that

the inquiry was generated by a party who did not have a permissible purpose to obtain a consumer report on the consumer. [40]

Defendant responds that this guidance should not be considered "authoritative" because it is non-binding FTC staff guidance, analogizing it to the individual letter written by a staff member discounted by the Supreme Court in *Safeco*. *See* 551 U.S. at 70, n.19 (refusing to consider a letter written by an FTC staff member because "the letter did not canvass the issue" and "explicitly indicated that it was merely 'an informal staff opinion . . . not binding on the Commission'") (citations omitted).

As a preliminary matter, I note that Trans Union is inconsistent in how it approaches the 40 Years Report. For purposes of its credit repair argument, it cites to the Report for support, but then objects to Plaintiffs' citation of the Report as it bears upon the scope of the duty to reinvestigate.

It is also not clear to me that the reservation expressed by the Court in *Safeco* renders the 40 Years Report non-authoritative. As noted by the First Circuit, "it is not readily apparent what the Court meant" in *Safeco*. *See McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 100 (1st Cir. 2022) (questioning whether the CPFB's "Supervisory Highlights" could be sufficient guidance under *Safeco*, even though it is not binding authority); *see also Beseke v. Equifax*, 420 F. Supp. 3d 885, 898 (D. Minn. 2019) (considering the 40 Years Report, among other informal guidance, to support its conclusion that Equifax "had the benefit of guidance that might have warned it away from the view it took"); *Goode v. LexisNexis Risk & Info. Analytics Group, Inc.*, 848 F. Supp. 2d 532, 543 (E.D. Pa. 2012) (Dubois, J.) ("Further, the FTC Staff Report that defendant cites supports its interpretation [of the statute], and *Safeco* instructs that parties may rely on authoritative guidance

---

[40] Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* 77 (July 2011), available at https://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations.

from the FTC in interpreting the FCRA.").[41]  The FTC 40 Years Report is certainly different from the admittedly non-binding opinion expressed by an individual staff member cited in *Safeco*, and as a "compendium" of advice also stands on a different footing than informal opinion letters.  *See Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314, 1319 (11th Cir. 2009) (finding two FTC staff opinion letters weren't authoritative guidance under *Safeco*); *Syed*, 853 F.3d at 504, 504 n.6 (stating that "informal opinion letters do not constitute authoritative guidance" under *Safeco*).

At a minimum, the 40 Years Report supports the view that disputes over hard inquiries must be investigated.  The fact that it might not raise to the level of "authoritative guidance" under *Safeco* does not render Trans Union's interpretation reasonable given the clear statutory language and Third Circuit case law discussed above.  *See Syed*, 853 F.3d at 504 (explaining that "a lack of guidance does not itself render [Defendant's] interpretation reasonable") (cleaned up).  The first two prongs of *Safeco* strongly support the conclusion that Trans Union's interpretation was objectively unreasonable, and even if I assume there was no authoritative guidance, its absence does not alter my ultimate conclusion.

### 2. Trans Union's Industry Practice Defense Does Not Suffice to Prove a Lack of Willful or Reckless Conduct.

Independent of the *Safeco* test, Defendant Trans Union argues that it could not have willfully or recklessly violated the FCRA when its practices for dealing with consumer disputes of hard inquiries remain consistent with industry-wide practices.  Defendant's experts, John Ulzheimer and Michael Turner, both agree in their reports that Equifax and Experian employ the same procedures as Trans Union does when responding to consumers' disputes of hard inquiries

---

[41] Even in *Steed v. Equifax Infor. Servs., LLC*, No. 14-437, 2016 WL 7888040 (N.D. Ga. July 15, 2016), which Defendant cites in support of its position, the Magistrate Judge did not discount the possibility that the report could be considered authoritative guidance.  Instead, the Court held that the Report did not actually answer the question at issue, because "Plaintiffs' complaint [did] not allege that any of the inquiries disputed by Plaintiffs involved a user who did not have a permissible purpose."  *Id.* at *16.

on their credit report.  *See* Ulzheimer Report 26, Ex. A to ECF 81 ("To be clear, the credit reporting agencies do not, as a practice, reinvestigate consumer disputes of credit inquiries, which they readily acknowledge."); Turner Report ¶ 37, Ex. A to ECF 80 ("Equifax, Experian, Innovis and Trans Union have highly similar procedures for handling disputed hard inquiries").[42]  In response, Plaintiffs argue that Trans Union cannot defend an unlawful procedure merely because the two other nationwide credit bureaus are engaging in the same unlawful conduct.

Some courts have considered industry practice as a relevant factor in determining willfulness.  For example, in *Moran v. Screen Pros, LLC*, 25 F.4th 722, 729-30 (9th Cir. 2022), the Court considered the defendant's industry practice defense after first finding that several judges presiding over the case at both the District and Circuit court levels disagreed about the plain meaning of the FCRA provision at issue, ultimately finding that subsection ambiguous.  *See* § 15 U.S.C. § 1681c(a)(5).  Here, on the other hand, I have found that § 1681i(a) is not ambiguous, and that Third Circuit case law further reinforces that credit reporting agencies must, if they refuse to delete the item and have not deemed it frivolous, reinvestigate any item of information that a consumer disputes as inaccurate.  In the words of Judge Easterbrook, "'[e]veryone knows' is no substitute for support in the text." *Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 489 (7th Cir. 2012).  When industry practices are contradicted by clear statutory language and case law giving force to that language, common practice does not save a defendant from a finding of willfulness.  *See Coulter*, 2020 WL 5820700, at *12 (explaining that adherence to industry guidelines does not shield a furnisher from FCRA liability).  And courts would be naïve not to

---

[42] Both Ulzheimer and Turner cite to the declarations drafted for this litigation from Kimberly Cave, Compliance and Litigation Analyst at Experian, and Celestine Gobin, Litigation Support Manager for Equifax, to support their assertions about standard industry practices.  *See* Cave Dec., ECF 76-10; Gobin Dec., ECF 76-11.

recognize that credit reporting agencies have a common interest in minimizing their costs of reinvestigation.

As a result, neither *Safeco* nor an industry standards defense compels a grant of Defendant's summary judgment motion.

## IV.    Conclusion

For the reasons set forth above, Trans Union's Motion for Summary Judgment and Motion for Decertification are denied.  Likewise, the parties' respective evidentiary motions are denied to the extent they seek total preclusion, without prejudice to reconsideration of the scope of testimony closer to trial.  An appropriate order follows.

  /s/ Gerald Austin McHugh   
United States District Judge